1 | ALEJANDRO N. MAYORKAS
United States Attorney
2 | JOHN S. GORDON
Assistant United States Attorney
3 | Chief, Criminal Division
ANDREW BROWN, No. 172009
4 | Assistant United States Attorney
1500 United States Courthouse
5 | 312 North Spring Street
Los Angeles, California 90012
6 | Telephone: (213) 894-0102
Facsimile: (213) 894-3713
7 | Attorneys for Respondent
United States of America

FILED

8 |

UNITED STATES DISTRICT COURT

9 |

FOR THE CENTRAL DISTRICT OF CALIFORNIA

10 |

11 | UNITED STATES OF AMERICA,          )     No. CV 00-11896-AHM
                                    )     (No. CR 99-123-AHM)
12 |        Plaintiff,                )
                                    )     GOVERNMENT'S OPPOSITION TO
13 |        v.                       )     DEFENDANT'S 28 U.S.C. § 2255
                                    )     MOTION; DECLARATION OF
14 | MONTEZ DAY,                     )     MICHAEL MAYOCK; EXHIBITS
                                    )
15 |        Defendant.               )
     _____ )

16 |

17 |        The United States of America respectfully files this

18 | opposition to defendant's 28 U.S.C. § 2255 motion.

19 | DATED:    March 23, 2001.

20 |                              Respectfully submitted,
                               ALEJANDRO N. MAYORKAS
21 |                              United States Attorney

22 |                              JOHN S. GORDON
                               Assistant United States Attorney
23 |                              Chief, Criminal Division

24 |

25 |                              ANDREW BROWN
                               Assistant United States Attorney

26 |
                               Attorneys for Respondent
27 |                              UNITED STATES OF AMERICA

28 |

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

Background

3    On February 9, 1999, Montez Day ("defendant") was indicted
4 for conspiracy to commit bank robbery, armed bank robbery, and
5 use of a firearm during a crime of violence.  On May 14, 1999,
6 defendant pled guilty to all three counts.  On October 25, 1999,
7 the Court sentenced defendant to 288 months in prison (60 months
8 on the conspiracy charge, count one; 204 months on the armed bank
9 robbery charge, count two, to run concurrently; and 84 months on
10 the firearms charge, count three, to run consecutively).  This
11 judgment became final ten days later when defendant failed to
12 file a notice of appeal.  Defendant has declared that he gave his
13 Section 2255 motion to prison officials for mailing on October
14 24, 2000, which would be within the one year limitations period
15 provided for by the Antiterrorism and Effective Death Penalty Act
16 of 1996 ("AEDPA"), 110 Stat. 1214 (1996).

17

Introduction

18    Defendant raises three separate grounds in his motion to
19 vacate, set aside, or correct his sentence.  First, he contends
20 that his attorney was ineffective in that he allegedly misadvised
21 defendant as to the statutory maximum sentence available under
22 Title 18, United States Code, Section 924(c), and pressured
23 defendant into pleading guilty.  Second, defendant contends that
24 his status as a career offender overstated the seriousness of his
25 prior criminal history.  And third, defendant argues that he
26 should have received a downward departure for the purportedly
27 extraordinary abuse he suffered as a child.  As will be shown,
28 none of these contentions justifies the relief defendant seeks.

2

1      1.   <u>Defense Counsel Accurately Advised Defendant Regarding</u>
<u>the Statutory Maximum Sentence and the Risks of Taking</u>
2            <u>the Case to Trial</u>

3       Defendant contends that he did not understand the

4 consequences of his plea, and that his attorney was ineffective,

5 because his attorney advised defendant that the statutory maximum

6 sentence for a violation of 18 U.S.C. § 924(c) (Count 3) is life

7 imprisonment. (Opening Brief 1). Defendant's claim fails,

8 however, because the advice he received regarding the statutory

9 maximum sentence is correct. <u>United States v. Pounds</u>, 230 F.3d

10 1317, 1319 (11th Cir. 2000) ("every conviction under

11 § 924(c)(1)(A) carries with it a statutory maximum sentence of

12 life imprisonment, regardless of what subsection the defendant is

13 sentenced under"). Defendant's confusion doubtless stems from

14 the fact that Section 924(c) specifies a series of minimum

15 sentences, but never states a maximum. Under well-established

16 rules of statutory interpretation, however, a criminal statute

17 that does not specify a maximum sentence carries with it a

18 potential sentence of life imprisonment. Moreover, the

19 sentencing guidelines make clear that the court can impose a

20 Section 924(c) sentence over the mandatory minimum, although to

21 do so constitutes an upward departure. U.S.S.G. § 2K2.4,

22 application note 1 ("A sentence above the minimum term specified

23 by 18 U.S.C. § 924(c) . . . is an upward departure from the

24 guideline sentence").

25       Defendant also complains that he felt pressured to plead

26 guilty because, he claims, his counsel told him he would "lose"

27 if he went to trial. Although former defense counsel Michael

28 Mayock does not believe he used those words, he did advise

3

1  defendant that he would probably be convicted if he went to
2  trial.  Far from showing ineffective assistance of counsel, this
3  demonstrates Mr. Mayock's seasoned assessment of the evidence,
4  which is summarized below:

5      On January 26, 1999, two masked men carrying handguns robbed
6  the Home Savings Bank of America, San Fernando, California, of
7  $85,600, including $100 in bait money which had pre-recorded
8  serial numbers.  (Exh. A at 4).  The robbers got into a silver
9  Toyota van and fled from the bank.  (Exh. A at 1-2).  The police
10  followed the silver van to where the occupants abandoned it,
11  getting into a Ford Expedition instead.  (Exh. A at 2).  The
12  police, continued to pursue the Expedition, never losing sight of
13  it, and observed one of the occupants throw out the window an
14  item that looked like a handgun.  (Exh. A at 3).  The robbers
15  attempted to abandon the Expedition by a shopping mall.  The
16  police were so close behind the Expedition, however, that the
17  robbers were not able to get more than ten feet from the vehicle
18  before being captured.  (Id.).  A search of the vehicle resulted
19  in the seizure of exactly $85,600 in cash, including the bait
20  bills with pre-recorded serial numbers, as well as masks like the
21  ones the robbers wore.  (Exh. A at 4).  The next day, a citizen
22  informed the police that he had spotted a pistol along the route
23  in which the robbers had fled.  The police examined the pistol
24  and determined that it was real and loaded.  (Exh. B).
25  Surveillance photographs inside the bank also show that each
26  robber had a handgun.  Finally, the surveillance photographs show
27  that one of the robbers was wearing the same clothing defendant
28  Montez Day had on when he was captured after the pursuit.  (Decl.

4

of Mayock ¶ 3).

2.  Defendant Cannot Re-Litigate His Non-Constitutional
    Sentencing Claims in a Section 2255 Motion When He
    Failed to Raise Those Claims on Appeal

Defendant seeks to raise two separate sentencing claims in his 2255 motion.  First, he asks the court to grant him a downward departure for over-representation of criminal history because, he contends, the facts of his predicate offenses are more minor than those of most career offenders.  (2255 Brief at 3-4).  Second, defendant contends that he was entitled to another downward departure due to the extraordinary child abuse he suffered.  (2255 Brief at 5-10).  Defendant does not claim, nor could he, that his counsel was ineffective in failing to pursue these claims.  Indeed, Michael Mayock raised both these issues at sentencing, and the court explained that it was sentencing defendant toward the low-end of the guideline range because of defendant's history of abuse as a child.  (Exh. D, 35).

But while defendant did raise these issues at sentencing, he failed to file any appeal, let alone one based on these sentencing claims.  The Ninth Circuit has held that a defendant who fails to appeal based on claimed non-constitutional sentencing defects cannot later seek to raise those claims through a section 2255 motion.  United States v. Evanstad, 978 F.2d 1154, 1158 (9th Cir. 1992) (Section 2255 petitioner "makes a number of challenges to his sentencing not suggesting constitutional error, but these are all barred because he did not appeal").

In any case, defendant's claims regarding his criminal

1 history and childhood abuse were fully litigated before the
2 court, and defendant offers no new information or argument.  For
3 the reasons set forth by the court at sentencing, the court
4 properly exercised its discretion by denying the requested
5 downward departures and sentencing defendant toward the low-end
6 of the guideline range.

7      2.   The Court Need Not Hold an Evidentiary Hearing

8      When a prisoner files a motion under 28 U.S.C. § 2255, the
9 district court must hold an evidentiary hearing to determine the
10 validity of the claims "[u]nless the motion and the files and
11 records in the case conclusively show that the prisoner is
12 entitled to no relief."  28 U.S.C. § 2255.  Here, there are some
13 discrepancies between the affidavits of former defense counsel
14 Michael Mayock and defendant, but even crediting defendant's non-
15 conclusory assertions in his affidavit, he is entitled to no
16 relief.  In order to prevail on a claim of ineffective assistance
17 of counsel, defendant would have to show both that: (1) his
18 attorney's performance was unreasonable under prevailing
19 professions standards, <u>Strickland v. Washington</u>, 466 U.S. 668,
20 687-91 (1984), and (2) that there is a "reasonable probability
21 that but for counsel's unprofessional errors, the result would
22 have been different," <u>id.</u> at 694.

23      Here, defendant has failed to satisfy either prong of the
24 <u>Strickland</u> test.  First, Michael Mayock's advice to defendant was
25 accurate, so there was no deficient performance.  And second,
26 defendant has offered nothing that would "undermine confidence in
27 the outcome," <u>id.</u>, or demonstrate that defendant was actually
28 innocent of the charges to which he pled guilty, other than his

6

own assertion, unsupported by any facts or argument, that "he was only guilty of Count 2 [armed bank robbery] and possiblely [sic] Count 1 [conspiracy], [and] he did not want to Plead Guilty to Count 3 [brandishing a firearm during a crime of violence]." (Defendant's Motion at 2). Because defendant is entitled to no relief even crediting the non-conclusory allegations in his motion, the Court should not hold an evidentiary hearing.

## DECLARATION OF MICHAEL MAYOCK

I, Michael Mayock, hereby declare as follows:

1.    I was appointed to represent defendant Montez Day in the case of <u>United States of America v. Bruce Bell and Montez Day</u>, CR 99-123-AHM.

2.    I informed Mr. Day that the statutory maximum sentence for a conviction under 18 U.S.C. § 924(c) was life imprisonment, although I never suggested that he was likely to receive a life sentence on that count.

3.    I told Mr. Day that, based on my review of the evidence, I did not think he would win at trial.  My opinion was based primarily on the following, as set forth in the discovery provided by the government: police officers had followed defendants Bell and Day from the bank, caught them after a high-speed chase with the precise amount of money stolen from the bank including pre-recorded bait bills, recovered the day after the pursuit, on the route of the pursuit, and around where officers had broadcast during the pursuit that the occupants had thrown two guns from the vehicle a real, loaded pistol like the one used by co-defendant Bell.  Moreover, surveillance photographs from the bank showed that both robbers carried firearms, and that one of the robbers had on the same clothing that defendant Montez Day was wearing when he was apprehended.  I also explained to Mr. Day that if he went to trial and lost, he would not receive a three-level acceptance of responsibility reduction which he otherwise would under the plea agreement.  I never told Mr. Day that going to trial would make the court "mad," although I probably did tell him that going to trial could make it harder to obtain a downward

8

1  departure; in my experience, having victims of crimes of violence
2  testify at trial tends to focus a court's attention on the harm
3  caused by a defendant, making leniency less likely in cases like
4  this one where the victims were treated roughly.

5      4.    I never pressured Mr. Day to plead guilty.  I did tell
6  him that I thought it was in his best interest to plead guilty, a
7  position which I still hold today.

8      I declare under penalty of perjury under the laws of the
9  United States that the foregoing is true and correct.

10     Executed on March 23, 2001, in Los Angeles, California.

11

12     *Michael Mayock* /A.B.
       Michael Mayock
13
       [by telephone authorization]
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



## SAN FERNANDO POLICE DEPARTMENT
## DR# 99-0254

## SUPPLEMENTAL REPORT
## 211 PC – BANK ROBBERY

**REPORT DATE:**   1/26/99

**DATE:**           1/26/99      1316 hours

**CRIME:**          Bank Robbery - Armed

**VICTIM:**         Home Savings of America

**LOCATION:**       301 South Maclay Avenue San Fernando, CA 91340
                    (818) 361-0166

### OBSERVATIONS:

On Tuesday, 1/26/99 at about 1316 hours, Detectives and Officers from the San Fernando Police Department responded to 301 South Maclay Avenue, regarding a radio call of two male blacks suspects, entering the Home Savings of America, wearing ski masks and carrying guns.

The bank is located on the southwest corner of South Maclay Avenue and Celis Street, in the middle of a high traffic, central business district, in the City of San Fernando. This same bank had been the scene of two previous armed bank robberies, (3/24/98 and 8/24/98) where the suspects were described as two male blacks with ski masks. The suspects in those previous robberies fled the location in stolen Toyota vans and then abandoned those vans, presumably for "cold" cars, within several blocks of the bank, always fleeing southbound from the location.

Sergeant David HARVEY, unit 2L30 (also the watch commander) was the first unit on the scene. Sgt. HARVEY notified dispatch that he was south of the location, at South Maclay Avenue and Pico Street, approximately one block south of the bank, standing by for additional information and units. Sgt. HARVEY arrived about 30 seconds after the call was dispatched.

Detective STEAMAN, the Robbery-Homicide Detective for the City of San Fernando and the handling detective for this case, arrived at Sgt. HARVEY'S location at about the same time.

As Sgt. HARVEY and Detective STEAMAN arrived, Sgt. HARVEY was contacted by an unknown citizen, who stated that two male blacks with ski masks and guns had just entered the Home Savings of America. At about that time, police dispatch broadcast that the suspects had exited the bank and were leaving in a silver Toyota Van.

1



## SAN FERNANDO POLICE DEPARTMENT
## DR# 99-0254

## SUPPLEMENTAL REPORT
## 211 PC – BANK ROBBERY

Just as police dispatch gave the suspect vehicle description, Detective STEAMAN and Sgt. HARVEY observed a 1985 Toyota van, silver, California license # 1MQV642 traveling S/B on South Maclay Avenue. The vehicle drove directly past Sgt. HARVEY and Detective STEAMAN and turned E/B onto Pico Street. As the vehicle passed the officers, Detective STEAMAN could see two male black subjects in the vehicle.

Detective STEAMAN made a u-turn and followed the silver van as it traveled E/B Pico Street and then turned S/B Carlisle Street. The van failed to stop for the posted stop sign at Coronel Street and instead made an E/B turn. The van then failed to stop for the posted stop sign at S. Brand Boulevard. The van made a S/B turn onto S. Brand Blvd., with Detective STEAMAN still following the van and broadcasting that he was following the suspect vehicle.

Detective STEAMAN followed the van S/B S. Brand Blvd. Until it turned W/B onto Kewen Street. The van stopped at the north curb line of Kewen Street. Detective STEAMAN observed the two male black occupants exited the van, carrying a black duffel bag. The two suspects ran S/B across Kewen Street and ran to a 1997 Ford Expedition, black in color, California license 3WAW818. The Expedition was parked unoccupied, against the south curb line of Kewen Street, facing E/B.

Detective Steaman, who was standing by, watching the suspects until additional units arrived, observed the suspect to enter the Ford Expedition and start the vehicle. At that time, Lt. Robert ORDELHEIDE and Detective Michael SOMERVILLE, who also were driving an unmarked, dual purpose police vehicle, arrived and pulled up next to Detective STEAMAN. At that time, The two detective vehicles approached the Expedition, in a head on manner. At that time, the Expedition sped off, in reverse, W/B on Kewen Street, almost striking Sgt. HARVEY'S vehicle, which was arriving from S/B Carlisle Street to Kewen Street. The Expedition continued traveling in reverse on Kewen Street at about 40 mph, until reaching South Maclay Avenue. The Expedition then fled, S/B on South Maclay Avenue, driving forward.

At that time, Officer Michael DELGADO, driving a marked black and white police vehicle, pulled in behind the Expedition and activated his overhead red and blue emergency lights and siren. Officers Adrian FLORES and Robert PARKS, who were also in a marked black and white police vehicle, followed Officer DELGADO. The Expedition accelerated S/B South Maclay Avenue, failing to yield to the emergency vehicles. The Expedition failed to stop for the posted stop sign at Laurel Canyon Boulevard. The Expedition turned (LAPD directions) S/B Laurel Canyon Blvd. and continued to W/B Brand Boulevard. The Expedition fled at speeds in excess of 70 mph W/B Brand Blvd. to Sepulveda Blvd., where the Expedition failed to stop for the red traffic signal and turned S/B onto Sepulveda Boulevard. By this time, the San Fernando

2

## SAN FERNANDO POLICE DEPARTMENT
## DR# 99-0254

## SUPPLEMENTAL REPORT
## 211 PC – BANK ROBBERY

Police department had numerous black and white and dual purpose police vehicles joining Officers DELGADO, FLORES, PARKS, Sergeant HARVEY, Detectives STEAMAN and SOMERVILLE and Lt. ORDELHEIDE in the pursuit, including Detectives VASQUEZ and LIVINGSTON, Officers Albert MARTINEZ, and Joe SANCHEZ.

Over the next 20 to 25 minutes, the Expedition drove at an extremely high rate of speed, through business and residential areas, past occupied schools and through numerous stop signs and red traffic signals, without due regard for the safety of other drivers and pedestrians on those streets and in and around those schools. Along the way, in the area of Sepulveda Blvd. and Mayall Street, Officer DELGADO observed one of the suspects to throw an object from the vehicle. Officer DELGADO stated he believed it to be a handgun and he broadcast this information over the radio.

At one point, the Expedition failed to stop for a red traffic signal, S/B Bartee Avenue at Van Nuys Boulevard. As the Expedition fled through the red signal and into the intersection, it struck a 1994 Nissan Quest Mini Van, which in turn struck one other vehicle. The Expedition was estimated to be traveling at around 30 to 40 mph through the red traffic signal and after the collision, the vehicle never slowed or stopped at the scene of the collision. See the LAPD Valley Traffic Division collision report, LAPD DR# 99-1605985 completed by Officer J. BARNES #25465. In that report, one of the victim's was transported to Kaiser Permanente Hospital in Panorama City with a reported back injury.

As the vehicle pursuit continued, the officers eventually chased the Expedition W/B Nordhoff Street past California State University, Northridge. At about that area, LAPD Helicopter, Unit Air-30 arrived overhead. As the Expedition continued W/B Nordhoff Street, the Expedition turned S/B into the shopping center parking lot at the southeast corner of Tampa Avenue and Nordhoff Street (Good Guys/Marshall's Center). The Expedition sped through the parking lot until being cut off and trapped by pursuing units and other civilian traffic in the parking lot. The Expedition traveled up onto the curb/sidewalk in front of the Marshall's Department Store at 8960 Tampa Avenue and stopped.

One suspect, later identified as suspect Bruce Edward BELL, exited the passenger door and attempted to flee on foot. He took several steps and fell to the ground. He regained his feet and was ordered to stop by pursuing officers. Suspect BELL stopped and was taken into custody without further incident by LAPD Officers LOMAX #32674 and CHASE #33125, LAPD Foothill unit 16X35. That unit had entered the pursuit at SFPD request when Officer DELGADO'S vehicle began to fail and the Expedition appeared to be pulling away from the other pursuing units.

3



## SAN FERNANDO POLICE DEPARTMENT     SUPPLEMENTAL REPORT
## DR# 99-0254                        211 PC – BANK ROBBERY

The second suspect, the driver of the Expedition, later identified as suspect Montez DAY, never exited the Expedition until ordered to do so and he was taken into custody without further incident by SFPD Officers PARKS and FLORES.

### ARREST:

Based on the descriptions of the two suspects, the description of the suspect vehicle, the actions of the two suspects and the observations of Detective STEAMAN, officer DELGADO and the rest of the officers involved, along with the recovery of the masks, gloves, duffel bag and US Currency, the suspects were both placed under arrest for 211 PC, Bank Robbery. The suspects were then transported to the San Fernando City Jail, where they were booked accordingly.

No force was used to effect the arrests. The suspects did not appear to have any visible injuries and they did not request any medical treatment. They also did not appear to be under the influence of alcohol or drugs at the time of arrest.

### ADDITIONAL:

The Expedition as then impounded per 22655.5 CVC, used in a crime. An inventory search was conducted pursuant to that impound. During that search, Detective VASQUEZ located a large black duffel back lying on the front passenger floorboard of vehicle. Inside of the duffel bag was a large amount of US Currency, two black knit caps, with two holes cut out several inches apart, laterally on each caps, and one black knit glove. No firearms were located within the vehicle. Polaroid photographs of those items were taken and those items, except for the currency, were then recovered and booked into evidence at the San Fernando Police Department.

The currency was recovered and transported to the San Fernando Police Station. The currency was then counted by and released to Home Savings of America branch manager Elizabeth AGUILLON. FBI Special agent Andy CHAMBERS witnessed the count. Ms. AGUILLON counted $85,600 dollars recovered, including a stack of twenty ($20) dollar bills that were believed to be pre-recorded serial numbered bills. That stack of twenty dollar bills ($100 total) was retained by Special Agent CHAMBERS, to be compared to the list of pre-recorded bills held by Home Savings of America. The $85,600 dollars was the same amount reported stolen from the vault by AGUILLON. The remaining $85,500 was released back into the custody of ANGUILLON. See the attached receipt issued to AGUILLON by Special Agent CHAMBERS.

A search was conducted by San Fernando Police Officers of the area surrounding Sepulveda Blvd. and Mayall Street, in an attempt to locate the item(s) discarded by the

4

## SAN FERNANDO POLICE DEPARTMENT
DR# 99-0254

## SUPPLEMENTAL REPORT
211 PC – BANK ROBBERY

suspects during the pursuit. No firearms were located in the area. Numerous citizens were contacted who stated that several persons had been wondering in the area after the pursuit went by.

During a booking search of suspect BELL, San Fernando Police Department Officer Joe SANCHEZ located a pair of black knit gloves in the pants pocket of suspect BELL. Those gloves were similar to the glove recovered in the Expedition. Those gloves were recovered and booked into evidence.

After the suspect were taken into custody, San Fernando Police Officers responded back to the Home Savings of America. The Los Angeles Office of the FBI was contacted and responded. See the attached officers supplemental reports for additional witness statements and officers actions.

The silver Toyota van, California license 1MQV642 used by the suspects in their initial exit from the bank, was determined to be a LAPD Van Nuys stolen vehicle. It was reported stolen on 1/22/98, LAPD DR# 99-0906302. That vehicle was recovered and towed to the OPG Tow, Black and White Towing at 10857 San Fernando Road in Pacoima, where it was secured with the Expedition, pending latent print lifts on 1/27/99 by FBI evidence technicians.

The Home Savings of America surveillance system was active during this incident and a tape was recovered and retained by FBI Special Agent Joseph AUTHER. Several still photos were captured off of the video. Those still shots were booked into evidence.

In addition, Los Angeles television station KABC, channel 7 news helicopter was overhead for a portion of the pursuit and the termination of the pursuit was captured on video by that crew. A copy of that tape will be requested.

5

SECTION MC

## SAN FERNANDO POLICE DEPARTMENT
## DR# 99-0254

**SUPPLEMENTAL REPORT**
**211 PC – ROBBERY**

**DATE:** 1/29/99

**VICTIM:** Home Savings of America

**INVESTIGATOR:** Detective Lance Steaman

**WITNESSES:**

**Delong, James DOB 7/4/65 CDL# C2878790**
hm: 8557 Newcastle Avenue Northridge CA 91325 (818) 882-9235
wk: 10143 Sepulveda Blvd. North Hills CA 91343 (818) 893-0008

**Los Angeles Police Department Officers Smith #23091 and Gonzalez #33143**
LAPD Foothill Division      12760 Osborne Blvd. Pacoima CA 91331 (818) 756-8861

On Thursday, 1/28/99 at about 1230 hours, I was contacted by LAPD Foothill Division patrol officers SMITH #23091 and GONZALEZ #33143, unit 16X22. Officer SMITH stated that on 1/28/99 at about 1210 hours, they received a radio call of a citizen reporting a found gun near the intersection of LANGDON Avenue and LEMARSH Street. SMITH stated they responded to the area and contacted James DELONG.

DELONG stated to Officer SMITH that on 1/28/99 at about 1200 hours, he was driving N/B on LANGDON Street, passing ROMAR Street, when he looked to his left (west) and observed what appeared to be a gun lying on the parkway, between the two driveways for 15500 LEMARSH Street. (Those driveways actually are on LANGDON Street, but are for the residence at 15500 LEMARSH Street.) DELONG said he stopped and exited his vehicle and verified that the item was a handgun. DELONG told Officer SMITH that he was aware that police officers had chased a suspect through this area within the last couple of days, so he went to a neighbors house and asked them to call the police.

Officer SMITH stated that upon their arrival, SMITH contacted DELONG and received his statement. DELONG then pointed out the handgun to Officer SMITH. Officer SMITH observed that the handgun was a Smith & Wesson, blue steel, 38 cal. revolver, serial #D73114. Officer SMITH, with preserving the weapon for prints in mind, recovered and unloaded the weapon. Officer SMITH noted that the weapon was loaded with six live 38 cal. rounds. Officer SMITH said he placed those rounds in a napkin and drove to San Fernando Police Station to see if the weapon matched any weapon used in the bank robbery-pursuit.

I observed the weapon and noted that it did match one of the weapons described as being used by the suspects. I also verified that the suspects were pursued S/B on

## SAN FERNANDO POLICE DEPARTMENT    SUPPLEMENTAL REPORT
## DR# 99-0254                                        211 PC – ROBBERY

LANGDON Avenue, from LAMARSH Street, directly past the location the weapon was recovered. I asked officers SMITH and GONZALEZ to show me exactly where they recovered the weapon. I followed them out to the area of LANGDON Avenue and LEMARSH Street and Officer SMITH point out the approximate location where he recovered the weapon.

The location was about 105 feet south of the south curb line of LEMARSH Street and about 9 feet west of the west curb line of LANGDON Avenue. I took Polaroid photos of the general area and those photos, along with the weapon and the rounds recovered were then booked into evidence.

I also received a master copy of the 911 call and the radio/telephone traffic surrounding this incident. That master copy was also booked into evidence.

On Friday, 1/29/99 at about 1100 hours, I telephoned the registered owner of the 1997 Ford Expedition used in this robbery. I contacted Gregory HOOFKIN at (310 204-5833. Mr. HOOFKIN said that he owns a property development company and as part of that business, he leased the Expedition for an employee, Eugene CAMPER. HOOFKIN said that CAMPER is an old friend that HOOFKIN hired when he (CAMPER) was released from prison. HOOFKIN said that earlier that week, he was called by CAMPER, who said he had been arrested for credit card fraud. HOOFKIN said he assumed that the Expedition was parked at CAMPER'S residence at 4517 ELLENITA Avenue in Tarzana (818) 343-3616.

I asked HOOFKIN if he knew Montez DAY and HOOFKIN said that name sounded familiar, that maybe he was a friend of CAMPER. HOOFKIN was also asked about Bruce BELL and HOOFKIN said that name was not familiar to him. HOOKFIN said he could normally be reached at his business at (310) 670-4892.

16

SAN FERNANDO POLICE DEPARTMENT

**EVIDENCE LOG**

D.R./CITE NO. _99 - 0254_

OFFENSE_ _211 PC_

SEARCH WARRANT

☐     ☒ FELONY
RELEASE RECEIVED    ☐ MISD.
☐        ☐ OTHER
          ☐ JUVENILE

SUSPECT(s) MULTIPLE ☒ _Boll, Bert_
_PAY, Monres_
VICTIM(s) MULTIPLE ☐

BOOKING NUMBER(s)

COURT NO./JAIN

INV. OFCR.

REVIEW DATE

PROPERTY OFFICER

DATE & TIME RECVD.

LOCATION WHERE PROPERTY OBTAINED
_916 First St / Longon Ave @ Lemarsh St._
DATE & TIME OBTAINED
_1-29-99_
OFCR(s) WHO OBTAINED PROPERTY
_Stermn  6650_
DELIVERED TO PROPERTY UNIT BY
_Stermn  6650_
TEMPORARY STORAGE LOCATION

| ITEM NO. | QUAN | ARTICLE NAME | BRAND/MAKE | MODEL NO. | MISC. DESCRIPTION | SERIAL NO. | STORAGE LOCATION |
|---|---|---|---|---|---|---|---|
| 11 | 1 | ENVELOPE CONTAINING (3) THREE PLAROID PHOTOS OF SUSP. WHERE ITEM #9 +10 WERE RECOVERED. | | | | | |
| 12 | 1 | ENVELOPE CONTAINING ONE AUDIO TAPE OF INCIDENT RADIO / PHONE TRAFFIC 99-0254 | | | | | |
| 13 | 1 | ENVELOPE CONTAINING (11) ELEVEN 35MM PHOTO OF BLK CANVAS BAG, KNIT CAPS, GLOVE & US CURRENCY RECOVERED INSIDE 97 FORD EXPEDITION. | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

PREPARED BY:
_Steamon  6650_

DATE
_2-9-99_

APPROVING SUPERVISOR

DATE