HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
BRIANNA FULLER MIRCHEFF (Bar No. 243641)
(E-Mail: Brianna_Mircheff@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-4784
Facsimile: (213) 894-0081

Attorneys for Petitioner
MONTEZ DAY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONTEZ DAY,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　　Respondent. | Case No. CV _____<br>CR 99-00123-AHM<br><br>**MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY (FILED PROTECTIVELY) AND NOTICE OF FILING OF SECOND OR SUCCESSIVE PETITION IN THE NINTH CIRCUIT**<br><br>**FILED PURSUANT TO *JOHNSON V. UNITED STATES*** |

Petitioner, by and through his counsel of record Brianna Fuller Mircheff, hereby files the attached motion to vacate his sentence. This petition is filed protectively, in order to ensure compliance with the one-year statute of limitations. Petitioner further notifies the Court that he has filed an application for leave to file the instant second or successive motion to vacate his sentence in the Ninth Circuit, Case No. 16-71519. Petitioner asks that this Court hold this petition in abeyance until such time as the Ninth Circuit grants his application. Petitioner will notify the Court if his application is granted.

　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　HILARY POTASHNER
　　　　　　　　　　　　　Federal Public Defender

DATED: May 18, 2016　　　By　*/s/ Brianna Fuller Mircheff*
　　　　　　　　　　　　　Brianna Fuller Mircheff
　　　　　　　　　　　　　Deputy Federal Public Defender

HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
BRIANNA FULLER MIRCHEFF (Bar No. 243641)
(Email: Brianna_Mircheff@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Tel: 213-894-4784
Fax: 213-894-0081

Attorneys for Petitioner
MONTEZ DAY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| MONTEZ DAY, | Case No. CV_____ |
| Petitioner, | [CR 99-00123-AHM] |
| v. | **MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255** |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

Petitioner Montez Day, through undersigned counsel, hereby respectfully moves this Court to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED: May 18, 2016          By  /s/ *Brianna Fuller Mircheff*
                                 BRIANNA FULLER MIRCHEFF
                                 Deputy Federal Public Defender

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................... 1

II. PROCEDURAL HISTORY ............................................................. 1

    A.   Conviction and Sentencing ................................................ 1

    B.   Section 2255 Motion .......................................................... 4

    C.   Subsequent Filings ............................................................. 4

    D.   Second or Successive 2255 Motion ................................... 4

III. ARGUMENT ................................................................................. 4

    A.   Mr. Day's Section 924(c) Conviction, and the Resulting Seven-Year Mandatory Consecutive Sentence, Must Be Vacated because the Predicate Offense, Either Unarmed Bank Robbery or Armed Bank Robbery, Is Not a Crime of Violence. ........................................................................ 5

         1.   Neither Unarmed Bank Robbery Nor Armed Bank Robbery Qualifies as a Crime of Violence under the Force Clause. ............................................................... 6

             a.   Neither Unarmed Bank Robbery Nor Armed Bank Robbery Requires the *Intentional* Use or Threatened Use of Force. ............................. 9

             b.   Neither Unarmed Bank Robbery Nor Armed Bank Robbery Requires the Use or Threatened Use of *Violent* Force. .......................................... 11

         2.   Following *Johnson*, Neither Unarmed Bank Robbery Nor Armed Bank Robbery Qualifies as a Crime of Violence under the Residual Clause because that Clause Is Void for Vagueness ........................................ 14

    B.   Mr. Day Is Not a Career Offender Because Neither His Instant Conviction for Armed Bank Robbery Nor His Prior Conviction for Unarmed Bank Robbery Is a Crime of Violence Under *Johnson* ........................................... 17

         1.   Neither Unarmed Bank Robbery Nor Armed Bank Robbery Is a Crime of Violence Under the Residual Clause following *Johnson*, and Neither Satisfies the Force Clause. ................................................................. 18

         2.   The Excision of the Residual Clause Takes with It the Commentary Offense of Robbery, which Only Served to Interpret the Residual Clause. ............. 19

IV. CONCLUSION ............................................................................ 24

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Carter v. United States*,
   530 U.S. 255 (2000)...................................................................................... 9

*Chrzanoski v. Ashcroft*,
   327 F.3d 188 (2d Cir. 2003) ...................................................................... 12

*Delgado-Hernandez v. Holder*,
   697 F.3d 1125 (9th Cir. 2012) .............................................................. 16, 21

*Descamps v. United States*,
   133 S. Ct. 2276 (2013)............................................................................ 7, 17

*Dimaya v. Lynch*,
   803 F.3d 1110 (9th Cir. 2015) .............................................................. 15, 16

*Fernandez-Ruiz v. Gonzales*,
   466 F.3d 1121 (9th Cir. 2006) ................................................................ 8, 11

*Matter of Guzman-Polanco*,
   26 I. & N. Dec. 713 (BIA 2016)................................................................ 12

*James v. United States*,
   550 U.S. 192 (2007)................................................................................ 15, 21

*Johnson v. United States*,
   135 S. Ct. 2551 (2015).........................................................................*passim*

*Johnson v. United States*,
   559 U.S. 133 (2010) (*Johnson I*) ............................................................... 8

*Leocal v. Ashcroft*,
   543 U.S. 1 (2004)............................................................................... 8, 11, 14

*McLaughlin v. United States*,
   476 U.S. 16 (1986)................................................................................. 13, 14

*Miller v. Gammie*,
   335 F.3d 889 (9th Cir. 2003) ............................................................... 11, 14

ii

**Federal Cases (cont.)**

*Mistretta v. United States*,
 488 U.S. 361 (1989) ................................................................ 19

*Quijada-Aguilar v. Lynch*,
 799 F.3d 1303 (9th Cir. 2015) ................................................ 20

*Stinson v. United States*,
 508 U.S. 36 (1993) ............................................................ 19, 20

*Sykes v. United States*,
 131 S. Ct. 2267 (2011) ............................................................ 15

*Taylor v. United States*,
 495 U.S. 575 (1990) .................................................................. 7

*United States v. Acosta*,
 470 F.3d 132 (2d Cir. 2006) ..................................................... 8

*United States v. Alsop*,
 479 F.2d 65 (9th Cir. 1973) ............................................... 10, 17

*United States v. Alvarado-Pineda*,
 774 F.3d 1198 (9th Cir. 2014) ................................................ 22

*United States v. Amparo*,
 68 F.3d 1222 (9th Cir. 1995) ............................................... 6, 16

*United States v. Anderson*,
 942 F.2d 606 (9th Cir. 1991) ................................................... 19

*United States v. Aragon*,
 983 F.2d 1306 (4th Cir. 1993) ................................................ 16

*United States v. Armijo*,
 651 F.3d 1226 (10th Cir. 2011) .............................................. 23

*United States v. Baza-Martinez*,
 464 F.3d 1010 (9th Cir. 2006) .................................................. 7

*United States v. Becerril-Lopez*,
 541 F.3d 881 (9th Cir. 2008) .................................................. 21

iii

**Federal Cases (cont.)**

*United States v. Bell,*
2016 WL 344749 (N.D. Cal. Jan. 28, 2016)................................................................ 16

*United States v. Benavides,*
617 Fed. App'x 790 (9th Cir. 2015) ........................................................................ 18

*United States v. Boyd,*
924 F.2d 945 (9th Cir. 1991) ................................................................................ 13

*United States v. Chandler,*
743 F.3d 648 (9th Cir. 2014) ............................................................................ 14, 21

*United States v. Crews,*
621 F.3d 849 (9th Cir. 2010) ................................................................................ 18

*United States v. Cruz-Rodriguez,*
625 F.3d 274 (5th Cir. 2010) ................................................................................ 12

*United States v. Dixon,*
805 F.3d 1193 (9th Cir. 2015) ............................................................................ 8, 22

*United States v. Dunlap,*
___ F. Supp. 3d ___, 2016 WL 591757 (D. Or. 2016)................................................ 22

*United States v. Edmunson,*
__ F. Supp. 3d __, 2015 WL 9311983 (D. Md. Dec. 30, 2015)................................... 16

*United States v. Foppe,*
993 F.2d 1444 (9th Cir. 1993) ................................................................................ 10

*United States v. Grajeda,*
581 F.3d 1186 (9th Cir. 2009) .................................................................................. 7

*United States v. Hopkins,*
703 F.2d 1102 (9th Cir. 1983) ................................................................................ 11

*United States v. Jones,*
84 F.3d 1206 (9th Cir. 1996) ................................................................................ 13

*United States v. Kelley,*
412 F.3d 1240 (11th Cir. 2005) .............................................................................. 10

**Federal Cases (cont.)**

*United States v. Landa*,
  642 F.3d 833 (9th Cir. 2011) ................................................................ 20

*United States v. Lattanaphom*,
  __ F. Supp. 3d __, 2016 WL 393545 (E.D. Cal. Feb. 1, 2016) ................................. 16

*United States v. Leshen*,
  453 Fed. App'x 408 (4th Cir. 2011) ................................................... 20, 21

*United States v. Martinez-Jimenez*,
  864 F.2d 664 (9th Cir. 1989) ........................................................ 11, 13

*United States v. McDougherty*,
  920 F.2d 569 (9th Cir. 1990) ........................................................ 14, 21

*United States v. Mendez*,
  992 F.2d 1488 (9th Cir. 1993) ........................................................... 16

*United States v. Parnell*,
  14-30208 slip op. (9th Cir. April 12, 2016) ............................................. 12

*United States v. Perez-Vargas*,
  414 F.3d 1282 (10th Cir. 2005) .......................................................... 12

*United States v. Piccolo*,
  441 F.3d 1084 (9th Cir. 2006) ............................................................ 7

*United States v. Prince*,
  772 F.3d 1173 (9th Cir. 2014) ........................................................ 14, 21

*United States v. Selfa*,
  918 F.2d 749 (9th Cir. 1990) ....................................................... 6, 7, 14

*United States v. Serafin*,
  562 F.3d 1105 (9th Cir. 2009) ............................................................ 8

*United States v. Serna*,
  309 F.3d 859 (5th Cir. 2002) ............................................................ 23

*United States v. Shell*,
  789 F.3d 335 (4th Cir. 2015) ........................................................ 20, 22

**Federal Cases (cont.)**

*United States v. Soto-Rivera*,
811 F.3d 53 (1st Cir. 2016) ............................................................... 22

*United States v. Terrell*,
593 F.3d 1084 (9th Cir. 2010) .......................................................... 18

*United States v. Torres-Miguel*,
701 F.3d 165 (4th Cir. 2012) ....................................................... 7, 12

*United States v. Vivas-Ceja*,
808 F.3d 719 (7th Cir. 2015) ........................................................... 16

*United States v. Werle*,
__ F.3d __, 2016 WL 828132 (9th Cir. Mar. 3, 2016) ................. 17

*United States v. Williams*,
110 F.3d 50 (9th Cir. 1997) ............................................................. 21

*United States v. Woodrup*,
86 F.3d 359 (4th Cir. 1996) ............................................................. 10

*United States v. Wright*,
215 F.3d 1020 (9th Cir. 2000) ................................................. *passim*

*United States v. Yockel*,
320 F.3d 818 (8th Cir. 2003) ........................................................... 10

*Whyte v. Lynch*,
807 F.3d 463 (1st Cir. 2015) ........................................................... 12

**Federal Statutes**

8 U.S.C. § 1101 ......................................................................... 15, 16

18 U.S.C. § 16 ................................................................... *passim*

18 U.S.C. § 371 ............................................................................... 1

18 U.S.C. § 924 ................................................................... *passim*

18 U.S.C § 2113 .................................................................. *passim*

21 U.S.C. 841 .................................................................................. 2

**Federal Statutes (cont.)**

28 U.S.C. § 994.................................................................................................. 19

28 U.S.C. § 2255..................................................................................... 1, 4, 24

U.S.S.G. § 1B1.7................................................................................................ 19

U.S.S.G. § 4B1.1.................................................................................... 1, 2, 3, 17

U.S.S.G. § 4B1.2.......................................................................................*passim*

**Federal Rules**

Federal Rule of Civil Procedure 15 ..................................................................... 4

Federal Rule of Civil Procedure 60(b)................................................................. 4

**State Statutes**

Cal. Penal Code § 422.......................................................................................12

**Other Authorities**

Ninth Cir. Model Criminal Jury Instructions § 8.162 (2015)......................... 17

# TABLE OF EXHIBITS

Exhibit A:    Indictment (February 9, 1999, CR 13)

Exhibit B:    Change of Plea Hearing Transcript (May 14, 1999, CR 59)

Exhibit C:    Sentencing Hearing Transcript (October 25, 1999, CR 59)

Exhibit D:    Judgment and Commitment Order (October 25, 1999, CR 53)

Exhibit E:    Motion to Vacate, Set Aside or Correct Sentence By a Person in Federal
              Custody (November 7, 2000, CR 61)

Exhibit F:    Order Denying Section 2255 Petition (November 29, 2001, CR 75; District
              Court Case No. CV 00-11896, Dkt. 3)

Exhibit G:    Motion for Leave of Court Pursuant to Rule 15 (November 29, 2001, CR
              79; District Court Case No. CV 00-11896, Dkt. 5)

Exhibit H:    Motion for Reconsideration Pursuant to Federal Rules of Civil Procedure,
              Rule 60(b) (December 11, 2001, CR 83; District Court Case No. CV 00-
              11896, Dkt. 6)

## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

## I.  INTRODUCTION

Petitioner Montez Day, by and through his attorney, Deputy Federal Public Defender Brianna Fuller Mircheff, hereby submits this motion to vacate, set aside, or correct his sentence, based on *Johnson v. United States*, 135 S. Ct. 2551 (2015).  In *Johnson*, the Supreme Court held that the residual clause of the Armed Career Criminal Act, 18 U.S.C. § 924(e), is void for vagueness.  *Johnson*'s reasoning applies equally to the residual clauses in the career offender guideline, U.S.S.G. § 4B1.2(a)(2), and in 18 U.S.C. § 924(c)(3)(B).  Therefore, in light of *Johnson*, Mr. Day's sentence under U.S.S.G. § 4B1.1 and seven-year mandatory consecutive sentence under 18 U.S.C. § 924(c) were imposed in violation of the Constitution or the laws of the United States and exceeded the maximum authorized by law.

## II.  PROCEDURAL HISTORY

### A.     Conviction and Sentencing

Mr. Day was charged in a three-count Indictment.  (Ex. A, Indictment, CR 13.)  On May 14, 1999, he pleaded guilty without a plea agreement to all of the charges in the Indictment against him: one count of conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371 (Count 1); one count of armed bank robbery, in violation of 18 U.S.C § 2113(a), (d) (Count 2); and one count of use of a firearm during a crime of violence, in violation of 18 U.S.C. 924(c) (Count 3).  (Ex. B, Change of Plea Hearing Transcript, CR 59.)  On October 25, 1999, he was sentenced to 288 months imprisonment under the then-mandatory Sentencing Guidelines—60 months on Count 1, 204 months on Count 2, to be served concurrently, and a mandatory consecutive 84

months on Count 3 (the Section 924(c) count).  (Ex. C, Sentencing Transcript, CR 59, at 37; Ex. D, Judgment and Commitment Order, CR 53.) [1]

Two things drove Mr. Day's sentence.  First, the Section 924(c) charge: Count 3 of the Indictment charged Mr. Day with violating Section 924(c) when he "knowingly used and carried a firearm, namely, a loaded .38 caliber revolver, during and in relation to a crime of violence, namely, robbery of Home Savings of America . . . in violation of Title 8, United States Code, Section 2113(a), by brandishing the pistol at the employees and customers[.]"  (Ex. A, Indictment, at 6.)[2]  Mr. Day admitted that he was guilty of this offense under a *Pinkerton* theory of liability. (Ex. B, Change of Plea Transcript, at 22.) By operation of law, this 924(c) conviction carried a mandatory consecutive sentence of 84 months.  (Ex. B, Change of Plea Hearing Transcript, at 26; *see also* 18 U.S.C. § 924(c)(1).)

Second, Mr. Day was found to be a career offender.  The Presentence Report ("PSR") concluded that Mr. Day was a career offender under U.S.S.G. § 4B1.1 because the instant offense, armed bank robbery in violation of 18 U.S.C. § 2113(a), (d) "meets the definition of a 'crime of violence' as set forth in Section 4B1.2(a)", and Mr. Day also had the requisite two prior qualifying felony convictions.  (PSR ¶¶ 47-50.)  The first career offender predicate was Mr. Day's 1992 conviction for possession with intent to distribute cocaine, in violation of 21 U.S.C. 841(a)(1).  (PSR ¶¶ 48; 64-70; U.S. District Court, Western District of Tennessee, Dkt. No. 90-20034.)  The second of the career offender predicates was Mr. Day's 1995 conviction for bank robbery, in violation of 18 U.S.C. § 2113(a).  (PSR ¶¶ 49; 71-75.)

---

[1] Unless otherwise indicated, all citations to "CR" refer to the clerk's record in CR 99-00123, Mr. Day's underlying criminal case in this Court.

[2] While Count 3 of the Indictment describes the predicate offense as "bank robbery in violation of Title 18, United States Code, Section 2113(a)," Count 2, the predicate, is actually for *armed* bank robbery in violation of 18 U.S.C. § 2113(a), (d). This Petition addresses both unarmed and armed bank robbery as a 924(c) predicate, out of an abundance of caution.

2

1    The career offender finding and Mr. Day's Section 924(c) conviction both had a

2    significant impact on Mr. Day's sentence.  The PSR found that his non-career-offender

3    offense level was 27, but that his career-offender offense level was 31, a swing of four

4    levels.  (PSR ¶ 44; 54.)  Moreover, because all career offenders are automatically

5    placed in Criminal History Category VI, *see* U.S.S.G. § 4B1.1(b), the career offender

6    determination increased Mr. Day's criminal history category from V to VI.  (PSR ¶¶

7    79-80.)  In total, then, the career offender determination caused Mr. Day's guideline

8    range to jump from 120-140 months to 188-235 months.  (PSR ¶ 115.)  In addition, the

9    Section 924(c) conviction on Count 3 added a mandatory consecutive 84 months on top

10   of that, for a total guidelines range of 272-319 months.  (Ex. C, Sentencing Transcript,

11   at 37.)

12   Mr. Day argued that his criminal history was overstated based on the minor

13   nature of his predicate prior conviction for possession of cocaine and the fact that the

14   offense occurred when he was young.  (Ex. C, Sentencing Transcript, at 11:6-16; 18-

15   19.)  Additionally, Mr. Day sought a downward departure based upon extraordinary

16   childhood abuse.  (Ex. C, Sentencing Transcript, at 11:17-23; 13-18.)

17   The court declined to depart from the guideline range, agreeing with the

18   government that the circumstances of the prior controlled substance offense and the

19   nature of the drug that was possessed made it an appropriate predicate for the career

20   offender designation.  (Ex. C, Sentencing Transcript, at 11:24-25; 12:1-4; 32.)  The

21   court also found that although it had the discretion to make a downward departure

22   based on extraordinary childhood abuse, it did not think a departure was warranted in

23   this case.  (Ex. C, Sentencing Transcript, at 12-13.)

24   At the sentencing hearing held on October 25, 1999, the district court imposed a

25   term of 288 months imprisonment, consisting of 60 months on Count 1 and 204 months

26   on Count 2, to be served concurrently, and a mandatory consecutive 84 months on

27   Count 3 (the Section 924(c) count).  (Ex. C, Sentencing Transcript, at 37.)

28   Mr. Day did not file a direct appeal of his case.

3

**B.      Section 2255 Motion**

On November 7, 2000, Mr. Day filed a motion pursuant to 28 U.S.C. § 2255, claiming: (1) his attorney was ineffective in that he misadvised Mr. Day regarding the statutory maximum sentence under 18 U.S.C. § 924(c) and pressured Mr. Day into pleading guilty; (2) the career offender determination overstated the seriousness of his prior criminal history; and (3) he should have received a downward departure for extraordinary childhood abuse.  (Ex. E, Motion to Vacate, Set Aside or Correct Sentence By a Person in Federal Custody, CR 61; Ex. F, Order Denying Section 2255 Petition, CR 79; Case No. CV 00-11896, Dkt. 1.)  The district court denied Mr. Day's Section 2255 motion on November 29, 2001.  (Ex. F, Order Denying Section 2255 Petition.)

**C.      Subsequent Filings**

On November 29, 2001, Mr. Day filed a motion pursuant to Federal Rule of Civil Procedure 15 for leave of court to file a supplement on newly discovered evidence. (CR 5; Ex. G, Motion for Leave of Court Pursuant to Rule 15, CR 79.)  On December 11, 2001, Mr. Day filed a motion for reconsideration pursuant to Federal Rule of Civil Procedure 60(b), which was denied on December 12, 2001.  (Ex. H, Motion for Reconsideration Pursuant to Federal Rules of Civil Procedure, Rule 60(b), CR 82-84.) The district court denied a certificate of appealability on January 2, 2002, and the Ninth Circuit denied a certificate of appealability on June 13, 2002.  (CR 87; CA 02-55034, Dkt. 1, 11.

**D.      Second or Successive 2255 Motion**

The instant Motion is filed in conjunction with a request for leave to file a second or successive petition in the Ninth Circuit.

# III.  ARGUMENT

Under 28 U.S.C. § 2255(a), a defendant is entitled to a resentencing when his original sentence was imposed "in violation of the Constitution or laws of the United

States," or is "in excess of the maximum authorized by law."  Mr. Day is entitled to relief on all these grounds because under *Johnson v. United States*, 135 S. Ct. 2251 (2015), he is now serving illegal and unconstitutional career offender and Section 924(c) sentences.

**A.    Mr. Day's Section 924(c) Conviction, and the Resulting Seven-Year Mandatory Consecutive Sentence, Must Be Vacated because the Predicate Offense, Either Unarmed Bank Robbery or Armed Bank Robbery, Is Not a Crime of Violence.**

Section 924(c) provides for a series of graduated, mandatory consecutive sentences for using or carrying a firearm during and in relation to a "crime of violence." 18 U.S.C. § 924(c)(1)(A), (B).  The term "crime of violence," in turn, is defined as "an offense that is a felony and—"

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3).  As used in this brief, subsection (A) is called the "force clause" and subsection (B) is called the "residual clause."

Here, as noted, Count 3 of the Indictment charged Mr. Day with violating Section 924(c) when he "knowingly used and carried a firearm, namely, a loaded .38 caliber revolver, during and in relation to a crime of violence, namely, robbery of Home Savings of America . . . in violation of Title 8, United States Code, Section 2113(a), by brandishing the pistol at the employees and customers[.]"  (Ex. A, Indictment, at 6.)  However, the predicate offense, Count 2, actually charged Mr. Day with committing *armed* bank robbery in violation of 18 U.S.C. § 2113(a), (d)[.]"  (Ex. A, Indictment, at 5.)  Following *Johnson*, neither unarmed bank robbery nor armed bank robbery is a crime of violence for purposes of Section 924(c).

In a 1990 case, the Ninth Circuit held that unarmed bank robbery *was* a crime of violence under U.S.S.G. § 4B1.2's force clause because unarmed bank robbery required that money or property be taken through force and violence or through intimidation, which amounted to a "threatened use of physical force." *See United States v. Selfa*, 918 F.2d 749, 751 (9th Cir. 1990). The decision's analysis was limited, reasoning only that acting in a way that would put an ordinary person in fear of bodily harm necessarily constituted the threatened use of force. *Id.* The Court also cited the application note to the guideline, which includes "robbery" as an enumerated offense. *Id.*

Similarly, in a 2000 case, the Ninth Circuit held that armed bank robbery *was* a crime of violence under the force clause of Section 924(c)(3)(A). *United States v. Wright*, 215 F.3d 1020, 1028 (9th Cir. 2000). The decision's analysis was limited, reasoning only "[a]rmed bank robbery qualifies as a crime of violence because one of the elements of the offense is a taking 'by force and violence, or by intimidation.'" *Id.* (citing 18 U.S.C. § 2113(a)).

There is much water under the bridge since *Selfa* and *Wright* were decided, however, and intervening Supreme Court and en banc Ninth Circuit decisions have undermined their reasoning that bank robbery was a crime of violence. Specifically, the Supreme Court issued a series of cases redefining the boundaries of the force clause, such that bank robbery no longer satisfies that clause for two independent reasons. *Johnson*, moreover, removed the alternative ground on which bank robbery could have been deemed a crime of violence: that bank robbery qualified as a predicate crime of violence under the residual clause. After *Johnson*, therefore, Mr. Day no longer has a qualifying crime of violence supporting his Section 924(c) conviction and sentence.

### 1.    Neither Unarmed Bank Robbery Nor Armed Bank Robbery Qualifies as a Crime of Violence under the Force Clause.

To determine whether a predicate offense qualifies as a "crime of violence" under § 924(c), this Court must use the categorical approach. *See United States v.*

1    *Amparo*, 68 F.3d 1222, 1225 (9th Cir. 1995); *United States v. Piccolo*, 441 F.3d 1084,

2    1086-87 (9th Cir. 2006) ("[I]n the context of crime-of-violence determinations under

3    § 924(c), our categorical approach applies regardless of whether we review a current or

4    prior crime."); *see also Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013)

5    (applying categorical approach in case under ACCA, 18 U.S.C. § 924(e)).  Under

6    *Taylor*, only the statutory definitions –i.e., the elements – of the predicate crime are

7    relevant to determine whether the conduct criminalized by the statute, including the

8    most innocent conduct, qualifies as a "crime of violence."  *Taylor v. United States*, 495

9    U.S. 575, 599-601 (1990).

10           Determination of whether a criminal offense is categorically a crime of violence

11   is done by "assessing whether the 'full range of conduct covered by [the statute] falls

12   within the meaning of that term.'"  *United States v. Grajeda*, 581 F.3d 1186, 1189 (9th

13   Cir. 2009) (citation omitted).  To do this, courts must look "at the least egregious end of

14   [the. . . statute's] range of conduct."  *United States v. Baza-Martinez*, 464 F.3d 1010,

15   1014 (9th Cir. 2006) (quoting *United States v. Lopez-Solis*, 447 F.3d 1201, 1206 (9th

16   Cir. 2006)).  In other words, under the categorical approach, a prior offense can only

17   qualify as a "crime of violence" if all of the criminal conduct covered by a statute—

18   "including the most innocent conduct" —matches or is narrower than the "crime of

19   violence" definition.  *United States v. Torres-Miguel*, 701 F.3d 165, 167 (4th Cir.

20   2012).  If the statute punishes some conduct that would qualify as a crime of violence

21   and some conduct that would not, it does not categorically constitute a crime of

22   violence.  *Grajeda*, 581 F.3d at 1189.  In a "narrow range of cases," if the statute is

23   divisible as to a material element, then the court may apply the modified categorical

24   approach by looking beyond the statutory elements to certain documents of conviction

25   to determine whether the defendant's conviction necessarily involved facts

26   corresponding to the generic federal offense.  *Descamps*, 133 S. Ct. at 2283-84.

27           Intervening Supreme Court and en banc Ninth Circuit precedent following *Selfa*

28   and *Wright* holds that to be a categorical match to the terms of the force clause in

7

Section 924(c), a state statute must require proof of both intentional conduct and violent force.  As to intentional conduct, in *Leocal v. Ashcroft*, 543 U.S. 1, 9-10 (2004), the Supreme Court held that a conviction under a Florida statute prohibiting driving under the influence was not a crime of violence under the identical force clause in 18 U.S.C. Section 16(a) because the crime could be committed through mere negligence or even accidental conduct.  An en banc panel of the Ninth Circuit then interpreted *Leocal* as requiring that, "to constitute a federal crime of violence an offense must involve the *intentional* use of force against the person or property of another."  *Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121, 1132 (9th Cir. 2006) (en banc) (emphasis added); *see also United States v. Dixon*, 805 F.3d 1193, 1197 (9th Cir. 2015) (citing *Leocal* and holding that the almost-identically worded force clause in the ACCA requires that "the use of force must be intentional, not just reckless or negligent"); *United States v. Serafin*, 562 F.3d 1105, 1108 (9th Cir. 2009) (applying *Leocal*'s gloss on 18 U.S.C. § 16 to Section 924(c)(3)); *United States v. Acosta*, 470 F.3d 132, 134-35 (2d Cir. 2006) (same).

"Physical force" has the meaning given to it by *Leocal* and the Supreme Court's 2010 decision in *Johnson v. United States*, 559 U.S. 133, 140 (2010) (*Johnson I*).  In *Leocal*, in addition to interpreting the *mens rea* requirement of Section 16(a), the Supreme Court also held that the phrase "physical force" in that section requires a "violent, active crime[]."  543 U.S. at 11.  The *Johnson I* Court expanded on that definition, holding that the phrase "physical force" in ACCA's almost-identical force clause defining "violent felony" means "*violent* force—that is, force capable of causing physical pain or injury to another person."  *Johnson I*, 559 U.S. at 140.

A person violates the unarmed bank robbery statute if he, "by force and violence, or by intimidation, takes or attempts to take, from the person or presence of another" the property of a bank. 18 U.S.C. § 2113(a).  A person violates the armed bank robbery statute if he, "by force and violence, or by intimidation, takes or attempts to take, from the person or presence of another" the property of a bank and in so doing, "assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or

8

device." 18 U.S.C. § 2113(a), (d).  Thus, the elements of the armed bank robbery offense are:

> (1) the defendant took money belonging to a bank, credit union, or savings and loan, (2) by using force and violence or intimidation, (3) the deposits of the institution were insured by the Federal Deposit Insurance Corporation ("FDIC"), and (4) in committing the offense, the defendant assaulted any person, or put in danger the life of any person by the use of a dangerous weapon.

*Wright*, 215 F.3d at 1028.  Neither unarmed bank robbery nor armed bank robbery requires an *intentional* threat of force, nor does it require a threat of *violent* force.  As such, neither unarmed bank robbery nor armed bank robbery is a crime of violence under the force clause.

**a.  Neither Unarmed Bank Robbery Nor Armed Bank Robbery Requires the *Intentional* Use or Threatened Use of Force.**

The first reason bank robbery is categorically overbroad and cannot support a finding that a defendant's predicate offense is a crime of violence under the force clause is because the statute contains no requirement that a defendant have possessed any *mens rea* with respect to either his or her use of force and violence or intimidation, let alone that the defendant used force and violence or intimidation intentionally.

In *Carter v. United States*, 530 U.S. 255, 268 (2000), the Supreme Court held that bank robbery is a general intent crime.  That is, the defendant must have "possessed knowledge with respect to the *actus reus* of the crime."  *Id.*  As an example of a hypothetical defendant who should not be punished under the statute, the *Carter* Court wrote that "Section 2113(a) certainly should not be interpreted to apply to the hypothetical person who engages in forceful taking of money while sleepwalking[.]" *Id.* at 269.  Following *Carter*, courts have held that the *actus reus* of bank robbery is the taking of money and therefore, the statute requires a showing only that the defendant

9

"knew he was physically taking money."  *See United States v. Yockel*, 320 F.3d 818, 823 (8th Cir. 2003).  Whether the defendant took money via an intentional use of force and violence or intimidation is "irrelevant."  *Id.*; *see also United States v. Kelley*, 412 F.3d 1240, 1244 (11th Cir. 2005) ("[A] defendant can be convicted under section 2113(a) even if he did not intend for an act to be intimidating.").  Thus, in *Yockel*, the Eighth Circuit affirmed the district court's exclusion at trial of any evidence regarding whether the defendant intended to use force and violence or intimidation.  320 F.3d at 823.

      *Yockel* and *Kelley* are in accord with this Circuit's longstanding, pre-*Carter* case law which also holds that, at least in cases involving intimidation, whether a defendant "specifically intended to intimidate . . . is irrelevant."  *United States v. Foppe*, 993 F.2d 1444, 1451 (9th Cir. 1993).  This holding stems from the court's conclusion that the definition of taking, or attempting to take "'by intimidation' means willfully to take, or attempt to take, in such a way that would put an ordinary, reasonable person in fear of bodily harm."  *United States v. Alsop*, 479 F.2d 65, 67 n.4 (9th Cir. 1973).  Because this definition focuses on the effect of the accused's actions on the victim, "[t]he determination of whether there has been an intimidation should be guided by an objective test focusing on the accused's actions," *not* his or her intent.  *Id.*; *see also United States v. Woodrup*, 86 F.3d 359, 363 (4th Cir. 1996) ("The intimidation element of § 2113(a) is satisfied if 'an ordinary person in the [victim's] position reasonably could infer a threat of bodily harm from the defendant's acts,' whether or not the defendant actually intended the intimidation.").  Therefore, a defendant may be convicted of federal unarmed bank robbery even though he did not intend to put another in fear, but merely did some act that would put an ordinary, reasonable person in fear of bodily harm.  It makes no difference in the analysis that a defendant in an armed bank robbery case uses a dangerous weapon in the course of committing the offense: whether he intentionally used the weapon is simply not an element of the crime.  Therefore, a defendant may be convicted of armed bank robbery

10

even though he did not intend to put another in fear, but merely did some act involving a dangerous weapon that would put an ordinary, reasonable person in fear of bodily harm. *See United States v. Martinez-Jimenez*, 864 F.2d 664, 666-67 (9th Cir. 1989) (Section 2113(d) "focuses on the harms created, not the manner of creating the harm.").

As a statute must require the intentional use of force in order to match the definition of "use of force" in Section 924(c)'s force clause following *Leocal* and *Fernandez-Ruiz*, and because neither Section 2113(a) nor Section 2113(a), (d) requires any such showing, *Selfa*'s and *Wright*'s conclusions that bank robbery is a crime of violence under the force clause are no longer good law. *See Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc) ("[T]he issues decided by the higher court need not be identical in order to be controlling. Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable."). Following *Leocal* and *Fernandez-Ruiz*, federal bank robbery cannot be a crime of violence under the force clause.

### b.     Neither Unarmed Bank Robbery Nor Armed Bank Robbery Requires the Use or Threatened Use of *Violent* Force.

Moreover, neither unarmed bank robbery nor armed bank robbery requires the use or threat of *violent* physical force. Nothing in the term "intimidation" requires a threat of *violent* physical force. Intimidation is satisfied even where there is no explicit threat at all, let alone the threat of violent force. For example, a simple demand for money from a bank teller will support a bank robbery conviction. *See United States v. Hopkins*, 703 F.2d 1102, 1103 (9th Cir. 1983) ("Although the evidence showed that Hopkins spoke calmly, made no threats, and was clearly unarmed, we have previously held that 'express threats of bodily harm, threatening body motions, or the physical possibility of concealed weapon[s]' are not required for a conviction for bank robbery by intimidation." (quoting *United States v. Bingham*, 628 F.2d 548, 549 (9th

11

Cir.1980))).  But, as the Ninth Circuit recently held, an "uncommunicated willingness or readiness to use [physical] force . . . is not a threat to do so." *United States v. Parnell*, 14-30208 slip op. at 8-9 (9th Cir. April 12, 2016).  A threat of physical force, as would satisfy the force clause "requires some outward expression or indication of an intention to inflict pain, harm or punishment." *Id.*  Federal bank robbery has no such requirement.

Further, the Ninth Circuit's definition of intimidation does not require a showing of the use or threatened use of violent physical force because placing a person "in fear of bodily harm" does not necessarily require the use or threatened use of violent physical force.  On this matter, the Fourth Circuit has "recognized that, to constitute a predicate crime of violence justifying a sentencing enhancement under the Guidelines, a [predicate] offense must constitute a use or threatened use of violent force, not simply result in physical injury or death." *Torres-Miguel*, 701 F.3d at 169; *Accord United States v. Cruz-Rodriguez*, 625 F.3d 274, 276 (5th Cir. 2010); *Chrzanoski v. Ashcroft*, 327 F.3d 188, 194 (2d Cir. 2003) ("there is 'a difference between causation of an injury and in injury's causation by the "use of physical force"'"); *United States v. Perez-Vargas*, 414 F.3d 1282, 1287 (10th Cir. 2005); *Whyte v. Lynch*, 807 F.3d 463, 469-72 (1st Cir. 2015).  For example, a defendant could commit bank robbery through intimidation by threatening to poison the teller, but this would not constitute the threatened use of violent physical force, even though it would result in the teller being in fear of bodily harm. *Cf. Torres-Miguel*, 701 F.3d at 168-69 (holding that California's criminal threats statute does not constitute a crime of violence because "a defendant can violate statutes like § 422(a) by threatening to poison another, which involves no use or threatened use of force."); *Matter of Guzman-Polanco*, 26 I. & N. Dec. 713 (BIA 2016) ("Caesar's death at the hands of Brutus and his fellow conspirators was undoubtedly violent; the death of Hamlet's father at the hands of his brother, Claudius, by poison, was not.") (quoting *Rummel v. Estelle*, 445 U.S. 263, 282 n.27 (1980)).

12

With respect to the deadly weapon element of Section 2113(d), a defendant may be found guilty of armed bank robbery without engaging in conduct that involves the use or threat of violent physical force.  For example, a defendant's mere display of or reference to possession of a gun, without making any threat to use the gun, is sufficient to sustain a conviction under section 2113(d).  *See United States v. Jones*, 84 F.3d 1206, 1211 (9th Cir. 1996); *McLaughlin v. United States*, 476 U.S. 16, 17-18 (1986); *Martinez-Jimenez*, 864 F.2d at 666.

Moreover, a defendant may be convicted of armed bank robbery even though he displays or refers only to an unloaded or inoperable firearm, or even a toy resembling a firearm.  *See McLaughlin*, 476 U.S. 16, 17-18 (1986) (unloaded gun); *Martinez-Jimenez*, 864 F.2d at 666-67 (inoperable gun, toy gun); *see also United States v. Boyd*, 924 F.2d 945, 947-48 (9th Cir. 1991) (road flare qualifies as a dangerous weapon).  This conduct does not involve the use or threatened use of violent force.  In *McLaughlin*, the Supreme Court reasoned that an unloaded gun qualified as a dangerous weapon within the meaning of Section 2113(d) because "a gun is an article that is typically and characteristically dangerous . . . and the law reasonably may presume that such an article is always dangerous even though it may not be armed at a particular time or place" and because "the display of a gun instills fear in the average citizen; as a consequence, it creates an immediate danger that a violent response will ensue."  476 U.S. at 17-18.  In other words, the *McLaughlin* court concluded that a robber's use of an unloaded gun could be considered to put in danger another person's life not because the robber could actually use the gun or because the gun actually posed a threat of violence against anyone in the bank but merely because it was a reasonable position for the law to take that all guns are dangerous, since as a general matter guns often are dangerous.  The Court also concluded that a robber's use of an unloaded gun could put in danger another person's life not because the robber actually used or threatened to use the gun in a violent, active way but only because others who saw the gun might *themselves* react in a violent way.  In the words of the *Martinez-Jimenez* court, "[t]he

13

*McLaughlin* opinion recognizes that the dangerousness of a device used in a bank robbery is not simply a function of its potential to injure people directly.  Its dangerousness results from the greater burdens that it imposes upon victims and law enforcement officers."  864 F.3d at 666.  As these cases make clear, defendants can be, and indeed many have been, convicted of armed bank robbery without using or threatening to use violent force.

For these reasons, neither unarmed bank robbery nor armed bank robbery qualifies as a crime of violence under the force clause of Section 924(c).  The contrary holdings in *Selfa* and *Wright* are clearly irreconcilable with *Johnson I* and *Leocal*.  *See Miller*, 335 F.3d at 899-900.

## 2. Following *Johnson*, Neither Unarmed Bank Robbery Nor Armed Bank Robbery Qualifies as a Crime of Violence under the Residual Clause because that Clause Is Void for Vagueness.

Until *Johnson*, defendants like Mr. Day had little motivation to challenge *Selfa*'s and *Wright*'s force clause holdings, knowing that their bank robbery predicates would likely still be deemed crimes of violence under Section 924(c)'s residual clause.  Indeed, prior to *Johnson*, the Ninth Circuit had held that various state robbery crimes were crimes of violence under the residual clause of several crime-of-violence definitions.  *See, e.g., United States v. Prince*, 772 F.3d 1173, 1176 (9th Cir. 2014) (finding that California second degree robbery is a violent felony under the residual clause of ACCA, because it "certainly" is the kind of crime that presents a serious potential risk of physical injury to another); *United States v. Chandler*, 743 F.3d 648, 652-55 (9th Cir. 2014) (Nevada conspiracy to commit robbery is a violent felony under the residual clause), *remanded pursuant to Johnson*, 743 F.3d 648 (9th Cir. 2015); *see also United States v. McDougherty*, 920 F.2d 569, 574 & n.3 (9th Cir. 1990) ("Clearly then, robbery as defined in California falls under 18 U.S.C. 16(b) as a felony that 'by its nature, involves a substantial risk' that physical force may be used"; interpreting an earlier version of the career-offender residual clause, but stating that the "result . . .

14

would be no different" under the present version of the guideline). *Johnson*, however, removed this alternative ground of justifying Mr. Day's Section 924(c) sentence.

In *Johnson*, the Supreme Court declared the residual clause of the ACCA to be "unconstitutionally vague" because the "indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." *Johnson*, 135 S. Ct. at 2557. Thus, the Supreme Court concluded, "[i]ncreasing a defendant's sentence under the clause denies due process of law." *Id*. The Supreme Court held the residual clause "vague in all its applications," *id*. at 2561, and overruled its contrary decisions in *James v. United States*, 550 U.S. 192 (2007), and *Sykes v. United States*, 131 S. Ct. 2267 (2011). *Johnson*, 135 S. Ct. at 2562-63.

The holding in *Johnson* invalidating the residual clause of the ACCA applies equally to the residual clause of Section 924(c). In *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015), the Ninth Circuit held that the identically worded definition of a "crime of violence" in the Immigration and Nationality Act (INA), 8 U.S.C. § 1101(a)(43)(F), is unconstitutionally vague. *Dimaya*, 803 F.3d at 1111. The INA defines a "crime of violence" by reference to the definition in 18 U.S.C. Section 16(b). Section 16(b), like Section 924(c)(3), has a force clause and a residual clause—indeed, the provisions are identical. They each define "crime of violence" as:

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16; 18 U.S.C. § 924(c)(3).

15

1    Although the language of Section 16(b), as incorporated into the INA, is not

2    identical to that of ACCA's residual clause, the Ninth Circuit concluded that Section

3    16(b) suffered from the same constitutional defects identified in *Johnson*, and was

4    therefore unconstitutionally vague.  *Dimaya*, 803 F.3d at 1114-17; *see also United*

5    *States v. Vivas-Ceja*, 808 F.3d 719, 722-23 (7th Cir. 2015) (same).  Because both

6    statutes require a consideration of what kind of conduct the "ordinary case" of the

7    crime involves, and both statutes left uncertainty about the amount of risk required, the

8    Ninth Circuit reasoned that Section 16(b), like ACCA's residual clause, produced too

9    much unpredictability and arbitrariness to comport with due process.  *Dimaya*, 803

10   F.3d at 1116-17.

11   The same is true of the residual clause in Section 924(c)(3)(B), which the Ninth

12   Circuit has recognized is "identical" to Section 16(b)'s residual clause.  *See United*

13   *States v. Amparo*, 68 F.3d 1222, 1226 (9th Cir. 1995); *Delgado-Hernandez v. Holder*,

14   697 F.3d 1125, 1130 (9th Cir. 2012).  For interpretive purposes, the Ninth Circuit has

15   treated Section 16(b) as the "equivalent" of Section 924(c)(3).  *See United States v.*

16   *Mendez*, 992 F.2d 1488, 1492 (9th Cir. 1993); *Amparo*, 68 F.3d at 1226 (relying on

17   *United States v. Aragon*, 983 F.2d 1306 (4th Cir. 1993), a Section 16(b) case, to

18   interpret Section 924(c)(3)(B)).  At least three district courts have squarely held that

19   Section 924(c)(3)'s residual clause is unconstitutionally vague after *Johnson*.  *See*

20   *United States v. Lattanaphom*, __ F. Supp. 3d __, 2016 WL 393545, at *3-6 (E.D. Cal.

21   Feb. 1, 2016); *United States v. Bell*, 2016 WL 344749, at *12-13 (N.D. Cal. Jan. 28,

22   2016); *United States v. Edmunson*, __ F. Supp. 3d __, 2015 WL 9311983, at *3-5 (D.

23   Md. Dec. 30, 2015) (as amended).  This Court should likewise conclude that Section

24   924(c)(3)(B) is unconstitutionally vague and cannot be used to support Mr. Day's

25   Section 924(c) conviction and sentence.

26   Federal unarmed bank robbery and federal armed bank robbery categorically are

27   not crimes of violence under the force clause of Section 924(c).  And *Johnson*

28   eliminated the residual clause.  As such, that provision can no longer serve as an

16

alternative basis upon which to hold that Mr. Day's offense is a crime of violence.  In short, following *Johnson*, Mr. Day's underlying bank robbery offense is not a crime of violence for purposes of Section 924(c).[3]

## B.   Mr. Day Is Not a Career Offender Because Neither His Instant Conviction for Armed Bank Robbery Nor His Prior Conviction for Unarmed Bank Robbery Is a Crime of Violence Under *Johnson*.

Mr. Day's instant conviction for armed bank robbery and his 1995 conviction for unarmed bank robbery both contributed to the court's finding that he was a career offender.  (Ex. C, Sentencing Transcript, at 32-33; PSR ¶¶ 49; 71-75.)  Section 4B1.1 of the Sentencing Guidelines provides for enhanced guidelines ranges where (1) the defendant is 18 years or older at the time of the instant offense, (2) the instant offense is a felony "crime of violence" or "controlled substance offense," and (3) the defendant has at least two prior felony convictions of either a "crime of violence" or a "controlled substance offense."  See USSG § 4B1.1(a).  As set out in the career offender guideline, the term "crime of violence" is defined as:

> [A]ny offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—

---

[3] It should be noted that bank robbery is indivisible as between "force and violence" and "intimidation" because these are merely different means by which a defendant can commit the offense.  More specifically, the jury is not called upon to parse out and unanimously agree whether the taking was (a) by force and violence or (b) by intimidation.  *See United States v. Wright*, 215 F.3d 1020, 1028 (9th Cir. 2000) ("[O]ne of the elements of the offense is a taking 'by force and violence, or by intimidation.'" (quoting § 2113(a))); *United States v. Alsop*, 479 F.2d 65, 66 (9th Cir. 1973) ("That the statute and the indictment use the disjunctive phrase 'by force and violence, or by intimidation' does not mean the indictment is duplicitous.  Only one offense was charged." (citation omitted)); *see also* Ninth Cir. Model Criminal Jury Instructions § 8.162 (2015) (stating the elements of bank robbery, which include using "force and violence or intimidation").  Because the statute is indivisible as to this required element, the modified categorical approach is inapplicable.  *See Descamps*, 133 S. Ct. 2276 (2013); *United States v. Werle*, __ F.3d __, 2016 WL 828132, *4 (9th Cir. Mar. 3, 2016) ("If a statute is overinclusive and indivisible as to any required element, the modified categorical approach cannot be applied to that statute.").

(1)   has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(2)   is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2(a). As used in this section of the brief, subsection (1) is called the "force clause"; subsection (2)'s list of offenses is called the "enumerated offenses clause," and the remainder of subsection (2) is called the "residual clause."

### 1. Neither Unarmed Bank Robbery Nor Armed Bank Robbery Is a Crime of Violence Under the Residual Clause following *Johnson*, and Neither Satisfies the Force Clause.

For the reasons just articulated in connection with the Section 924(c) argument, Mr. Day's instant conviction for armed bank robbery and his prior conviction for unarmed bank robbery cannot serve as career-offender predicates either. Specifically, following *Johnson*, the residual clause of the career offender guideline is unconstitutionally vague. *See supra*, Part III.A.2.; *United States v. Benavides*, 617 Fed. App'x 790 (9th Cir. 2015) (vacating and remanding for resentencing in light of government's concession that *Johnson* applies to the residual clause in the guidelines); *see also, e.g.*, *United States v. Terrell*, 593 F.3d 1084, 1087 n.1 (9th Cir. 2010) (internal citations omitted) (stating that the ACCA's "violent felony" definition is "nearly identical" to section 4B1.2 and that the decision's ACCA analysis "applies equally to § 4B1.2"); *United States v. Crews*, 621 F.3d 849, 852 n.4 (9th Cir. 2010) ("In the past we have made no distinction between the terms 'violent felony' and 'crime of violence' for purposes of interpreting the residual clause . . ."). And neither unarmed nor armed bank robbery satisfies the force clause because neither requires the intentional use of violent force. *See supra*, Part III.A.1.

**2.** **The Excision of the Residual Clause Takes with It the Commentary Offense of Robbery, which Only Served to Interpret the Residual Clause.**

The career offender designation in Mr. Day's case cannot be salvaged under the commentary either.  The application notes contained in the commentary to section 4B1.2 include a separate list of offenses that the application notes state qualify as crimes of violence.  Among those offenses is "robbery."  See U.S.S.G. § 4B1.2 cmt. n.1.  With the excision of the residual clause from the career offender provision, however, the offenses listed only in the commentary to the guideline are no longer of any effect either, because they only possibly interpreted the residual clause.

The Sentencing Reform Act of 1984 created the Sentencing Commission and authorized it to create "guidelines . . . for use of a sentencing court in determining the sentence to be imposed in a criminal case."  28 U.S.C. § 994(a)(1).  Those guidelines are submitted to Congress in advance, *id.* § 994(p), making the Sentencing Commission "fully accountable to Congress."  *See Mistretta v. United States*, 488 U.S. 361, 393-94 (1989) (upholding the Sentencing Commission against a separation of powers challenge on this ground).

Commentary, on the other hand, does not receive the same treatment as the guidelines.  The Sentencing Reform Act does not explicitly authorize the creation of commentary. 28 U.S.C. § 994(a) (authorizing "guidelines" and "policy statements"); *see also Stinson v. United States*, 508 U.S. 36, 41 (1993).  Nor does the Sentencing Reform Act require that commentary be submitted to Congress for approval.  *See* 28 US.C. § 994(p) (requiring only that amendments to guidelines be submitted to Congress); *Stinson*, 508 U.S. at 46 (commentary "is not reviewed by Congress").  And the Sentencing Commission itself has relegated commentary to a secondary, interpretative role.  *See* U.S.S.G. § 1B1.7 (explaining that the purpose of the commentary is to "interpret [a] guideline or explain how it is to be applied"); *United States v. Anderson*, 942 F.2d 606, 611 (9th Cir. 1991), *abrogated on other grounds by*

19

*Stinson v. United States*, 508 U.S. 36 (1993) (noting the Sentencing Commission's belief that commentary "is an aid to correct interpretation of the guidelines, not a guideline itself or on a par with the guidelines themselves"). Where commentary assists and amplifies the text of the guideline – and where the text of the guideline "will bear the construction" the commentary offers – the commentary's interpretation of the guideline is binding. *Stinson*, 508 U.S. at 46. But where commentary runs afoul of the Constitution or a federal statute or where it is "plainly erroneous or inconsistent" with the guideline it interprets, it is the text of the guideline, not the commentary, that must control. *Id.* at 45-47; *United States v. Landa*, 642 F.3d 833, 836 (9th Cir. 2011) (stating if there is a potential conflict between the text and the commentary, the text controls).

Because commentary is solely an interpretative aid, it "does not have freestanding definitional power" and only has force insofar as it interprets or explains a guideline's text. *United States v. Leshen*, 453 Fed. App'x 408, 413-15 (4th Cir. 2011) (unpublished) (finding that prior state sex offenses did not qualify as crimes of violence, despite government argument that offenses fell within the commentary); *accord United States v. Shell*, 789 F.3d 335, 340-41 (4th Cir. 2015) ("[The government skips past the text of § 4B1.2 to focus on its commentary," but "it is the text, of course, that takes precedence."). It follows that, if a portion of a guideline is excised, the commentary that interpreted that portion of the guideline must go as well. Vestigial commentary without a textual hook must be deemed "inconsistent" with the text under *Stinson*, because its only "functional purpose" was to "assist in the interpretation and application" of a rule no longer exists. *Stinson*, 508 U.S. at 45.

The only question that remains, then, is whether the term "robbery" in the commentary interpreted the residual clause or whether it interpreted some portion of the definition that remains intact. As a general matter, the offenses enumerated in the commentary could only have been interpreting the residual clause; time and again, the Ninth Circuit has held that the state offenses most closely related to those commentary offenses do not require the use of force. *E.g.*, *Quijada-Aguilar v. Lynch*, 799 F.3d

20

1303, 1306-07 (9th Cir. 2015) (California voluntary manslaughter does not have an element of the use of force); *Delgado-Hernandez v. Holder*, 697 F.3d 1125, 1127 (9th Cir. 2012) (California kidnapping does not require an element of force); *United States v. Williams*, 110 F.3d 50, 52 (9th Cir. 1997) (Oregon kidnapping does not require an element of use of force); *see also James v. United States*, 550 U.S. 192, 206 (2007) (holding that attempt was appropriately included in the commentary enumerated offenses, "based on the Commission's review of empirical sentencing data [which] presumably reflects an assessment that attempt crimes often pose a similar risk of injury as completed offenses"). It cannot be said, then, that the commentary offenses are there to "assist in the interpretation of" the force clause—the inclusion of those offenses is quite inconsistent with the text of the force clause.

Of all of the offenses listed in the commentary, robbery has perhaps the strongest tie to the residual clause. The Ninth Circuit's generic definition of robbery is tied to the risk of harm to the person, not to any element of force. *United States v. Becerril-Lopez*, 541 F.3d 881, 891 (9th Cir. 2008) (defining generic robbery as "aggravated larceny, containing at least the elements of misappropriation of property under circumstances *involving immediate danger to the person*") (emphasis added); *see also Leshen*, 453 Fed. Appx. at 415 (noting that the generic term "robbery" in the commentary interpreted the residual clause of the career offender guideline). Indeed, as noted, Ninth Circuit precedents have generally tied state robbery statutes to the residual clause of various crime-of-violence definitions. *Prince*, 772 F.3d at 1176 (finding that California second degree robbery is a violent felony under the residual clause of the Armed Career Criminal Act, because it "certainly" is the kind of crime that presents a serious potential risk of physical injury to another); *Chandler*, 743 F.3d at 652-55 (Nevada conspiracy to commit robbery is a violent felony under the residual clause), *remanded pursuant to Johnson*, 743 F.3d 648 (9th Cir. 2015); *see also McDougherty*, 920 F.2d at 574 & n.3 ("Clearly then, robbery as defined in California falls under 18 U.S.C. 16(b) as a felony that 'by its nature, involves a substantial risk' that physical force may be used";

21

interpreting an earlier version of the career-offender residual clause, but stating that the "result . . . would be no different" under the present version of the guideline).

On the flip side, it is equally clear that the majority of Ninth Circuit state robbery statutes are not crimes of violence under the force clause.  *See Dixon*, 805 F.3d at 1197 (California robbery does not satisfy the force clause); *United States v. Alvarado-Pineda*, 774 F.3d 1198 (9th Cir. 2014) (suggesting, without deciding, that Washington robbery might not be a crime of violence under the similarly worded force clause of 18 U.S.C. § 16(a), because the statute required "any force or threat, no matter how slight"); *United States v. Dunlap*, ___ F. Supp. 3d ___, 2016 WL 591757, at *4-6 (D. Or. 2016) (Oregon robbery is not a crime of violence under the force clause).

Against this background, it is clear that the commentary's reference to robbery could only have interpreted the residual clause, i.e., as an example of a type of crime that entails "a serious potential risk of physical injury to another."  With the residual clause excised from the guideline, the commentary no longer serves to interpret or amplify any provision of the remaining text, but, instead, is a contrary and plainly erroneous interpretation of what remains.  Once the residual clause is gone, the commentary offenses—and especially robbery—must go as well.

The First Circuit has already reached this conclusion post-*Johnson*, holding that the list of enumerated offenses contained in the guidelines commentary was interpreting only the residual clause, and that post-*Johnson*, such commentary is no longer of any effect.  As the Court stated, "once shorn of the residual clause § 4B1.2(a) sets forth a limited universe of specific offenses that qualify as a 'crime of violence.' There is simply no mechanism or textual hook in the Guideline that allows us to import offenses not specifically listed therein into 4B1.2(a)'s definition of 'crime of violence.'"  *See United States v. Soto-Rivera*, 811 F.3d 53, 60 (1st Cir. 2016).  This holding is in line with the interpretation many Circuits had given to the career-offender commentary even before *Johnson*.  *See Shell*, 789 F.3d at 345 (finding that a state statute that did not meet the requirements of the *text* of § 4B1.2 could not be saved on

the grounds that it might fall under one of the commentary's list of offenses, noting that the commentary serves "only to amplify that definition, and any inconsistency between the two [must be] resolved in favor of the text") (citing *Stinson*, 508 U.S. at 43); *United States v. Armijo*, 651 F.3d 1226, 1234-37 (10th Cir. 2011) (rejecting the government's argument that Colorado manslaughter qualifies as a crime of violence simply because it is listed in the commentary and need not qualify under the definitions set out in the text; "[t]o read application note 1 as encompassing non-intentional crimes would render it utterly inconsistent with the language of § 4B1.2(a)"); *see also United States v. Serna*, 309 F.3d 859, 862 & n.6 (5th Cir. 2002) (possession of a sawed-off shotgun, while listed in the commentary, must satisfy one of the definitions in the text). This Court should do so as well.

Neither unarmed bank robbery or armed bank robbery is categorically a crime of violence under any provision of the text of Section 4B1.2, and commentary cannot be used to expand the definition of crime of violence beyond what the text will bear. As such, it cannot serve as an alternative basis to hold that Mr. Day's convictions are crimes of violence.  In short, neither Mr. Day's instant conviction under 18 U.S.C. § 2113(a), (d) nor his 1995 conviction under 18 U.S.C. § 2113(a) is a crime of violence for career offender purposes. Mr. Day must be resentenced without the career offender designation.

1

## IV.  CONCLUSION

2

3
        For the reasons set forth above, Mr. Day's sentence was "imposed in violation of

4
the Constitution or laws of the United States," and is "in excess of the maximum

5
authorized by law."  Mr. Day is entitled to Section 2255 relief and should be

6
resentenced under the non-career-offender guideline and without a mandatory

7
consecutive sentence for a violation of Section 924(c).

8

9                                          Respectfully submitted,

10                                          HILARY POTASHNER
                                           Federal Public Defender

11

12

13
DATED: May 18, 2016          By  /s/ Brianna Fuller Mircheff
                                           BRIANNA FULLER MIRCHEFF
                                           Deputy Federal Public Defender

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 1998 Grand Jury

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 99- 123 _____ |
| Plaintiff, | ) | I N D I C T M E N T |
| v. | ) | [18 U.S.C. § 371: Conspiracy to Commit Bank Robbery; 18 U.S.C. § 2113(a)(d): Armed Bank Robbery; 18 U.S.C. § 924(c): Use of Firearm During Crime of Violence] |
| BRUCE EDWARD BELL and MONTEZ DAY, | ) | |
| Defendants. | ) | |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 371]

A.   OBJECT OF THE CONSPIRACY

Beginning on or before January 22, 1999, and continuing to on or about January 26, 1999, in Los Angeles County, within the Central District of California, defendants BRUCE EDWARD BELL and MONTEZ DAY, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit a bank robbery of Home Savings of America, 301 South Maclay Street, San Fernando, California, in violation of Title 18, United States Code, Section 2113(a).

AB:ab AB

B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
     ACCOMPLISHED

     The object of the conspiracy was to be accomplished in
substance as follows:

     1.   Defendants BELL and DAY would obtain a stolen van to
use as a preliminary getaway vehicle from the robbery.

     2.   Defendants BELL and DAY would park a legally owned Ford
Expedition at a distance from Home Savings of America for use as
a secondary getaway vehicle from the robbery.

     3.   Defendants BELL and DAY would drive to Home Savings of
America in the stolen getaway van.

     4.   Defendants BELL and DAY would enter Home Savings of
America brandishing handguns and would order the employees and
customers inside to get down on the floor.

     5.   Defendants BELL and DAY would order the manager of Home
Savings of America to open the bank vault.

     6.   Defendants BELL and DAY would flee from Home Savings of
America in the stolen van.

     7.   Defendants BELL and DAY would switch from the stolen
van to the Ford Expedition out of sight of Home Savings of
America.

     8.   Defendants BELL and DAY would drive the Ford Expedition
to a safe place, where they would divide the money stolen from
Home Savings of America.

C.   OVERT ACTS

     In furtherance of the conspiracy and to accomplish the
object of the conspiracy, on or about January 26, 1999,
defendants BELL and DAY, and others known and unknown to the

                                    2

1  Grand Jury, committed various overt acts within the Central

2  District of California, including but not limited to the

3  following:

4      1.   Defendants BELL and DAY drove a stolen getaway van to

5  Home Savings of America.

6      2.   Defendants BELL and DAY entered Home Savings of America

7  wearing masks and gloves, and brandishing a revolver and a

8  semiautomatic handgun.

9      3.   Defendants BELL and DAY forced the employees of Home

10 Savings of America to open the vault and give defendants $85,600

11 in cash.

12     4.   One of the defendants told Home Savings of America

13 assistant manager Elizabeth Aguillon that she would be sorry if

14 she put a dye pack in with the stolen money because he and the

15 other defendant were going to take her with them when they left.

16     5.   One of the defendants stopped assistant manager

17 Elizabeth Aguillon from exiting Home Savings of America by

18 grabbing her by her hair and pulling her back.

19     6.   Defendants BELL and DAY fled Home Savings of America in

20 the stolen getaway van.

21     7.   Defendants BELL and DAY switched getaway vehicles from

22 the stolen van to a Ford Expedition.

23     8.   Defendant DAY drove the Ford Expedition at high speeds

24 to evade the police, striking other vehicles while doing so.

25     9.   Defendant BELL threw the revolver out the window of the

26 Ford Expedition during the flight from the police.

27     10.  Defendant DAY stopped the Ford Expedition at a mall so

28 that defendants could hide themselves from the view of a police

helicopter and pursuing police officers by mixing in with the
customers inside the mall.

COUNT TWO

[18 U.S.C. § 2113(a)(d)]

On or about January 26, 1999, in Los Angeles County, within the Central District of California, defendants BRUCE EDWARD BELL and MONTEZ DAY, by force, violence, and intimidation, knowingly took from the person or presence of another approximately $85,600 belonging to and in the care, custody, control, management, and possession of Home Savings of America, 301 South Maclay Street, San Fernando, California, a savings and loan association the deposits of which were then insured by the Federal Deposit Insurance Corporation.

In committing said offense, defendants BELL and DAY assaulted and put in jeopardy the life of victim assistant manager Elizabeth Aguillon and others by using a handgun, a dangerous weapon and device.

COUNT THREE

[18 U.S.C. § 924(c)]

On or about January 26, 1999, in Los Angeles County, within the Central District of California, defendants BRUCE EDWARD BELL and MONTEZ DAY knowingly used and carried a firearm, namely, a loaded .38 caliber revolver, during and in relation to a crime of violence, namely, robbery of Home Savings of America, 301 South Maclay Street, San Fernando, California, in violation of Title 18, United States Code, Section 2113(a), by brandishing the pistol at the employees and customers of Home Savings of America.

A TRUE BILL

_____
Foreperson

ALEJANDRO N. MAYORKAS
United States Attorney

GEORGE S. CARDONA
Assistant United States Attorney
Chief, Criminal Division

GREGORY W. JESSNER
Assistant United States Attorney
Chief, Criminal Complaints

SHARON MCCASLIN
Assistant United States Attorney
Deputy Chief, Criminal Complaints

6

# EXHIBIT B

1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

THE HONORABLE A. HOWARD MATZ, JUDGE PRESIDING

- - -

------------------------------
UNITED STATES OF AMERICA,      )
                  PLAINTIFF,   )
          -v-                  )     CASE NO. CR 99-123-AHM
BRUCE BELL,                    )
              DEFENDANT.       )
------------------------------

COPY

REPORTER'S TRANSCRIPT OF PROCEEDINGS
LOS ANGELES, CALIFORNIA
FRIDAY, MAY 14, 1999

LYNNE SMITH
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
312 NORTH SPRING STREET, #430
LOS ANGELES, CALIFORNIA  90012

2

APPEARANCES:

    ON BEHALF OF PLAINTIFF:
ALEJANDRO MAYORKAS
UNITED STATES ATTORNEY
BY:  ANDREW BROWN
ASSISTANT UNITED STATES ATTORNEY
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA     90012


    ON BEHALF OF DEFENDANT:
BRIAN NEWMAN
400 CORPORATE POINTE, #805
CULVER CITY, CALIFORNIA  90230

3

1              FRIDAY, MAY 14, 1999; LOS ANGELES, CALIFORNIA

2                             -o0o-

3          THE CLERK:  Item 1, CR 99-123-AHM, U.S.A. versus Bruce

4   Bell and Montez Day.

5          Appearances, counsel.

6          MR. BROWN:  Good afternoon, Your Honor.  Andrew Brown

7   for the government.

8          MR. NEWMAN:  Good afternoon, Your Honor.  Brian Newman

9   for Bruce Bell.  And I do apologize for being late.

10         THE COURT:  You had an important event, one of your

11  kids had a social event at school?

12         MR. NEWMAN:  Yes, Your Honor.

13         THE COURT:  That's very important.

14         MR. NEWMAN:  It is.  It's something that we do as a

15  support group for the school a couple times a year and it's

16  something that I'm active in.

17         THE COURT:  How old is this child?

18         MR. NEWMAN:  Eight.

19         THE COURT:  That's priority.  Unless there are

20  compelling circumstances, I understand why.  No problem.

21         MR. MAYOCK:  Good afternoon, Your Honor.  Michael

22  Mayock with Mr. Montez Day.

23         THE COURT:  Nice to see you Mr. Mayock.  We were

24  colleagues in the U.S. attorney's office.  You should know that.

25  We're here for a change of plea to a single indictment in which

20

4

1    Mr. Bell and Mr. Day are both named as defendants; is that

2    correct?

3              MR. NEWMAN:  Correct.

4              MR. MAYOCK:  Correct, Your Honor.

5              THE COURT:  Is there a plea agreement for one but not

6    for the other?

7              MR. BROWN:  Yes, Your Honor.

8              THE COURT:  Is there any reason there can't be

9    reference to that agreement?

10             MR. BROWN:  No, Your Honor.

11             THE COURT:  The plea agreement for Mr. Bell refers to

12   Counts 2 and 3.  To which count or counts is Mr. Day intending

13   to change his plea?

14             MR. BROWN:  One, two and three.

15             THE COURT:  All three.  Is that correct, all three?

16             MR. BROWN:  Yes, Your Honor.

17             THE COURT:  Okay.  Let me address my remarks to Mr. Day

18   and Mr. Bell for a second.  This procedure of changing a plea

19   and entering a guilty plea is elaborate.  Certain things have to

20   be dealt with.  A certain format has to be followed.  I'm going

21   to explain it.

22             I need your cooperation and I need your careful

23   attention.  I will be asking each of you a number of questions.

24   But at some point in the proceedings I will be telling both of

25   you the identical thing such as what rights you have that you

1     will be giving up.

2             To save time I will say certain things once that apply

3     to both and then I will ask each of you separately whether you

4     enter that plea.  If either of you, once you talk to your

5     respective lawyers or raise a question with me or otherwise

6     pause in what we're doing, just let me know and you will have a

7     right to do that.  But otherwise work with me.  Please be very

8     attentive because I want to make sure you know what you're doing

9     and the consequences to you of what you are planning to do.

10            Is that understood by both of you?  Mr. Bell?

11            DEFENDANT BELL:  Right.

12            THE COURT:  Mr. Day?

13            DEFENDANT DAY:  Yes, Your Honor.

14            THE COURT:  The first thing to remember is that you can

15    change your mind before we get to the finish line.  And by the

16    finish line, I don't mean to minimize the importance of what

17    we're doing with these changes of plea being accepted and

18    entered.  Once that happens there is no going back on that.  You

19    will be found guilty and what will remain will be sentencing

20    basically.  So until we get there, you have a right to change

21    your mind.  But it may be something that you have already

22    committed to do and that's fine also.

23            At the outset I'm going to ask the clerk to swear each

24    of you in.  She'll ask you preliminary questions and then I will

25    turn to the questions and the advice of rights that I will be

6

1     giving to each of you.

2                THE CLERK:  Mr. Bell, is Bruce Bell your true and full

3     name?

4                DEFENDANT BELL:  Yes, it is.

5                THE CLERK:  It has been indicated that you wish to

6     withdraw your previously entered pleas of not guilty to Counts 2

7     and 3 of the indictment and tender a different plea.  Do you now

8     withdraw your previously entered plea of not guilty to Counts 2

9     and 3 of the indictment?

10               DEFENDANT BELL:  Yes.

11               THE CLERK:  How do you now plead to the indictment

12    filed against you, guilty or not guilty?

13               DEFENDANT BELL:  Guilty.

14               THE CLERK:  How do you now plead to Count 3 of the

15    indictment, guilty or not guilty?

16               DEFENDANT BELL:  Guilty.

17               THE CLERK:  Mr. Day, is Montez Day your true and full

18    name?

19               THE DEFENDANT:  Yes.

20               THE CLERK:  It has been indicated that you wish to

21    withdraw your previously entered pleas of not guilty to Counts

22    1, 2 and 3 of the indictment and enter a different plea.  Do you

23    now withdraw your previously entered plea of not guilty to

24    Counts 1, 2 and 3 of the indictment?

25               DEFENDANT DAY:  Yes.

1          THE CLERK:   How do you now plead to Count 1 of the

2    indictment filed against you, guilty or not guilty?

3          DEFENDANT DAY:   Guilty.

4          THE CLERK:   How do you now plead to Count 2, guilty or

5    not guilty?

6          DEFENDANT DAY:   Guilty.

7          THE CLERK:   How do you now plead to Count 3, guilty or

8    not guilty?

9          DEFENDANT DAY:   Guilty.

10         THE CLERK:   The court will ask you the nature of your

11   pleas under oath.   Would each of you please raise your right

12   hand to be sworn.

13          (DEFENDANTS SWORN)

14         THE COURT:   Okay.   Let me start with you, Mr. Bell.

15   Tell me how you're feeling right now.

16         DEFENDANT BELL:   How do I feel?   I feel all right.

17         THE COURT:   Are you dealing with any physical or

18   emotional illnesses or conditions that might affect your ability

19   to make a decision, a sensibly formed decision?

20         DEFENDANT DAY:   No.

21         THE COURT:   Are you under any treatment for any

22   condition today?

23         DEFENDANT BELL:   No, I'm not.

24         THE COURT:   Any illness?

25         DEFENDANT BELL:   No.

8

1          THE COURT:  Have you taken any medicines or drugs

2     today?

3          DEFENDANT BELL:  No.

4          THE COURT:  Alcoholic beverages?

5          DEFENDANT BELL:  No.

6          THE COURT:  Are you currently under any doctor's care?

7          DEFENDANT BELL:  No.

8          THE COURT:  Tell me please what your age is.

9          DEFENDANT BELL:  46.

10         THE COURT:  And your level of education?

11         DEFENDANT BELL:  High school.

12         THE COURT:  High school?

13         DEFENDANT BELL:  Yes.

14         THE COURT:  Did you finish?

15         THE DEFENDANT:  I got a G.E.D.

16         THE COURT:  Have you been under psychiatric care of any

17    kind?

18         DEFENDANT BELL:  No, I haven't.

19         THE COURT:  Are you a citizen of the United States?

20         DEFENDANT BELL:  Yes.

21         THE COURT:  Okay.  Now I'm going to ask the same

22    questions to you, Mr. Day.  Then I will turn to some things that

23    apply to both of you.

24         How are you feeling today?

25         DEFENDANT DAY:  I'm feeling okay.

9

1          THE COURT:  Have you taken any medicines or drugs

2   today?

3          DEFENDANT BELL:  No.

4          THE COURT:  Any alcoholic beverages or any other kind

5   of drug?

6          DEFENDANT DAY:  No, sir.

7          THE COURT:  Are you under any doctor's care today?

8          DEFENDANT DAY:  No, sir.

9          THE COURT:  Please tell me your age.

10         DEFENDANT DAY:  28.

11         THE COURT:  And your level of education?

12         DEFENDANT DAY:  G.E.D., pre-college.

13         THE COURT:  Have you been under any psychiatric or

14  psychological care?

15         DEFENDANT DAY:  Yes.

16         THE COURT:  Are you currently receiving psychological

17  or psychiatric care?

18         DEFENDANT DAY:  No.

19         THE COURT:  Do you feel you're in condition and a

20  position today to understand what is going on?

21         DEFENDANT DAY:  Yes.

22         THE COURT:  Are you also a citizen of the United

23  States?

24         DEFENDANT DAY:  Yes.

25         THE COURT:  Okay.  Mr. Bell, did you receive a copy of

10

1    the indictment?

2           DEFENDANT BELL:  Yes, I have.

3           THE COURT:  Did you also, Mr. Day?

4           DEFENDANT DAY:  Yes, sir.

5           THE COURT:  Mr. Bell, did you read it?

6           DEFENDANT BELL:  Yes.

7           THE COURT:  Did you read it, Mr. Day?

8           DEFENDANT DAY:  I did, yes.

9           THE COURT:  Okay.  Do you each believe that you

10   understand the charges that are in that indictment?  First you,

11   Mr. Bell.

12          DEFENDANT BELL:  Yes.

13          THE COURT:  Mr. Day?

14          DEFENDANT DAY:  Yes.

15          THE COURT:  Let me tell you now collectively, jointly,

16   each of you, certain things which I think you already know and

17   in the case of Mr. Bell which are actually placed in writing in

18   the plea agreement.  These are rights that you will be giving

19   up.  They were mentioned I think in the arraignment when you

20   were first arraigned on these charges.  But it's important that

21   you understand these are your rights.

22          By pleading guilty, with the exception of the right to

23   counsel, you will be giving up these rights.  Each time I

24   mention a right, I will ask you in turn whether you wish to give

25   it up.  So let me begin.

11

1          You each have a constitutional right to a speedy and

2    public trial by jury.  Do you wish to give up that right,

3    Mr. Bell?

4          DEFENDANT BELL:  Yes.

5          THE COURT:  Do you, Mr. Day?

6          DEFENDANT DAY:  Yes.

7          THE COURT:  You each have a right to be presumed

8    innocent and to have the burden shifted to the government to

9    prove you guilty beyond a reasonable doubt.  Neither of you has

10   to prove yourself innocent.  The burden is always upon the

11   government.

12          Do you wish to give up that right, Mr. Bell?

13          DEFENDANT BELL:  Yes.

14          THE COURT:  Mr. Day?

15          DEFENDANT DAY:  Yes.

16          THE COURT:  Each of you, if you went to trial, would

17   have the right to see and examine the evidence and to

18   cross-examine the witnesses.  Do you wish to give up that right,

19   Mr. Bell?

20          DEFENDANT BELL:  Yes.

21          THE COURT:  Do you, Mr. Day?

22          DEFENDANT DAY:  Yes.

23          THE COURT:  At all times you would have the right

24   against self incrimination.  And as I think you undoubtedly

25   know, that means the right to refuse to testify.  No one can

12

1  compel you to give information that may hurt you.  You could

2  always remain silent.  Do you wish to give up that right?

3          DEFENDANT BELL:  Yes.

4          THE COURT:  Do you, Mr. Day?

5          DEFENDANT DAY:  Yes.

6          THE COURT:  The other side of the coin is true also.

7  If you do take the case to trial, each of you could choose to

8  testify, go up to the witness stand and give your versions of

9  the facts and ask the jury to accept your view.  Do you wish to

10 give up that right, Mr. Bell?

11         DEFENDANT BELL:  Yes.

12         THE COURT:  Do you, Mr. Day?

13         DEFENDANT DAY:  Yes, sir.

14         THE COURT:  You could also, if the case went to trial,

15 use the subpoena power of the court to compel other witnesses to

16 come to court and if they were in a position to do so, to

17 testify on your behalf.  Did you wish to give up that right,

18 Mr. Bell?

19         DEFENDANT BELL:  Yes.

20         THE COURT:  Do you, Mr. Day?

21         DEFENDANT DAY:  Yes.

22         THE COURT:  If you took the case to trial and were

23 found guilty, you could appeal the verdict of guilt.  But if you

24 plead guilty, you won't be able to do that.  Do you understand

25 that?

13

1      DEFENDANT BELL:  Yes.

2      THE COURT:  Are you willing to give up that right?

3      DEFENDANT BELL:  Yes.

4      THE COURT:  And you, Mr. Day?

5      DEFENDANT DAY:  Yes.

6      THE COURT:  Each of you will continue to have the right

7  to counsel and if you can't afford counsel to have counsel

8  appointed at the public's expense to continue to represent you.

9      Mr. Newman, is it your intention to continue to

10  represent Mr. Bell?

11      MR. NEWMAN:  It is, Your Honor.

12      THE COURT:  Mr. Mayock?

13      MR. MAYOCK:  Yes, Your Honor.

14      THE COURT:  Okay.  Those are rights that neither of you

15  will lose.  Until the completion of this case and through the

16  point of sentencing, each of you will continue to enjoy that

17  right to effective counsel.

18      Now both of you being citizens, and I don't know

19  anything about your background so some of this may apply, maybe

20  not, but I want you to understand by pleading guilty to those

21  charges you are more likely than not going to lose certain civil

22  rights that citizens otherwise enjoy:  The right to vote, the

23  right to run for public office, the right to serve on a jury,

24  the right to purchase and possess firearms.  You will be giving

25  up all those rights.

30

14

1       Do you wish to do that, Mr. Bell?

2       DEFENDANT BELL:  Yes.

3       THE COURT:  Do you, Mr. Day?

4       DEFENDANT DAY:  Yes.

5       THE COURT:  Does either of you have any questions about

6  the rights that I just spelled out for you?

7       DEFENDANT BELL:  No, sir.

8       DEFENDANT DAY:  No, sir.

9       THE COURT:  Do you understand, Mr. Bell, that each of

10  the two counts to which you're pleading guilty is a felony,

11  separate felony?

12       DEFENDANT BELL:  Yes.

13       THE COURT:  All the three counts you're pleading guilty

14  to, Mr. Day, those are felonies too.  Do you understand that?

15       DEFENDANT DAY:  Yes.

16       THE COURT:  Okay.  Now I'm going to ask that Mr. Brown

17  set forth first the elements of these offenses.  I'm going to

18  summarize the offenses as paraphrased in the indictment.  I'm

19  going to ask Mr. Brown to summarize what the elements are, what

20  the government would have to prove.

21       I will ask him to do it for all three counts.  And then

22  I will address each of you.  Then I will go back to you, Mr.

23  Brown, and ask you to summarize what the evidence would be,

24  first against Mr. Bell and then against Mr. Day.

25       Now the indictment in case Number 99-123 is only a

15

1    single indictment.  It wasn't superseding, was it?

2         MR. BROWN:  That's correct, Your Honor.

3         THE COURT:  Okay.  In Count 1 the indictment alleges

4    violation of 18 USC Section 371, conspiracy to commit a bank

5    robbery.  This is particularly applicable to you, Mr. Day,

6    because you're pleading guilty to that count.

7         It says beginning on or before January 22 of this year,

8    1999, and continuing to on or about January 26 of '99, both you

9    and Mr. Bell and others known and unknown to the grand jury

10   conspired and agreed with each other to commit a bank robbery of

11   Home Savings in San Fernando, California.

12        On Page 2 it describes the means by which this

13   agreement, this conspiracy was to be accomplished and it sets

14   forth eight ways in which the object of the conspiracy was to be

15   accomplished.  It claims that both defendants would obtain a

16   stolen van to use as a preliminary getaway vehicle; that both

17   defendants would park illegally a Ford Expedition a distance

18   from Home Savings for use as a secondary getaway vehicle.

19        That both defendants would drive to Home Savings in the

20   stolen van.  They would enter Home Savings brandishing guns,

21   handguns, would order the employees and customers inside to get

22   down on the floor.  Both defendants would order the manager of

23   Home Savings to open the bank vault and then they would flee

24   from Home Savings in a stolen van.  After that it's alleged that

25   both defendants would switch from the stolen van to the Ford

16

1    Expedition and drive the Ford Expedition to a safe place and

2    divide the money.

3         The first counts also alleges that they commit various

4    fraudulent and overt acts to carry out this plan.  And they

5    include driving a stolen getaway van to Home Savings.  That's

6    something that's alleged as to both defendants.  Both defendants

7    entering the bank wearing masks and hand gloves and brandishing

8    a revolver, semi-automatic handgun.  Both defendants forced the

9    employees to open the vault and give them over $85,000.

10        And I'm going to focus on the ones you're specifically

11   mentioned in Mr. Bell -- excuse me, Mr. Day.  Both defendants

12   fled Home Savings in the stolen getaway van.  One of the

13   defendants --  actually I should mention this -- told by the

14   assistant manager that she was sorry she put a dye pack in with

15   the stolen money and prevented her from exiting the bank by

16   grabbing her hair and pulling her back.

17        Attention now to you, Mr. Day, drove the Ford

18   Expedition to avoid the police and you stopped the Ford

19   Expedition at a mall so defendants could hide themselves from

20   the view of a helicopter, police helicopter, and from pursuing

21   police officers.  All of that is spelled out in the first count.

22        The second count says that 18 USC Section 2113,

23   Subsections A and D was violated in that both defendants by

24   force, violence, intimidation knowingly took from a person

25   approximately $85,600 belonging to Home Savings, San Fernando

17

1   branch, Home Savings then insured by the FDIC, Federal Deposit

2   Insurance Corporation; that both defendants assaulted and put in

3   jeopardy the life of the victim assistant manager and others by

4   using a handgun.

5       Finally the third count says that both defendants

6   violated 18 USC Section 924(c) by knowingly using and carrying a

7   firearm, namely a loaded .38 caliber revolver during the

8   commission of A crime of violence of robbing Home Savings.

9       Now Mr. Brown, would you as to Count 1, just stop after

10  you do it for Count 1, describe what the elements of the offense

11  of conspiracy in violation 18 USC 371 would be.

12      MR. BROWN:  In order for defendant Day to be proved

13  guilty of conspiracy, he must have, on or about the dates

14  charged in the indictment, agreed with another person to commit

15  the bank robbery.  Second, he must have become a member of the

16  conspiracy knowing of its object and intending to help

17  accomplish it.

18      And third, at least one of the members of the

19  conspiracy must have performed at least one overt act for the

20  purpose of carrying out the conspiracy.

21      THE COURT:  Now again, in order to make this clear and

22  simple, I would appreciate it if you would turn to, Mr. Brown,

23  only focusing on Count 1 and only as to Mr. Day and summarize

24  what the evidence would be that the government would introduce

25  before the jury.

34

18

1          MR. BROWN:  The government would prove that on or about

2     January 22nd, 1999, the day on which the getaway van was stolen,

3     and continuing through January 26th, 1999, the date on which the

4     bank robbery was committed in Los Angeles County, defendant

5     Montez Day agreed with defendant Bruce Bell to commit an armed

6     takeover robbery of Home Savings of America in San Fernando,

7     California, the deposits of which were then insured by the

8     Federal Deposit Insurance Corporation.

9          THE COURT:  Mr. Day, I have asked the prosecutor to

10    focus only on Count 1 because that's a count that you are

11    planning to change your plea to.  Did you hear what he said?

12          DEFENDANT DAY:  Yes.

13          THE COURT:  Did you understand it?

14          DEFENDANT DAY:  Yes, sir.

15          THE COURT:  So what he did was describe technically

16    what has to be proven to convict someone of conspiracy.  He

17    summarized what the government would introduce --

18          MR. BROWN:  Your Honor, I omitted one element.  The

19    government would show that the overt act occurred and that is

20    established by the defendants entering the bank.

21          THE COURT:  Do you have -- would you be putting on

22    witnesses, eyewitnesses?

23          MR. BROWN:  Yes, Your Honor.  And surveillance photos.

24          THE COURT:  Did the eyewitnesses identify these

25    defendants through lineups or through pictures?

19

1        MR. BROWN:  No, they were wearing masks.   The

2   identifications would have been made based on clothing and

3   witnesses seeing the defendants fleeing and the police following

4   them until their vehicle was stopped.   The stolen van was found

5   and one of the weapons was later found.

6        THE COURT:  Is it correct that each of the defendants

7   was caught and arrested shortly after they fled the bank?

8        MR. BROWN:  Yes, Your Honor.

9        THE COURT:  In possession of the money?

10       MR. BROWN:  Yes, Your Honor.

11       THE COURT:  Let's focus back on you, Mr. Day.  Do you

12   agree with what the prosecutor said as far as the summary of the

13   proof that he would introduce?  Let me explain what the question

14   is.  It may be the question wasn't very clear.

15       In order for this proceeding to be conducted properly,

16   the record has to show that there's a factual basis.  It's not

17   enough for someone to come in and say I plead guilty, I want to

18   get the benefit of whatever deal or whatever impact pleading

19   guilty may be to the person that's done what he's accused of.

20       I asked Mr. Brown to summarize what the evidence would

21   be hoping that you would listen to it and be able to tell me

22   whether in fact you would agree that those are things that

23   happened.  If you do agree, if you did the things that he's

24   talking about, then the record will show a factual basis and I

25   will be entitled to accept your guilty plea.  Does that help you

20

1   understand what I'm driving at?

2           DEFENDANT DAY:  Yes.

3           THE COURT:  Do you agree with what Mr. Brown said?

4           DEFENDANT DAY:  Yes.

5           THE COURT:  Did you in fact do those things?

6           DEFENDANT DAY:  Yes, Your Honor.

7           THE COURT:  Okay.  Now Mr. Brown, do the same thing,

8   but this is going to apply to both Mr. Bell and Mr. Day.

9   They're both planning to plead to each of Counts 2 and 3.  So

10  set forth what the elements of Count 2 are and what the evidence

11  would be.

12          MR. BROWN:  In order to be guilty of armed bank

13  robbery, the defendant must have taken from a teller money

14  belonging to a bank.  The defendant must have used force and

15  violence or intimidation in doing so.  The deposits of the bank

16  must have been insured by the Federal Deposit Insurance

17  Corporation at that time.  And finally, the defendant must have

18  intentionally made a show of force that caused the teller to

19  fear bodily harm by using a dangerous weapon.

20          If this case went to trial, the government would prove

21  that defendants Bruce Bell and Montez Day entered the Home

22  Savings of America in San Fernando, California on January 26th,

23  1999 and that defendant Montez Day brandished a semi-automatic

24  pistol while defendant Bruce Bell brandished a loaded .38

25  caliber revolver.  Defendants Montez Day and Bruce Bell forced

21

1   the assistant manager Elizabeth Aguillon to open the bank vault

2   and took from the bank vault approximately $85,600 in cash.

3           THE COURT:  Mr. Bell, do you understand what Mr. Brown

4   said?

5           DEFENDANT BELL:  Yes.

6           THE COURT:  Did you in fact do the things he just

7   described?

8           DEFENDANT BELL:  Yes.

9           THE COURT:  How about you, Mr. Day, do you understand

10  what he said?

11          DEFENDANT DAY:  Yes.

12          THE COURT:  Did you do those things?

13          DEFENDANT DAY:  Yes.

14          THE COURT:  Let me hear Count 3, Mr. Brown.  Summarize

15  what the elements are and what the evidence would be, please.

16          MR. BROWN:  In order to be guilty of using or carrying

17  a firearm during a crime of violence, the following must be

18  true.  One, defendant committed the crime of violence charged in

19  the indictment, bank robbery in this case; two, the defendant

20  knowingly used or carried a firearm; three, defendant used or

21  carried the firearm during and in relation to the crime of

22  violence.

23          Because the 924(c) charge in this case carries a

24  mandatory minimum sentence of seven years, the government would

25  also have to prove the defendant brandished the firearm.

22

1    Now Your Honor, because the firearm charged was only

2    possessed by defendant Bell and the government is relying on

3    Pinkerton liability as to defendant Day for that firearm, I'd

4    also like to put on the record the elements of Pinkerton

5    liability.

6         THE COURT:  I want Mr. Day to pay attention to this.

7    Is it an accurate way of paraphrasing what you're about to do,

8    Mr. Brown, that you're saying the indictment singles out only

9    the weapon that Mr. Bell actually carried, but that you have a

10   basis to obtain a conviction of guilt as to Mr. Day?

11        MR. BROWN:  That's correct, Your Honor.

12        THE COURT:  It's a legal basis called Pinkerton?

13        MR. BROWN:  Yes.  In order, if you have a criminal

14   agreement with somebody to commit an act, there are certain

15   instances in which you will be liable for the crime, the acts

16   committed by the person you're conspiring with.  That is called

17   Pinkerton liability.  And if the acts of your partner in crime

18   are reasonably foreseeable and a necessary and natural

19   consequence of your criminal agreement, you will be liable for

20   those acts as well.  Shall I specify the elements, Your Honor?

21        THE COURT:  Yes.

22        MR. BROWN:  In order for the defendant to be guilty of

23   a crime committed by his co-conspirator, the following must be

24   true.  One, defendant's co-conspirator committed a crime such as

25   a bank robbery; two, that the co-conspirator was a member of the

39

23

1   conspiracy charged in Count 1 of the indictment; three, that the

2   co-conspirator committed the crime in furtherance of the

3   conspiracy; four, defendant was a member of the conspiracy on

4   the date that the co-conspirator committed the crime; and five,

5   the crime fell within the scope of the conspiracy and could

6   reasonably have been foreseen to be a necessary and natural

7   consequence of the conspiracy.

8           Shall I proceed with the factual basis, Your Honor?

9           THE COURT:  Yes.

10          MR. BROWN:  On January 26, 1999, defendants Bruce Bell

11  and Montez Day entered the Home Savings of America in San

12  Fernando which was then insured by the Federal Deposit Insurance

13  Corporation.  Bruce Bell brandished a loaded .38 caliber

14  revolver.  Bruce Bell's brandishing of a .38 caliber revolver

15  was within the scope of Montez Day and Bruce Bell's unlawful

16  agreement and could reasonably have been foreseen by defendant

17  Montez Day as a necessary and natural consequence of that

18  agreement.  And the defendants used that weapon in order to rob

19  the bank on that day.

20          THE COURT:  Okay.  I want to turn to you first,

21  Mr. Day.  There were a lot words Mr. Brown used.  Were you able

22  to understand what he was saying as to why you could be found

23  guilty of what Mr. Bell did as to his .38 caliber revolver?

24          DEFENDANT DAY:  Yes.

25          THE COURT:  Okay.  Mr. Bell, did you do the things that

40

24

1    Mr. Brown referred to in connection with Count 3 relating to the

2    use of a firearm?

3              DEFENDANT BELL:  Yes.

4              THE COURT:  Did you, Mr. Day?

5              DEFENDANT DAY:  Yes.

6              THE COURT:  All right.  And I want to address some

7    questions next to you, Mr. Bell, because I have been informed

8    and have been given a copy of the plea agreement.  And do you

9    have this with you, Mr. Newman?

10             MR. NEWMAN:  I do, Your Honor.

11             THE COURT:  Okay.  Would you turn to Page 8, please.

12             Mr. Bell, on Page 8 is that your signature?

13             DEFENDANT BELL:  Yes, it is.

14             THE COURT:  Did you sign that agreement in the presence

15   of Mr. Newman?

16             DEFENDANT BELL:  Yes.

17             THE COURT:  Before you signed it, did you read it?

18             DEFENDANT BELL:  Yes.

19             THE COURT:  Did you understand it?

20             DEFENDANT BELL:  Yes.

21             THE COURT:  As far as you're concerned, does this plea

22   agreement contain the entire terms of the agreement between you

23   on the one hand and the U.S. attorney's office on the other?

24             DEFENDANT BELL:  Yes.

25             THE COURT:  Has anyone made you any promises or

25

1    representations of guarantees other than whatever may be set

2    forth in this plea agreement?

3            DEFENDANT BELL:   No.

4            THE COURT:   Has anyone made any threats to you that

5    prompted you to plead guilty this afternoon?

6            DEFENDANT BELL:   No.

7            THE COURT:   Did anyone tell you about or promise to you

8    what specific sentence would be imposed?

9            DEFENDANT BELL:   No.

10           THE COURT:   Do you have any other agreement with the

11   government besides what is now in your hands as a written plea

12   agreement?

13           DEFENDANT BELL:   No.

14           THE COURT:   Did anyone promise you any leniency or

15   probation or any kind of outcome once the day of sentencing

16   comes?

17           DEFENDANT BELL:   No.

18           THE COURT:   Are you presently on parole?

19           DEFENDANT BELL:   Yes.

20           THE COURT:   Have you discussed with your lawyer the

21   impact on your parole of being found guilty today, the impact on

22   the offense for which you're on parole?

23           DEFENDANT BELL:   Yes.

24           THE COURT:   Are you involved in any court proceedings?

25           DEFENDANT BELL:   No.

26

```
1          THE COURT:  Have you been advised of the maximum
2  penalty under the law?
3          DEFENDANT BELL:  Yes, I have.
4          THE COURT:  For these offenses, at least for Count 3,
5  there's also a minimum penalty; is that correct?
6          MR. BROWN:  Yes, Your Honor.
7          THE COURT:  Both of you should listen because I'm now
8  going to ask Mr. Brown to place on the record both the maximum
9  and minimum penalties.
10          MR. BROWN:  The maximum penalty for the conspiracy
11  count, Count 1, is five years imprisonment, a three-year period
12  of supervised release, a fine of $250,000 and a mandatory
13  special assessment of $100.
14          The maximum sentence the court could impose for the
15  armed bank robbery, Count 2, is 25 years imprisonment, a
16  five-year period of supervised release, a fine of $250,000 and a
17  mandatory special assessment of $100.
18          The statutory maximum sentence the court could impose
19  for violation of 924(c), the third count, is life imprisonment,
20  a five-year period of supervised release, a fine of $250,000 and
21  a mandatory special assessment of $100.
22          The statutory mandatory minimum sentence that the court
23  must impose for Count 3 and the 924(c) charge is a seven-year
24  term which must run consecutive to any other sentence of
25  imprisonment.  Therefore, the total maximum sentence for all of
```

27

1   these offenses to which defendant Montez Day is pleading guilty

2   is life imprisonment, a five-year period of supervised release,

3   a fine of $750,000 and a mandatory special assessment of $300.

4           The maximum total sentence for the two offenses to

5   which defendant Bruce Bell is pleading guilty is life

6   imprisonment, a five-year period of supervised release, a fine

7   of $500,000 and a mandatory special assessment of $200.

8           THE COURT:  Okay.  Mr. Bell, continuing with you for a

9   moment.  You've heard some reference to supervised release.

10  This is something that applies to both of you.  Do you both

11  understand that in the federal system there's no longer such a

12  thing as parole?  If someone sentenced to prison serves out the

13  term of sentence except for the reduction that may be earned for

14  good time or good behavior and then when that person is released

15  from prison he may be subjected to something called supervised

16  release which is basically supervision that has conditions,

17  restrictions, terms and limitations.  If a person violates the

18  terms of his supervised release, he can be sent back to prison

19  for the entire amount of the period of supervised release.

20          Do you understand that, Mr. Bell?

21          DEFENDANT BELL:  Yes, I do.

22          THE COURT:  Do you understand that, Mr. Day?

23          DEFENDANT DAY:  Yes, sir.

24          THE COURT:  Now there's also been some reference at

25  least in the plea agreement I think and perhaps there's

28

1    something been said today about the Sentencing Commission

2    guidelines.  I want to tell you both about those.  There will be

3    some things you and I will talk about directly with you in a

4    minute, Mr. Day.  I will be getting to you as well, Mr. Bell.

5        Now this again applies to both of you.  Under the

6    federal system that you're now part of there are sentencing

7    guidelines which are issued by something called the Sentencing

8    Commission.  They contain an analysis of the relevant facts and

9    those include the nature of the offense, the criminal history of

10   the defendant, whether the defendant accepted responsibility for

11   what he was accused of, whether in the alternative he obstructed

12   justice; a lot of factors.  They are all taken into account by

13   the probation office.

14       The probation office applies these guidelines issued by

15   the commission and comes up with a guideline range expressed in

16   months, how many months can the defendant be sentenced.  The low

17   end and the high end are included.  But I'm not bound by these

18   guideline determinations.  Under certain circumstances I impose

19   a tougher sentence, a longer sentence, or I can impose a shorter

20   sentence.  You each will get through your lawyers and directly

21   in your own right a copy of the presentence report which is

22   prepared by the probation office and which deals with these

23   guidelines.

24       Each of you through your lawyer will have a chance to

25   challenge it or add to it or change it.  It eventually comes to

29

1   me and then I will review it.  But I again want to make sure you

2   each understand that I'm not bound by it.

3           Do you understand that, Mr. Bell?

4           DEFENDANT BELL:  Yes, sir.

5           THE COURT:  Are there any questions you have at the

6   moment about what I have said about the sentencing guidelines?

7           DEFENDANT BELL:  No.

8           THE COURT:  Mr. Day, do you understand what I said

9   about the guidelines?

10          DEFENDANT DAY:  Yes, sir.

11          THE COURT:  Do you have any questions about those

12  guidelines?

13          DEFENDANT DAY:  No, sir.

14          THE COURT:  Okay.  Now Mr. Brown, in the plea agreement

15  from Mr. Bell is there any provision relating to appeal?

16          MR. BROWN:  No, Your Honor.

17          THE COURT:  Okay.  And there's no agreement restricting

18  Mr. Day; is that correct, Mr. Mayock?

19          MR. MAYOCK:  That's correct, Your Honor.

20          THE COURT:  Each of you needs to understand that when I

21  finally do impose sentence, if we get to that point, if I'm

22  wrong you can appeal what I did.  You may file your appeal

23  through your lawyer, challenge the sentence, not the finding of

24  guilty, not the guilty verdict, but the sentence.

25          Do you understand that, Mr. Bell?

30

1            DEFENDANT BELL:  Yes, sir.

2            THE COURT:  Do you, Mr. Day?

3            DEFENDANT DAY:  Yes, sir.

4            THE COURT:  Okay.  Turning to you for a minute,

5  Mr. Bell, have you had sufficient time to discuss this case with

6  Mr. Newman?

7            DEFENDANT BELL:  Yes.

8            THE COURT:  Are you satisfied that he's fully

9  considered any defenses you might have to the charges?

10           DEFENDANT BELL:  Yes, I am.

11           THE COURT:  Are you satisfied with his representation

12  of you?

13           DEFENDANT BELL:  Yes.

14           THE COURT:  Has he advised you of the nature of these

15  charges and how the factors that go into the sentence generally

16  work?

17           DEFENDANT BELL:  Yes.

18           THE COURT:  Have you told him all the facts and

19  circumstances surrounding this case?

20           DEFENDANT BELL:  Yes.

21           THE COURT:  Okay.  Mr. Day, same question.  I'm asking

22  now a few questions about Mr. Mayock.  Have you had a sufficient

23  opportunity to discuss this case with him?

24           DEFENDANT DAY:  Yes.

25           THE COURT:  Are you satisfied with his representation

31

1    of you?

2           DEFENDANT DAY:  Yes.

3           THE COURT:  Has he told about any defenses you might

4    have to these charges?

5           DEFENDANT DAY:  Yes.

6           THE COURT:  Has he explained the nature of the

7    charges?

8           DEFENDANT DAY:  Yes.

9           THE COURT:  Has he explained how the sentencing process

10    works in general?

11           DEFENDANT DAY:  Yes.

12           THE COURT:  Have you given him all the facts that

13    you're aware of that he would need to know to figure out what is

14    in your best interest?

15           DEFENDANT DAY:  Yes.

16           THE COURT:  Continuing with you for a moment, Mr. Day,

17    there is no plea agreement that I'm aware of.  But I want to

18    make sure you tell me whether anyone has made you any promises

19    or representations, guarantees or other statements about what

20    will happen to you at the time of sentencing.

21           DEFENDANT DAY:  No.

22           THE COURT:  Has anyone made any threats to you or to

23    any member of your family that prompts you to plead guilty this

24    afternoon?

25           DEFENDANT DAY:  No, sir.

32

1          THE COURT:  Has anyone made you any promises of

2    leniency?

3          DEFENDANT DAY:  No, sir.

4          THE COURT:  No one has told you what specific sentence

5    the court will impose; is that correct?

6          DEFENDANT DAY:  That's correct, sir.

7          THE COURT:  Are you presently on parole?

8          DEFENDANT DAY:  No.  I'm on supervised release, sir.

9          THE COURT:  From an earlier federal offense?

10         DEFENDANT DAY:  Yes, sir.

11         THE COURT:  Are you aware of the consequences for

12   pleading guilty today in terms of what happens on that other

13   previous federal case?

14         DEFENDANT DAY:  I'm aware of the consequences, yes.

15         THE COURT:  Mr. Bell, do you feel that you understand

16   everything that's taking place here this afternoon?

17         DEFENDANT BELL:  Yes.

18         THE COURT:  Do you know of any reason why I shouldn't

19   accept your guilty plea?

20         DEFENDANT BELL:  No.

21         THE COURT:  Do you understand then that all that's left

22   in your case if I do accept the plea is for sentence to be

23   imposed?

24         DEFENDANT BELL:  Yes.

25         THE COURT:  And is your decision to plead guilty this

33

1    afternoon to Counts 2 and 3 entirely free and voluntary?

2         DEFENDANT BELL:  Yes.

3         THE COURT:  Mr. Day, I'm going to ask you the same

4    questions.  Do you think you understand everything that's been

5    going on here today?

6         DEFENDANT DAY:  Yes.

7         THE COURT:  Do you know of any reason why I shouldn't

8    accept your guilty plea?

9         DEFENDANT DAY:  No.

10        THE COURT:  Then do you understand that all that will

11   be left in this case is for sentence to be imposed?

12        DEFENDANT DAY:  Yes.

13        THE COURT:  Is it still your desire to plead guilty

14   notwithstanding everything that I have tried to explain to you?

15        DEFENDANT DAY:  Yes.

16        THE COURT:  Mr. Newman, there are a few questions I

17   would like to address to you.  Through your representation of

18   Mr. Bell, has he been able to cooperate with you in a competent

19   fashion?

20        MR. NEWMAN:  Yes, Your Honor.

21        THE COURT:  Did you sign the plea agreement in his

22   presence?

23        MR. NEWMAN:  I did, Your Honor.

24        THE COURT:  Did you discuss it with him before he and

25   you signed it?

34

1        MR. NEWMAN:  Yes, Your Honor.

2        THE COURT:  Does this plea agreement that Mr. Bell

3   entered into represent the entire disposition of his case?

4        MR. NEWMAN:  It does, Your Honor.

5        THE COURT:  Did anyone make any promises,

6   representations or guarantees to you that prompted you to

7   recommend that Mr. Bell plead guilty?

8        MR. NEWMAN:  No, Your Honor.

9        THE COURT:  Are you satisfied that his constitutional

10  rights have been observed?

11       MR. NEWMAN:  I am, Your Honor.

12       THE COURT:  Is Mr. Bell pleading guilty because of any

13  illegally obtained evidence in the government's possession that

14  you're aware of?

15       MR. NEWMAN:  No, Your Honor.

16       THE COURT:  Based upon your analysis of the law and of

17  the facts, is it your conclusion that it's in Mr. Bell's

18  interest for him to plead guilty today?

19       MR. NEWMAN:  It is, Your Honor.

20       THE COURT:  Same questions to Mr. Mayock.  I know

21  there's no plea agreement, but throughout your representation of

22  Mr. Day, has he been able to cooperate with you in a competent

23  way?

24       MR. MAYOCK:  He has, Your Honor.

25       THE COURT:  Have you discussed the facts of this case

35

1    in detail with him?

2            MR. MAYOCK:  I have.

3            THE COURT:  Are you satisfied that he has no

4    meritorious defenses?

5            MR. MAYOCK:  I am, Your Honor.

6            THE COURT:  Is he pleading guilty because of any

7    illegally obtained evidence in the possession of the government

8    that you're aware of?

9            MR. MAYOCK:  No, Your Honor.

10           THE COURT:  Do you think after your analysis of the law

11   and the facts that it's in his best interests to plead guilty?

12           MR. MAYOCK:  Yes, I do.

13           THE COURT:  Mr. Brown.

14           MR. BROWN:  Yes.  Your Honor, I would like to state the

15   obvious consequence of pleading guilty in this case as regards

16   supervised release that constitute a violation of their

17   supervised release.

18           THE COURT:  That applies only I think to Mr. Day.

19   Parole is the same basic consequence as to Bell.

20           MR. BROWN:  Thank you, Your Honor.  I'd also like to

21   point out that restitution is mandatory in this case.  To my

22   knowledge, currently all the currency from the bank was

23   recovered so I don't believe it will apply.  But in case I'm

24   incorrect on that or there was some other loss at the bank, I

25   did want the defendants to know they could be required to pay

36

1    restitution.

2         THE COURT:  You anticipated something I was going to

3    ask you about when I got to you.  Your turn will come in just a

4    minute.

5         MR. BROWN:  I apologize, Your Honor.

6         THE COURT:  That's all right.  Mr. Mayock, do you know

7    of any reason why I shouldn't accept Mr. Day's guilty plea?

8         MR. MAYOCK:  No, Your Honor.

9         THE COURT:  Mr. Brown, as to the plea agreement between

10   the government and Mr. Bell, other than what is expressly set

11   forth in that plea agreement, has the government made any other

12   promises or representations, guarantees to him or his counsel?

13        MR. BROWN:  No, Your Honor.

14        THE COURT:  Has the government obtained a written

15   statement from either defendant?

16        MR. BROWN:  No, Your Honor.

17        THE COURT:  Other than what was seized at the time of

18   the arrest, has the government obtained any other evidence

19   directly from the defendants?

20        MR. BROWN:  No, Your Honor.

21        THE COURT:  Can you think of any reason why I shouldn't

22   accept the guilty pleas?

23        MR. BROWN:  No, Your Honor.

24        THE COURT:  That's true for both Mr. Bell and Mr. Day?

25        MR. BROWN:  Yes.

37

1    THE COURT:  Is there any additional inquiry you want me

2    to touch on, Mr. Brown?

3    MR. BROWN:  No, Your Honor.

4    THE COURT:  How about you, Mr. Mayock?

5    MR. MAYOCK:  No, Your Honor.

6    THE COURT:  All right.  I'm going to do certain things

7    and here's what they are.  As to each of Mr. Bell and Mr. Day, I

8    find that there's a factual basis for the entry of each of the

9    guilty pleas, in the case of Mr. Bell to Counts 2 and 3;

10   Mr. Day, Counts 1, 2 and 3.  I find that each of them is alert,

11   seem to be able, intelligent, responsive, good demeanor.

12   I think each of them knows what he's doing and why.

13   Each of them understands the consequences.  There seems to be no

14   basis to believe for either of them that there is any extrinsic

15   factor such as threats or physical condition or mental condition

16   or use of prescriptive drugs or other drugs that might interfere

17   with their ability to make a free and voluntary decision.

18   I think they're making a free and voluntary decision.

19   I find there's been no promises made by anyone and no other

20   instances of inducements or coercion that place in question the

21   voluntariness of the decision that each of them is making this

22   afternoon.

23   For all those reasons I order that the guilty plea from

24   Mr. Bell be accepted and the guilty plea from Mr. Day be

25   accepted.  We're going to accept the guilty pleas to each of the

38

1    respective counts.  We're going to set a date for sentencing

2    and it won't be until September for a host of reasons.

3           What date do you recommend?

4           THE CLERK:  The 13th.

5           THE COURT:  September 13th which is a Monday.  Is that

6    available?

7           MR. MAYOCK:  It is, Your Honor.

8           THE COURT:  Mr. Newman?

9           MR. NEWMAN:  Yes, Your Honor.

10          THE COURT:  Mr. Brown?

11          MR. BROWN:  Yes, Your Honor.

12          THE COURT:  September 13th, 4:00, this court.  The

13   presentence report will be compiled by the probation office.

14   Subject to advice that each of you may get from your respective

15   lawyer, I order you to cooperate with the probation office and

16   to return here for sentencing.  Whatever the terms were of bail

17   and confinement that were previously imposed, those will remain

18   in effect.  I think the marshal representatives are here.  I

19   will remand you to the custody of the marshals.

20          Thank you, counsel.

21          MR. MAYOCK:  There is one thing Mr. Brown has to bring

22   to your attention at this time regarding the custodial

23   situation.

24          MR. BROWN:  Well, Your Honor, it's actually not for

25   Your Honor.  It's for the Metropolitan Detention Center.  I need

39

1    to write them a letter, status can be renotified.

2            THE COURT:  Mr. Brown --

3            MR. BROWN:  There's an order between the two defendants

4    and the Metropolitan Detention Center.  It's administrative,

5    Metropolitan Detention Center.  But it is true I'm going to

6    rescind that request today.

7            THE COURT:  Okay.  You may and now you're confirming it

8    on the record.

9            MR. BROWN:  I don't think it's actually an agreement,

10   Your Honor.  It's a representation that I'm going to do that.

11           THE COURT:  All right.  Does that take care of that?

12           MR. MAYOCK:  Yes, Your Honor.

13           THE COURT:  Anything else, counsel?

14           MR. MAYOCK:  No, Your Honor.

15           THE COURT:  Thank you.

16               (PROCEEDINGS ADJOURNED)

17

18                        C E R T I F I C A T E

19           I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT
     TRANSCRIPT OF THE ABOVE-ENTITLED PROCEEDINGS, PAGES 1-39.

20   DATED JANUARY 6, 2000; LOS ANGELES, CALIFORNIA.

21

22   LYNNE SMITH
     OFFICIAL COURT REPORTER

23

24

25

# EXHIBIT C

1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

THE HONORABLE A. HOWARD MATZ, JUDGE PRESIDING

- - -

```
------------------------------
UNITED STATES OF AMERICA,      )
                 PLAINTIFF,    )
         -v-                   )    CASE NO. CR 99-123-AHM
BRUCE BELL,                    )
                 DEFENDANT.    )
------------------------------
```

COPY

REPORTER'S TRANSCRIPT OF PROCEEDINGS
LOS ANGELES, CALIFORNIA
MONDAY, OCTOBER 25, 1999

LYNNE SMITH
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
312 NORTH SPRING STREET, #430
LOS ANGELES, CALIFORNIA  90012

2

APPEARANCES:

    ON BEHALF OF PLAINTIFF:
    ALEJANDRO MAYORKAS
    UNITED STATES ATTORNEY
    BY:  ANDREW BROWN
    ASSISTANT UNITED STATES ATTORNEY
    312 NORTH SPRING STREET
    LOS ANGELES, CALIFORNIA     90012



    ON BEHALF OF DEFENDANT:
    BRIAN NEWMAN
    400 CORPORATE POINTE, #805
    CULVER CITY, CALIFORNIA  90230

3

```
 1            MONDAY, OCTOBER 25, 1999; LOS ANGELES, CALIFORNIA

 2                              -000-

 3            THE CLERK:  CR 99-123-AHM, U.S.A. versus Montez Day and

 4      Bruce Bell.

 5            Appearances, counsel.

 6            MR. BROWN:  Good afternoon, Your Honor.  Andrew Brown

 7      for the government.

 8            THE COURT:  Good afternoon, Mr. Brown.

 9            MR. NEWMAN:  Good afternoon, Your Honor.  Brian Newman

10      for Mr. Bell who is present in court.

11            MR. MAYOCK:  Good afternoon, Your Honor.  Michael

12      Mayock on behalf of Montez Day who likewise is present.

13            THE COURT:  Good afternoon to all four of you.

14            All right.  We're here for the pronouncement of

15      judgment and the sentence on both Mr. Day and Mr. Bell.  I would

16      like to do Mr. Bell first.

17            MR. NEWMAN:  Your Honor, on behalf of Mr. Bell, HE has

18      asked for a further continuance of today's sentencing.  The

19      reason for the continuance -- and we would ask that a short

20      continuance of no more than a week -- is because of a flurry of

21      last-minute responses to my arguments by the probation office

22      which I didn't receive until late I believe Thursday, and also

23      had not gotten the psychiatric report until Tuesday, I think it

24      was Tuesday of last week, none of which Mr. Bell has had an

25      opportunity to even see.
```

4

1        So we were talking about he would like the opportunity

2   to see those reports and give me input considering the fact that

3   I think the structural issue that we're going to be addressing,

4   Your Honor, today is the core, whether Mr. Bell is actually a

5   career offender or not.  These differences in sentencing between

6   whether he is or he isn't is very significant.

7        THE COURT:  What does the psychiatric report then have

8   to do with whether he's a career offender?

9        MR. NEWMAN:  Well, that doesn't.  He has not seen that

10  report.  And that is not the foundation for my request for a

11  week continuance.

12       THE COURT:  All right.  Well, that's what you said

13  though.

14       MR. NEWMAN:  I'm sorry.

15       THE COURT:  And I'm really not inclined to drag this

16  out any further.

17       Mr. Brown.

18       MR. BROWN:  Your Honor, I just wanted to object to the

19  continuance.  We had the change of plea on May 14th.  It's been

20  five-and-a-half months.  The late filings have been caused by

21  the defendant who filed his papers just days before the hearing

22  putting great strain on the government, the court and the

23  probation office in filing responses within 24 hours so that

24  people would have them.

25            And if he wanted to be sentenced second today to give



5

1   him a chance to go over the probation officer's responses, the

2   government wouldn't object to that.  But the reply from the

3   probation office to his papers, they are minuscule changes.

4   They basically just reiterated their earlier position.  So I

5   don't see that there's some big new thing that he needs to read

6   before the sentencing.

7          THE COURT:  Okay.  Well, I was just going to suggest

8   that you give your -- and I'll go first with Mr. Bell, with Mr.

9   Day.  Sit down.  You can do it at that table in the back so

10  you're not distracted.  You can show him these very skimpy

11  items.  They won't take long to review.  You can explain them to

12  him.  They don't address what you tell me is going to be the

13  principal focus of your argument anyway.

14          I have given both sides so many extensions and so many

15  opportunities to build their case and I have too many other

16  sentences on for next week to continue this again.  So I'm going

17  to deny that request.

18          MR. NEWMAN:  I understand, Your Honor.  But for the

19  record, a lot of the continuance or extensions were because for

20  some reason the Bureau of Prisons moved Mr. Bell to Oklahoma, if

21  the court recalls, and it took a while to find him and to get

22  him back.

23          THE COURT:  Let me make it clear to both you and Mr.

24  Bell, I'm not holding that against him in terms of your request

25  now.  I'm simply reflecting that this has gone on for a long

6

1    time.  You've both had an opportunity to meet with other each

2    and coordinate with each other.  And I think you'll both have

3    the full opportunity to be heard.  So I'll take Mr. Day first,

4    but that won't take all that long.  So be efficient in showing

5    this material to your client.

6              MR. NEWMAN:  I will, Your Honor.

7              THE COURT:  Don't tell me you're going to seek a

8    continuance, Mr. Mayock.

9              MR. MAYOCK:  Well, perhaps, Your Honor.  There was a

10   little bit of a miss in the communications.  Apparently

11   Mr. Brown had filed and FAXed a response to my position paper,

12   which admittedly I didn't file until Wednesday of last week as

13   your court stamp will indicate.

14             However, it will also indicate inside the attachment

15   that it was at that time that I was getting a copy from the

16   psychologist, a report, and I waited for that report.  That was

17   the basis for the delay waiting for that.

18             But in any event, going back to the issue, I did not

19   receive a copy of the government's opposition.  There was a FAX

20   number that I had about four or five years ago.  And apparently

21   there was a FAX that was transmitted, that's happened in the

22   past.

23             Unless Mr. Brown has that document showing the FAX

24   number, it's a FAX of a firm that used to be on the same floor

25   where I was and I didn't get it in any event.

7

1          THE COURT:  When did you get it?

2          MR. MAYOCK:  I just was able to read his in court

3     today.  And the problem that I have is this.  Essentially my

4     client has advised me and I saw nothing to contradict this that

5     the early conviction, the first conviction was for powder

6     cocaine, not crack cocaine.

7          And secondly, there was an objection to unsworn

8     statements of the defendant.  Now if there's going to be some

9     allegation that his father was not arrested and actually

10    convicted for murdering his mother, we can get court records if

11    that's what the prosecution seems to want.  But I don't think

12    that that is essential.  If that's the kind of record that

13    they're looking for, we can definitely obtain that if we had a

14    very brief continuance.

15         MR. BROWN:  Two points, Your Honor.  As far as the

16    crack cocaine versus powder cocaine, that was an inference that

17    I made from the quantity of the cocaine.  I remembered reading

18    it, but I went over the presentence report just before sitting

19    down and I don't see it.  So for all I know, it may well be

20    powder cocaine and I'm willing to so stipulate for purposes of

21    the sentencing.

22         And as to the second point, Your Honor, the government

23    isn't contending that it didn't happen.  The government is

24    merely saying that they haven't carried their burden.

25         THE COURT:  Okay.  Well, there's no need for a

8

1   continuance in terms of what your concerns are, Mr. Mayock.  I

2   have not assumed that it was crack cocaine and the difference

3   between whether it was crack or other cocaine is not going to be

4   at all a factor in my, and hasn't been as I prepared for this

5   sentencing.

6        In terms of the government's position relating to your

7   client's childhood history, I have construed it the way

8   Mr. Brown just described.  I have assumed for purposes of my

9   analysis that what apparently happened did happen, what you say

10  happened happened.  And that is to say that as horrific as it

11  is, your client as a very young boy may have actually seen, but

12  in any event, directly experienced the slaying of his mother by

13  his father.

14       I think that there are other reasons why it's highly

15  unlikely I would consider that as a basis for departure.  It may

16  be a basis and I think there may well be other bases to not

17  impose the sentence at the high end of the guidelines as the

18  probation recommended, at least as to your client.  But what you

19  think I might be inclined to misunderstand or not apply won't be

20  a factor at all.  So I want to go ahead with today's proceeding.

21       MR. MAYOCK:  Fine, Your Honor.  If that's the case,

22  we're ready to proceed.

23       THE COURT:  Okay.  Then let's do so.

24       Now did you show to Mr. Day the government's very brief

25  response?

9

1          MR. MAYOCK: No, I didn't. I just read it in court.

2          THE COURT: Well, I want you --

3          MR. MAYOCK: I have discussed some of the factors with

4     him.

5          THE COURT: Mr. Day, do you feel that based upon what

6     Mr. Mayock summarized to you after he this afternoon for the

7     first time read the government's opposition to your position

8     about sentencing, do you feel that you understand what the

9     government's position is?

10          DEFENDANT DAY: Yes. Yes, Your Honor.

11          THE COURT: Okay. Then I don't think it's necessary

12     even to take a short break for Mr. Day to read that. And it's

13     pretty straightforward anyway. So we're going to proceed now

14     and let me start by saying this. Obviously both sides have read

15     the presentence report. So have I.

16          On Mr. Day's behalf, Mr. Mayock has made a number of

17     points and I'm going to recite those and then give you an

18     opportunity, Mr. Mayock, to supplement those by giving you a

19     focus and that focus will be my response to it. The way to do

20     this most efficiently and Mr. Newman, I want you to listen to

21     what I'm saying because this is going to be applicable to your

22     client as well.

23          After careful review of the way that the presentence

24     report and the recommendation characterize the guideline range,

25     I believe that there is a more precise way of stating it. And

10

1   this is the way it should be stated and this is the way I

2   believe the range is as presented by the probation office.

3           Your client, Mr. Mayock, has pled guilty to all three

4   counts.  Mr. Bell pleaded only to Counts 2 and 3.  As to

5   Mr. Day, the guideline sentencing range really is between 188

6   and 235 months.  Well, at least as to Mr. Bell it is.  Let's

7   take his to begin with.  That's on Count 2.  Plus an additional

8   84 months consecutive for Count 3.  That means that the

9   guideline range is 272 months at the downward end, at the low

10  end, and 319 months at the high end.

11          For your client, Mr. Mayock, who is dealing with a

12  guilty plea to all three counts, it comes out much the same, but

13  the calculation is a little bit different.  There is 60 months

14  on Count 1 -- excuse me.  There is a range on Count 2 of just

15  what it is for Mr. Bell, between 188 months and 235 months.

16  There is a range, not a range, but a consecutive sentence

17  mandated on Count 3 of 84 months.  Those two counts wind up

18  being at the range of 272 months to 319 months and that's the

19  range that I have calculated for purposes of figuring out what

20  is the fair sentence for your client as well.

21          As to the first count, for Mr. Day I would like to ask

22  our representative from the probation office whether that

23  changes the range given that there's a third count.

24          THE PROBATION OFFICER:  It does not change the

25  guideline range; however, the sentencing mandatory maximum is 60

11

1    months.  And then on that particular count your cap is 60

2    months.

3            THE COURT:  Okay.  So the range will be the same,

4    Mr. Mayock.

5            MR. MAYOCK:  Yes.

6            THE COURT:  Now getting back then to the positions that

7    you have asserted, Mr. Mayock, you believe that the criminal

8    history is overstated.  And essentially as I construe and

9    understand your argument, it's because your client after appeal

10   was sentenced to a 16-month sentence, had already served 27

11   months before the weapon component of the conviction was

12   reversed and really was being sentenced for mere possession, not

13   mere possession for sale.  But the offense occurred when he was

14   young and that to consider it to be a basis for career offender

15   status is unfair and distorts what is in fact the true situation

16   in terms of the prior criminal history.

17           Secondly, you have made an eloquent argument for a

18   departure based on what you classify as post-traumatic stress

19   syndrome and that gets us to the unique situation of the

20   father's apparent slaying of the mother.  And coupled with that,

21   you point to a different classification arising out of the I

22   think the same concept and the same facts and that's that he

23   suffered extraordinary abuse as a child.

24           As to the criminal history factor, I think that I'm

25   inclined to accept Mr. Brown's response to that.  I think that

1    the circumstances of the offense and the nature of the drug that

2    was being possessed unquestionably make it appropriate to serve

3    as the basis for career offender status.  I do want you to

4    address that in light of what the government has said.

5           As to the request for departure, what most, what I find

6    to be most noteworthy is that Dr. Maloney's report itself and he

7    had two reports and I read them both, every word of both of

8    them.  He said that it couldn't be argued that these awful

9    events caused Mr. Day to engage in, quote, "the illegal and

10   problematical behavior."  He said -- and this is also a quote --

11   "He certainly does not present with any significant symptoms of

12   a major mental disturbance."

13          I went and looked at not only the provisions you've

14   cited, but 5(k)(2.13) which is the guideline provision relating

15   to diminished capacity.  And then that speaks in terms of a

16   significant impairment, significantly impaired ability to

17   understand the wrongfulness of the behavior or to control the

18   behavior that the defendant knows is wrongful.  And neither

19   component of what would be significantly reduced capacity has

20   been established by Dr. Maloney's report.

21          So although I think there are considerations that

22   militate in favor of not sentencing Mr. Day to the 319 months

23   that the probation office recommended -- and I'll give you a

24   chance to be heard about that too, Mr. Brown -- and although I

25   acknowledge that under the Brown decision where the Ninth

13

1   Circuit clarified a misunderstanding that Judge Tevrizian had, I

2   would have the discretion, if I thought it was warranted, to

3   make a departure, I decline to do so tentatively.

4           I'll listen to both of you, you and your client.  For

5   the reasons that I have indicated, I don't think a departure is

6   warranted under the evidence before me.  It is presumptively

7   discouraged.  Disadvantaged upbringing and psychological trauma

8   such as this are not presumptively the basis.  I think that the

9   guideline range as I have defined it and refined it is the range

10  within which the sentence should be imposed.

11          So that's my attempt, Mr. Mayock, to give you guidance.

12  You need to know, Mr. Day, that you have a right to speak to me.

13  I have been addressing your lawyer inkind of technical terms and

14  that's inevitable because that's what the guidelines require a

15  judge to do.  It's just the way they're structured.  But I do

16  want to hear from you.  And with that I'll give the lawyers a

17  chance to be heard now.

18          Go ahead, Mr. Mayock.

19          MR. MAYOCK:  Thank you, Your Honor.

20          The first point that I would want to make, and I will

21  focus these points on the departure, there are admittedly

22  categories that have been set forth in the sentencing

23  guidelines, particularly the 5(h)(1) sequence.  The prosecution

24  has said that family ties is not ordinarily a basis for

25  departure and that under 5(h)(1.2) lack of guidance and a

14

1   disadvantaged upbringing is not relevant.  They cite those and

2   they also cite a lack of guidance case coming from another

3   circuit involving a decision from the Second Circuit about --

4           THE COURT:  A very recent decision.

5           MR. MAYOCK:  Yes, but it's not from this circuit

6   either.  But it's a stepfather killing, being killed.  It

7   doesn't saying anything about whether it was in the presence of

8   the defendant in that case who was apparently eight at the time.

9   Also it was not a mother.  Particularly important and

10  instructive would be the fact that you have a mother who is

11  murdered by her husband.

12          These are the parents of Mr. Day when he's

13  approximately six years old.  And as Dr. Maloney reports, that

14  is a very crucial and important time in any child's life as far

15  as what impact that is going to have on them.  So I would say

16  that even though Revera seems to talk about something that might

17  be significant, it's not relevant.

18          We pointed out in our position paper Section 5(h)(1.3)

19  as mental and emotional condition.  And I analogize that to

20  departures that had been made under the post-traumatic stress

21  syndrome ground.  And essentially as the court has recognized,

22  that is under diminished capacity.  Diminished capacity, as the

23  court I'm sure is recognizing in looking at it, does not deal

24  specifically or allow departures where you have a violent act

25  taking place.  But we're not asking in this case for any

15

1   departure based on that basis.

2           Rather, what we're asking for and it's specifically

3   mentioned is a downward departure because of extraordinary abuse

4   suffered by the defendant as a child.  I would suggest that does

5   not come within the compass of family ties.  It does not come

6   within the compass of lack of guidance either which the

7   prosecutor cites.  Instead we're talking about unchartered

8   waters.  I would talk about this in this way.

9           The Kuhn decision was decided in 1998 as this court is

10  well aware.  In Kuhn they said virtually any appropriate

11  information relevant to a defendant's background, character or

12  conduct could be presented to the court as a basis for a

13  downward departure and the court's discretion was virtually

14  unlimited.  If those bases were presented in an unusual way, the

15  court can depart downward.

16          My suggestion is that extraordinary abuse suffered as a

17  child doesn't directly fall under mental or emotional condition,

18  although that may be the closest.  It doesn't fall under lack of

19  guidance and it doesn't fall under family ties.

20          Instead I think we have to take a look at those

21  sections, these 5(h) sections, and see when they were enacted.

22  Those were enacted in 1991.  If you look at Kuhn, that's a 1998

23  U.S. Supreme Court decision.  Clearly the U.S. Supreme Court

24  could recognize those and in essence gave authorization for a

25  court to create and have a departure where something doesn't fit

16

1    neatly within the box.  And clearly in this case we don't

2    believe the box includes Mr. Day within the family ties or lack

3    of guidance 5(h)(1) groupings.

4            Again I would point out, as the court is well aware,

5    that the Ninth Circuit in the Brown case did consider severe

6    childhood abuse and neglect and a psychologist's report about

7    that childhood trauma as a basis for a downward departure.  And

8    again, forgetting about Brown for a moment but a more recent

9    case, in United States versus Sanchez Rodriguez, the court

10   authorized, an en banc decision, authorized a departure for a

11   career offender along the base offense level where the predicate

12   offense was a very small amount of drugs.  So I'm trying to come

13   around back to this point.

14           I think if we look at this entire situation based on

15   what has happened to my client in his life, you see here's a

16   person who, and I won't reiterate all the points that were made

17   in the paper, who has had a very traumatic, a very difficult

18   life, a life that no one would ever wish upon anyone else, any

19   other human being.

20           And he falls within a scope that is not clearly covered

21   by any of the guidelines and that's why Kuhn would apply.  And

22   that's why under these circumstances too the court could look

23   under the authority of Sanchez Rodriguez for a downward

24   departure.

25           Specifically we've pointed out in looking at this kind

17

1  of case the four building blocks of mental health, the first one

2  being heredity.  And here we've got an individual whose father

3  was diagnosed as a paranoid schizophrenic.  And I've been

4  advised by his uncle, Arthur Day, that in the last couple of

5  months he's attempted to commit suicide.  This is the heredity

6  that Mr. Day has.

7          The second building block is early nurturance.  He

8  didn't get that.  His mother was murdered.  He was shifted from

9  place to place.  And then his father came back when he was

10  probably about nine or ten years old and then raised him based

11  on voices that he heard directing him where to go and put him in

12  incredibly difficult situations in gang infested areas, poor

13  schools.

14          He's had numerous problems with early nurturance which

15  he did not receive.  His traumatic experiences are just

16  overwhelming, start again with the murder and being reared by a

17  paranoid schizophrenic father, clearly that's a traumatic life

18  experience.  And last, the quality of support system.  He

19  doesn't have that.  It's clear he has nothing.  He has on all

20  four building blocks of mental health, he has fallen far, far

21  short.

22          On TV the other night there was a program involving

23  Mike Wallace.  Mike Wallace talked about having depression and

24  what effect it had on him.  But you look at him and you look at

25  other people like Tipper Gore who have had admitted problems

18

1    with chronic depression and you look at what they have as far as

2    the quality of their support systems.  And early nurturance and

3    a lack of traumatic experiences -- I can't say anything about

4    heredity -- but on those bases they're very different.

5           Even though they have mental problems, they don't have

6    the problems with the whole, all four building blocks basically

7    being shattered and falling down.  That's why Mr. Day is very

8    much different than other people who might come in and might

9    make this sort of claim.  On that basis I would respectfully

10   submit to the court that there is a basis for a downward

11   departure because of that and because of these circumstances

12   which are particularly unusual.

13          Turning to the overstated criminal history.  I think

14   Your Honor hit the nail on the head.  You said there were

15   problems that he had in getting an extra 11 months after the

16   case came back.  He entered a guilty plea.  Rather than remain

17   in custody and go through another trial after serving 27 months,

18   he did enter a plea.

19          Clearly the circumstances of that for an immediate

20   release would be a justification for someone to think that the

21   criminal history was over represented, particularly because he

22   had those extra 11 months.  He'd already served above and beyond

23   the maximum that he could possibly get if he were convicted of a

24   charge.

25          At the time he was an 18-year-old youth.  It was a

19

1   possession only case of powder cocaine which was for personal

2   use.  On that basis I suggest respectfully that the court

3   reconsider the criminal history as being over represented,

4   particularly when you think of the circumstances under which

5   someone at 18 would have the opportunity to go on with his life

6   and the easiest thing to do would be to enter that plea and get

7   released from jail instead of continuing on on the presumptive

8   detention that, as the court is well aware, occurs in drug

9   cases.

10          THE COURT:  Are you basically saying that I should

11  consider your client not have to been factually guilty, that he

12  didn't commit the crime that he wound up pleading to because he

13  pled given the circumstances you've now described?

14          MR. MAYOCK:  Well, I'm saying that under the

15  circumstances rather than go forward with the trial, the case

16  was reversed and tainted parts were thrown out.

17          THE COURT:  Right.

18          MR. MAYOCK:  That was a clear motivating factor as

19  to -- and I'm not saying he didn't enter a plea.  He's never

20  denied that he entered a plea.  But when you look behind the

21  motive for entering that plea, to be released, particularly when

22  you've got a young man who committed this offense at age 18.

23  He's definitely not going to be as thoughtful as someone with

24  more life experiences, particularly more beneficial life

25  experiences than Mr. Day has had in his life, that that's a

20

1    basis for saying over representation or overstating the criminal

2    history occurred.  And if that's the case, I have suggested in

3    our papers that the court consider looking at this as a

4    non-criminal history, a non- --

5           THE COURT:  Non-career offender.

6           MR. MAYOCK:  -- non-career offender case and look at

7    the offense level and consider what the offense level would have

8    been just considering all these factors, and we came up with a

9    calculation if the court did that it would be a guideline

10   range -- and this is a criminal history offense level of 27 that

11   was calculated by the probation officer -- would come out to be,

12   if the court made his criminal history category 4 instead of 5,

13   because it was just on the border of 5, 100 to 125 months plus

14   84 months which would give a sentencing range of 184 to 209

15   months.

16          Clearly that's a very, very substantial sentence.

17   We're not talking about anything that's inconsequential in any

18   way.  That's an awful lot of time and it's a time that would

19   give my client the opportunity, we hope as Dr. Maloney hopes, to

20   receive the kind of counseling that he didn't receive early in

21   life and which he clearly needs and which Dr. Maloney who is a

22   clinical psychologist at the USC Medical School recognizes and I

23   would ask that the court impose that sort of a sentence.

24          THE COURT:  Okay.  Now a couple of questions.  In terms

25   of counseling, I can make a recommendation and it will either

21

1  become available or not regardless of which alternative proposal

2  I adopt, right?

3        MR. MAYOCK:   That's true, Your Honor.   The Bureau of

4  Prisons has its own authority to do what it wants often.

5        THE COURT:   And I hope he does get the benefit of

6  counseling if he needs it and I'll say so when I pronounce the

7  judgment.

8        Secondly, why don't you address what has been very

9  troubling to me which is the circumstances of the flight.  Your

10  client was the driver.  We could be sitting here, but for the

11  grace of God, with dead victims out there given that incredibly

12  reckless conduct that he displayed in trying to get away from

13  arrest.

14        I know what your arguments are and you've made them

15  very, very eloquently and that's not just trying to pat you on

16  the back.  You've really done a good job.  But you haven't said

17  anything about that and any judge sitting up here is going to be

18  greatly troubled, at least I'm greatly troubled by that.

19        MR. MAYOCK:   I thought that the court might be asking a

20  question like that.  I directed that specific question to my

21  client earlier to ask him what happened.  And that's one of the

22  reasons why the post-traumatic stress analogy and argument was

23  made.  What happens to somebody who has mental problems of this

24  kind and has experienced this kind of life is they just react.

25  They don't sit and contemplate.  They in a stressful situation

22

1  find that they are acting in ways that a normal person wouldn't

2  act.  That's what that entire stress syndrome is all about is

3  that kind of behavior.

4          What he did was he did drive, although there were a

5  couple of parts of the report that are inaccurate.  Initially he

6  did not drive the van away, the vehicle away from the bank.

7  They got in a second vehicle and he was driving that vehicle.

8  That vehicle ended up being chased.  There were --

9          THE COURT:  Don't go into what happened during the

10  chase because it's just going to upset me all over again.  I

11  know how dangerous it was.

12          MR. MAYOCK:  The police were following.  I think there

13  was a helicopter or two as well.  He pulled into a mall and just

14  stopped where the police came up.  He was the only one who

15  remained in the car.  He didn't try to run at that point.

16          He has expressed to me that the concern he had was that

17  he was going to be shot and he felt that if he went to a mall,

18  that by being there where there were a lot of people, he

19  wouldn't get shot by the police.

20          I'm not saying this is clear thinking because clearly

21  it's not.  But it is stressful thinking and it's the kind of

22  thinking that a person who has had the kind of upbringing that

23  my client has maybe engages in.  That's the explanation he's

24  given me about why he stopped there and why he just sat in the

25  car and didn't make any effort to take his hands off the

23

1    steering wheel.  He just brought the car to a stop and made no

2    further effort to run away.

3              THE COURT:  I would like to hear from Mr. Brown before

4    I give Mr. Day a chance to speak with me.  That way you can at

5    least have in mind whatever it is the prosecution is going to

6    say, Mr. Day.

7              MR. Brown.

8              MR. BROWN:  Thank you, Your Honor.

9              First, I have a different explanation for arriving at

10   the mall and that's when you're being chased by a helicopter,

11   you don't really have a lot of options to evade the police on

12   the ground.  Really the only way you're going to be able to get

13   away from them is if you can be someplace where a helicopter

14   can't see you such as inside an enclosed building.

15             There really isn't a better way to flee in hot pursuit

16   than if you can blend in with the crowd.  And the fact that he

17   did not continue to flee after he stopped the car, I attribute

18   to the fact that the police were right on him and he didn't have

19   an opportunity and that his co-conspirator who was not driving

20   and was therefore able to leave the car more quickly only got a

21   few feet before being captured by the police.

22             THE COURT:  Mr. Brown, what I would find most

23   productive in terms of your response is the issue of whether he

24   he's a career offender and how to deal with that first

25   conviction for the cocaine.

24

1        MR. BROWN:  Okay.  Well, Your Honor, he pled guilty to

2   possession of cocaine with the intent to distribute which is

3   clearly a predicate felony under the guidelines.  And the

4   offense was actually a very serious one.  There were three

5   separate firearms found in the house in which he was hiding.

6        THE COURT:  But in the end, he wasn't convicted of

7   anything related to those firearms; is that correct?

8        MR. BROWN:  No.  His conviction for possession of a

9   firearm during the drug trafficking crime was reversed on

10  appeal.  But it's not necessary that he be convicted of a

11  firearms offense in order for the conviction to count as a

12  predicate felony.

13        And here it's the defendant's burden to prove that his

14  criminal history is overstated.  And all the defendant has said

15  is well, he may have had a reason to plead to an offense that he

16  didn't in fact commit.  The defendant certainly hasn't said

17  that.  There's certainly no evidence.  This is merely a lawyer's

18  speculation as to what happened.

19        All we know for a fact is that he pled guilty to a drug

20  trafficking offense.  Not only that, but there were very serious

21  circumstances surrounding it, including the shooting of a police

22  officer.  So I don't think that there's any way to get around,

23  even if Your Honor was inclined to go there, the defendant

24  certainly has not carried his burden.  There's nothing that

25  indicates that the count of conviction is an accurate one.

25

1        Moreover, I think that the history of the defendant

2    shows that a departure on criminal history access would be

3    inappropriate because of the danger he poses to the community,

4    which I think is the most serious factor warranting a sentence

5    at the high end.   The defendant has numerous involvements with

6    firearms.   In Paragraphs 59, 66, 73 and 84 there's all the

7    defendant involved with firearms.

8        Let's just take one of those, for instance Paragraph

9    84, where he was not actually charged with this.   He was

10   arrested for being a felon in possession of a firearm in January

11   of 1994.   Your Honor, that was just months before he then got

12   convicted of armed bank robbery where he had a pistol that the

13   teller saw tucked into his belt.   And now, Your Honor, he gets

14   out of prison in mid-1998 and then in the beginning of 1999 he's

15   again arrested for armed bank robbery.   This time two

16   defendants, two firearms.   I think with his history of

17   involvement in firearms, the court should decline any departure

18   in the court's discretion because he's simply a danger to the

19   community.

20       Whether he's going to kill somebody for recklessly

21   fleeing from a crime or whether he's going to kill somebody with

22   the firearms that he uses time and again is immaterial.   The

23   fact of the matter is, he's an extremely dangerous man.   He's

24   had two opportunities to turn his life around in prison and each

25   time all he's done is get involved in ever-escalating crimes in

26

1    terms of their seriousness.

2            THE COURT:  Just for the sake of analytical precision,

3    do you construe Mr. Mayock's arguments relating to the career

4    offender status as a request for a departure?

5            MR. BROWN:  That is how I understood it, Your Honor.

6            THE COURT:  Okay.  I understood it slightly differently

7    as a request for a correction in terms of the calculation.

8    Which did you intend it to be, Mr. Mayock?

9            MR. MAYOCK:  As a departure.  That's why I was citing

10   the Sanchez Rodriguez case.

11           THE COURT:  Okay.  Anything further, Mr. Brown?

12           MR. BROWN:  No, Your Honor.

13           THE COURT:  Okay.  Thank you.

14           Mr. Day, would you like to say anything to me?  You

15   have a right to do it and sometimes it's very helpful to a

16   judge.  So feel free to do it if you choose.

17           THE DEFENDANT:  Your Honor, I'm not going to try to

18   make excuses for what I've done wrong.  I admit to what I did

19   wrong in this case and in the last bank robbery.

20           I pled guilty to unarmed bank robbery which I did

21   commit.  And I went to trial and the jury found me guilty of not

22   having a gun because -- not because they just didn't believe,

23   because they believed me, but they found me not guilty of not

24   having a gun because I didn't have one and because the people

25   had doubt.

27

1      They wasn't sure where I brought my bag from.  They

2  couldn't say.  They said I had a bag with blue and brown writing

3  on the bag and they said the gun was blue and brown.  When they

4  asked where was that, where did I get it, they didn't even know.

5  Well, we don't know, he just had it in his hand; one minute he

6  did, one minute he didn't.

7      But I didn't have a gun.  That's what I pled guilty

8  immediately.  When my lawyer told me, I said I'll plead guilty

9  to the robbery.  I did it.  I was desperate and in the act of

10  impulse I went into Wells Fargo.  I banked at Wells Fargo.  I

11  had about $12 in my account.  My wife was -- my fiancee was

12  pregnant.  The rent was due.  I walked into there and I said

13  give me the money.  I did that.  That was just stupidity and it

14  was done -- it was just stupidity.

15      The first criminal case that I have, the possession

16  with intent to distribute powder cocaine, I was visiting a

17  friend's house.  I was in the back room where there was no guns

18  with a lady.  There was no drugs found in that room.  The guy

19  who shot the police was in a totally different room with the gun

20  that belonged to his girlfriend.  Okay?

21      The cocaine that they found was found in a can inside

22  of a bathroom.  There was no evidence in the whole trial against

23  me being a drug dealer of any sort in there.  There was nobody

24  said that I sold drugs.  It was they were saying that the guy

25  that lived there sold the drugs.

28

1          I was visiting, the girl that was with me was visiting

2   that house.  And the Appeals Court overturned the case because

3   of the lack of evidence in the trial, not just because of the

4   judge's ruling in the argument, but because of a lack of

5   evidence also.  And I pled guilty because they told me I was

6   going to go home.  When they said you plead guilty you go home

7   tomorrow.  I mean, I've already been in prison two years, over

8   two years.  I pled guilty.  I didn't know that this would do

9   this to me later.

10          This case right here, this was stupidity.  I mean, this

11  was just -- I don't know why.  I don't know where the impulse,

12  why I just allowed myself to do something this stupid.  Running

13  from the police, I was scared.  The police was pulling guns out

14  on us.  Every time we turned a corner they were coming out their

15  cars pointing guns.  We were ducking.  I didn't want to get

16  shot.

17          There was no guns in the car when the police finally

18  caught up to us.  And I ran because I did not want to get shot.

19  I did not want them to shoot us because I know they're coming

20  because of the armed bank robbery.  I don't want them to shoot

21  me.  I'm trying to get away.  I don't want no guns in the car.

22          I don't want to get killed.  I don't want to get

23  killed.  I pulled into the parking lot because I know there's a

24  lot of cars there, there's a lot of people there.  I'm hoping

25  they're not going to open fire.  I didn't jump out of the car

29

1    because I don't want to get killed.

2              THE COURT:  A couple of people got hit by the car,

3    didn't they?

4              THE DEFENDANT:  I had an accident in the intersection.

5    A light turned red on me and I was going so fast I slid on the

6    brakes.  I couldn't stop and I wish I could apologize to the

7    person.

8              THE COURT:  You hit one car and that car hit a second

9    car, right?

10             THE DEFENDANT:  Yes.  I hit the back of a burgundy,

11   dark burgundy mini van.  I remember it clear as day.  And that

12   car slid and hit the front of another car that was turning

13   right, making a right-hand corner.  I mean I stopped for a

14   second and all I could think about was the police was going to

15   shoot me.  So I proceeded on.

16             I didn't get out -- I wasn't trying to run from them as

17   far as -- I knew I couldn't get away from no helicopter.  I know

18   once the helicopter's on you, you're going to jail.  But I

19   didn't want them to shoot me and I kept driving around looking

20   for somewhere where it was populated that I could go to to keep

21   them from killing me.  That's all I could think of.  I didn't

22   want them to shoot me and kill me.

23             I mean, I can't ask -- I'm not asking, Your Honor, I'm

24   not asking you give me leniency because I didn't do anything

25   wrong or because I don't deserve to be punished.  I agree.  I

1   accept the fact that I deserve to be punished.  I pled guilty

2   with no plea agreement, not because I was going to get a

3   benefit.  I didn't get a benefit from the plea.  I pled guilty

4   because I know I was guilty.  There was no benefit offered to

5   me.  No deal.  There was no deal.  I pled guilty because I know

6   I was guilty.  I know I was caught dead bang doing what I was

7   doing.

8           As far as my childhood, Your Honor, that's something

9   that I don't normally discuss.  I don't normally even tell

10  people.  I have friends that's known me for years that don't

11  know my father killed my mother.  And they don't know because

12  that's something that I don't talk about and I don't think is

13  any of their business.

14          I didn't tell none -- I never told anybody about it

15  until -- I didn't tell -- my fiancee told my lawyer the last

16  time I had a case when my lawyer talked about the issue.  I just

17  didn't want to push the issue because it's something that I have

18  been dealing with all my life.  And I have never known how to

19  deal with it.  It's not something that -- I mean, it's just

20  something I've never known how to deal with it.

21          I'm asking for leniency not because I want to go home.

22  Because I don't feel that I deserve that much time.  Because I

23  didn't make -- the mistakes that I made, a lot of it was made

24  out of impulses.  The robbery of the bank was pure impulse.  I

25  was visiting a friend which bad company brings about problems, I

31

1   agree.  And this robbery right here was a stupid mistake.  But I

2   know maybe one day I'll have the opportunity, I don't know.

3          Maybe I could write a letter and apologize to the

4   people in the car.  I would like to apologize to the people in

5   the bank because I know they were scared.  Even the teller in

6   the bank, I told -- not the teller, but the security guard, he

7   had his hands up.  I said put your hands down, man, I'm not

8   going to do anything to you, man.  Because I had no intentions

9   of physically hurting anybody.  I needed some money.

10         My father after the FBI went and talked to my father,

11  they got my father attempting suicide.  My family had to move

12  him back out of town.  And now I'm going through more.  I've got

13  more pain from my personal life than I do about being in jail.

14         THE COURT:  Well, I understand the impact of that and I

15  also understand as best as somebody who is a total stranger to

16  you can from a very different perspective why the trauma of your

17  childhood or at least the experience of your childhood is not

18  something you quickly or routinely talk about.  I really hear

19  you on that.

20         Is there anything further that you think I need to

21  know?

22         THE DEFENDANT:  I mean, I think you have more than

23  enough in front of you to take your judgment, Your Honor.  I

24  would just like to apologize to those that I've hurt.  I mean,

25  the people inside the bank and the people that I ran into their

32

1  cars and the person that was involved in it and the trauma that

2  I brought upon them.

3         As I started to say about post-traumatic stress

4  disorder, I realize the trauma that I put people in by the

5  things that I've done.  And I just hope that it doesn't affect

6  them like it's affected me.  And there's nothing else I have to

7  say, Your Honor.  Thank you for your time.

8         THE COURT:  All right.  I find that the guideline range

9  is what I stated.  The low end would be 272 and the high end

10  would be 319, taking into account the mandatory consecutive 84

11  months on Count 3.  I am not going to depart of either of the

12  bases that Mr. Day or his lawyer ask for and here's why.

13         As to whether or not the prior criminal record

14  overstates the seriousness of Mr. Day's offenses or distorts his

15  criminal profile, I think that the real question at its core is

16  what kind of risk to society does the prior history suggest

17  should be a factor for classification and for purposes of

18  sentencing.  And I don't think that Mr. Day's history can be

19  looked at only in terms of the possession with intent to

20  distribute offense and the current charge before me and the

21  prior bank robbery before that.

22         There is a pattern of criminal behavior.  It's

23  reflected in the probation report only in part in the sections

24  that Mr. Brown pointed to.  I think that the fact that he was 18

25  when the cocaine offense occurred is a factor that affects where

33

1    I come out on the guidelines.   I find that the particular

2    details of this offense and the explanation that Mr. Day just

3    gave me for what happened during the attempted flight reflect a

4    couple of factors that actually incline me not to depart.

5          Mr. Day's own statements are understandable.   Not

6    wanting to be shot is a basic and very survival instinct that we

7    all, almost all of us have.   But the choice that he made to

8    attempt to protect himself was made at the expense of society

9    and I'm afraid that that would be the choice he would make in

10   comparable circumstances in the future until and unless he can

11   get either the counseling or the treatment or the self insight

12   that would enable him to balance his interests as he perceives

13   them, his fears as he feels them with the interest and the fears

14   and the needs and the rights of other people, particularly other

15   innocent people.

16          So while I would have the discretion to accept

17   Mr. Mayock's requested departure on the seriousness of the

18   offense and whether or not Mr. Day should be classified as a

19   career offender, I decline to do so.

20          With respect to the impact of what happened when

21   Mr. Day was five or six, it's astonishing that someone could be

22   as strong as you appear to be, Mr. Day.   I don't want you to

23   think I'm holding that against you.   But in fact, I admire that

24   you can stand before me and speak to me in a really unusually

25   articulate way.   You can deal with something in public that

34

1    slices anybody to the bone and that you can be capable of

2    alternative behavior in light of that.

3              The information that Mr. Mayock attempted to get and

4    that in fact was provided by the doctor doesn't support the

5    factors that Mr. Mayock pointed to.  He has done what a good

6    lawyer should try to do and that is develop a basis for a

7    departure that isn't focused on any particular ground but

8    combines all of them and would make the whole greater than the

9    sum of its parts.

10             I don't say that to demean your argument, Mr. Mayock.

11   But that's the way I think it comes over.  And I'm trying to

12   look at the whole here.  And the whole that I see is somebody

13   who had other alternatives, even -- what I understand from the

14   probation reports -- in terms of the Seventh Day Adventist

15   suffering that you were exposed to, the several years of

16   non-criminal, non-violent, non-suicidal behavior on the part of

17   your father, you had opportunities, that you didn't have the

18   opportunities that many other people in society have, that I may

19   have had is unfortunate, but it doesn't require or authorize a

20   judge to say I'm going to depart downward from these factors.

21             And for those reasons and even given the recognition

22   that I'm now reflecting that I could do it, I decline to do it.

23   But I'm not going to sentence you to the 319 months.  I don't

24   think that that would be appropriate for a number of reasons.

25   And those reasons need to be expressed because the range of the

35

1   guidelines here is in excess of 24 months.

2        Unlike Mr. Bell, Mr. Day is a younger man. There's an

3   opportunity that if the message is correct and if it's

4   calibrated, if I came out with something that is appropriate and

5   you may not be ever in agreement with that either today,

6   tomorrow or ten years from now.  But what I'm trying to do is

7   reflect the seriousness of your conduct to the potential for you

8   to do better.

9        To simply and routinely give you what I'm authorized to

10  because of what you did, which is incredibly serious and not

11  just an isolated event, I think would be a mistake.  I think

12  that you need to be given a hope and I'm trying to give you the

13  basis to hope that there is some opportunity, particularly at

14  your relatively young age.  You'll be in jail no matter whether

15  I bought and accepted every argument that Mr. Mayock made.  The

16  term would be lengthy even at that classification.

17        I haven't accepted his argument.  But I don't want you

18  to think that I'm putting you in the same boat as Mr. Bell or

19  that I would just take all of the significant and very

20  compelling circumstances and say this is a bad guy, I'll give

21  him the highest end of the range I'm authorized to consider.

22  That is what I'm not going to do.  So that's the reason for the

23  sentence that I'm now about to impose and here is the sentence.

24        Pursuant to Section 5E1.2, Subsection A of the

25  guidelines -- Mr. Brown?

36

1      MR. BROWN:  Yes, Your Honor.  I apologize if I missed

2  this, but I don't believe Your Honor has inquired whether the

3  defendant and defense counsel reviewed and discussed the

4  presentence report as is required under Rule 32(c)(3)(A).  I

5  also don't whether -- I don't believe Your Honor has adopted the

6  findings of the presentence report.

7      THE COURT:  Well, I will get to the findings in a

8  minute.  I have not adopted the findings in terms of the way the

9  range has been reflected.  I don't understand exactly what the

10  basis is for a potential life sentence.  Neither lawyer has

11  addressed that.  I've looked into that and I'm aware of at least

12  one decision, a Ninth Circuit decision, that says in essence if

13  there is a mandatory minimum and no max, a life sentence can be

14  implied as the max.

15      But that's under 924 Subsection E, not under 924(c).

16  So I don't know what the basis is for considering that there was

17  a potential upward range of a life sentence here.  For that

18  reason I'm not accepting their findings.  But as reflected and

19  corrected, and I thought I did this adequately at the beginning,

20  I accept their findings and their calculations.

21      In terms of the review of the report, I thought we had

22  gone over that.  Mr. Mayock and Mr. Day, you have had a chance

23  to review the presentence report; is that correct?

24      MR. MAYOCK:  It is, Your Honor.

25      THE COURT:  And you and at least the government's

37

1   response to your opposition, correct?

2           MR. MAYOCK:  Yes, Your Honor.

3           THE COURT:  Is there any basis that you can think of

4   procedurally why it is not timely for me to impose sentence?

5           MR. MAYOCK:  No, Your Honor, no legal cause.

6           THE COURT:  Okay.  Pursuant to Section 5E1.2 of the

7   guidelines, all fines are waived because I find that Mr. Day

8   does not have the ability to pay a fine.  It is ordered that the

9   defendant shall pay to the United States a special assessment of

10  $300 which is due immediately to the clerk of the court.

11          Pursuant to the Sentencing Reform Act of 1984 it is the

12  judgment of the court that the defendant Mr. Montez Day is

13  hereby committed on Counts 1, 2 and 3 of the indictment to the

14  custody of the Bureau of Prisons to be imprisoned for a term of

15  288 months.  That is 24 years.  This term consists of -- I have

16  to break this down.  A combined -- Mr. Brown?

17          MR. BROWN:  No, Your Honor.  I was just going to break

18  it down.

19          THE COURT:  How were you going to break it down?

20          MR. BROWN:  60 months on Count 1 to be run concurrently

21  with 204 months on Count 2, followed by a mandatory consecutive

22  term of 84 months.

23          THE COURT:  Yes.  Well, that's what I had scoped out

24  and that's the basis for the calculation of 288.

25          Upon release from imprisonment, Mr. Day shall be placed

38

1    on supervised release for a term of five years.  This term

2    consists of three years on Count 1 and five years on Counts 2

3    and 3, with all those terms to be served concurrently and under

4    these conditions and terms.

5         First, Mr. Day shall comply with the rules and

6    regulations of the U.S. Probation Office and General Order 318.

7    Second, he shall participate in outpatient substance abuse

8    treatment and submit to drug and alcohol testing as instructed

9    by the probation officer.  Mr. Day shall abstain from using

10   elicit drugs, alcohol and abusing prescription medications

11   during the period of supervision.  During the period of

12   community supervision the defendant shall pay a special

13   assessment in accordance with this judgment's orders pertaining

14   to such payment.

15        The defendant shall participate in a psychological

16   psychiatric counseling or treatment program as approved and

17   directed by the probation office.  And the defendant shall not

18   obtain or possess any driver's license, social security number,

19   birth certificate, passport or any other form of identification

20   without the prior written approval of the probation officer.

21   And he shall not use for any purpose or in any manner any name

22   other than his true legal name.

23        Now you have a right to appeal this sentence, Mr. Day.

24   And if you do so, you need to do so within ten days from today.

25   Please speak to Mr. Mayock who will give you all of the

39

1    information you need on how to prosecute an appeal from the

2    sentence that I've now imposed.  And if you are in doubt and

3    need to know this, if you cannot afford to have Mr. Mayock

4    represent you on appeal, he will continue to be appointed at no

5    cost to you.

6            Now there are no counts to dismiss; is that right,

7    Mr. Brown?

8            MR. BROWN:  That's right, Your Honor.

9            THE COURT:  Okay.  Is there anything further that needs

10   to be addressed?

11           MR. MAYOCK:  Yes, Your Honor.  I believe you said that

12   with respect to the supervised release each of the terms were to

13   run concurrently.  But I don't know if you said that with

14   respect to the 60-month, 204-month and 84-month sentence.  Those

15   are consecutive or concurrent?

16           THE COURT:  Well, the 84 months is consecutive.

17           MR. MAYOCK:  The 60 then is a concurrent sentence; is

18   that correct?  I just wanted to make sure because otherwise the

19   Bureau of Prisons will run every sentence, if there's no record,

20   it runs consecutively.

21           THE COURT:  I'm not sure how to --

22           MR. BROWN:  Count 1, the 60-month term, runs concurrent

23   with Count 2, the 204-month term.

24           THE COURT:  And that's what my findings were.

25           MR. MAYOCK:  And then the 84-month term for the 924(C)

40

1    is consecutive.

2              THE COURT:  Right.  All right.  Thank you.

3              MR. MAYOCK:  Thank you, Your Honor.

4              THE COURT:  Now let's turn to Mr. Bell, please.

5              Okay.  Mr. Bell and Mr. Newman, have you had a chance

6    to review what you needed to?

7              MR. NEWMAN:  We have, Your Honor.

8              THE COURT:  Can you think of any reason why I should

9    not impose the sentence?

10             MR. NEWMAN:  No, Your Honor.

11             THE COURT:  Okay.  Did you understand -- did you listen

12   to and understand what I said concerning the way I believe that

13   the calculations need to be articulated?

14             MR. NEWMAN:  Yes, Your Honor.

15             THE COURT:  Okay.  Now I would like to proceed much as

16   I did with Mr. Day and that is to give you, Mr. Newman, a chance

17   to understand what my take is on your arguments.  Then you can

18   address those in your oral arguments.  Your client will be given

19   an opportunity also.

20             You have seen, Mr. Newman, that to the extent you are

21   objecting to the references in the presentence report concerning

22   the uncharged bank robberies, those have been modified and

23   changed.  And I want you to know I truly have not taken those

24   into account.

25             MR. NEWMAN:  I understand.

41

1          THE COURT:  I don't have basis to consider that your

2    client committed those robberies and I don't think that he

3    should be treated that way and I haven't treated him that way in

4    my provisional thinking.  So I want you to be clear about that.

5          To the extent that much of your position is based upon

6    Mr. Bell's designation as a career offender, it is that he was

7    not serving a sentence within the 15-year period that is the

8    outer scope.  I think that the government's assessment of what

9    really happened, and it may be the probation officer's

10   assessment is correct too, he began serving a sentence on August

11   6th, 1981.  That was aggregated.  It was 30-plus year sentence.

12         The fact that he has chosen not to return from the day

13   of release was built into the sentence.  It was basically for

14   the unauthorized escape.  And had he not escaped, he'd have been

15   in custody past the start date which is January 29th in 1984.

16         I believe that the calculation is correct.  I believe

17   that the reasons for the calculation make sense in this

18   particular case.  I am not inclined to adopt your contention

19   that he should not be classified as a career offender.

20         You have also moved for a downward departure because

21   your client didn't wield a semi-automatic weapon, but instead a

22   .38 caliber weapon.  I have no difficulty whatsoever in

23   rejecting that basis for a departure.  Just because there's no

24   basis for departing upward under 5K2.17 doesn't mean and doesn't

25   justify flipping that concept and granting your client a

42

1    downward departure.

2         As to the relatively recent issue concerning his mental

3    status and his capacity, I have looked at Dr. St. John's report

4    and the diagnosis is what I think I'm required to pay most

5    attention to.  The diagnosis is that Mr. Bell had borderline

6    intellectual functioning.

7         But the report itself makes it clear that while

8    immature, your client was capable of distinguishing right from

9    wrong and I don't find any basis, none, in the evidence before

10   me to suggest that the classification or the diagnosis that your

11   expert has come up with of being borderline intellectual, being

12   in the borderline intellectual functioning status warrants any

13   special consideration given the nature of this conduct.  So

14   those are my initial reactions to the contentions that you have

15   asserted in response to the presentence report.

16        So that this transcript can stand alone and the Court

17   of Appeals can have a basis to evaluate from where I'm coming

18   from and how I've approached this sentencing, let me reiterate

19   what I said earlier this afternoon as to the co-defendant

20   Mr. Day.  I think that the correct way of assessing the

21   guidelines, and your client is being sentenced only on Counts 2

22   and 3, is that the range for Count 2 is 188 months to 235

23   months.  Count 3 brings a mandatory consecutive period of 84

24   months.  So correctly stated the range would really be 272

25   months to 319 months.

43

1          And in a moment I will listen very carefully to what
2     you say and anything that Mr. Bell may choose to say. I am
3     inclined to sentence him at the upward level of 319 months.
4     With that as guidance, feel free to address it.
5          MR. NEWMAN: Thank you, Your Honor. We'll start first
6     with the career offender issue and that is that the basis of the
7     probation department's calculation as to what transpired with
8     the court subsequent to his recapture from the 1975 bank robbery
9     is based on records from the Bureau of Prisons that were
10    received from Metropolitan Detention Center because the records
11    were so old that that's where the probation officer went.
12         My client insists that the fact that the cut-off date
13    that he was sentenced to ten years on the bank robbery and that
14    that sentence had been terminated and that the second sentence
15    of 25 years on the second bank robbery was started after the
16    date of the, the break-off date.
17         THE COURT: If you can be precise and give me months,
18    dates and years, I'll be able to follow you better.
19         MR. NEWMAN: Yes. The date of -- let me get my paper
20    here.
21         THE COURT: Maybe you should look at Paragraphs 88 and
22    89.
23         MR. NEWMAN: Yes, Your Honor. That's what I was just
24    trying to find.
25         Mr. Bell was sentenced and was received at Lompoc on

44

1    January 16th, 1976 concerning the 1975 bank robbery; that he

2    continued serving that sentence until he was released on I

3    believe March 13th, 1981. At that time Mr. Bell was released on

4    a day pass and was then classified as an escapee. And I should

5    note that this paragraph and the subsequent paragraph are all

6    taken from the Bureau of Prisons records and not from the

7    court's records.

8          THE COURT: Do you have conflicting information from

9    these?

10         MR. NEWMAN: No, I don't, Your Honor, because the

11   records are so old. And I think that's why the probation

12   department usually tries to use court records, but in this case

13   was unable to which in and of itself makes the accuracy of this

14   information somewhat, somewhat -- I don't want to say unreliable

15   is probably too harsh a word -- but let's put it questionable.

16         THE COURT: Okay. Keep going.

17         MR. NEWMAN: That Mr. Bell was arrested on April the

18   28th of 1981 for the second bank robbery. Now that bank robbery

19   I should note, Your Honor, is not an issue as to being a

20   predicate offense. And as to what Mr. Bell states, is that the

21   sentence that he received for that conviction on July 8th, 1981,

22   he received consecutive sentences from the first bank robbery to

23   which he had previously been sentenced to.

24         So that by the time we get to I think it's July of 1984

25   wherein we're within the 15 years for the predicate first

45

1   offense for a career offender, that sentence had already been

2   served and at that time he was serving the subsequent sentence

3   for the 1981 bank robbery.  Therefore, the 1975 bank robbery

4   would not be a predicate offense for career offender status.

5          THE COURT:  Well, if you'll look at Paragraph 87, it

6   says he was sentenced in Docket 81-000583, escaped -- five

7   years' imprisonment concurrent to Count 1 in a different docket.

8   I'm trying to figure out what that different docket was.

9          MR. NEWMAN:  I would assume the different docket would

10  have been the 1975 bank robbery.

11         THE COURT:  Yes, but that's not what -- it's a

12  different docket number.  The docket number for the '75

13  robbery's in Paragraph 84.  Then you get to Paragraph 87 and it

14  refers to a different docket number, 497.  I don't understand

15  why they do it this way.  It would be so much easier to say the

16  1975 Crocker robbery and the 1981 Great Western robbery.  It

17  would be much easier -- I'm just saying this for the sake of

18  communicating.  It is so hard for a court to be as conscientious

19  as we try to be.

20         Anyway, what's your point?

21         MR. NEWMAN:  So the point is is if the 19, if he had

22  completed his sentence for the 1975 bank robbery prior to July

23  1984, that would have been outside the 15-year requirement for a

24  predicate offense and he would not be a career offender.

25         THE COURT:  I think that's analytically sound.  That's

46

1    correct.  But what about the "if," what makes you say that he

2    did complete it?

3           MR. NEWMAN:  Well, Your Honor, the records are, I

4    believe are questionable at best.  They're confusing as written

5    here as Your Honor just noticed.  And the numbers don't really,

6    I should say the case numbers, docket numbers do not jive and I

7    think that that's evidence of the fact that it was an old case

8    that the records are not readily available.

9           The Bureau of Prisons in maintaining their records, I'm

10   not sure how complete they are or whether they're summarized.

11   They don't generally have the first information.  They do now,

12   but in those days it was different.  And whether they just had

13   case summaries, that would make the efforts of the probation

14   officer who I believe is conscientious and well meaning, make it

15   inaccurate or tend to be inaccurate or unclear.  And certainly

16   if it's unclear, then the benefit of the doubt should go to the

17   defendant.

18          THE COURT:  Okay.

19          MR. NEWMAN:  The second other matter that Your Honor

20   addressed with regard to why the court would not do sort of an

21   about face because no --

22          THE COURT:  I just want to help you out because if you

23   look at Paragraph 95, that's what seems to describe the nature

24   of the sentence that was imposed on July 8th of '81.  That

25   supports the government's contention that the sentence for

47

1   No. 75-1734 which is the Crocker Bank 1975 holdup, was part of

2   an aggregated sentence.

3           MR. NEWMAN:  But this was all taken from MDC records

4   and not from court files or judgment commitment orders.

5           THE COURT:  Okay.  But if I were to find or required to

6   find that this evidence is reliable, what does that do to your

7   argument?

8           MR. NEWMAN:  Well, certainly if the sentences are

9   merged or are combined, then it appears that he would be a

10  career offender.

11          THE COURT:  Okay.

12          MR. NEWMAN:  I mean, I've got to be honest.

13          The other issue that Your Honor addressed with regard

14  to a requested downward departure based on the fact that he was

15  not armed with an automatic weapon, there is some case law to

16  support the fact, and we did cite some in our papers, that some

17  courts have taken the discretion and downward departed because

18  of the lack of using an automatic weapon.

19          Those cases have said that in a -- if you look at the

20  types of cases that where people are armed, that the typical

21  armed robber is armed with an automatic weapon as opposed to a

22  revolver and, therefore, some courts have elected to, because of

23  the ability of course of an automatic weapon to facilitate more

24  damage.

25          THE COURT:  This weapon was plenty lethal enough.  I

48

1    really don't think you should press that argument because I find

2    it to be utterly unpersuasive.

3          MR. NEWMAN:  I understand, Your Honor.

4          The next issue Your Honor did not address in the

5    summary that I did raise in my paper, two other issues, where

6    the probation officer has increased his sentence or his range.

7    One is concerning the escape and the probation officer increased

8    his level by two levels pursuant to 2(b)(3.1)(B)(3)(a) of that

9    being, you know, a danger to the public.  I think as the court

10   noted in the previous sentence --

11         THE COURT:  Wait a minute.  Are you talking about

12   whether there was an increment for reckless endangerment?

13         MR. NEWMAN:  Reckless endangerment, that's correct,

14   Your Honor.

15         THE COURT:  I don't think you're correct.  I think the

16   probation office did not tack on two points for that.

17         MR. NEWMAN:  I'm looking at Paragraph 36, Your Honor,

18   Page 8.  And it certainly indicates a two-level increase.

19         THE COURT:  Yes, but that's for physical restraint.

20   That's for what happened inside the bank.  That's not for what

21   happened on the attempted flight.

22         MR. NEWMAN:  Well, my understanding was the -- let's

23   see.  Well, the following Paragraph 38 referred to a two-level

24   for the physically restrained.

25         THE COURT:  No.  I think what you need to appreciate,

49

1   Mr. Newman, is that the probation officer's calculation, which I

2   think is correct, is that you add on two points for the

3   restraint of the tellers and the bank manager.  That occurred

4   inside the premises of the bank.  The probation officer was very

5   explicit in saying that as to what happened in the cars

6   afterward really is attributable to the co-defendant.  And I

7   took that into account in assessing the co-defendant's

8   arguments.  So Mr. Day, but not Mr. Bell, was assessed for

9   reckless endangerment after the flight.

10          MR. NEWMAN:  Well, my interpretation of those

11  paragraphs, Your Honor, was in Paragraph 37 -- I'm sorry, 36,

12  37, 38 in that she increased Paragraph 36 two levels.

13          THE COURT:  Look at 40 and look at the top of Page 9

14  and you'll see zero, a big zero.  This enhancement has not been

15  applied to Bell.  It can't be any clearer.  On top of Page 9.

16          MR. NEWMAN:  I see where it is, Your Honor.  But I also

17  see where -- I'm adding the points here.  That she increased by

18  eight levels.

19          THE COURT:  Two for property being taken, two for

20  bodily injury out of the collision, two for physical restraint

21  in the bank, two for the loss.  That's 8 plus 20 which is the

22  base offense level.  That would get to the 28.  That's your 28.

23  If there were no career offender status, their reduction, the

24  three points for acceptance of responsibility and you would get

25  to the 25 that you're advocating.

50

1          MR. NEWMAN:  Well, then it was my understanding in

2     reading this, Your Honor, in that my interpretation was that she

3     had increased it for physical restraint of the manager in the

4     branch which we argued against and the reckless endangerment

5     which we believe that Mr. Bell should not be --

6          THE COURT:  I think you are not correct on that point,

7     Mr. Newman.  The reckless endangerment has not been applied to

8     this.

9          Is that correct, Mr. Brown?

10         MR. BROWN:  It is, Your Honor.

11         THE COURT:  Okay.  So why don't you move on beyond

12    that.

13         MR. NEWMAN:  Okay.  Going with Dr. St. Martin's report,

14    Your Honor, yes, Mr. Bell was considered of low intellectual

15    function and being immature, if you want to talk about someone

16    being immature at 47 years old.  But what we have here is

17    someone who has had extreme difficulty functioning and that for

18    a short period of time he was able to beat a long history of

19    drug abuse and that we can say that this offense was not

20    predicated by his drug abuse, but predicated on the need for his

21    loss of his job, that he had no income and that, as was stated

22    earlier, it was virtually a spontaneous decision to do this.

23         And that Mr. Bell as a disjunctive argument to the

24    downward departure for the psychological impact or immaturity of

25    Mr. Bell, we ask that the court in the alternative mitigate that

51

1    because of his mental state, his low intellect would mitigate

2    some of the aggravating factors in the sentence.

3         Mr. Bell has been very vocal in his claim that he never

4    threatened to kidnap the manager, that he did push her away from

5    the door.  He did not pull her by the hair.  That it was a

6    violent robbery.  He's not minimizing what he's done.  But if

7    Your Honor sentences him as the court indicated, he will be in

8    his late seventies or eighties by the time he is released.

9         We are asking for a sentence in the low to mid-range of

10   the guideline range.  The sentence that Your Honor meted out to

11   the co-defendant, 24 years, even if you sentenced Mr. Bell to

12   that sentence would put him into the upper sixties or seventies

13   by the time he would be released, certainly over any age of the

14   ability to commit any further offenses.

15        Mr. Bell has shown that for a period of time he was

16   able to function lawfully in society until some, until he lost

17   his job and he lost his job through no fault of his own or even

18   the employer.  But he was injured on the job and therefore was

19   unable to work.  And Mr. Bell came in early and pled guilty to

20   this offense.

21        THE COURT:  For which he has been given three downward

22   points.

23        MR. NEWMAN:  I understand that, Your Honor.  But what

24   we're asking for -- and we're not asking for an unsubstantial

25   sentence.  That 188 months is roughly 22 years.  Where the

52

1    range -- I should say to 235, it goes up to 25 years -- is more

2    than substantial to adequately protect society and also to act

3    as a deterrent and rehabilitation such as it is within the

4    Bureau of Prisons to date.

5         But it should be noted, Your Honor, that Mr. Bell has

6    succeeded at least in his prior prison sentence in deridding

7    himself of a substantial drug habit that he's had.  If Your

8    Honor looks at his record, it goes back to when he was a

9    teenager in the 1960s.  And unless the court has any other

10   questions....

11        THE COURT:  I don't think I do, but thank you,

12   Mr. Newman.

13        Mr. Brown, I think you heard what I said before about

14   my inclination.  Do you feel any compelling need to add to what

15   you've said in your papers?

16        MR. BROWN:  No, Your Honor.

17        THE COURT:  Okay.  Thank you.

18        Mr. Bell, you have a right, as did Mr. Day, to speak to

19   me.  Please feel free to tell me anything that you want me to

20   take into account.

21        THE DEFENDANT:  I have nothing to say, Your Honor.

22        THE COURT:  All right.  I respectfully decline to

23   depart from the guidelines and I also decline to deviate from

24   the probation office recommendation.  I am going to sentence

25   Mr. Bell to the high end of the guideline range.  And for the

53

1   record, the reasons are that I think that at the age of 47 the

2   lessons of the past still have not been learned.

3           This is a man who has an extremely extensive criminal

4   record.  This offense was extremely serious.  The factors that

5   counsel have pointed to in an admirable effort to do the best he

6   can for his client are unpersuasive.  The mental considerations

7   I already addressed.

8           I do find and Mr. Newman was professional enough to

9   acknowledge that if there's no clear basis to dispute or reject

10  the calculation as to what happened in the aggregated sentence,

11  then there is a basis to incorporate the prior '75 offense as a

12  predicate felony for purposes of career offender status.  I

13  don't find that there's any basis to question what apparently is

14  in the records of the MDC.

15          I think that the circumstances of this offense, the

16  nature of the offense, the defendant's previous history,

17  especially his criminal history all warrant sentencing at the

18  upward end of the guidelines.  So for those reasons here's the

19  sentence.

20          All fines are waived as it is found that the defendant

21  does not have the ability to pay a fine.  It is ordered that the

22  defendant shall pay to the United States a special assessment of

23  $200 which is due immediately to the clerk of the court.

24          Pursuant to the Sentencing Reform Act of 1984, it is

25  the judgment of the court that Bruce Bell is hereby committed on

54

1   Counts 2 and 3 of the indictment to the custody of the Bureau of

2   Prisons to be imprisoned for a term of 319 months.  This term

3   consists of 235 months on Count 2 and 84 months on Count 3 which

4   shall be served consecutively to the term on Count 2.

5        Upon release from imprisonment, the defendant shall be

6   placed on supervised release for a term of five years.  This

7   term consists of five years on Counts 2 and 3 with all such

8   terms of supervised release to be served concurrently and under

9   these terms and conditions.

10        First, the defendant shall comply with the rules and

11   regulations of the U.S. Probation Office and General Order 318.

12        Second, the defendant shall participate in outpatient

13   substance abuse treatment and submit to drug and alcohol testing

14   as instructed by the probation officer.  The defendant shall

15   abstain from using elicit drugs, alcohol and abusing

16   prescription medications during the period of supervision.

17        Third, during the period of community supervision, the

18   defendant shall pay the special assessment in accordance with

19   this judgment's order pertaining to such payment.

20        Fourth, the defendant shall not obtain or possess any

21   driver's license, social security number, birth certificate,

22   passport or any other form of identification without the prior

23   written approval of the probation officer.  Further, the

24   defendant shall not use for any purpose or any manner any name

25   other than his true legal name.

55

1          Mr. Bell, you may appeal the sentence.  To do so you to

2     need to file a notice of appeal within ten days.  Please speak

3     to Mr. Newman about that.  He will be available to represent

4     you.  If you cannot afford to have a lawyer for purposes of

5     appeal, he can be made available to serve as your attorney.

6          Is there a motion concerning Count 1?

7          MR. BROWN:  Yes, Your Honor.  The government moves to

8     dismiss Count 1.

9          THE COURT:  Okay.  That motion, in the interest of

10    justice will be granted.

11         Is there anything further, counsel?

12         MR. NEWMAN:  No, Your Honor.

13         THE COURT:  Mr. Brown?

14         MR. BROWN:  Nothing, Your Honor.

15         THE COURT:  All right.  Thank you, counsel.

16         (PROCEEDINGS ADJOURNED)

17

18                    C E R T I F I C A T E
19         I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT
      TRANSCRIPT OF THE ABOVE-ENTITLED PROCEEDINGS, PAGES 1-56.
20    DATED JANUARY 10, 2000; LOS ANGELES, CALIFORNIA.

21    _Lynne Smith_____
      LYNNE SMITH
22    OFFICIAL COURT REPORTER

23

24

25

111

1

CERTIFICATE OF SERVICE BY MAIL

2

3
I, TERESA GUZMAN, declare:

That I am a citizen of the United States and resident or
4
employed in Los Angeles County, California; that my business address
5
is Office of United States Attorney, United States Courthouse, 312
6
North Spring Street, Los Angeles, California 90012; that I am over
7
the age of eighteen years, and am not a party to the above-entitled
8
action;

9
That I am employed by the United States Attorney for the Central
10
District of California who is a member of the Bar of the United
11
States District Court for the Central District of California, at
12
whose direction the service by mail described in this Certificate was
13
made; that on March 23, 2001, I deposited in the United States mails
14
in the United States Courthouse at 312 North Spring Street, Los
15
Angeles, California, in the above-entitled action, in an envelope
16
bearing the requisite postage, a copy of: GOVERNMENT'S OPPOSITION TO
17
DEFENDANT'S 28 U.S.C. § 2255 MOTION; DECLARATION OF MICHAEL MAYOCK;
18
EXHIBITS

19
Addressed:     MICHAEL MAYOCK, ESQ.      MONTEZ DAY
20
               35 S. RAYMOND, SUITE 400  REG. NO. 12291-076
               PASADENA, CA 91105        U.S. PENITENTIARY, LOMPOC
21
                                         3901 KLEIN BOULEVARD
                                         LOMPOC, CA 93436
22

23
This Certificate is executed on March 23, 2001, in Los

24
Angeles, California.

25
I certify under penalty of perjury that the foregoing is

26
true and correct.

27
                                    Teresa Guzma

                                  TERESA GUZMAN
28

# EXHIBIT D

**United States District Court**
**Central District of California**

$122 9/0/6$

UNITED STATES OF AMERICA vs                Docket No. _____ CR99-123-AHM _____

Defendant ___ MONTEZ DAY _____        Social Security No. ▮▮▮-4812
    Akas Derek Dayton, Derek James Dalton, Derek Daton,        ▮▮▮-3442, ▮▮▮4912
      Montez Days, Montey R. Day, Barry Black,
  Jackie Davis, Jackie James Rime
  MDC, Los Angeles, CA _____

---

### JUDGMENT AND PROBATION/COMMITMENT ORDER

In the presence of the attorney for the government, the defendant appeared in person, on this date

of : __ OCTOBER 25, 1999 __

COUNSEL:  _X_ WITH COUNSEL __ Michael Mayock, apptd __

PLEA:        _X_ GUILTY, and the Court being satisfied that there is a factual basis for the plea.

**OFFENSE:** Conspiracy to commit bank robbery, in violation of 18 USC 371, as charged in Count 1; armed bank robbery, in violation of 18 USC 2113(a)(d), as charged in Count 2; use of a firearm during a crime of violence, in violation of 18 USC 924(c), as charged in Count 3 of the Indictment.

### JUDGMENT AND PROBATION/COMMITMENT ORDER:

The Court inquired of the defendant and his counsel as to whether there is any legal cause or reason as to the imposition of sentence. Due to the fact that there was not sufficient cause shown to the contrary by the defendant and /or his counsel, the Court ordered judgment as follows:

Pursuant to Section 5E1.2(e) of the Guidelines, all fines are waived as it is found that the defendant does not have the ability to pay a fine.

IT IS ORDERED that the defendant shall pay to the United States a special assessment of $300, which is due immediately to the Clerk of Court.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the court that the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of a total of two hundred eighty-eight (288) months, which consists of sixty (60) months on Count 1, two hundred four (204) months on Count 2 and eighty-four (84) months on Count 3. The terms of imprisonment on Counts 2 and 3 to be served consecutively to each other and the term of imprisonment on Count 1 to be served concurrently with the terms on Counts 2 and 3 of the Indictment.

IT IS ADJUDGED, upon release from imprisonment, the defendant shall be placed on supervised release for a total term of five (5) years, which consists of three (3) years on Count 1 and five (5) years on each Count 2 and 3, all such terms to be served concurrently with each other, under the following terms and conditions:

     1.  That he shall comply with the rules and regulations of the U. S. Probation Office and General Order 318;

     2.  That he shall participate in outpatient substance abuse treatment and submit to drug and alcohol testing, as instructed by the probation officer; and that he shall abstain from using illicit drugs, alcohol and abusing prescription medications during the period of supervision;

JUDGMENT AND COMMITMENT ORDER, MONTEZ DAY, CR99-123-AHM

     3.   During the period of community supervision, he shall pay the special assessment in accordance with this judgment's orders pertaining to such payment;

     4.   That he shall participate in a psychological/psychiatric counseling or treatment program, as approved and directed by the Probation Officer; and

     5.   That he shall not obtain or possess any driver's license, Social Security number, birth certificate, passport or any other form of identification without the prior written approval of the Probation Officer; further, that he shall not use, for any purpose or in any manner, any name other than his true legal name.

Defendant informed of right to appeal.

The Court Recommends that the Bureau of Prisons provide psychiatric counseling to the defendant.

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release set out on the reverse side of this judgment be imposed. The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

Signed by: _____     DATED/FILED: 10/28/99
           **A. HOWARD MATZ**
           U.S. District Judge

It is ordered that the Clerk deliver a certified copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

                    Sherri R. Carter, Clerk

Dated/Filed 10-28-99
   Month / Day / Year           By_____
                    Deputy Clerk

**Page 1 of 3 Pages**

Judgment-Page __3__ of __3____

DEFENDANT:  MONTEZ DAY
CASE NUMBER: CR99-123-AHM

## STATEMENT OF REASONS

☐ The court adopts the factual findings and guideline application in the presentence report.

### OR

X  The court adopts the factual findings and guideline application in the presentence report except (see attachment, if necessary):
The parties failed to establish support for the U.S.P.O.'s statement that the high end of the Guidelines would be a life sentence.

Guideline Range Determined by the Court:

    Total Offense Level: 27 plus enhancement for career offender: 31
    Criminal History Category: VI
    Imprisonment Range: 272-319 months, including 18 USC 924(c)
    Supervised Release Range: 3 to 5 years
    Fine Range: $ _15,000_____ to $ 150,000_____

X  Fine waived or below the guideline range because of inability to pay.
    Total Amount of Restitution: $ ___0_____

        ☐ Restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweighs the need to provide restitution to any victims, pursuant to 18 U.S.C. § 3663(d).

        ☐ For offenses committed on or after September 13, 1994 but before April 23, 1996 that require the total amount of loss stated, pursuant to Chapters 109A, 110, 110A, and 113A of Title 18, restitution is not ordered because the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the payment of any or some portion of a restitution order in the foreseeable future under any reasonable schedule of payments.

        ☐ Partial restitution is ordered for the following reasons(s):

☐ The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by the application of the guidelines.

### OR

X  The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reasons(s):
    Defendant is young enough to benefit from the experience of 24 years in prison, but his prior background—both as a cr5iminal and as a victim of a childhood trauma (seeing his father slay his mother) justify less than the high end.

### OR

☐ The sentence departs from the guideline range:
☐ upon motion of the government, as a result of defendant's substantial assistance.
☐ for the following specific reason(s):

# EXHIBIT E

Montez Day Register # 12291-076

**NAME**

United States Penitentiary,  Lompoc

3901 Klein Boulevard

Lompoc,  California  93436

(ADDRESS or PLACE OF CONFINEMENT and PRISON NUMBER)

NOTE: *If represented by an attorney, his name, address and telephone number*

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 ℭ𝔬𝔲𝔯𝔱
## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA | CASE NO. |
|---|---|
| v. | |
| MONTEZ  DAY | (To be supplied by the Clerk of the U.S. District Court) |
| Full name of movant (include name under which you were convicted) | **MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY** |
| | 28 U.S.C. §2255 |

(If movant has a sentence to be served in the future under a federal judgment which he wishes to attack, he should file a motion in the federal court which entered the judgment.)

## INSTRUCTIONS AND INFORMATION — READ CAREFULLY

This motion must be legibly handwritten or typewritten and signed by the movant under penalty of perjury. Any false statement of a material fact may serve as the basis for prosecution and conviction for perjury. All questions must be answered concisely in the proper space on the form. Where more room is needed to answer any question use reverse side of sheet.

Additional pages are not permitted. No citation or authorities need be furnished. If briefs or arguments are submitted, they should be submitted in the form of a separate memorandum.

Upon receipt, your motion will be filed if it is in proper order. No fee is required with this motion.

If you do not have the necessary funds for transcripts, counsel, appeal, and other costs connected with a motion of this type, you may request permission to proceed *in forma pauperis*, in which event you must execute the declaration on the last page, setting forth information establishing your inability to pay the costs. If you wish to proceed *in forma pauperis*, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account in the institution.

MOTION UNDER 28 U.S.C. §2255

Civ. - 67 (01/83)

Only judgments entered by one court may be challenged in a single motion. If you seek to challenge judgments entered by different judges or divisions either in the same district or in different districts, you must file separate motions as to each judgment.

Your attention is directed to the fact that you must include all grounds for relief and all facts supporting such grounds for relief in the motion you file seeking relief from any judgment of conviction.

When the motion is fully completed, the *original and two copies* must be mailed to the Clerk of the United States District Court whose address is: 312 N. Spring St., Los Angeles, Ca 90012

ATTN: Intake/Docket Section

Motions which do not conform to these instructions will be returned with a notation as to the deficiency.

### MOTION

1. Name and location of court which entered the judgment of conviction under attack <u>Central District of California</u>

2. Date of judgment of conviction <u>5/14/99</u>

3. Length of sentence <u>288 Months</u>    Sentencing Judge <u>A. Howard Matz</u>

4. Nature of offense or offenses for which you were convicted <u>18 U.S.C.§371: Conspiracy to commit Bank Robbery; 18 U.S.C. § 2113 (a): Armed Bank Robbery; 18 U.S.C. § 924 (c) : use of Firearm during Crime of Violence</u>

5. What was your plea? (Check one)

    (a)  Not guilty (  )
    (b)  Guilty ( X )
    (c)  Nolo Contendere (  )

    If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details _____

6. Kind of trial: (Check one)

    (a)  Jury (  )
    (b)  Judge only (  )

7. Did you testify at the trial?  Yes (  )  No (X)

8. Did you appeal from the judgment of conviction?  Yes (  )  No (Ẍ)

-2-

9. If you did appeal, answer the following:

   (a)  Name of Court _____

   (b)  Result _____

   (c)  Date of Result _____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any federal court? Yes ( ) No (X)

11. If your answer to 10 was "yes", give the following information:

   (a)  (1)  Name of Court _____

        (2)  Nature of proceeding _____

        (3)  Grounds raised _____

                    _____

                    _____

                    _____

                    _____

        (4)  Did you receive an evidentiary hearing on your petition, application or motion?
             Yes ( ) No ( )

        (5)  Result_____

        (6)  Date of result _____

   (b)  As to any second petition, application or motion give the same information:

        (1)  Name of Court _____

        (2)  Nature of proceeding _____

        (3)  Grounds raised _____

                      _____

                    _____

                    _____

                    _____

        (4)  Did you receive an evidentiary hearing on your petition, application or motion?
             Yes ( ) No ( )

        (5)  Result_____

        (6)  Date of result _____

   (c)  As to any third petition, application or motion, give the same information:

        (1)  Name of Court _____

        (2)  Nature of proceeding _____

        (3)  Grounds raised _____

                      _____

                    _____

                    _____

                    _____

        (4)  Did you receive an evidentiary hearing on your petition, application or motion?
             Yes ( ) No ( )

        (5)  Result_____

        (6)  Date of result _____

Civ. - 67 (01/83)

MOTION UNDER 28 U.S.C. §2255

(d) Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion?

   (1)  First petition, etc.                Yes ( )  No ( )
   (2)  Second petition, etc.            Yes ( )  No ( )
   (3)  Third petition, etc.               Yes ( )  No ( )

(e) If you *did not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:_____

12. State *concisely* every ground on which you claim that you are being held unlawfully.

   CAUTION:    If you fail to set forth all grounds in this motion, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you have other than those listed. However, *you should raise in this motion all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

If you select one or more of these grounds for relief, you must allege facts in support of the grounds listed below. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

   (a)  Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.

   (b)  Conviction obtained by use of coerced confession.

   (c)  Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

   (d)  Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

   (e)  Conviction obtained by a violation of the privilege against self-incrimination.

   (f)  Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

   (g)  Conviction obtained by a violation of the protection against double jeopardy.

   (h)  Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

   (i)  Denial of effective assistance of counsel.

   (j)  Denial of right of appeal.

-4-

MOTION UNDER 28 U.S.C. §2255

A.  Ground one:_____ SEE ATTACHED _____

Supporting FACTS (tell your story *briefly* without citing cases or law):_____

_____

_____

_____

_____

_____

_____


B.  Ground two: _____ SEE ATTACHED _____

Supporting FACTS (tell your story *briefly* without citing cases or law):_____

_____

_____

_____

_____

_____

_____


C.  Ground three: _____ SEE   ATTACHED _____

Supporting FACTS (tell your story *briefly* without citing cases or law):_____

_____

_____

_____

_____

_____

_____


D.  Ground four: _____

Supporting FACTS (tell your story *briefly* without citing cases or law):_____

_____

_____

_____

_____

_____

_____


13.  If any of the grounds listed in 12A, B, C and D were not previously presented, state *briefly* what grounds were not so presented, and give your reasons for not presenting them: _____

_____

_____

_____

Civ. - 67 (01/83)            MOTION UNDER 28 U.S.C. §2255

14. Do you have any petition or appeal now pending in any court as to the judgment under attack?
Yes ( )  No (X)

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing _____

(b) At arraignment and plea _Michael Mayock, 35 South Raymond Avenue, Suite 400,_
_Pasadena, California   91105-1931_

(c) At trial _SAME AS ABOVE_____

(d) At sentencing _SAME AS ABOVE_____

(e) On appeal _____

(f) In any post-conviction proceeding _____

(g) On appeal from any adverse ruling in a post-conviction proceeding_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court at approximately the same time?  Yes (X)  No ( )

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?  Yes ( )  No (X)

(a) If so, give name and location of court which imposed sentence to be served in the future:_____

(b) And give date and length of sentence to be served in the future: _____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed sentence to be served in the future?  Yes ( )  No ( )

WHEREFORE, movant prays that the court grant him all relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.
Executed on___ _10-23-2000_____
(Date)

_____
Signature of Movant

-6-

_____
(Petitioner)

_____
(Respondent[s])

**DECLARATION IN SUPPORT
OF REQUEST
TO PROCEED
IN FORMA PAUPERIS**

I, __MONTEZ DAY_____ , declare that I am the movant in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs or give security therefor, I state that because of my poverty, I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1.  Are you presently employed?        Yes__X_____        No_____

    a.  If the answer is yes, state the amount of your salary or wages per month, and give the name and address of your employer.

        $57.00 Monthly, U.S.P. Lompoc, 3901 Klein Blvd., Lompoc, Ca. 93436

    b.  If the answer is no, state the date of last employment and the amount of the salary and wages per month which you received.

        _____

2.  Have you received, within the past twelve months, any money from any of the following sources?

    a.  Business, profession or form of self-employment?  Yes____  No X____
    b.  Rent payments, interest or dividends?  Yes____  No X____
    c.  Pensions, annuities or life insurance payments?  Yes____  No X____
    d.  Gifts or inheritances?  Yes____  No X____
    e.  Any other sources?  Yes____  No X____

    If the answer to any of the above is yes, describe each source of money and state the amount received from each during the past twelve months.

    _____

3.  Do you own any cash, or do you have money in a checking or savings account?  Yes X  No____  (Include any funds in prison accounts)

    If the answer is yes, state the total value of the items owned.

    $12.00

4.  Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)?  Yes____  No X____

    If the answer is yes, describe the property and state its approximate value. _____

-7-

5.  List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support. Tiyona M. McCladdie (daughter)

Haalin F. Taalib-Din (daughter)

I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct. Executed on ___10-23-2000___

(Date)

_Morten Day_
Signature of Movant

## CERTIFICATE

I hereby certify that the Petitioner herein has the sum of $_____ on account to his credit at the _____ institution where he is confined. I further certify that Petitioner likewise has the following securities to his credit according to the records of said _____ institution: _____

_____
Authorized Officer of Institution

_____
Title of Officer

-8-

## 28 U.S. CODE, SEC. 2255

§2255.   Federal Custody: remedies on motion attacking sentence

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

A motion for such relief may be made at any time.

Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

A court may entertain and determine such motion without requiring the production of the prisoner at the hearing.

The sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner.

An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention. As amended May 24, 1949, c. 139, § 114, 63 Stat. 105.

### DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL,

### CONVICTION OBTAINED BY PLEA OF GUILTY WHICH WAS UNLAWFULLY INDUCED

### NOT UNDERSTANDING OF THE CONSEQUENCES OF THE PLEA.

Prior to plea, Defendant, MONTEZ DAY received a Pre-Plea Report from Attorney Michael Mayock, stating that the Defendant was facing a sentence of 60 months on Count 1, 300 months on Count 2 and 84 months to life on Count 3. This Pre-Plea Report was reviewed by Attorney Michael Mayock and Defendant, MONTEZ DAY.

When the Defendant questioned Attorney in regards to the Law and the Sentence recommended by the Pre-Plea Report, Defendant was told that he was facing what the Pre-Plea Report stated and that the Defendant could receive a Life sentence for Count 3.

When the Defendant, MONTEZ DAY talked to Attorney, Mayock about going to trial to prove his innocents as to Count 3, the Defendant was told that he would lose the trial and that the judge would more than likely give him more than 7 years, for Count 3, possibly Life, if he gets mad during trial.

When Defendant, MONTEZ DAY talked about going to trial, he was told that if he did he would lose.  Defendant continued to maintain his desire to go to trial on Count 3, at one time Attorney, Mayock told the Defendant that if he went to trial that he would lose the 3 points for acceptance of responsibility on count 2, and that he did not want to make the Judge mad.

The Defendant was shown a Plea-Aggreement, and was urged by the Attorney to sign.  When the Defendant refused to sign the Plea-Agreement he was told by his Attorney that he should take the deal so that he could get less time, and that the judge would probably give him (the defendant) only 7 years on count 3.

1    Defendant, MONTEZ DAY asked his Attorney how could he receive a
2    Life sentence on Count 3, and stated that he did not believe that the
3    law allowed such a sentence in his case, but was told by Attorney
4    that he could get a Life sentence for Count 3.
5        During the Defendants Plea-hearing the Defendant was asked by the
6    Court if he (the defendant) understood the charges and when MONTEZ
7    DAY, the defendant was asked if he understood Count 3, he initially
8    stated No, after the Prosecutor gave a Legal definition of Count 3 the
9    defendant stated yes, even though he was still confused.
10       At that hearing the Defendant, MONTEZ DAY was urged to Plead to
11   all Counts, despite the fact that he was only guilty of Count 2 and
12   possiblely Count 1, he did not want to Plead Guilty to Count 3 and
13   asked his Attorney for more time, but his Attorney, Michael Mayock
14   told him that he should Plead Guilty.
15       Criminal Procedure 18 §924(c)(1)(A)(ii) states if the firearm is
16   brandished, be sentenced to a term of imprisonment of not less than
17   7 years; and, Section (C) states "In the case of a second or subse-
18   quent conviction under this subsection, the person shall (i) be sen-
19   tence to a term of imprisonment of not less than 25 years; and (ii)
20   if the firearm involved is a machinegun or a destructive device, or
21   is equipped with a firearm  silencer or firearm muffler, be sentence
22   to imprisonment for Life.
23       The Defendant, MONTEZ DAY was induced to Plead Guilty to a charge
24   that he is innocent of, from the time he reviewed the Pre-Plea report,
25   which was supplied by the Government and used by his Attorney, Michael
26   Mayock which stated that the defendant was facing a Life sentence.
27       Therefore defendants Attorney not only unlawfully induced the def-
28   endant to plead Guilty when he was innocent, but used a flawed report.

2

## DEFENDANT'S CRIMINAL HISTORY AND OFFEENSE LEVEL

### ARE OVERREPRESENTED

Several circuits have held that a district court may depart downward from the career offender guidline. United States v. Shoupe, 35 F.3d 835 (3rd Cir. 1994) (departure from career offender can be in both criminal history and offense level); United States v. Lawrence, 916 F.2d 553 (9th Cir. 1990). The Ninth Circuit found it was proper to depart downward for a career offender based on the disproportionate treatment of drug offenders United States v. Reyes, 8 F.3d 1379 (9th Cir. 1993) and based on the nature of priors and the age of the defendant, United States v. Brown, 985 F.2d 478 (9th Cir. 1993).

According to the Probation Report, Defendant MONTEZ DAY at age 18 was arrested for and covicted of possession of 16 grams of cocaine. PSR. ₰66 other charges against Mr. DAY were reversed on appeal. This amount consistent with personal use. During the trial there was very little testimony or evidence against Mr. DAY, so little that the trial Judge gave Mr. DAY a downward depart, stating is words and action that MONTEZ DAY played a Minor if not a minimal role in the case. this was his reasons for giving MONTEZ DAY two point departure for his role, this statement by the court shows that his involement in such a small amount of cocaine was Minor, This statement can be found in the original sentencing hearing.

Due to the youth of defendant MONTEZ DAY and the Minor role in the offense, coupled with the fact he served an additional 11 months more the sentence actually imposed, he should be granted a downward departure on the basis that his Criminal History is overrepresented.

United States v. Brown, 985 F.2d 478 (9th Cir. 1993)

3

held that the guidelines permit a court to depart downward even for induvuduals designated as career offenders.  The United States Sentencing Guidelines allow a sentencing court to depart downward if the applicable criminal history category "significantly overrepresents the seriousness of a defendant's criminal history." USSG § 4A1.3 (Policy Statement).  In <u>United States v. Sanchell-Rodriquell</u> , 161 F.3d 556 (9th Cir. 1998) (en banc) the Ninth Circuit authorized a departure for a career offender along the base offense level axis where the predicate prior was a very smal amount of drugs. That is the case here also  the  fact that the defendant played a Minor role in the prior offense should be taken in  considration based on the Application Notes of § 4b1.1.Career Offender (2) "Section4B1.1 (Career Offender) express-ly provides that the instant and prior offense must be crimes of viol-ence or controlled substance offenses of which the defendant was con-victed. Therefore, in <u>determining  whether an offense is a crime of violence or controlled substance **for the purpose of § 4B1.1(Career Offender),**</u> the offense of conviction(i.e. the conduct of which the defendant was convicted) is the focus of inquriy.

Therefore the Defendant, MONTEZ request that the court, resentence him, by either granting this request for a Downward departure, or by determining that the predicate prior  dose not fit the purpose of § 4B1.1 Career Offender based on the Application notes.

4

## A DOWNWARD DEPARTURE IS WARRANTED BECAUSE OF EXTRAORDINARY ABUSE SUFFERED BY DEFENDANT AS A CHILD

The United States Sentencing Guidelines permit a downward departure in the atypical case where a guideline or guidelines linguistically applies but the defendant's conduct falls outside the "heartland" of cases.   USCG Ch. 1, Pt. A, Section 4(b).   In this case, a number of factors separate MONTEZ DAY from the heartland of other cases and converge to establish an appropriate basis for a downward departure.   As the United States Supreme Court has now unequivocally affirmed, in the exceptional or unusual case, a sentencing court may depart downward.

The Court's decision in Koon v. United States, 518 U.S. 81, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392  (1966), establishes definitively that, where as here, atypical circumstances exist that are not sepcifically forbidden by the United States Sentencing Guide, a court has discretion to depart where a factor is present to an exceptional or unusual degree. At least two such factors exist in this case, neither of which is specifically forbidden by the Guidelines. The presence of these factors compel an "atypical" characterization of the circumstance of this case.

Section 3661 of Title 18 United States Code codifies the fundamental tenet, echoed in the Guidelines at Section 1B1.4 (Nov. 1995), that a sentencing court's ability to consider virtually any appropriate information relative to a defendant's background, character or conduct in determining whether to grant departure is virtually limitless. Section 3661 states in pertinent part:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the

5

1  United States may receive and consider for the purpose of
2  imposing an appropriate sentence.

3  Similarly, the Supreme Court's decision in Koon instructs:

4  Whether a given factor is present to a degree not
   adequately considered by the Commission, or whether a
5  discouraged factor nonetheless justifies departure
   because it is present in some unusual or exceptional
6  way, are matters determined in large part by comparison
   with the facts of other Guidelines cases. Id. at 2039.

7

8  The United States Sentencing Guidelines (USSG) section 5H1.3 (Policy

9  statement) provides in relevant part:

10  Mental and emotional conditions are not ordinarily relevant
    in determining whether a sentence should be outside the
11  applicable guidelines range...

12  Discouraged factors are not ordinarily relevant but may be relied

13  upon as bases for departure in exceptional cases, such as where the

14  factor is present to an exceptional degree, or in a way that makes

15  the case different from an ordinary case where the factor is present.

16  While it is clear that the Commission at least consirdered family

17  circumstances, and that "ordinary" family circumstances are normally

18  discouraged factors for departure, the Ninth Circuit has recognized

19  that the presence of family circumstances to an unusual, special, or

20  extraordinary degree can serve to remove a case from the heartland.

21  United States v. Mondelo, 927 F.2d 1463, 13470 (9th Cir. 1991).

22  MONTEZ DAY is a young man who has from childhood faced exceptional

23  circumstances.  At age 6 his father murdered his mother with a knife

24  in his presence.  His father was convicted of murder and imprisoned.

25  He was diagnosed as a Chronic Schizophrenic.  According to his uncle,

26  Arthur Day, who has a Master's Degree in Psychology, MONTEZ DAY

27  never taled about losing his mother or the murder.  His aunt

28  Henrietta Day took MONTEZ to therapy for several years, after his

6

traumatic lost.   MONTEZ was an angry child who did not play or spend
a lot of time with other children.   His father, Jimmy Day,   came
back about 4 years later and took MONTEZ to live with him.   Jimmy
Day was upset that MONTEZ had been taken to therapy, even though he
him self was in therapy, and believed his thoughts and the voices he
was hearing could help him.   Jimmy Day moved into bad areas where
there was a lot of gang activity and switched MONTEZ from school to
school.   MONTEZ became very withdrawn and did not interact with
others.   Arthur Day believes MONTEZ needs more therapy than he
received and that MONTEZ became cold although he looks calm and
rastrained, since he is out of touch with his feelings.

Dr.   Michael P. Maloney, Ph.D. conducted a psychological
evaluation of the defendant, MONTEZ DAY. Subsequently Dr. Maloney
prepared a report and a later supplement to it which are appended
hereto. In the personal history section of the report Dr. Maloney
reviews the murder of MONTEZ DAY's mother by his father and the
aggravation of the effect of this by an uncle being killed in a
stabbing a couple of years after his mother's death. Dr. Maloney at
page 6 of his report states "there is also a strong suggestion that
he was the victim of on-going physical abuse during his early teens.
There is also a certain amount of instability in that he moved from
one family home to another."  After administering mental status
examinations, Dr. Maloney concludes "it would appear that he dose
not have these traits that are often associated with what is
sometimes referred to as a criminal personality".   Dr.   Maloney
Concludes "this man dose not present (sic) with any characteristics
of a significant mental disorder".   Then Dr. Maloney qualifies this
respones by saying "at the same time however, his quite atypical

childhood experiences did contribute to his general problematic behavior which started during his adolescence years.  Not only was this man exposed to severe and atypical circumstances (including being present at or about the time of his mother's killing by his father) but was also exposed to a primary parenting figure (father) who had been incarcerated on more than one occasion.  Mr.  Day has not ever had the opportunity of fully exploring the effect of these early traumas on his psychological makeup.  Whatever the disposition in this case, it would seem quite important that he be provided an opportunity to explore this. This may result in a decrease in recidivistic criminal behavior."

The foregoing statement by Dr. Maloney encouraging counseling for MONTEZ DAY because of his severe and atypical background actually presents a case for a downward departure  on  the  basis of  post traumatic stress syndrome.  According to medical literature there is a five-step process for competent psychiatric evaluation of an individual. They are as follows:

1.   Accurate medical and social histroy;

2.   Historical data from the patient and independent sources;

3.   Thorough physical exemination;

4.   Appropriate diagnostic studies; and

5.   A mental sight evaluation (which alone is insufficient for diagnosis).

Dr. Maloney's observations tend to indicate there is a problem with Defendant MONTEZ DAY and this problem can be readily seen in examining the four characteristics that mental health professionals recognize as the building blocks of mental health.  These are: 1)  heredity,  2)  early  nurturance;  3)  summation of  traumatic

8

life experiences;  and 4) quality of an individual's support system.

Defendant MONTEZ DAY falls outside the scope of each of the building blocks for mental health.  First, under the heredity prong, his father is a know and diagnosed schizophrenic.  Second, he experienced little early nurturance because his mother was murdered by his father and he was raised by his father under circumstances which caused him to receive little guidance of counseling.   Third, MONTEZ DAY"s traumatic life experiences include the murder of his mother by his father in his presence and the subsequent murder of a close uncle also by stabbing.  Fourthly, the quality of MONTZ DAY'S support system is non-existent.  He had no family or therapist on whom he could rely to give him needed support or counseling to develop adequate mental health.  Instead, what appears is a symptomology consistent with an individual who is a victim of post traumatic stress syndrome.

The court also has discretion to depart downward in cases of post traumatic stress syndrome.  <u>United States v. Cantu</u>, 12 F.3d 1506, 1512 (9th Cir. 1993).  In <u>United States v. Risse</u>, 83 F.3d 212, (8th Cir. 1996) it was determined that the court properly departed downward for diminished capacity based on a defendant's post traumatic stress order resulting from service from  the Vietnam War.  According to Dr. Dennis Charney, A yale psychiatrist, "victims of a devastating trauma may never be the same biologically.  It dose not matter if it was the incessant terror of combat, torture, or repeated abuse in childhood, or a one-time experience like being trapped in a hurricane or nearly dying in an auto accident, all uncontrollable stress can have the same biological impact.   <u>Emotional  Intelligence</u>, Daniel Goldman at pages 203 and 204.

In this supplemental report, Dr. Maloney relates the information he gleaned about MONTEZ DAY from his uncle, Arthur Day, who has a master's degree in psychology and also works as a counselor. Arthur Day reiterated for Dr. Maloney the abusive and frightful life of MONTEZ DAY as a child. Dr. Maloney concludes, "It dose seem quite clear that Montez Day suffered extreme psychological trauma at the time of his mother's death." Dr. Maloney reports that at 6 or 7 years of age MONTEZ DAY was at "an extremely vulnerable time" when he witnessed his mother's death at his father's hands and that his father was "a very problematic role model." Dr. Maloney concludes that the extremely traumatic events during (Montez Day's) childhood years contributed to his having serious difficulty in terms of being able to maintain a well-adjusted, stable and law-abiding life." Again, Dr. Maloney stresses the importance of MONTEZ DAY receiving counseling.

In United States v. Brown, 985 F.2d 478 (9th Cir. 1993) the court was allowed to consider as a basis for a downward departure the severe childhood abuse and neglect of a defendant where a psychologist's report concluded that childhood trauma was the primary cause of defendant's criminal behavior. In the instant case Dr. Maloney concluded that it would be difficult to argue that MONTEZ DAY'S traumatic childhood had "no impact" on his ability to abide by the structures of society.

For the foregoing reasons, a downward departure for MONTEZ DAY'S abusive and traumatic childhood experience is more than warranted. The Defendant ask that the Court re-consider this Plea for a Down-ward departure and re-sentence MONTEZ DAY to a substantial lower sentence.

## CONCLUSION

For the above reasons and facts the Defendant, MONTEZ DAY respectfully asks the court to reverse defendant Guilty Plea, to Count 3 and set a date for trail, so that the defendant can have a fare trail as our Constitution allows.   The Defendant also request that the Court reverse his Sentence in regards to Count 2 and Determine for the purpose of Justice that the Defendants prior Offense dose not fit the purpose of § 4B1.1 Career Offender.

Lastly MONTEZ DAY, the defendant Pleas to the Court to grant a downward departure, for the Extraordinary Trauma suffered by the Defendant, MONTEZ as a child.

I declare under penalty that the foregoing is true and correct. Executed on October 23, 2000

Respectfully submitted,

MONTEZ DAY
REGISTER # 12291-076
UNITED STATES PRISON, LOMPOC
3901 KLEIN BLVD.
LOMPOC, CALIFORNIA   93436

### CERTIFICATE OF SERVICE

I, MONTEZ DAY hereby certify that I have served a true and correct copy of the following; Motion to Vacate, Set aside or correct Sentence by a Person in Federal Custody 28 U.S.C.§2255.

Which is deemed filed at the time it was delivered to prison authorities for forwarding to the court and parties to litigation, by placing same in a sealed, postage prepaid envelope Addressed to; United States Court House, United States District Judge, 312 N. Spring Street, Los Angeles, California  90012, and deposited same in the United States Postal Mail at the United States Penitentiary, Lompoc, California, on this 24 day of October, 2000.

Montez Day
Register # 12291-076
United States Penitentiary
3901 Klein Blvd.
Lompoc, California 93436

# EXHIBIT F

ENTERED
CLERK. U.S. DISTRICT COURT

NOV 30 2001
11-30-01

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

NOV 2 9 2001

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

Priority ✓
Send ✓
Enter
Closed
JS-5/JS-6 ✓
JS-2/JS-3 ____
Scan Only ____

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF
AMERICA,

              Plaintiff,

v.

MONTEZ DAY,

              Defendant.

CASE NO. CV 00-11896 AHM ✓
(No. CR 99-123 AHM)

ORDER DENYING SECTION 2255
PETITION

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

## Introduction

    Defendant raised three separate grounds in his initial motion to vacate, set aside or correct his sentence. First, he contended that his attorney was ineffective in that he allegedly misadvised defendant as to the statutory maximum sentence available under Title 18, United States Code, Section 924(c), and pressured defendant into pleading guilty. Second, defendant contended that his status as a career offender overstated the seriousness of his prior criminal history. And third, defendant argued that he should have received a downward departure for the purportedly extraordinary abuse he suffered as a child.

    In his reply to the Government's opposition, defendant appears to add the argument that his trial counsel was ineffective because he did not file a notice of

1    appeal. As will be shown, none of these contentions justifies the relief defendant

2    seeks.

3    1.     Statutory Maximum Sentence

4        The Government is correct that the information that defendant's counsel

5    gave him about the statutory maximum for a violation of 18 U.S.C. § 924(c)

6    (Count 3) is, and was, life imprisonment. *United States v. Pounds*, 230 F.3d

7    1317, 1319 (11th Cir. 2000).

8    2.     Criminal History Calculation

9        The gist of defendant's arguments were proffered before the sentence was

10    imposed. The Court was aware of these arguments and in calculating the proper

11    criminal history, the Court exercised its discretion appropriately.

12    3.     Downward Departure Based on Childhood Abuse

13        The gist of defendant's arguments were proffered before the sentence was

14    imposed. The Court was aware of these arguments and in declining to adopt

15    them, the Court exercised its discretion appropriately.

16    4.     Notice of Appeal

17        The transcript reflects that defendant himself was advised of his right of

18    appeal. (Ex. C., p. 94, to Government's Opposition.) Indeed, defendant

19    acknowledges that he himself "signed the paper" (evidently, a waiver of his right

20    to appeal). Reply Memo, page 5. Because this Court has addressed the merits of

21    defendant's second and third claims, and has not adopted the Government's

22    position that those claims are barred procedurally because no appeal was taken,

23    the alleged failure of trial counsel to file an appeal is moot and harmless.

24        Defendant's trial counsel is known to be one of the most experienced,

25    conscientious, diligent and effective criminal defense attorneys in this District.

26    His representation of defendant was consistent with that reputation. Even on a

27    prima facie basis defendant's contentions fail to meet the exacting standards of

28

2

1  *Strickland v. Washington*, 466 U.S. 668, 687-91, 694 (1984) for demonstrating

2  ineffective assistance of counsel.  No hearing is warranted.

3

4      IT IS SO ORDERED.

5

6  DATE: __11/29/200__

7                                      A. Howard Matz
                                        United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT G

FILED
CLERK, U S DISTRICT COURT
FILED
NOV 29 2001
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

1  MONTEZ DAY
   Register # 12291-076
2  United States Penitentiary, Lompoc
   3901 Klein Boulevard, J-unit
3  Lompoc, California 93436

4

5  ___ Priority
   _✓_ Send
6  _✓_ Clsd
   ___ Enter
7  ___ JS-5/JS-6
8  ___ JS-2/JS-3

**DENIED**
BY ORDER OF
A. HOWARD MATZ
UNITED STATES DISTRICT JUDGE
ON ___12-3-01___

RECEIVED AND RETURNED
CLERK U.S. DISTRICT COURT
NOV 20 2001
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

9              UNITED STATES DISTRICT COURT

10          FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12  UNITED STATES OF AMERICA,      )
                                   )    No. CV 00-11896-AHM
13       Plaintiff,               )    (No. Cr 99-123-AHM)
                                   )
14            v.                   )
                                   )    MOTION FOR LEAVE OF COURT
15  MONTEZ DAY,                    )    PURSUANT TO RULE 15 ( )
                                   )
16       Defendant.               )
                                   )
17  _____)

18

19       The Petitioner comes before this court Pro se, filing a Motion

20  for leave of Court pursuant to Rule 15. For the purpose of filing

21  a supplement on newly discovered evidence and a memorandum of points

22  and authorities.

23  DATED: October 31, 2001

                RECEIVED
24             BUT NOT FILED

25

26  //            NOV 13 2001

27  //         CLERK, U.S. DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
28  //            WESTERN DIVISION
                              DEPUTY

                                      Respectfully submitted,

                                      _____
                                      Montez Day

    DEC 4 2001                1

ENTERED ON ICMS
DEC 5 2001
CV      RL

5

## CERTIFICATE OF SERVICE

I, MONTEZ DAY hereby certify that I have served a true and correct copy of the following; Motion for leave of Court.

Which is deemed filed at the time it was delivered to prison authorities for forwarding to the Court and parties to litigation; by placing same in a sealed, postage prepaid envelope Addressed to; United States Court House, United States District Judge, 312 N. Spring Street, Los Angeles, California 90012, and deposted same in the United States Postal Mail at United States Penitentiary, Lompoc, California, on this 31 day of October, 2001.

Montez Day
Register # 12291-076
United States Penitentiary, Lompoc
3901 Klein Boulevard, J-Unit
Lompoc, California 93436

2

## CERTIFICATE OF SERVICE BY MAIL

1    I, MONTEZ DAY hereby certify that I have served a true and

2   correct copy of the following; MOTION FOR LEAVE OF COURT

3   PURSUANT TO 28 U.S.C. §2255 MOTION, by placing same in a sealed

4   postage prepaid envelope addressed to; ANDREW BROWN, Assistant

5   United States Attorney, 312 North Spring Street, Los Angeles,

6   California 90012, in the United States Postal Mail at United

7   States Penitentiary, Lompoc on this 27, day of November, 2001.

8       This Certificate is executed on November 27, 2001 and is

9   deemed filed at the time it was delivered to prison authorities

10  for forwarding to the COURT and above addressed parties for

11  litigation, by placing same in a sealed, postage prepaid

12  envelope addressed to; United States Court House, United States

13  District Judge, 312 North Spring Street, Los Angeles, California

14  90012, and deposted same in the United States Postal Mail at

15  United States Penitentiary, Lompoc, California, on this 27 day

16  of November, 2001.

17

18

19                              _____
                                MONTEZ DAY
20                              Register #12291-076
                                United States Penitentiary, Lompoc
21                              3901 Klein Boulevard, J-Unit
                                Lompoc, California 93436-2706

22

23

24

25

26

27

28

# EXHIBIT H

1   MONTEZ DAY
    REGISTER #12291-076
2   UNITED STATES PENITENTIARY LOMPOC
    3901 KLEIN BOULEVARD, J-UNIT
3   LOMPOC, CALIFORNIA 93436

4

5                UNITED STATES DISTRICT COURT

6          FOR THE CENTRAL DISTRICT OF CALIFORNIA

7

8   UNITED STATES OF AMERICA,        )
                                     )   No. CV 00-11896-AHM
9         Plaintiff,                 )   (No. CR 99-123-AHM)
                                     )
10        v.                         )
                                     )
11  MONTEZ DAY,                      )   MOTION FOR RECONSIDERATION
                                     )   PURSUANT TO FEDERAL RULES OF
12        Petitioner,                )   CIVIL PROCEDURE, RULE 60 (b)
                                     )
13  _____ )

14

15

16        The Petitioner comes before this Court Pro se, and moves this

17  Honorable Court for Relief from judgment/order of November 30,

18  2001, and request Reconsideration of 28 U.S.C. §2255 issues

19  Pursuant to Federal Rules of Civil Procedure, Rule 60 (b).

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

DENIED
BY ORDER OF
UNITED STATES DISTRICT JUDGE
ON

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

ENTER ON ICMS
DEC 13

Docketed
Mld copy Ptys
Notice Ptys
JS - 6

1

# MEMORANDUM OF POINTS AND AUTHORITIES

## I

## FACTUAL BACKGROUND

In 1999, Petitioner, MONTEZ DAY was indicted for robbing "HOME SAVINGS OF AMERICA"... On May 14, 1999, Petitioner pled guilty to all counts surrounding the alleged bank robbery and was sentence to 24 years. On November 30, 2001 this Court denied Petitioner's Section 2255 Motion.

Pending before this Court is Petitioner's MOTION FOR RECONSIDERATION pursuant to Federal Rules of Civil Procedure 60 (b).

A motion for reconsideration under Federal Rules of Civil Procedure 60 (b) must based on one of three grounds: 1) Intervening change of controlling law; 2) New evidence not previously available; or 3) A need to correct a clear error of law or to prevent manifest injustice. See **ATKINS v. MARATHON LETOURNEAN CO.,** 130 F.R.D. 625, 626 (S.D.Miss. 1990)(citing **NATURAL RESOURCES DEFENSE COUNCIL v. UNITED STATES ENVTL. PROTECTION AGENCY,** 705 F.Supp. 698, 702 (D.D.C.). The decision whether to grant or deny the motion is entrusted to the sound discretion of the district court. See **RODGERS v. WATT,** 722 F.2d 456, 460 (9th Cir. 1983)(en banc).

The issue in this motion for reconsideration under 60 (b) is appropriate based on **"A need to correct a clear error of law (and/or) to prevent manifest injustice, and Newly discovered evidence.**

## II

### LEGAL ARGUMENTS

Petitioner was convicted of three (3) counts surrounding a Robbery of "**Home Savings Of America**". The crime of Bank Robbery has as an essential element a proper showing of Federal Deposit Insurance Corporation insurance. See <u>UNITED STATES vs. SCHULTZ</u>, 17 F.3d 723 (5th Cir.1994) (stating proof of Federal Deposit Insurance Corporation insurance is not only an essential element of the crime, but it is also essential for the establishment of Federal Jurisdiction). **See also 18 U.S.C. §2113(a) and (f)** "(a) whoever, by force and violence, or by intimidation takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to or in the care, custody, control, management, or possession of any Bank, Credit Union, or any Savings and Loan Association;"

"(f) as used in this section the term "Bank" means **any member Bank of the Federal Reserve System,** and any Bank, Banking association, Trust company, Savings Bank, or other Banking institution organized or **operating** under the laws of the United States including a Branch or agency of a Foreign Bank (as such terms are defined in paragraphs (1) and (3) of section (b) of the International Banking Act of 1978), and **any institution the deposit of which are insured by the Federal Deposit Insurance Corporation.**"

It could be inferred from the language of subsection (f) that the institution referred to in 18 U.S.C. §2113(a). That the requisite element to establish the crime of Bank Robbery would be

3

1 the institution be a member of the Federal Reserve System and
2 insured by Federal Deposit Insurance Corporation.

3 The instant case at hand is void of both these requirements
4 to support Petitioners conviction. It can be glean from the
5 attached Exhibits that the government has not and cannot prove the
6 jurisdictional element required to sustain this conviction.

7 Petitioner was indicted for crimes committed against a
8 non-operating institution with inactive or no insurance. See
9 Exhibit "A" which is a Federal Deposit Insurance Corporation
10 Confirmation and Report, showing that "Home Savings Of America",
11 became inactive as of October 03, 1998. This document shows that
12 Petitioner's conviction was obtained without jurisdiction and based
13 on a fatally defective indictment.

14 Petitioner's Indictment alleges that on or about January 26,
15 1999, Petitioner by force, violence, and intimidation, knowingly
16 took from "Home Savings Of America", 301 South Maclay Street, San
17 Fernando California, a Savings and Loan association the deposits
18 of which were then insured by Federal Deposit Insurance
19 Corporation.

20 In UNITED STATES vs.FITZGERALD, 882 F.2d 397,399(9th Cir.1989)
21 The court stated: according Fed. R. Crim. P.7, an indictment must
22 be a plain, concise, definite written statement of the essential
23 facts constituting offense charged. Fed. R. Crim. P.7(c)(1) "the
24 instrument must set forth the elements of the offense charged and
25 contain a statement of the facts and circumstances that will inform
26 the accused of the elements of the specific offense." UNITED STATES
27 vs. MARTIN, 783, F.2d 1449, 1452(9th Cir. 1986)

28 In the instant case the indictment alleges a crime that could

4

1  not possibly been committed. Petitioner was charged with robbing

2  a financial institution, which on the date of alleged, was closed

3  or inactive on that date. See **Exhibit "A"**.

4      During Petitioner's Plea colloquy or change of plea hearing,

5  the government had Petitioner agree that the institution allegedly

6  robbed was a federally insured institution (FDIC). **Exhibit "B"**,

7  which is a Declaration by a FDIC Attorney, dated February 21, 2001,

8  indicates that the Bank known as **"Home Savings Of America"** was

9  acquired by another bank "Washinton Mutual Bank" on October 03,

10  1998, months prior to the date of the alleged robbery.

11      This communication, stipulation or agreement is in valid under

12  the circumstances. First, it was done unitelligently, due to lack

13  of advise from counsel. Second, it violates Fed. R. Crim. P. Rule

14  11(f), which provides "notwithstanding the acceptance of a plea

15  of guilty, the court should not enter a judgment upon such plea

16  without making such inquiry as shall satisfy it that there is a

17  factual basis for the plea."

18      This requires finding sufficient evidence to conclude that the

19  conduct admitted by the defendant constitutes the offense charged.

20  UNITED STATES vs. BAKER, 618 F.2d 589, 592(9th Cir.1982) the

21  purpose of the rule is to protect a defendant who pleads with an

22  understanding of the charges, but "without realizing that his

23  conduct does not actually fall within the definition of the crime

24  charged" UNITED STATES vs. ANGELES-MASCOTES, 206 F.3d 529(5th

25  Cir.2000).

26      Under Fed. R. Crim. P.11, before a plea may be accepted, the

27  district court must "address the defendant personally in open court

28  and inform the defendant of, and determine that the defendant

5

1   understand ,... the nature of the charge to which the plea is

2   offered..." Fed. R. Crim. P.11(c)(1) **"omitting to tell the**

3   defendant of an essential element of the offense entails a complete

4   failure to inform the defendant of the nature of the offense to

5   which he pleads", in violation of Rule 11(c)(1).UNITED STATES vs.

6   GREEN, 882 F.2d 999, 1005(5th Cir.1989)(citation omitted); see also

7   UNITED STATES vs. SMITH, 184 F.3d 415, 417(5th Cir.

8   1999)(reiterating rule). Likewise, the constitution also requires

9   that "the Defendant receive []"real notice of the true nature of

10  the charge against him, the first and most universally recognized

11  requirement of due process," HENDERSON vs. MORGAN, 426 U.S. 637,

12  645 (1976), quoting SMITH vs. O'GRADY, 312 U.S. 329. 334 (1941) A

13  notice that requires a description of the essential elements of the

14  plea offense, at least where the elements are "critical". see id.

15  at 647 N.18.

16      In viewing the record neither the government nor the court ever

17  informed Petitioner that the government was required to prove

18  jurisdiction (FDIC) if the case were to go to trial, which clearly

19  violates Fed. R. Crim. P. 11 see also UNITED STATES vs. SCHULTZ, 17

20  F.3d 723 (5th Cir. 1994).

21      SWEETON vs. BROWN, 27 F.3d 1162, 1169(6th Cir. 1994) (citing

22  UNITED STATES vs. SIVIGLA, 689, F.2d 832, 835(10th Cir.1981), cert.

23  denied, 461 U.S. 918, 103 s.ct. 1902, 77 L.ed. 2d. 289(1983)

24  stating "lack of jurisdiction cannot be wavied and jurisdiction

25  cannot be conferred  upon a federal court by consent, inaction or

26  stipulation... **A court lacking jurisdiction cannot render judgment**

27  **but must dismiss the cause at any stage of the proceedings** in which

28  it becomes apparent that jurisdiction is lacking."

1   There is nothing directly to support the inference of Federal

2   Deposit Insurance Corporation, insurance on the date of the alleged

3   offense. UNITED STATES vs. ALI, 2001 DJDAR 10641 (9th Cir. 2001)

4   "twenty years ago, the fifth circuit forcefully put the government

5   on notice that "[d]espite the fact that FDIC insurance status is

6   an express requirement of the applicable statues, **an essential part**

7   **of a valid indictment,** and an indispensable item of proof of an

8   offense, prosecutors have been extremely lax in the treatment

9   accorded this element"..."Today we reiterate that sentiment. **Proof**

10  **of Federal Insurance is not merely an element of the offenses for**

11  **which** Ali **was convicted: it is essential to establish federal**

12  **jurisdiction."**

13  In the instant case the charging document is fatally flawed,

14  the allegations contained  therein allege an offense that could

15  not possibly have occurred. The attached Exhibits clearly show and

16  state that after October 03, 1998, the institution known as "**Home**

17  **Savings Of America"** was not Federal Deposit Insurance Corporation,

18  **insured, in fact it did not exist.**

19  Petitioner's conviction is void.

20

21                          CONCLUSION

22

23  Based on the foregoing reasons, Petitioner, Montez Day prays that

24  this Court, to correct a manifest injustice, vacate Petitioner's

25  sentence and order dismissal of Petitioner's indictment for lack

26  of jurisdiction as a matter of law.

27  Dated December 6, 2001

28                              Respectfully submitted,

                                Montez Day

                          7

SCANNED

# EXHIBIT "A"

# Home Savings of America, FSB

4900 Rivergrade Road
Irwindale, CA 91706
FDIC Certificate # 15919   Bank Charter Class: SA
Primary Federal Regulator:  OTS
Primary Internet Web Address:  Web site not available
Demographic Information As Of:  February 6, 2001

 This is an inactive institution.

| | |
|---|---|
| **Inactive as of:** | October 3, 1998 |
| **Closing history:** | Merged without Assistance into |
| **Acquiring institution:** | Washington Mutual Bank, FA - (32633) |

**Report Selection:**

Assets and Liabilities - $ Amount

**Report Date:**

September 30, 1998

Generate Report

Last Updated: 2/16/2001                                    Research@fdic.gov

Sitemap | Search | Help | Home

SCANNED

# EXHIBIT "B"



**FDIC**
**Federal Deposit Insurance Corporation**
550 17th Street NW, Washington, DC 20429           Office of Executive Secretary

Mr. Montez Day
#12291-076 "J" Unit
United States Penitentiary          **FEB 2 1 2001**
3901 Klein Boulevard
Lompoc, California 93436

FDIC Log # 01-0058

Dear Mr. Day:

This will respond to your letter dated January 16, 2001, pursuant to the provisions of the Freedom of Information Act ("FOIA," 5 U.S.C. § 552), for information with regard to Home Savings of America, 301 South Maclay, San Fernando, California 91340. You specifically ask the following questions: (1) Is this bank a member of the Federal Reserve System? If so, list date when it became a member and send a copy of the certificate. (2) Is this bank chartered in the state of California? (3) Is this bank a member of the Federal Deposit Insurance Corporation? If so, list date and send a copy of the FDIC certificate. (4) Is this bank a national bank branch? Please send status of this bank.

The FOIA does not require an agency to answer questions, but rather to provide copies of releaseable documents in response to requests for the same. In an attempt to assist you, however, in this one instance, we will address the questions you pose as well as the document requests.

FDIC records show that Home Savings of America, FSB, Irwindale, California, with the branch you list located at 301 South Maclay Avenue, San Fernando, California, became insured by the FDIC on January 1, 1934. It is a savings association (and not a national bank) which was insured by the FDIC, but was supervised and regulated by the Office of Thrift Supervision ("OTS.") The OTS should be consulted with regard to your questions on the chartering of this bank, at the following address:

Office of Thrift Supervision
Ms. Mary Ann Reinhart
Senior Program Specialist/FOIA
1700 G Street, N.W.
Washington, D. C. 20552

I note that on October 3, 1998, Home Savings of America, FSB merged, without assistance, into Washington Mutual Bank, FA, Stockton, California, which is presently an open and operating FDIC-insured savings association. Enclosed please find several printouts with regard to these banks.

With regard to whether or not Home Savings of America, FSB was a member of the Federal Reserve System, you should write directly to the Board of Governors of the Federal Reserve System at the following address:

SCANNED

- 2 —

Board of Governors of the Federal Reserve System
Ms. Martha Connor
FOIA Office
20th & C Streets, N.W., Room MP500
Washington, D. C. 20551

Upon admission to the FDIC, as a courtesy only, Home Savings of America, FSB was issued an
FDIC certificate of insurance. This certificate is not an official record of the FDIC required to be
kept by law or regulation, and copies are not retained. Therefore, there is no certificate of
insurance to provide for your request.

Federal deposit insurance covers depositors against losses incurred through the insolvency of an
institution. It **does not** cover an institution for losses incurred as a result of theft or robbery.
Any such claim, therefore, would not be reimbursed by the FDIC. Such insurance is obtained
under a bond or through a private insurance carrier chosen by each bank. You may request that
an institution provide you with the name of its bondholder or carrier, but they are not required to
do so nor are they required to supply the FDIC with that information. Enclosed please find a
copy of "Your Insured Deposit," which will provide you with other helpful information on FDIC
insurance.

This concludes the processing of your request. Our FOIA regulations at 309(f)(iii) state that as an
individual requester, you are entitled to 2 free hours of search and 100 free pages of duplication
in making your request (copy enclosed). In processing your request, we have expended the 2
free hours of professional search time to which you are entitled. Our FOIA regulations further
state that multiple requests seeking similar or related records from the same requester or group of
requesters will be aggregated for the purpose of [fees]. Therefore, any future requests which you
may choose to make on the subject of the insurance status of this institution will be subject to the
assessment of fees, and should include your agreement to pay such fees, whether or not any
information is found or if found, is released. For your reference, enclosed please find a copy of
our fee schedule.

As there is no copy of the FDIC insurance certificate to provide for your request, you may
choose to treat our response as a partial denial of your request and appeal to the FDIC's General
Counsel within 30 business days following receipt of this letter. Should you decide to appeal,
please submit your appeal in writing to the Office of the Executive Secretary. Please refer to the
FDIC log number and include any additional information that you would like the General
Counsel to consider.

Sincerely,

Fredrick L. Fisch
Senior Attorney

Enclosures

# CERTIFICATE OF SERVICE

SCANNED

I, __MONTEZ DAY_____ hereby certify that I have served a true and correct copy of the following:

> MOTION FOR RECONSIDERATION PURSUANT TO FEDERAL
> RULES OF CIVIL PROCEDURE, RULE 60 (b).

Which is deemed filed at the time it was delivered to prison authorities for forwarding to the court, *Houston v. Lack,* 101 L.Ed.2d 245 (1988), upon the court and parties to litigation and or his/her attorney(s) of record, by placing same in a sealed, postage prepaid envelope addressed to:

> ASSISTANT UNITED STATES ATTORNEY
> ANDREW BROWN, ATTORNEY
> 312 NORTH SPRING STREET
> LOS ANGELES, CALIFORNIA 90012

and deposited same in the United States Postal Mail at the United States Penitentiary, Lompoc, California, on this: __06_____ day of: __December_____, 2001.

Montez Day #12291-076
3901 Klein Boulevard
Lompoc, California 93436