FILED

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

DEC 22 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| MONTEZ DAY,<br><br>Applicant,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | No.   16-71519<br><br>D.C. No. 2:99-cr-00123-AHM<br>Central District of California,<br>Los Angeles<br><br><br>ORDER |

Before:     WALLACE, LEAVY, and FISHER, Circuit Judges.

The application for authorization to file a second or successive 28 U.S.C.

§ 2255 motion makes a prima facie showing for relief under *Johnson v. United States*, 135 S. Ct. 2551 (2015).  The application is granted.  *See Welch v. United States*, 136 S. Ct. 1257, 1264-68 (2016) (*Johnson* announced a new substantive rule that has retroactive effect in cases on collateral review).

The district court is authorized to proceed with the identical section 2255 motion, protectively filed in case number 2:99-cr-00123-AHM, on May 18, 2016. The motion shall be deemed filed in the district court on May 18, 2016, the date the application was filed in this court.  *See Orona v. United States*, 826 F.3d 1196 (9th Cir. 2016).

The applicant's unopposed motion for appointment of counsel is denied without prejudice to renewal in the district court.

The Clerk shall serve this order and the application directly on the chambers of the Honorable Virginia A. Phillips.

No further filings will be entertained in this case (16-71519).

16-71519

NO._____

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT


MONTEZ DAY,

        Petitioner,

    v.

UNITED STATES OF AMERICA,

        Respondent.


**APPLICATION FOR LEAVE TO FILE A SECOND OR
SUCCESSIVE SECTION 2255 MOTION**


HILARY POTASHNER
Federal Public Defender
BRIANNA FULLER MIRCHEFF
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California  90012-4202
Telephone:  (213) 894-4784
Facsimile:  (213) 894-0081
Email:  Brianna_Mircheff@fd.org

Attorneys for Petitioner

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ....................................................................................1

II.   PROCEDURAL HISTORY ....................................................................1

    A.   Conviction and Sentencing.............................................................1

    B.   Section 2255 Motion ......................................................................5

    C.   Subsequent Filings .........................................................................5

    D.   The Instant Claims..........................................................................6

II. ARGUMENT ...........................................................................................7

    A.   Petitioner Has Made a Prima Facie Showing that His
         Successive Section 2255 Motion Satisfies the Gatekeeping
         Conditions in 28 U.S.C. § 2255 (h).................................................7

         1.   *Johnson* Announced a New Rule of Constitutional
              Law............................................................................................8

         2.   Petitioner Has Made a Prima Facie Showing That
              the Supreme Court Has Made *Johnson* Retroactive
              to Cases on Collateral Review. .................................................9

         3.   *Johnson*'s Rule Was "Previously Unavailable" to
              Petitioner. ...............................................................................14

    B.   Because Petitioner Has Made a Prima Facie Showing As
         to Least One Claim in His Proposed Section 2255 Motion,
          This Court Should Authorize the Filing of the Entire Motion
         in District Court..............................................................................15

III. CONCLUSION .....................................................................................16

# TABLE OF AUTHORITIES

**PAGE(S)**

## FEDERAL CASES

*Bennett v. United States,*
119 F.3d 468 (7th Cir. 1997) ........................................................7, 8

*Bousley v. United States,*
523 U.S. 614 (1998).........................................................................9

*Chaidez v. United States,*
133 S. Ct. 1103 (2013).....................................................................9

*Ezell v. United States,*
778 F.3d 762 (9th Cir. 2015) ...........................................................8

*Hughes v. United States,*
770 F.3d 814 (9th Cir. 2014) .........................................................12

*In re Williams,*
364 F.3d 235 (4th Cir. 2004) .........................................................14

*Johnson v. United States,*
135 S. Ct. 2551 (2015).......................................................... *passim*

*Koon v. United States,*
518 U.S.C. 81 (1996) ......................................................................13

*Miller v. Alabama,*
*132 S. Ct. 2455 (2012)* ........................................................... 12, 13

*Montgomery v. Louisiana,*
577 U.S. ___ , 136 S.Ct. 718 (2016)...................................... 12, 13, 14

*Ochoa v. Sirmons,*
485 F.3d 538 (10th Cir. 2007) .........................................................8

*Peugh v. United States,*
133 S.Ct. 2072 (2013)...................................................................13

*Reina-Rodriguez v. United States,*
655 F.3d 1182 (9th Cir. 2011) .......................................................11

**FEDERAL CASES (CONT.)**

*Schriro v. Summerlin*,
    542 U.S. 348 (2004)..........................................................................................9, 10

*Teague v. Lane*,
    489 U.S. 288 (1989)....................................................................................9, 11, 12

*Tyler v. Cain*,
    533 U.S. 656  (2001)....................................................................................8, 9, 12

*United States v. Doe*,
    810 F.3d 123 (3d Cir. 2015) ................................................................................11

*United States v. United States Coin & Currency*,
    401 U.S. 715 (1971)..............................................................................................14

*Welch v. United States*,
    578 U.S. ___, No. 15-6418, (Apr. 18, 2016) ....................................... 9, 10, 12, 14

*Whorton v. Bockting*,
    549 U.S. 406 (2007)................................................................................................9

*Woratzeck v. Stewart*,
    118 F.3d 648 (9th Cir. 1997) ................................................................... 6, 7, 8, 15

**FEDERAL STATUTES**

18 U.S.C. § 371......................................................................................................1

18 U.S.C. § 924.......................................................................................... *passim*

18 U.S.C. § 2113 ............................................................................................ 1, 3, 6

21 U.S.C. § 841 .....................................................................................................3

28 U.S.C. § 2244......................................................................................7, 15

28 U.S.C. § 2255 ......................................................................................... *passim*

U.S.S.G. § 4B1.1 ....................................................................................................3

U.S.S.G. § 4B1.2 ................................................................................................3, 6

**RULES**

Federal Rule of Civil Procedure 60(b).......................................................................5

# I.   INTRODUCTION

Petitioner hereby applies to the Court for authorization to file a second or successive motion under 28 U.S.C. § 2255, based on the Supreme Court's recent decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015).  Because *Johnson* announced a new, previously unavailable rule of constitutional law, which has been made retroactive to cases on collateral review by the Supreme Court, this Court should authorize the filing of Petitioner's Section 2255 motion in district court for the Central District of California, and should deem that petition filed in the district court *nunc pro tunc* to the date of the filing of this application for authorization to file this second or successive petition.[1]

# II.   PROCEDURAL HISTORY

## A.   Conviction and Sentencing

Mr. Day was charged in a three-count Indictment.  (Ex. A, Indictment, CR 13.)  On May 14, 1999, he pleaded guilty without a plea agreement to all of the charges in the Indictment against him: one count of conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371 (Count 1); one count of armed bank robbery, in violation of 18 U.S.C § 2113(a), (d) (Count 2); and one count of use of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c) (Count 3).

---

[1] Pursuant to Circuit Rule 22-3(a)(1), a copy of the Section 2255 motion Petitioner seeks to file in the district court is attached as Exhibit 1.  "Ex." followed by a letter refers to an exhibit to the Section 2255 motion.  The Presentence Report has been filed concurrently under seal.

(Ex. B, Change of Plea Hearing Transcript, CR 59.)  On October 25, 1999, he was sentenced to 288 months imprisonment under the then-mandatory Sentencing Guidelines—60 months on Count 1, 204 months on Count 2, to be served concurrently, and a mandatory consecutive 84 months on Count 3 (the Section 924(c) count).  (Ex. C, Sentencing Transcript, CR 59, at 37; Ex. D, Judgment and Commitment Order, CR 53.) [2]

Two things drove Mr. Day's sentence.  First, the Section 924(c) charge: Count 3 of the Indictment charged Mr. Day with violating Section 924(c) when he "knowingly used and carried a firearm, namely, a loaded .38 caliber revolver, during and in relation to a crime of violence, namely, robbery of Home Savings of America . . . in violation of Title 18, United States Code, Section 2113(a), by brandishing the pistol at the employees and customers[.]"  (Ex. A, Indictment, at 6.)[3]  By operation of law, this 924(c) conviction carried a mandatory consecutive sentence of 84 months.  (Ex. B, Change of Plea Hearing Transcript, at 26; *see also* 18 U.S.C. § 924(c)(1).)

---

[2] Unless otherwise indicated, all citations to "CR" refer to the clerk's record in CR 99-00123, Mr. Day's underlying criminal case in this Court.

[3] While Count 3 of the Indictment describes the predicate offense as "bank robbery in violation of Title 18, United States Code, Section 2113(a)," Count 2, the predicate, is actually for *armed* bank robbery in violation of 18 U.S.C. § 2113(a), (d). This Petition addresses both unarmed and armed bank robbery as a 924(c) predicate, out of an abundance of caution.

Second, Mr. Day was found to be a career offender. The Presentence Report ("PSR") concluded that Mr. Day was a career offender under U.S.S.G. § 4B1.1 because the instant offense, armed bank robbery in violation of 18 U.S.C. § 2113(a), (d) "meets the definition of a 'crime of violence' as set forth in Section 4B1.2(a)", and Mr. Day also had the requisite two prior qualifying felony convictions. (PSR ¶¶ 47-50.) The first career offender predicate was Mr. Day's 1992 conviction for possession with intent to distribute cocaine, in violation of 21 U.S.C. 841(a)(1). (PSR ¶¶ 48; 64-70; U.S. District Court, Western District of Tennessee, Dkt. No. 90-20034.) The second of the career offender predicates was Mr. Day's 1995 conviction for bank robbery, in violation of 18 U.S.C. § 2113(a). (PSR ¶¶ 49; 71-75.)

The career offender finding and Mr. Day's Section 924(c) conviction both had a significant impact on Mr. Day's sentence. The PSR found that his non-career-offender offense level was 27, but that his career-offender offense level was 31, a swing of four levels. (PSR ¶ 44; 54.) Moreover, because all career offenders are automatically placed in Criminal History Category VI, *see* U.S.S.G. § 4B1.1(b), the career offender determination increased Mr. Day's criminal history category from V to VI. (PSR ¶¶ 79-80.) In total, then, the career offender determination caused Mr. Day's guideline range to jump from 120-140 months to 188-235 months. (PSR ¶ 115.) In addition, the Section 924(c) conviction on

3

Count 3 added a mandatory consecutive 84 months on top of that, for a total guidelines range of 272-319 months.  (Ex. C, Sentencing Transcript, at 37.)

Mr. Day argued that his criminal history was overstated based on the minor nature of his predicate prior conviction for possession of cocaine and the fact that the offense occurred when he was young.  (Ex. C, Sentencing Transcript, at 11:6-16; 18-19.)  Additionally, Mr. Day sought a downward departure based upon extraordinary childhood abuse.  (Ex. C, Sentencing Transcript, at 11:17-23; 13-18.)

The court declined to depart from the guideline range, agreeing with the government that the circumstances of the prior controlled substance offense and the nature of the drug that was possessed made it an appropriate predicate for the career offender designation.  (Ex. C, Sentencing Transcript, at 11:24-25; 12:1-4; 32.)  The court also found that although it had the discretion to make a downward departure based on extraordinary childhood abuse, it did not think a departure was warranted in this case.  (Ex. C, Sentencing Transcript, at 12-13.)

At the sentencing hearing held on October 25, 1999, the district court imposed a term of 288 months imprisonment, consisting of 60 months on Count 1 and 204 months on Count 2, to be served concurrently, and a mandatory consecutive 84 months on Count 3 (the Section 924 (c) count).  (Ex. C, Sentencing Transcript, at 37.)

Mr. Day did not file a direct appeal of his case.

4

**B.      Section 2255 Motion**

On November 7, 2000, Mr. Day filed a motion pursuant to 28 U.S.C. §

2255, claiming: (1) his attorney was ineffective in that he misadvised Mr. Day

regarding the statutory maximum sentence under 18 U.S.C. § 924(c) and pressured

Mr. Day into pleading guilty; (2) the career offender determination overstated the

seriousness of his prior criminal history; and (3) he should have received a

downward departure for extraordinary childhood abuse.  (Ex. E, Motion to Vacate,

Set Aside or Correct Sentence By a Person in Federal Custody, CR 61; Ex. F,

Order Denying Section 2255 Petition, CR 79; Case No. CV 00-11896, Dkt. 1.)

The district court denied Mr. Day's Section 2255 motion on November 29, 2001.

(Ex. F, Order Denying Section 2255 Petition.)

**C.      Subsequent Filings**

On November 29, 2001, Mr. Day filed a motion pursuant to Federal Rule of

Civil Procedure 15 for leave of court to file a supplement on newly discovered

evidence.  (CR 5; Ex. G, Motion for Leave of Court Pursuant to Rule 15, CR 79.)

On December 11, 2001, Mr. Day filed a motion for reconsideration pursuant to

Federal Rule of Civil Procedure 60(b), which was denied on December 12, 2001.

(Ex. H, Motion for Reconsideration Pursuant to Federal Rules of Civil Procedure,

Rule 60(b), CR 82-84.)  The district court denied a certificate of appealability on

January 2, 2002, and the Ninth Circuit denied a certificate of appealability on June

13, 2002.  (CR 87; CA 02-55034, Dkt. 1, 11.

### D.   The Instant Claims[4]

To be sentenced as a career offender, a defendant must have at least two prior convictions for crimes of violence or controlled substance offenses, and the instant offense must be a crime of violence or a controlled substance offense. Moreover, to be convicted and sentenced under 18 U.S.C. Section 924(c), a defendant's instant offense must be a crime of violence.  Here, the district court found that Petitioner's conviction for 18 U.S.C. § 2113 (a), (d) was a crime of violence under both Section 924(c) and the career offender guideline, and that his prior conviction for 18 U.S.C. § 2113 (a) was also a crime of violence. After *Johnson*, and for reasons set out more fully in the attached 2255 petition and incorporated herein, Petitioner's prior conviction and his instant offense no longer satisfy the definition of "crime of violence" in U.S.S.G. § 4B1.2 (a) or Section

---

[4] Because the Second or Successive Application requires this Court only to determine whether the *prima facie* requirements of Section 2255(h) are met, and because the Court is decidedly *not* to dive deeply into the merits of the petition, the claims are presented here in summary form. *Woratzeck v. Stewart,* 118 F.3d 648, 650 (9th Cir. 1997) (per curiam) (The "possible merit" inquiry focuses on whether "it appears reasonably likely that the application satisfies the stringent requirements for the filing of a second or successive petition," not on the merit of the underlying claims.) The full analysis regarding these legal claims is, however, presented in the Petition attached to this Application, and rather than repeat them here, Petitioner incorporates those arguments by reference. Moreover, Petitioner does not raise any procedural barriers to relief at this stage; such hurdles are defenses that are the government's to raise (or waive, as they choose), and are not properly considered at this phase in any event, per *Woratzeck v. Stewart.* If the Court intends to consider any affirmative defense, Petitioner requests that the Court order a response and receive full briefing on the issue before deciding.

924(c), and as such, he should be resentenced without the career-offender

designation and without the mandatory consecutive sentence mandated by Section

924(c).

To the best of counsel's knowledge, Petitioner has not raised these claims in

any prior habeas petition.

## II.   ARGUMENT

### A.   Petitioner Has Made a Prima Facie Showing that His Successive Section 2255 Motion Satisfies the Gatekeeping Conditions in 28 U.S.C. § 2255 (h).

Before a federal prisoner may file a successive motion in the district court

under Section 2255, a court of appeals must certify that the motion satisfies one of

the "gatekeeping" conditions in 28 U.S.C. § 2255 (h). A court of appeals should

authorize a successive 2255 motion when the individual makes a "prima facie

showing," 28 U.S.C. § 2244 (b)(3)(C), that his application satisfies one of the

substantive grounds for a successive motion. *See* 28 U.S.C. § 2255 (h)

(incorporating the standards from  2244 into  2255).  This Court has explained that

a "prima facie showing" is "simply a sufficient showing of possible merit to

warrant a fuller exploration by the district court. . . ." *Woratzeck v. Stewart,* 118

F.3d 648, 650 (9th Cir. 1997 (per curiam) (quoting *Bennett v. United States*, 119

F.3d 468, 469 (7th Cir. 1997). The "possible merit" inquiry focuses on whether "it

appears reasonably likely that the application satisfies the stringent requirements

for the filing of a second or successive petition," not on the merit of the underlying

claims. *Woratzeck*, 118 F.3d at 650 (quoting *Bennett*, 119 F.3d at 469). At this stage, this Court should not undertake a "preliminary assessment of the merit of the claims for which second or successive authorization is sought." *Ochoa v. Sirmons*, 485 F.3d 538, 544 (10th Cir. 2007).

A federal prisoner may apply for leave to file a successive Section 2255 motion based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2255 (h)(2). Under this provision, a prisoner must make a prima facie showing that his motion is based on a (1) previously unavailable (2) new rule (3) of constitutional law (4) that has been made retroactive by the Supreme Court to cases on collateral review. *Tyler v. Cain*, 533 U.S. 656, 662 (2001; *Ezell v. United States*, 778 F.3d 762, 765 (9th Cir. 2015). The claims in Petitioner's proposed Section 2255 motion, which depend on the rule announced in *Johnson*, satisfy that standard.

### 1. *Johnson* Announced a New Rule of Constitutional Law

First, *Johnson*'s rule is constitutional in nature. *Johnson* expressly holds that "imposing an increased sentence under the residual clause of the Armed Career Criminal Act violates the Constitution's guarantee of due process." 135 S. Ct. at 2563; *see also id* at 2557 ("Two features of the residual clause conspire to make it unconstitutionally vague."); *id.* ("Increasing a defendant's sentence under the clause denies due process of law.").

It is well established that a rule is "new" if it was not "*dictated* by precedent existing at the time the defendant's conviction became final."  *Chaidez v. United States*, 133 S. Ct. 1103, 1107 (2013 (quoting *Teague v. Lane*, 489 U.S. 288, 301 (1989 (plurality op.)).  Here, the rule announced in *Johnson* is new because it expressly overruled *James* and *Syke*s, which had previously found the residual clause was not void for vagueness. *See Johnson*, 135 S. Ct. at 2563 ("Our contrary holdings in *James* and *Sykes* are overruled."); *Whorton v. Bockting*, 549 U.S. 406, 416 (2007) ("The explicit overruling of an earlier holding no doubt creates a new rule.").

> **2.  Petitioner Has Made a Prima Facie Showing That the Supreme Court Has Made *Johnson* Retroactive to Cases on Collateral Review.**

A new rule has been "made retroactive to cases on collateral review" if "the Supreme Court holds it to be retroactive."  *Tyler*, 533 U.S. at 663.  The Supreme Court has held that new substantive rules "generally apply retroactively," while new procedural rules do not.  *Schriro v. Summerlin*, 542 U.S. 348, 351-52 (2004; *see also Bousley v. United States*, 523 U.S. 614, 620 (1998; *Teague*, 489 U.S. at 311 (plurality op.).  Substantive rules include rules that "narrow the scope of a criminal statute by interpreting its terms," *Schriro*, 542 U.S. at 351-52, or "alter[ ] the range of conduct or the class of persons that the law punishes," *id.* at 353.

The Supreme Court, in *Welch v. United States* held that *Johnson v. United States* was a "new substantive rule that has retroactive effect in cases on collateral

9

review." 578 U.S. ___, No. 15-6418, slip op. at l5, (Apr.18, 2016). It is substantive, the Court held, because it changed the substantive reach of a sentencing enhancement, "altering 'the range of conduct or the class of persons [it] punishes.'" *Id.*, slip op. at 9 (quoting *Schriro v. Summerlin*, 542 U.S. 348, 353). "*Johnson* establishes . . . that 'even the use of impeccable fact-finding procedures could not legitimate' a sentence based on [the residual] clause." And, after *Johnson*, "the residual clause is invalid . . . [and] it can no longer mandate or authorize any sentence." *Id.*, slip op. at 9. "It follows that *Johnson* is a substantive decision." *Id.*

Just as clearly, the *Welch* Court held that *Johnson* is decidedly not a procedural rule. It does not "allocate decision making authority between judge and jury, or regulate the evidence that the court could consider in making its decision." *Id.* (internal citations and quotation marks omitted). Rather, "*Johnson* affected the reach of the underlying statute rather than the judicial procedures by which the statute is applied." *Id.*

The fact that *Welch* arose in the context of the Armed Career Criminal Act ("ACCA") is of no effect. The holding of *Welch* is not limited to ACCA defendants; the Court states: "The residual clause is invalid under *Johnson* so it can no longer mandate or authorize *any* sentence." *Id.* (emphasis added). "It follows that *Johnson* is a substantive decision," *id.* -- not a substantive decision as it relates to ACCA defendants, but a substantive decision, full stop.

Under *Teague*, "either a rule is retroactive or it is not." *United States v. Doe*, 810 F.3d 123, 154 & n.13 (3d Cir. 2015). As the government itself has previously argued, it was "not aware of any . . . chameleon-like rules" that "were substantive for some purposes and procedural for others." Supplemental Brief for United States on Rehearing En Banc, *Spencer v. United States*, at 15 (11th Cir.) (No. 10-10676). Rather, a rule's "status as a substantive rule is fixed," and "does not fluctuate based on whether the prisoner is challenging an ACCA enhancement, a mandatory guidelines enhancement, or, as here, an advisory guidelines enhancement." *Id.* at 15; *see also Reina-Rodriguez v. United States*, 655 F.3d 1182, 1189 (9th Cir. 2011) (en banc) (treating a rule that was substantive in the ACCA context as substantive in relation to the guidelines). Because *Johnson* is a substantive rule, it must be given retroactive effect, regardless of the context.

With respect to Petitioner's 924(c) claim, in practice, a sentence under 924(c) operates the same way as an ACCA sentence; it authorizes a mandatory consecutive sentence that would otherwise be impossible to impose. Thus, as with ACCA, "[a]fter *Johnson*, the same person engaging in the same conduct is no longer subject to the Act and faces at most [the sentence authorized under the underlying crime]." *Id.* And, as with ACCA, "'even the use of impeccable fact-finding procedures could not legitimate' a sentence based on that clause.'" *Id.* (citation omitted). For that reason, *Johnson* is retroactive to individuals sentenced under 924(c).

11

With respect to Petitioner's career offender claim, *Johnson* is retroactive to the guidelines as well. That is, if *Welch* alone did not serve to make *Johnson* retroactive to the guidelines, certainly the Supreme Court has made the decision retroactive to the guidelines by a combination of holdings. It is beyond dispute that the Supreme Court "can establish that a holding applies retroactively either expressly or through the combination of the holdings from multiple cases." *See Hughes v. United States*, 770 F.3d 814, 817 (9th Cir. 2014); *see also Tyler*, 533 U.S. at 666.  For instance, the Supreme Court may hold in one case that a particular error is structural error, and then hold in another case that "all structural-error rules apply retroactively or that all structural-error rules fit within the second *Teague* exception."  *Tyler*, 533 U.S. at 666; *see also id* at 668-69 ("[I]f we hold in Case One that a particular type of rule applies retroactively to cases on collateral review and hold in Case Two that a given rule is of that particular type, then it necessarily follows that the given rule applies retroactively to cases on collateral review.") (O'Connor, J., concurring).

Certainly the combined effect of *Welch* and *Montgomery v. Louisiana*, 577 U.S. ___ ,  136 S.Ct. 718 (2016), is to render a guideline sentence premised on the residual clause just as suspect as an ACCA sentence premised on the residual clause.  In *Montgomery*, the Court considered whether *Miller v. Alabama,* the decision doing away with mandatory life without parole for juveniles, was a substantive rule that was retroactive to cases on collateral review. 136 S.Ct. at 726.

12

Importantly, *Miller* did not hold that courts could not impose life without parole on a juvenile, but only that a state could not have a statute that required a court to impose mandatory life without any ability to consider the juvenile's "capacity for change." *Id*.  The Court held that even though *Miller* did not forbid imposition of a life sentence on a juvenile offender, it "'necessarily carr[ied] a significant risk that a defendant' -- here the vast majority of juvenile offenders -- 'face a punishment that the law cannot impose upon him.'" *Id.* at 734 (internal citations omitted).

As with *Miller*, *Johnson* did not take away the power of the court to impose a sentence as high as the one called for by the career offender guideline. Nevertheless, for individuals whose guideline calculations tie back to the residual clause, *Johnson* "raises a grave risk that many are being held in violation of the Constitution." *Montgomery*, 136 S.Ct. at 736. Under the mandatory guidelines, it is clear that a person sentenced as a career offender based on the residual clause received a sentence he would not have received, but for the career offender guideline – the court was bound to impose that sentence in all but a few cases that fell outside of the "heartland" of the guideline. *Koon v. United States*, 518 U.S. 81, 95-96 (1996). But even under the advisory guidelines regime, the guidelines continue to provide an "anchoring" effect at sentencing; they constitute the starting point in analysis, and any deviation from that guideline must be explained and justified. *Peugh v. United States*, 133 S.Ct. 2072, 2083 (2013). Because of the

13

gravitational pull of the guidelines, "after [*Johnson*], it will be the rare . . . offender who can receive th[e] same sentence." *Montgomery*, 136 S.Ct. at 734.

Moreover, just as applied to ACCA, *Welch*, slip op. at 9, *Johnson* is clearly not a procedural rule as it applies to the guidelines. It does not "allocate decision-making authority" as between the judge and jury, or regulate the evidence that the court can consider in making its decision. *Id.* Because not "'even the use of impeccable fact-finding procedures'" could legitimate a sentence based on the residual clause, the rule must be substantive, wherever it appears. *Id.* (quoting *United States v. United States Coin & Currency*, 401 U.S. 715, 724 (1971)).

The holdings of multiple cases establish that *Johnson* has been made retroactive to cases on collateral review.

### 3.     *Johnson*'s Rule Was "Previously Unavailable" to Petitioner.

Finally, *Johnson*'s new rule was "previously unavailable" in Petitioner's prior proceedings.  Although this Court has not expressly defined "previously unavailable," the Fourth Circuit has held that "the word 'previously' refers to the last federal proceeding . . . in which the applicant challenged the same criminal judgment."  *In re Williams*, 364 F.3d 235, 239 (4th Cir. 2004).  Here, Petitioner's last proceeding challenging this criminal judgment was the December 11, 2001 motion for reconsideration of the court's denial of his Section 2255 motion, which he filed in the district court on November 7, 2000. The district court denied the Section 2225 motion on November 29, 2001 and denied the motion for

14

reconsideration on December 12, 2001, years before *Johnson* was decided. Petitioner could not have availed himself of *Johnson* before this proceeding.

**B.    Because Petitioner Has Made a Prima Facie Showing As to Least One Claim in His Proposed Section 2255 Motion, This Court Should Authorize the Filing of the Entire Motion in District Court.**

This Court has held that if a petitioner has made a prima facie showing that at least one claim in his proposed Section 2255 motion satisfies Section 2255(h), then "he may proceed upon his entire application in the district court." *Woratzeck*, 118 F.3d at 650.  Whether each individual claim in the motion ultimately satisfies Section 2255's requirements for a second or successive petition is for the district court to decide.  *See* 28 U.S.C. §§ 2244(b)(4); 2255(h) (incorporating procedures in Section 2244).  Therefore, should this Court determine that *either* Petitioner's career offender claim *or* his Section 924(c) claim demonstrates prima facie compliance with Section 2255(h)'s gatekeeping standard, it should authorize the filing of the entire Section 2255 motion in district court.

## III.CONCLUSION

For the foregoing reasons, Petitioner requests that this Court grant him authorization to file the attached successive Section 2255 motion in the district court and order that the successive motion be filed *nunc pro tunc* as of May 18, 2016, the date of filing of his initial application.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender


DATED:  May 18, 2016            By  *s/ Brianna Fuller Mircheff*
                                BRIANNA FULLER MIRCHEFF
                                Deputy Federal Public Defender
                                Attorneys for Petitioner

16

# EXHIBIT 1

1   HILARY POTASHNER (Bar No. 167060)
    Federal Public Defender
2   BRIANNA FULLER MIRCHEFF (Bar No. 243641)
    (Email: Brianna_Mircheff@fd.org)
3   Deputy Federal Public Defender
    321 East 2nd Street
4   Los Angeles, California 90012-4202
    Tel: 213-894-4784
5   Fax: 213-894-0081

6   Attorneys for Petitioner
    MONTEZ DAY
7
                    UNITED STATES DISTRICT COURT
8
                  CENTRAL DISTRICT OF CALIFORNIA
9
                          WESTERN DIVISION
10
    MONTEZ DAY,                        Case No. CV_____
11
                   Petitioner,         [CR 99-00123-AHM]
12
             v.                        **MOTION TO VACATE, SET ASIDE,**
13                                     **OR CORRECT SENTENCE UNDER**
                                       **28 U.S.C. § 2255**
14   UNITED STATES OF AMERICA,

15                  Respondent.

16

17         Petitioner Montez Day, through undersigned counsel, hereby respectfully moves

18   this Court to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.

19                                     Respectfully submitted,

20                                     HILARY POTASHNER
                                       Federal Public Defender
21

22   DATED: May 18, 2016          By   /s/ Brianna Fuller Mircheff
                                       BRIANNA FULLER MIRCHEFF
23                                     Deputy Federal Public Defender

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................... 1

II. PROCEDURAL HISTORY ..................................................................... 1

    A.    Conviction and Sentencing ............................................................ 1

    B.    Section 2255 Motion ..................................................................... 4

    C.    Subsequent Filings ........................................................................ 4

    D.    Second or Successive 2255 Motion .............................................. 4

III. ARGUMENT .......................................................................................... 4

    A.    Mr. Day's Section 924(c) Conviction, and the Resulting Seven-Year Mandatory Consecutive Sentence, Must Be Vacated because the Predicate Offense, Either Unarmed Bank Robbery or Armed Bank Robbery, Is Not a Crime of Violence. ................................................................................... 5

        1.    Neither Unarmed Bank Robbery Nor Armed Bank Robbery Qualifies as a Crime of Violence under the Force Clause. ................................................................ 6

            a.    Neither Unarmed Bank Robbery Nor Armed Bank Robbery Requires the *Intentional* Use or Threatened Use of Force. ......................... 9

            b.    Neither Unarmed Bank Robbery Nor Armed Bank Robbery Requires the Use or Threatened Use of *Violent* Force. ................................ 11

        2.    Following *Johnson*, Neither Unarmed Bank Robbery Nor Armed Bank Robbery Qualifies as a Crime of Violence under the Residual Clause because that Clause Is Void for Vagueness ............................................. 14

    B.    Mr. Day Is Not a Career Offender Because Neither His Instant Conviction for Armed Bank Robbery Nor His Prior Conviction for Unarmed Bank Robbery Is a Crime of Violence Under *Johnson* ..................................................... 17

        1.    Neither Unarmed Bank Robbery Nor Armed Bank Robbery Is a Crime of Violence Under the Residual Clause following *Johnson*, and Neither Satisfies the Force Clause. ................................................................ 18

        2.    The Excision of the Residual Clause Takes with It the Commentary Offense of Robbery, which Only Served to Interpret the Residual Clause. ...................... 19

IV. CONCLUSION ...................................................................................... 24

i

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4  *Carter v. United States,*
      530 U.S. 255 (2000)..........................................................................................9

5

6  *Chrzanoski v. Ashcroft,*
      327 F.3d 188 (2d Cir. 2003) ......................................................................12

7

8  *Delgado-Hernandez v. Holder,*
      697 F.3d 1125 (9th Cir. 2012) ............................................................16, 21

9

10  *Descamps v. United States,*
      133 S. Ct. 2276 (2013)............................................................................7, 17

11

12  *Dimaya v. Lynch,*
      803 F.3d 1110 (9th Cir. 2015) ............................................................15, 16

13

14  *Fernandez-Ruiz v. Gonzales,*
      466 F.3d 1121 (9th Cir. 2006) ............................................................8, 11

15

16  *Matter of Guzman-Polanco,*
      26 I. & N. Dec. 713 (BIA 2016).............................................................12

17  *James v. United States,*
      550 U.S. 192 (2007)..........................................................................15, 21

18

19  *Johnson v. United States,*
      135 S. Ct. 2551 (2015)...................................................................*passim*

20

21  *Johnson v. United States,*
      559 U.S. 133 (2010) (*Johnson I*) .............................................................8

22

23  *Leocal v. Ashcroft,*
      543 U.S. 1 (2004)......................................................................8, 11, 14

24

25  *McLaughlin v. United States,*
      476 U.S. 16 (1986).........................................................................13, 14

26  *Miller v. Gammie,*
      335 F.3d 889 (9th Cir. 2003) ............................................................11, 14

27

28

ii

**Federal Cases (cont.)**

*Mistretta v. United States*,
    488 U.S. 361 (1989)................................................................... 19

*Quijada-Aguilar v. Lynch*,
    799 F.3d 1303 (9th Cir. 2015) .................................................. 20

*Stinson v. United States*,
    508 U.S. 36 (1993)............................................................. 19, 20

*Sykes v. United States*,
    131 S. Ct. 2267 (2011) .............................................................. 15

*Taylor v. United States*,
    495 U.S. 575 (1990)..................................................................... 7

*United States v. Acosta*,
    470 F.3d 132 (2d Cir. 2006) ....................................................... 8

*United States v. Alsop*,
    479 F.2d 65 (9th Cir. 1973) ................................................. 10, 17

*United States v. Alvarado-Pineda*,
    774 F.3d 1198 (9th Cir. 2014) .................................................. 22

*United States v. Amparo*,
    68 F.3d 1222 (9th Cir. 1995) .................................................. 6, 16

*United States v. Anderson*,
    942 F.2d 606 (9th Cir. 1991) .................................................... 19

*United States v. Aragon*,
    983 F.2d 1306 (4th Cir. 1993) .................................................. 16

*United States v. Armijo*,
    651 F.3d 1226 (10th Cir. 2011) ................................................ 23

*United States v. Baza-Martinez*,
    464 F.3d 1010 (9th Cir. 2006) .................................................... 7

*United States v. Becerril-Lopez*,
    541 F.3d 881 (9th Cir. 2008) .................................................... 21

1

**Federal Cases (cont.)**

*United States v. Bell*,
   2016 WL 344749 (N.D. Cal. Jan. 28, 2016)................................................................ 16

*United States v. Benavides*,
   617 Fed. App'x 790 (9th Cir. 2015) ...................................................................... 18

*United States v. Boyd*,
   924 F.2d 945 (9th Cir. 1991) ................................................................................ 13

*United States v. Chandler*,
   743 F.3d 648 (9th Cir. 2014) ........................................................................ 14, 21

*United States v. Crews*,
   621 F.3d 849 (9th Cir. 2010) ................................................................................ 18

*United States v. Cruz-Rodriguez*,
   625 F.3d 274 (5th Cir. 2010) ................................................................................ 12

*United States v. Dixon*,
   805 F.3d 1193 (9th Cir. 2015) ............................................................................ 8, 22

*United States v. Dunlap*,
   ___ F. Supp. 3d ___, 2016 WL 591757 (D. Or. 2016)........................................ 22

*United States v. Edmunson*,
   __ F. Supp. 3d __, 2015 WL 9311983 (D. Md. Dec. 30, 2015)............................ 16

*United States v. Foppe*,
   993 F.2d 1444 (9th Cir. 1993) .............................................................................. 10

*United States v. Grajeda*,
   581 F.3d 1186 (9th Cir. 2009) ................................................................................ 7

*United States v. Hopkins*,
   703 F.2d 1102 (9th Cir. 1983) .............................................................................. 11

*United States v. Jones*,
   84 F.3d 1206 (9th Cir. 1996) ................................................................................ 13

*United States v. Kelley*,
   412 F.3d 1240 (11th Cir. 2005) ............................................................................ 10

**Federal Cases (cont.)**

*United States v. Landa*,
   642 F.3d 833 (9th Cir. 2011) ................................................................. 20

*United States v. Lattanaphom*,
   __ F. Supp. 3d __, 2016 WL 393545 (E.D. Cal. Feb. 1, 2016) ................................ 16

*United States v. Leshen*,
   453 Fed. App'x 408 (4th Cir. 2011) ................................................... 20, 21

*United States v. Martinez-Jimenez*,
   864 F.2d 664 (9th Cir. 1989) ....................................................... 11, 13

*United States v. McDougherty*,
   920 F.2d 569 (9th Cir. 1990) ....................................................... 14, 21

*United States v. Mendez*,
   992 F.2d 1488 (9th Cir. 1993) ............................................................. 16

*United States v. Parnell*,
   14-30208 slip op. (9th Cir. April 12, 2016) ............................................ 12

*United States v. Perez-Vargas*,
   414 F.3d 1282 (10th Cir. 2005) ........................................................... 12

*United States v. Piccolo*,
   441 F.3d 1084 (9th Cir. 2006) ............................................................. 7

*United States v. Prince*,
   772 F.3d 1173 (9th Cir. 2014) ..................................................... 14, 21

*United States v. Selfa*,
   918 F.2d 749 (9th Cir. 1990) ................................................... 6, 7, 14

*United States v. Serafin*,
   562 F.3d 1105 (9th Cir. 2009) ............................................................. 8

*United States v. Serna*,
   309 F.3d 859 (5th Cir. 2002) ............................................................. 23

*United States v. Shell*,
   789 F.3d 335 (4th Cir. 2015) ..................................................... 20, 22

1

**Federal Cases (cont.)**

*United States v. Soto-Rivera*,
   811 F.3d 53 (1st Cir. 2016)......................................................................... 22

*United States v. Terrell*,
   593 F.3d 1084 (9th Cir. 2010) .................................................................... 18

*United States v. Torres-Miguel*,
   701 F.3d 165 (4th Cir. 2012) ................................................................ 7, 12

*United States v. Vivas-Ceja*,
   808 F.3d 719 (7th Cir. 2015) ...................................................................... 16

*United States v. Werle*,
   __ F.3d __, 2016 WL 828132 (9th Cir. Mar. 3, 2016) ............................. 17

*United States v. Williams*,
   110 F.3d 50 (9th Cir. 1997) ........................................................................ 21

*United States v. Woodrup*,
   86 F.3d 359 (4th Cir. 1996) ........................................................................ 10

*United States v. Wright*,
   215 F.3d 1020 (9th Cir. 2000) ...........................................................*passim*

*United States v. Yockel*,
   320 F.3d 818 (8th Cir. 2003) ...................................................................... 10

*Whyte v. Lynch*,
   807 F.3d 463 (1st Cir. 2015)........................................................................ 12

**Federal Statutes**

8 U.S.C. § 1101................................................................................... 15, 16

18 U.S.C. § 16...............................................................................*passim*

18 U.S.C. § 371 .......................................................................................... 1

18 U.S.C. § 924..........................................................................*passim*

18 U.S.C § 2113..........................................................................*passim*

21 U.S.C. 841 .............................................................................................. 2

**Federal Statutes (cont.)**

28 U.S.C. § 994...................................................................................................... 19

28 U.S.C. § 2255............................................................................................ 1, 4, 24

U.S.S.G. § 1B1.7.................................................................................................... 19

U.S.S.G. § 4B1.1.......................................................................................... 1, 2, 3, 17

U.S.S.G. § 4B1.2................................................................................................*passim*

**Federal Rules**

Federal Rule of Civil Procedure 15 ......................................................................... 4

Federal Rule of Civil Procedure 60(b).................................................................... 4

**State Statutes**

Cal. Penal Code § 422........................................................................................... 12

**Other Authorities**

Ninth Cir. Model Criminal Jury Instructions § 8.162 (2015)......................................... 17

1

**TABLE OF EXHIBITS**

2

3   Exhibit A:   Indictment (February 9, 1999, CR 13)

4   Exhibit B:   Change of Plea Hearing Transcript (May 14, 1999, CR 59)

5   Exhibit C:   Sentencing Hearing Transcript (October 25, 1999, CR 59)

6   Exhibit D:   Judgment and Commitment Order (October 25, 1999, CR 53)

7   Exhibit E:   Motion to Vacate, Set Aside or Correct Sentence By a Person in Federal

8                Custody (November 7, 2000, CR 61)

9   Exhibit F:   Order Denying Section 2255 Petition (November 29, 2001, CR 75; District

10               Court Case No. CV 00-11896, Dkt. 3)

11  Exhibit G:   Motion for Leave of Court Pursuant to Rule 15 (November 29, 2001, CR

12               79; District Court Case No. CV 00-11896, Dkt. 5)

13  Exhibit H:   Motion for Reconsideration Pursuant to Federal Rules of Civil Procedure,

14               Rule 60(b) (December 11, 2001, CR 83; District Court Case No. CV 00-

15               11896, Dkt. 6)

16

17

18

19

20

21

22

23

24

25

26

27

28

**MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE
UNDER 28 U.S.C. § 2255**

## I.  INTRODUCTION

Petitioner Montez Day, by and through his attorney, Deputy Federal Public Defender Brianna Fuller Mircheff, hereby submits this motion to vacate, set aside, or correct his sentence, based on *Johnson v. United States*, 135 S. Ct. 2551 (2015).  In *Johnson*, the Supreme Court held that the residual clause of the Armed Career Criminal Act, 18 U.S.C. § 924(e), is void for vagueness.  *Johnson*'s reasoning applies equally to the residual clauses in the career offender guideline, U.S.S.G. § 4B1.2(a)(2), and in 18 U.S.C. § 924(c)(3)(B).  Therefore, in light of *Johnson*, Mr. Day's sentence under U.S.S.G. § 4B1.1 and seven-year mandatory consecutive sentence under 18 U.S.C. § 924(c) were imposed in violation of the Constitution or the laws of the United States and exceeded the maximum authorized by law.

## II.  PROCEDURAL HISTORY

### A.      Conviction and Sentencing

Mr. Day was charged in a three-count Indictment.  (Ex. A, Indictment, CR 13.) On May 14, 1999, he pleaded guilty without a plea agreement to all of the charges in the Indictment against him: one count of conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371 (Count 1); one count of armed bank robbery, in violation of 18 U.S.C § 2113(a), (d) (Count 2); and one count of use of a firearm during a crime of violence, in violation of 18 U.S.C. 924(c) (Count 3).  (Ex. B, Change of Plea Hearing Transcript, CR 59.)  On October 25, 1999, he was sentenced to 288 months imprisonment under the then-mandatory Sentencing Guidelines—60 months on Count 1, 204 months on Count 2, to be served concurrently, and a mandatory consecutive 84

months on Count 3 (the Section 924(c) count).  (Ex. C, Sentencing Transcript, CR 59, at 37; Ex. D, Judgment and Commitment Order, CR 53.) [1]

Two things drove Mr. Day's sentence.  First, the Section 924(c) charge: Count 3 of the Indictment charged Mr. Day with violating Section 924(c) when he "knowingly used and carried a firearm, namely, a loaded .38 caliber revolver, during and in relation to a crime of violence, namely, robbery of Home Savings of America . . . in violation of Title 8, United States Code, Section 2113(a), by brandishing the pistol at the employees and customers[.]"  (Ex. A, Indictment, at 6.)[2]  Mr. Day admitted that he was guilty of this offense under a *Pinkerton* theory of liability. (Ex. B, Change of Plea Transcript, at 22.) By operation of law, this 924(c) conviction carried a mandatory consecutive sentence of 84 months.  (Ex. B, Change of Plea Hearing Transcript, at 26; *see also* 18 U.S.C. § 924(c)(1).)

Second, Mr. Day was found to be a career offender.  The Presentence Report ("PSR") concluded that Mr. Day was a career offender under U.S.S.G. § 4B1.1 because the instant offense, armed bank robbery in violation of 18 U.S.C. § 2113(a), (d) "meets the definition of a 'crime of violence' as set forth in Section 4B1.2(a)", and Mr. Day also had the requisite two prior qualifying felony convictions.  (PSR ¶¶ 47-50.)  The first career offender predicate was Mr. Day's 1992 conviction for possession with intent to distribute cocaine, in violation of 21 U.S.C. 841(a)(1).  (PSR ¶¶ 48; 64-70; U.S. District Court, Western District of Tennessee, Dkt. No. 90-20034.)  The second of the career offender predicates was Mr. Day's 1995 conviction for bank robbery, in violation of 18 U.S.C. § 2113(a).  (PSR ¶¶ 49; 71-75.)

---

[1] Unless otherwise indicated, all citations to "CR" refer to the clerk's record in CR 99-00123, Mr. Day's underlying criminal case in this Court.

[2] While Count 3 of the Indictment describes the predicate offense as "bank robbery in violation of Title 18, United States Code, Section 2113(a)," Count 2, the predicate, is actually for *armed* bank robbery in violation of 18 U.S.C. § 2113(a), (d). This Petition addresses both unarmed and armed bank robbery as a 924(c) predicate, out of an abundance of caution.

The career offender finding and Mr. Day's Section 924(c) conviction both had a significant impact on Mr. Day's sentence.  The PSR found that his non-career-offender offense level was 27, but that his career-offender offense level was 31, a swing of four levels.  (PSR ¶ 44; 54.)  Moreover, because all career offenders are automatically placed in Criminal History Category VI, *see* U.S.S.G. § 4B1.1(b), the career offender determination increased Mr. Day's criminal history category from V to VI.  (PSR ¶¶ 79-80.)  In total, then, the career offender determination caused Mr. Day's guideline range to jump from 120-140 months to 188-235 months.  (PSR ¶ 115.)  In addition, the Section 924(c) conviction on Count 3 added a mandatory consecutive 84 months on top of that, for a total guidelines range of 272-319 months.  (Ex. C, Sentencing Transcript, at 37.)

Mr. Day argued that his criminal history was overstated based on the minor nature of his predicate prior conviction for possession of cocaine and the fact that the offense occurred when he was young.  (Ex. C, Sentencing Transcript, at 11:6-16; 18-19.)  Additionally, Mr. Day sought a downward departure based upon extraordinary childhood abuse.  (Ex. C, Sentencing Transcript, at 11:17-23; 13-18.)

The court declined to depart from the guideline range, agreeing with the government that the circumstances of the prior controlled substance offense and the nature of the drug that was possessed made it an appropriate predicate for the career offender designation.  (Ex. C, Sentencing Transcript, at 11:24-25; 12:1-4; 32.)  The court also found that although it had the discretion to make a downward departure based on extraordinary childhood abuse, it did not think a departure was warranted in this case.  (Ex. C, Sentencing Transcript, at 12-13.)

At the sentencing hearing held on October 25, 1999, the district court imposed a term of 288 months imprisonment, consisting of 60 months on Count 1 and 204 months on Count 2, to be served concurrently, and a mandatory consecutive 84 months on Count 3 (the Section 924(c) count).  (Ex. C, Sentencing Transcript, at 37.)

Mr. Day did not file a direct appeal of his case.

3

**B.      Section 2255 Motion**

On November 7, 2000, Mr. Day filed a motion pursuant to 28 U.S.C. § 2255, claiming: (1) his attorney was ineffective in that he misadvised Mr. Day regarding the statutory maximum sentence under 18 U.S.C. § 924(c) and pressured Mr. Day into pleading guilty; (2) the career offender determination overstated the seriousness of his prior criminal history; and (3) he should have received a downward departure for extraordinary childhood abuse.  (Ex. E, Motion to Vacate, Set Aside or Correct Sentence By a Person in Federal Custody, CR 61; Ex. F, Order Denying Section 2255 Petition, CR 79; Case No. CV 00-11896, Dkt. 1.)  The district court denied Mr. Day's Section 2255 motion on November 29, 2001.  (Ex. F, Order Denying Section 2255 Petition.)

**C.      Subsequent Filings**

On November 29, 2001, Mr. Day filed a motion pursuant to Federal Rule of Civil Procedure 15 for leave of court to file a supplement on newly discovered evidence. (CR 5; Ex. G, Motion for Leave of Court Pursuant to Rule 15, CR 79.)  On December 11, 2001, Mr. Day filed a motion for reconsideration pursuant to Federal Rule of Civil Procedure 60(b), which was denied on December 12, 2001.  (Ex. H, Motion for Reconsideration Pursuant to Federal Rules of Civil Procedure, Rule 60(b), CR 82-84.) The district court denied a certificate of appealability on January 2, 2002, and the Ninth Circuit denied a certificate of appealability on June 13, 2002.  (CR 87; CA 02-55034, Dkt. 1, 11.

**D.      Second or Successive 2255 Motion**

The instant Motion is filed in conjunction with a request for leave to file a second or successive petition in the Ninth Circuit.

# III.  ARGUMENT

Under 28 U.S.C. § 2255(a), a defendant is entitled to a resentencing when his original sentence was imposed "in violation of the Constitution or laws of the United

4

States," or is "in excess of the maximum authorized by law."  Mr. Day is entitled to relief on all these grounds because under *Johnson v. United States*, 135 S. Ct. 2251 (2015), he is now serving illegal and unconstitutional career offender and Section 924(c) sentences.

**A.   Mr. Day's Section 924(c) Conviction, and the Resulting Seven-Year Mandatory Consecutive Sentence, Must Be Vacated because the Predicate Offense, Either Unarmed Bank Robbery or Armed Bank Robbery, Is Not a Crime of Violence.**

Section 924(c) provides for a series of graduated, mandatory consecutive sentences for using or carrying a firearm during and in relation to a "crime of violence." 18 U.S.C. § 924(c)(1)(A), (B).  The term "crime of violence," in turn, is defined as "an offense that is a felony and—"

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3).  As used in this brief, subsection (A) is called the "force clause" and subsection (B) is called the "residual clause."

Here, as noted, Count 3 of the Indictment charged Mr. Day with violating Section 924(c) when he "knowingly used and carried a firearm, namely, a loaded .38 caliber revolver, during and in relation to a crime of violence, namely, robbery of Home Savings of America . . . in violation of Title 8, United States Code, Section 2113(a), by brandishing the pistol at the employees and customers[.]"  (Ex. A, Indictment, at 6.)  However, the predicate offense, Count 2, actually charged Mr. Day with committing *armed* bank robbery in violation of 18 U.S.C. § 2113(a), (d)[.]"  (Ex. A, Indictment, at 5.)  Following *Johnson*, neither unarmed bank robbery nor armed bank robbery is a crime of violence for purposes of Section 924(c).

5

In a 1990 case, the Ninth Circuit held that unarmed bank robbery *was* a crime of violence under U.S.S.G. § 4B1.2's force clause because unarmed bank robbery required that money or property be taken through force and violence or through intimidation, which amounted to a "threatened use of physical force."  *See United States v. Selfa*, 918 F.2d 749, 751 (9th Cir. 1990).  The decision's analysis was limited, reasoning only that acting in a way that would put an ordinary person in fear of bodily harm necessarily constituted the threatened use of force.  *Id.*  The Court also cited the application note to the guideline, which includes "robbery" as an enumerated offense.  *Id.*

Similarly, in a 2000 case, the Ninth Circuit held that armed bank robbery *was* a crime of violence under the force clause of Section 924(c)(3)(A).  *United States v. Wright*, 215 F.3d 1020, 1028 (9th Cir. 2000).  The decision's analysis was limited, reasoning only "[a]rmed bank robbery qualifies as a crime of violence because one of the elements of the offense is a taking 'by force and violence, or by intimidation.'"  *Id.* (citing 18 U.S.C. § 2113(a)).

There is much water under the bridge since *Selfa* and *Wright* were decided, however, and intervening Supreme Court and en banc Ninth Circuit decisions have undermined their reasoning that bank robbery was a crime of violence.  Specifically, the Supreme Court issued a series of cases redefining the boundaries of the force clause, such that bank robbery no longer satisfies that clause for two independent reasons.  *Johnson*, moreover, removed the alternative ground on which bank robbery could have been deemed a crime of violence: that bank robbery qualified as a predicate crime of violence under the residual clause.  After *Johnson*, therefore, Mr. Day no longer has a qualifying crime of violence supporting his Section 924(c) conviction and sentence.

## 1.  Neither Unarmed Bank Robbery Nor Armed Bank Robbery Qualifies as a Crime of Violence under the Force Clause.

To determine whether a predicate offense qualifies as a "crime of violence" under § 924(c), this Court must use the categorical approach.  *See United States v.*

*Amparo*, 68 F.3d 1222, 1225 (9th Cir. 1995); *United States v. Piccolo*, 441 F.3d 1084, 1086-87 (9th Cir. 2006) ("[I]n the context of crime-of-violence determinations under § 924(c), our categorical approach applies regardless of whether we review a current or prior crime."); *see also Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013) (applying categorical approach in case under ACCA, 18 U.S.C. § 924(e)).  Under *Taylor*, only the statutory definitions –i.e., the elements – of the predicate crime are relevant to determine whether the conduct criminalized by the statute, including the most innocent conduct, qualifies as a "crime of violence." *Taylor v. United States*, 495 U.S. 575, 599-601 (1990).

Determination of whether a criminal offense is categorically a crime of violence is done by "assessing whether the 'full range of conduct covered by [the statute] falls within the meaning of that term.'" *United States v. Grajeda*, 581 F.3d 1186, 1189 (9th Cir. 2009) (citation omitted).  To do this, courts must look "at the least egregious end of [the. . . statute's] range of conduct." *United States v. Baza-Martinez*, 464 F.3d 1010, 1014 (9th Cir. 2006) (quoting *United States v. Lopez-Solis*, 447 F.3d 1201, 1206 (9th Cir. 2006)).  In other words, under the categorical approach, a prior offense can only qualify as a "crime of violence" if all of the criminal conduct covered by a statute— "including the most innocent conduct" —matches or is narrower than the "crime of violence" definition. *United States v. Torres-Miguel*, 701 F.3d 165, 167 (4th Cir. 2012).  If the statute punishes some conduct that would qualify as a crime of violence and some conduct that would not, it does not categorically constitute a crime of violence. *Grajeda*, 581 F.3d at 1189.  In a "narrow range of cases," if the statute is divisible as to a material element, then the court may apply the modified categorical approach by looking beyond the statutory elements to certain documents of conviction to determine whether the defendant's conviction necessarily involved facts corresponding to the generic federal offense. *Descamps*, 133 S. Ct. at 2283-84.

Intervening Supreme Court and en banc Ninth Circuit precedent following *Selfa* and *Wright* holds that to be a categorical match to the terms of the force clause in

Section 924(c), a state statute must require proof of both intentional conduct and violent force.  As to intentional conduct, in *Leocal v. Ashcroft*, 543 U.S. 1, 9-10 (2004), the Supreme Court held that a conviction under a Florida statute prohibiting driving under the influence was not a crime of violence under the identical force clause in 18 U.S.C. Section 16(a) because the crime could be committed through mere negligence or even accidental conduct.  An en banc panel of the Ninth Circuit then interpreted *Leocal* as requiring that, "to constitute a federal crime of violence an offense must involve the *intentional* use of force against the person or property of another."  *Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121, 1132 (9th Cir. 2006) (en banc) (emphasis added); *see also United States v. Dixon*, 805 F.3d 1193, 1197 (9th Cir. 2015) (citing *Leocal* and holding that the almost-identically worded force clause in the ACCA requires that "the use of force must be intentional, not just reckless or negligent"); *United States v. Serafin*, 562 F.3d 1105, 1108 (9th Cir. 2009) (applying *Leocal*'s gloss on 18 U.S.C. § 16 to Section 924(c)(3)); *United States v. Acosta*, 470 F.3d 132, 134-35 (2d Cir. 2006) (same).

"Physical force" has the meaning given to it by *Leocal* and the Supreme Court's 2010 decision in *Johnson v. United States*, 559 U.S. 133, 140 (2010) (*Johnson I*).  In *Leocal*, in addition to interpreting the *mens rea* requirement of Section 16(a), the Supreme Court also held that the phrase "physical force" in that section requires a "violent, active crime[]."  543 U.S. at 11.  The *Johnson I* Court expanded on that definition, holding that the phrase "physical force" in ACCA's almost-identical force clause defining "violent felony" means "*violent* force—that is, force capable of causing physical pain or injury to another person."  *Johnson I*, 559 U.S. at 140.

A person violates the unarmed bank robbery statute if he, "by force and violence, or by intimidation, takes or attempts to take, from the person or presence of another" the property of a bank. 18 U.S.C. § 2113(a).  A person violates the armed bank robbery statute if he, "by force and violence, or by intimidation, takes or attempts to take, from the person or presence of another" the property of a bank and in so doing, "assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or

device." 18 U.S.C. § 2113(a), (d).  Thus, the elements of the armed bank robbery offense are:

> (1) the defendant took money belonging to a bank, credit union, or savings and loan, (2) by using force and violence or intimidation, (3) the deposits of the institution were insured by the Federal Deposit Insurance Corporation ("FDIC"), and (4) in committing the offense, the defendant assaulted any person, or put in danger the life of any person by the use of a dangerous weapon.

*Wright*, 215 F.3d at 1028.  Neither unarmed bank robbery nor armed bank robbery requires an *intentional* threat of force, nor does it require a threat of *violent* force.  As such, neither unarmed bank robbery nor armed bank robbery is a crime of violence under the force clause.

### a. Neither Unarmed Bank Robbery Nor Armed Bank Robbery Requires the *Intentional* Use or Threatened Use of Force.

The first reason bank robbery is categorically overbroad and cannot support a finding that a defendant's predicate offense is a crime of violence under the force clause is because the statute contains no requirement that a defendant have possessed any *mens rea* with respect to either his or her use of force and violence or intimidation, let alone that the defendant used force and violence or intimidation intentionally.

In *Carter v. United States*, 530 U.S. 255, 268 (2000), the Supreme Court held that bank robbery is a general intent crime.  That is, the defendant must have "possessed knowledge with respect to the *actus reus* of the crime."  *Id.*  As an example of a hypothetical defendant who should not be punished under the statute, the *Carter* Court wrote that "Section 2113(a) certainly should not be interpreted to apply to the hypothetical person who engages in forceful taking of money while sleepwalking[.]" *Id.* at 269.  Following *Carter*, courts have held that the *actus reus* of bank robbery is the taking of money and therefore, the statute requires a showing only that the defendant

1   "knew he was physically taking money."  *See United States v. Yockel*, 320 F.3d 818,

2   823 (8th Cir. 2003).  Whether the defendant took money via an intentional use of force

3   and violence or intimidation is "irrelevant."  *Id.*; *see also United States v. Kelley*, 412

4   F.3d 1240, 1244 (11th Cir. 2005) ("[A] defendant can be convicted under section

5   2113(a) even if he did not intend for an act to be intimidating.").  Thus, in *Yockel*, the

6   Eighth Circuit affirmed the district court's exclusion at trial of any evidence regarding

7   whether the defendant intended to use force and violence or intimidation.  320 F.3d at

8   823.

9        *Yockel* and *Kelley* are in accord with this Circuit's longstanding, pre-*Carter*

10  case law which also holds that, at least in cases involving intimidation, whether a

11  defendant "specifically intended to intimidate . . . is irrelevant."  *United States v.*

12  *Foppe*, 993 F.2d 1444, 1451 (9th Cir. 1993).  This holding stems from the court's

13  conclusion that the definition of taking, or attempting to take "'by intimidation' means

14  willfully to take, or attempt to take, in such a way that would put an ordinary,

15  reasonable person in fear of bodily harm."  *United States v. Alsop*, 479 F.2d 65, 67 n.4

16  (9th Cir. 1973).  Because this definition focuses on the effect of the accused's actions

17  on the victim, "[t]he determination of whether there has been an intimidation should be

18  guided by an objective test focusing on the accused's actions," *not* his or her intent.

19  *Id.*; *see also United States v. Woodrup*, 86 F.3d 359, 363 (4th Cir. 1996) ("The

20  intimidation element of § 2113(a) is satisfied if 'an ordinary person in the [victim's]

21  position reasonably could infer a threat of bodily harm from the defendant's acts,'

22  whether or not the defendant actually intended the intimidation.").  Therefore, a

23  defendant may be convicted of federal unarmed bank robbery even though he did not

24  intend to put another in fear, but merely did some act that would put an ordinary,

25  reasonable person in fear of bodily harm.  It makes no difference in the analysis that a

26  defendant in an armed bank robbery case uses a dangerous weapon in the course of

27  committing the offense: whether he intentionally used the weapon is simply not an

28  element of the crime.  Therefore, a defendant may be convicted of armed bank robbery

even though he did not intend to put another in fear, but merely did some act involving a dangerous weapon that would put an ordinary, reasonable person in fear of bodily harm. *See United States v. Martinez-Jimenez*, 864 F.2d 664, 666-67 (9th Cir. 1989) (Section 2113(d) "focuses on the harms created, not the manner of creating the harm.").

As a statute must require the intentional use of force in order to match the definition of "use of force" in Section 924(c)'s force clause following *Leocal* and *Fernandez-Ruiz*, and because neither Section 2113(a) nor Section 2113(a), (d) requires any such showing, *Selfa*'s and *Wright*'s conclusions that bank robbery is a crime of violence under the force clause are no longer good law. *See Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc) ("[T]he issues decided by the higher court need not be identical in order to be controlling. Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable."). Following *Leocal* and *Fernandez-Ruiz*, federal bank robbery cannot be a crime of violence under the force clause.

### b. Neither Unarmed Bank Robbery Nor Armed Bank Robbery Requires the Use or Threatened Use of *Violent* Force.

Moreover, neither unarmed bank robbery nor armed bank robbery requires the use or threat of *violent* physical force. Nothing in the term "intimidation" requires a threat of *violent* physical force. Intimidation is satisfied even where there is no explicit threat at all, let alone the threat of violent force. For example, a simple demand for money from a bank teller will support a bank robbery conviction. *See United States v. Hopkins*, 703 F.2d 1102, 1103 (9th Cir. 1983) ("Although the evidence showed that Hopkins spoke calmly, made no threats, and was clearly unarmed, we have previously held that 'express threats of bodily harm, threatening body motions, or the physical possibility of concealed weapon[s]' are not required for a conviction for bank robbery by intimidation." (quoting *United States v. Bingham*, 628 F.2d 548, 549 (9th

11

Cir.1980))).  But, as the Ninth Circuit recently held, an "uncommunicated willingness or readiness to use [physical] force . . . is not a threat to do so." *United States v. Parnell*, 14-30208 slip op. at 8-9 (9th Cir. April 12, 2016).  A threat of physical force, as would satisfy the force clause "requires some outward expression or indication of an intention to inflict pain, harm or punishment." *Id.*  Federal bank robbery has no such requirement.

   Further, the Ninth Circuit's definition of intimidation does not require a showing of the use or threatened use of violent physical force because placing a person "in fear of bodily harm" does not necessarily require the use or threatened use of violent physical force.  On this matter, the Fourth Circuit has "recognized that, to constitute a predicate crime of violence justifying a sentencing enhancement under the Guidelines, a [predicate] offense must constitute a use or threatened use of violent force, not simply result in physical injury or death." *Torres-Miguel*, 701 F.3d at 169; *Accord United States v. Cruz-Rodriguez*, 625 F.3d 274, 276 (5th Cir. 2010); *Chrzanoski v. Ashcroft*, 327 F.3d 188, 194 (2d Cir. 2003) ("there is 'a difference between causation of an injury and in injury's causation by the "use of physical force"'"); *United States v. Perez-Vargas*, 414 F.3d 1282, 1287 (10th Cir. 2005); *Whyte v. Lynch*, 807 F.3d 463, 469-72 (1st Cir. 2015).  For example, a defendant could commit bank robbery through intimidation by threatening to poison the teller, but this would not constitute the threatened use of violent physical force, even though it would result in the teller being in fear of bodily harm.  *Cf. Torres-Miguel*, 701 F.3d at 168-69 (holding that California's criminal threats statute does not constitute a crime of violence because "a defendant can violate statutes like § 422(a) by threatening to poison another, which involves no use or threatened use of force."); *Matter of Guzman-Polanco*, 26 I. & N. Dec. 713 (BIA 2016) ("Caesar's death at the hands of Brutus and his fellow conspirators was undoubtedly violent; the death of Hamlet's father at the hands of his brother, Claudius, by poison, was not.") (quoting *Rummel v. Estelle*, 445 U.S. 263, 282 n.27 (1980)).

With respect to the deadly weapon element of Section 2113(d), a defendant may be found guilty of armed bank robbery without engaging in conduct that involves the use or threat of violent physical force. For example, a defendant's mere display of or reference to possession of a gun, without making any threat to use the gun, is sufficient to sustain a conviction under section 2113(d). *See United States v. Jones*, 84 F.3d 1206, 1211 (9th Cir. 1996); *McLaughlin v. United States*, 476 U.S. 16, 17-18 (1986); *Martinez-Jimenez*, 864 F.2d at 666.

Moreover, a defendant may be convicted of armed bank robbery even though he displays or refers only to an unloaded or inoperable firearm, or even a toy resembling a firearm. *See McLaughlin*, 476 U.S. 16, 17-18 (1986) (unloaded gun); *Martinez-Jimenez*, 864 F.2d at 666-67 (inoperable gun, toy gun); *see also United States v. Boyd*, 924 F.2d 945, 947-48 (9th Cir. 1991) (road flare qualifies as a dangerous weapon). This conduct does not involve the use or threatened use of violent force. In *McLaughlin*, the Supreme Court reasoned that an unloaded gun qualified as a dangerous weapon within the meaning of Section 2113(d) because "a gun is an article that is typically and characteristically dangerous . . . and the law reasonably may presume that such an article is always dangerous even though it may not be armed at a particular time or place" and because "the display of a gun instills fear in the average citizen; as a consequence, it creates an immediate danger that a violent response will ensue." 476 U.S. at 17-18. In other words, the *McLaughlin* court concluded that a robber's use of an unloaded gun could be considered to put in danger another person's life not because the robber could actually use the gun or because the gun actually posed a threat of violence against anyone in the bank but merely because it was a reasonable position for the law to take that all guns are dangerous, since as a general matter guns often are dangerous. The Court also concluded that a robber's use of an unloaded gun could put in danger another person's life not because the robber actually used or threatened to use the gun in a violent, active way but only because others who saw the gun might *themselves* react in a violent way. In the words of the *Martinez-Jimenez* court, "[t]he

13

1   *McLaughlin* opinion recognizes that the dangerousness of a device used in a bank

2   robbery is not simply a function of its potential to injure people directly.  Its

3   dangerousness results from the greater burdens that it imposes upon victims and law

4   enforcement officers."  864 F.3d at 666.  As these cases make clear, defendants can be,

5   and indeed many have been, convicted of armed bank robbery without using or

6   threatening to use violent force.

7        For these reasons, neither unarmed bank robbery nor armed bank robbery

8   qualifies as a crime of violence under the force clause of Section 924(c).  The contrary

9   holdings in *Selfa* and *Wright* are clearly irreconcilable with *Johnson I* and *Leocal*.  *See*

10  *Miller*, 335 F.3d at 899-900.

11       **2.**    **Following *Johnson*, Neither Unarmed Bank Robbery Nor Armed**

12           **Bank Robbery Qualifies as a Crime of Violence under the**

13           **Residual Clause because that Clause Is Void for Vagueness.**

14       Until *Johnson*, defendants like Mr. Day had little motivation to challenge *Selfa*'s

15  and *Wright*'s force clause holdings, knowing that their bank robbery predicates would

16  likely still be deemed crimes of violence under Section 924(c)'s residual clause.

17  Indeed, prior to *Johnson*, the Ninth Circuit had held that various state robbery crimes

18  were crimes of violence under the residual clause of several crime-of-violence

19  definitions.  *See, e.g., United States v. Prince*, 772 F.3d 1173, 1176 (9th Cir. 2014)

20  (finding that California second degree robbery is a violent felony under the residual

21  clause of ACCA, because it "certainly" is the kind of crime that presents a serious

22  potential risk of physical injury to another); *United States v. Chandler*, 743 F.3d 648,

23  652-55 (9th Cir. 2014) (Nevada conspiracy to commit robbery is a violent felony under

24  the residual clause), *remanded pursuant to Johnson*, 743 F.3d 648 (9th Cir. 2015); *see*

25  *also United States v. McDougherty*, 920 F.2d 569, 574 & n.3 (9th Cir. 1990) ("Clearly

26  then, robbery as defined in California falls under 18 U.S.C. 16(b) as a felony that 'by its

27  nature, involves a substantial risk' that physical force may be used"; interpreting an

28  earlier version of the career-offender residual clause, but stating that the "result . . .

14

would be no different" under the present version of the guideline).  *Johnson*, however, removed this alternative ground of justifying Mr. Day's Section 924(c) sentence.

In *Johnson*, the Supreme Court declared the residual clause of the ACCA to be "unconstitutionally vague" because the "indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." *Johnson*, 135 S. Ct. at 2557.  Thus, the Supreme Court concluded, "[i]ncreasing a defendant's sentence under the clause denies due process of law." *Id*.  The Supreme Court held the residual clause "vague in all its applications," *id*. at 2561, and overruled its contrary decisions in *James v. United States*, 550 U.S. 192 (2007), and *Sykes v. United States*, 131 S. Ct. 2267 (2011). *Johnson*, 135 S. Ct. at 2562-63.

The holding in *Johnson* invalidating the residual clause of the ACCA applies equally to the residual clause of Section 924(c).  In *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015), the Ninth Circuit held that the identically worded definition of a "crime of violence" in the Immigration and Nationality Act (INA), 8 U.S.C. § 1101(a)(43)(F), is unconstitutionally vague. *Dimaya*, 803 F.3d at 1111.  The INA defines a "crime of violence" by reference to the definition in 18 U.S.C. Section 16(b).  Section 16(b), like Section 924(c)(3), has a force clause and a residual clause—indeed, the provisions are identical.  They each define "crime of violence" as:

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16; 18 U.S.C. § 924(c)(3).

15

1    Although the language of Section 16(b), as incorporated into the INA, is not

2    identical to that of ACCA's residual clause, the Ninth Circuit concluded that Section

3    16(b) suffered from the same constitutional defects identified in *Johnson*, and was

4    therefore unconstitutionally vague.  *Dimaya*, 803 F.3d at 1114-17; *see also United*

5    *States v. Vivas-Ceja*, 808 F.3d 719, 722-23 (7th Cir. 2015) (same).  Because both

6    statutes require a consideration of what kind of conduct the "ordinary case" of the

7    crime involves, and both statutes left uncertainty about the amount of risk required, the

8    Ninth Circuit reasoned that Section 16(b), like ACCA's residual clause, produced too

9    much unpredictability and arbitrariness to comport with due process.  *Dimaya*, 803

10   F.3d at 1116-17.

11       The same is true of the residual clause in Section 924(c)(3)(B), which the Ninth

12   Circuit has recognized is "identical" to Section 16(b)'s residual clause.  *See United*

13   *States v. Amparo*, 68 F.3d 1222, 1226 (9th Cir. 1995); *Delgado-Hernandez v. Holder*,

14   697 F.3d 1125, 1130 (9th Cir. 2012).  For interpretive purposes, the Ninth Circuit has

15   treated Section 16(b) as the "equivalent" of Section 924(c)(3).  *See United States v.*

16   *Mendez*, 992 F.2d 1488, 1492 (9th Cir. 1993); *Amparo*, 68 F.3d at 1226 (relying on

17   *United States v. Aragon*, 983 F.2d 1306 (4th Cir. 1993), a Section 16(b) case, to

18   interpret Section 924(c)(3)(B)).  At least three district courts have squarely held that

19   Section 924(c)(3)'s residual clause is unconstitutionally vague after *Johnson*.  *See*

20   *United States v. Lattanaphom*, __ F. Supp. 3d __, 2016 WL 393545, at *3-6 (E.D. Cal.

21   Feb. 1, 2016); *United States v. Bell*, 2016 WL 344749, at *12-13 (N.D. Cal. Jan. 28,

22   2016); *United States v. Edmunson*, __ F. Supp. 3d __, 2015 WL 9311983, at *3-5 (D.

23   Md. Dec. 30, 2015) (as amended).  This Court should likewise conclude that Section

24   924(c)(3)(B) is unconstitutionally vague and cannot be used to support Mr. Day's

25   Section 924(c) conviction and sentence.

26       Federal unarmed bank robbery and federal armed bank robbery categorically are

27   not crimes of violence under the force clause of Section 924(c).  And *Johnson*

28   eliminated the residual clause.  As such, that provision can no longer serve as an

16

alternative basis upon which to hold that Mr. Day's offense is a crime of violence. In short, following *Johnson*, Mr. Day's underlying bank robbery offense is not a crime of violence for purposes of Section 924(c).[3]

## B. Mr. Day Is Not a Career Offender Because Neither His Instant Conviction for Armed Bank Robbery Nor His Prior Conviction for Unarmed Bank Robbery Is a Crime of Violence Under *Johnson*.

Mr. Day's instant conviction for armed bank robbery and his 1995 conviction for unarmed bank robbery both contributed to the court's finding that he was a career offender. (Ex. C, Sentencing Transcript, at 32-33; PSR ¶¶ 49; 71-75.) Section 4B1.1 of the Sentencing Guidelines provides for enhanced guidelines ranges where (1) the defendant is 18 years or older at the time of the instant offense, (2) the instant offense is a felony "crime of violence" or "controlled substance offense," and (3) the defendant has at least two prior felony convictions of either a "crime of violence" or a "controlled substance offense." See USSG § 4B1.1(a). As set out in the career offender guideline, the term "crime of violence" is defined as:

> [A]ny offense under federal or state law, punishable by imprisonment for a term
> exceeding one year, that—

---

[3] It should be noted that bank robbery is indivisible as between "force and violence" and "intimidation" because these are merely different means by which a defendant can commit the offense. More specifically, the jury is not called upon to parse out and unanimously agree whether the taking was (a) by force and violence or (b) by intimidation. *See United States v. Wright*, 215 F.3d 1020, 1028 (9th Cir. 2000) ("[O]ne of the elements of the offense is a taking 'by force and violence, or by intimidation.'" (quoting § 2113(a))); *United States v. Alsop*, 479 F.2d 65, 66 (9th Cir. 1973) ("That the statute and the indictment use the disjunctive phrase 'by force and violence, or by intimidation' does not mean the indictment is duplicitous. Only one offense was charged." (citation omitted)); *see also* Ninth Cir. Model Criminal Jury Instructions § 8.162 (2015) (stating the elements of bank robbery, which include using "force and violence or intimidation"). Because the statute is indivisible as to this required element, the modified categorical approach is inapplicable. *See Descamps*, 133 S. Ct. 2276 (2013); *United States v. Werle*, __ F.3d __, 2016 WL 828132, *4 (9th Cir. Mar. 3, 2016) ("If a statute is overinclusive and indivisible as to any required element, the modified categorical approach cannot be applied to that statute.").

17

(1)    has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(2)    is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2(a). As used in this section of the brief, subsection (1) is called the "force clause"; subsection (2)'s list of offenses is called the "enumerated offenses clause," and the remainder of subsection (2) is called the "residual clause."

## 1. Neither Unarmed Bank Robbery Nor Armed Bank Robbery Is a Crime of Violence Under the Residual Clause following *Johnson*, and Neither Satisfies the Force Clause.

For the reasons just articulated in connection with the Section 924(c) argument, Mr. Day's instant conviction for armed bank robbery and his prior conviction for unarmed bank robbery cannot serve as career-offender predicates either. Specifically, following *Johnson*, the residual clause of the career offender guideline is unconstitutionally vague. *See supra*, Part III.A.2.; *United States v. Benavides*, 617 Fed. App'x 790 (9th Cir. 2015) (vacating and remanding for resentencing in light of government's concession that *Johnson* applies to the residual clause in the guidelines); *see also, e.g.*, *United States v. Terrell*, 593 F.3d 1084, 1087 n.1 (9th Cir. 2010) (internal citations omitted) (stating that the ACCA's "violent felony" definition is "nearly identical" to section 4B1.2 and that the decision's ACCA analysis "applies equally to § 4B1.2"); *United States v. Crews*, 621 F.3d 849, 852 n.4 (9th Cir. 2010) ("In the past we have made no distinction between the terms 'violent felony' and 'crime of violence' for purposes of interpreting the residual clause . . ."). And neither unarmed nor armed bank robbery satisfies the force clause because neither requires the intentional use of violent force. *See supra*, Part III.A.1.

2.     **The Excision of the Residual Clause Takes with It the Commentary Offense of Robbery, which Only Served to Interpret the Residual Clause.**

The career offender designation in Mr. Day's case cannot be salvaged under the commentary either.  The application notes contained in the commentary to section 4B1.2 include a separate list of offenses that the application notes state qualify as crimes of violence.  Among those offenses is "robbery."  See U.S.S.G. § 4B1.2 cmt. n.1.  With the excision of the residual clause from the career offender provision, however, the offenses listed only in the commentary to the guideline are no longer of any effect either, because they only possibly interpreted the residual clause.

The Sentencing Reform Act of 1984 created the Sentencing Commission and authorized it to create "guidelines . . . for use of a sentencing court in determining the sentence to be imposed in a criminal case."  28 U.S.C. § 994(a)(1).  Those guidelines are submitted to Congress in advance, *id.* § 994(p), making the Sentencing Commission "fully accountable to Congress."  *See Mistretta v. United States*, 488 U.S. 361, 393-94 (1989) (upholding the Sentencing Commission against a separation of powers challenge on this ground).

Commentary, on the other hand, does not receive the same treatment as the guidelines.  The Sentencing Reform Act does not explicitly authorize the creation of commentary. 28 U.S.C. § 994(a) (authorizing "guidelines" and "policy statements"); *see also Stinson v. United States*, 508 U.S. 36, 41 (1993).  Nor does the Sentencing Reform Act require that commentary be submitted to Congress for approval.  *See* 28 US.C. § 994(p) (requiring only that amendments to guidelines be submitted to Congress); *Stinson*, 508 U.S. at 46 (commentary "is not reviewed by Congress").  And the Sentencing Commission itself has relegated commentary to a secondary, interpretative role.  *See* U.S.S.G. § 1B1.7 (explaining that the purpose of the commentary is to "interpret [a] guideline or explain how it is to be applied"); *United States v. Anderson*, 942 F.2d 606, 611 (9th Cir. 1991), *abrogated on other grounds by*

19

*Stinson v. United States*, 508 U.S. 36 (1993) (noting the Sentencing Commission's belief that commentary "is an aid to correct interpretation of the guidelines, not a guideline itself or on a par with the guidelines themselves").  Where commentary assists and amplifies the text of the guideline – and where the text of the guideline "will bear the construction" the commentary offers – the commentary's interpretation of the guideline is binding.  *Stinson*, 508 U.S. at 46.  But where commentary runs afoul of the Constitution or a federal statute or where it is "plainly erroneous or inconsistent" with the guideline it interprets, it is the text of the guideline, not the commentary, that must control.  *Id.* at 45-47; *United States v. Landa*, 642 F.3d 833, 836 (9th Cir. 2011) (stating if there is a potential conflict between the text and the commentary, the text controls).

Because commentary is solely an interpretative aid, it "does not have freestanding definitional power" and only has force insofar as it interprets or explains a guideline's text.  *United States v. Leshen*, 453 Fed. App'x 408, 413-15 (4th Cir. 2011) (unpublished) (finding that prior state sex offenses did not qualify as crimes of violence, despite government argument that offenses fell within the commentary); *accord United States v. Shell*, 789 F.3d 335, 340-41 (4th Cir. 2015) ("[The government skips past the text of § 4B1.2 to focus on its commentary," but "it is the text, of course, that takes precedence.").  It follows that, if a portion of a guideline is excised, the commentary that interpreted that portion of the guideline must go as well.  Vestigial commentary without a textual hook must be deemed "inconsistent" with the text under *Stinson*, because its only "functional purpose" was to "assist in the interpretation and application" of a rule no longer exists.  *Stinson*, 508 U.S. at 45.

The only question that remains, then, is whether the term "robbery" in the commentary interpreted the residual clause or whether it interpreted some portion of the definition that remains intact.  As a general matter, the offenses enumerated in the commentary could only have been interpreting the residual clause; time and again, the Ninth Circuit has held that the state offenses most closely related to those commentary offenses do not require the use of force.  *E.g.*, *Quijada-Aguilar v. Lynch*, 799 F.3d

20

1303, 1306-07 (9th Cir. 2015) (California voluntary manslaughter does not have an element of the use of force); *Delgado-Hernandez v. Holder*, 697 F.3d 1125, 1127 (9th Cir. 2012) (California kidnapping does not require an element of force); *United States v. Williams*, 110 F.3d 50, 52 (9th Cir. 1997) (Oregon kidnapping does not require an element of use of force); *see also James v. United States*, 550 U.S. 192, 206 (2007) (holding that attempt was appropriately included in the commentary enumerated offenses, "based on the Commission's review of empirical sentencing data [which] presumably reflects an assessment that attempt crimes often pose a similar risk of injury as completed offenses").  It cannot be said, then, that the commentary offenses are there to "assist in the interpretation of" the force clause—the inclusion of those offenses is quite inconsistent with the text of the force clause.

Of all of the offenses listed in the commentary, robbery has perhaps the strongest tie to the residual clause.  The Ninth Circuit's generic definition of robbery is tied to the risk of harm to the person, not to any element of force.  *United States v. Becerril-Lopez*, 541 F.3d 881, 891 (9th Cir. 2008) (defining generic robbery as "aggravated larceny, containing at least the elements of misappropriation of property under circumstances *involving immediate danger to the person*") (emphasis added); *see also Leshen*, 453 Fed. Appx. at 415 (noting that the generic term "robbery" in the commentary interpreted the residual clause of the career offender guideline).  Indeed, as noted, Ninth Circuit precedents have generally tied state robbery statutes to the residual clause of various crime-of-violence definitions.  *Prince*, 772 F.3d at 1176 (finding that California second degree robbery is a violent felony under the residual clause of the Armed Career Criminal Act, because it "certainly" is the kind of crime that presents a serious potential risk of physical injury to another); *Chandler*, 743 F.3d at 652-55 (Nevada conspiracy to commit robbery is a violent felony under the residual clause), *remanded pursuant to Johnson*, 743 F.3d 648 (9th Cir. 2015); *see also McDougherty*, 920 F.2d at 574 & n.3 ("Clearly then, robbery as defined in California falls under 18 U.S.C. 16(b) as a felony that 'by its nature, involves a substantial risk' that physical force may be used";

21

interpreting an earlier version of the career-offender residual clause, but stating that the "result . . . would be no different" under the present version of the guideline).

On the flip side, it is equally clear that the majority of Ninth Circuit state robbery statutes are not crimes of violence under the force clause. *See Dixon*, 805 F.3d at 1197 (California robbery does not satisfy the force clause); *United States v. Alvarado-Pineda*, 774 F.3d 1198 (9th Cir. 2014) (suggesting, without deciding, that Washington robbery might not be a crime of violence under the similarly worded force clause of 18 U.S.C. § 16(a), because the statute required "any force or threat, no matter how slight"); *United States v. Dunlap*, ___ F. Supp. 3d ___, 2016 WL 591757, at *4-6 (D. Or. 2016) (Oregon robbery is not a crime of violence under the force clause).

Against this background, it is clear that the commentary's reference to robbery could only have interpreted the residual clause, i.e., as an example of a type of crime that entails "a serious potential risk of physical injury to another." With the residual clause excised from the guideline, the commentary no longer serves to interpret or amplify any provision of the remaining text, but, instead, is a contrary and plainly erroneous interpretation of what remains. Once the residual clause is gone, the commentary offenses—and especially robbery—must go as well.

The First Circuit has already reached this conclusion post-*Johnson*, holding that the list of enumerated offenses contained in the guidelines commentary was interpreting only the residual clause, and that post-*Johnson*, such commentary is no longer of any effect. As the Court stated, "once shorn of the residual clause § 4B1.2(a) sets forth a limited universe of specific offenses that qualify as a 'crime of violence.' There is simply no mechanism or textual hook in the Guideline that allows us to import offenses not specifically listed therein into 4B1.2(a)'s definition of 'crime of violence.'" *See United States v. Soto-Rivera*, 811 F.3d 53, 60 (1st Cir. 2016). This holding is in line with the interpretation many Circuits had given to the career-offender commentary even before *Johnson*. *See Shell*, 789 F.3d at 345 (finding that a state statute that did not meet the requirements of the *text* of § 4B1.2 could not be saved on

the grounds that it might fall under one of the commentary's list of offenses, noting that the commentary serves "only to amplify that definition, and any inconsistency between the two [must be] resolved in favor of the text") (citing *Stinson*, 508 U.S. at 43); *United States v. Armijo*, 651 F.3d 1226, 1234-37 (10th Cir. 2011) (rejecting the government's argument that Colorado manslaughter qualifies as a crime of violence simply because it is listed in the commentary and need not qualify under the definitions set out in the text; "[t]o read application note 1 as encompassing non-intentional crimes would render it utterly inconsistent with the language of § 4B1.2(a)"); *see also United States v. Serna*, 309 F.3d 859, 862 & n.6 (5th Cir. 2002) (possession of a sawed-off shotgun, while listed in the commentary, must satisfy one of the definitions in the text). This Court should do so as well.

Neither unarmed bank robbery or armed bank robbery is categorically a crime of violence under any provision of the text of Section 4B1.2, and commentary cannot be used to expand the definition of crime of violence beyond what the text will bear. As such, it cannot serve as an alternative basis to hold that Mr. Day's convictions are crimes of violence.  In short, neither Mr. Day's instant conviction under 18 U.S.C. § 2113(a), (d) nor his 1995 conviction under 18 U.S.C. § 2113(a) is a crime of violence for career offender purposes. Mr. Day must be resentenced without the career offender designation.

1

## IV.  CONCLUSION

2
3
4
5
6

For the reasons set forth above, Mr. Day's sentence was "imposed in violation of the Constitution or laws of the United States," and is "in excess of the maximum authorized by law."  Mr. Day is entitled to Section 2255 relief and should be resentenced under the non-career-offender guideline and without a mandatory consecutive sentence for a violation of Section 924(c).

7
8

Respectfully submitted,

9

HILARY POTASHNER
Federal Public Defender

10
11
12
13

DATED: May 18, 2016          By  /s/ Brianna Fuller Mircheff
                                 BRIANNA FULLER MIRCHEFF
                                 Deputy Federal Public Defender

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

FEB - 9 1999

CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 1998 Grand Jury

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 99- 123 _____ |
| Plaintiff, | ) | I N D I C T M E N T |
| v. | ) | [18 U.S.C. § 371: Conspiracy to Commit Bank Robbery; 18 U.S.C. § 2113(a)(d): Armed Bank Robbery; 18 U.S.C. § 924(c): Use of Firearm During Crime of Violence] |
| BRUCE EDWARD BELL and MONTEZ DAY, | ) | |
| Defendants. | ) | |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 371]

A.   OBJECT OF THE CONSPIRACY

Beginning on or before January 22, 1999, and continuing to on or about January 26, 1999, in Los Angeles County, within the Central District of California, defendants BRUCE EDWARD BELL and MONTEZ DAY, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit a bank robbery of Home Savings of America, 301 South Maclay Street, San Fernando, California, in violation of Title 18, United States Code, Section 2113(a).

AB:ab AB

B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
     ACCOMPLISHED

     The object of the conspiracy was to be accomplished in
substance as follows:

     1.   Defendants BELL and DAY would obtain a stolen van to
use as a preliminary getaway vehicle from the robbery.

     2.   Defendants BELL and DAY would park a legally owned Ford
Expedition at a distance from Home Savings of America for use as
a secondary getaway vehicle from the robbery.

     3.   Defendants BELL and DAY would drive to Home Savings of
America in the stolen getaway van.

     4.   Defendants BELL and DAY would enter Home Savings of
America brandishing handguns and would order the employees and
customers inside to get down on the floor.

     5.   Defendants BELL and DAY would order the manager of Home
Savings of America to open the bank vault.

     6.   Defendants BELL and DAY would flee from Home Savings of
America in the stolen van.

     7.   Defendants BELL and DAY would switch from the stolen
van to the Ford Expedition out of sight of Home Savings of
America.

     8.   Defendants BELL and DAY would drive the Ford Expedition
to a safe place, where they would divide the money stolen from
Home Savings of America.

C.   OVERT ACTS

     In furtherance of the conspiracy and to accomplish the
object of the conspiracy, on or about January 26, 1999,
defendants BELL and DAY, and others known and unknown to the

                                2

Grand Jury, committed various overt acts within the Central District of California, including but not limited to the following:

1. Defendants BELL and DAY drove a stolen getaway van to Home Savings of America.

2. Defendants BELL and DAY entered Home Savings of America wearing masks and gloves, and brandishing a revolver and a semiautomatic handgun.

3. Defendants BELL and DAY forced the employees of Home Savings of America to open the vault and give defendants $85,600 in cash.

4. One of the defendants told Home Savings of America assistant manager Elizabeth Aguillon that she would be sorry if she put a dye pack in with the stolen money because he and the other defendant were going to take her with them when they left.

5. One of the defendants stopped assistant manager Elizabeth Aguillon from exiting Home Savings of America by grabbing her by her hair and pulling her back.

6. Defendants BELL and DAY fled Home Savings of America in the stolen getaway van.

7. Defendants BELL and DAY switched getaway vehicles from the stolen van to a Ford Expedition.

8. Defendant DAY drove the Ford Expedition at high speeds to evade the police, striking other vehicles while doing so.

9. Defendant BELL threw the revolver out the window of the Ford Expedition during the flight from the police.

10. Defendant DAY stopped the Ford Expedition at a mall so that defendants could hide themselves from the view of a police

3

1  helicopter and pursuing police officers by mixing in with the
2  customers inside the mall.

COUNT TWO

[18 U.S.C. § 2113(a)(d)]

On or about January 26, 1999, in Los Angeles County, within the Central District of California, defendants BRUCE EDWARD BELL and MONTEZ DAY, by force, violence, and intimidation, knowingly took from the person or presence of another approximately $85,600 belonging to and in the care, custody, control, management, and possession of Home Savings of America, 301 South Maclay Street, San Fernando, California, a savings and loan association the deposits of which were then insured by the Federal Deposit Insurance Corporation.

In committing said offense, defendants BELL and DAY assaulted and put in jeopardy the life of victim assistant manager Elizabeth Aguillon and others by using a handgun, a dangerous weapon and device.

5

COUNT THREE

[18 U.S.C. § 924(c)]

On or about January 26, 1999, in Los Angeles County, within the Central District of California, defendants BRUCE EDWARD BELL and MONTEZ DAY knowingly used and carried a firearm, namely, a loaded .38 caliber revolver, during and in relation to a crime of violence, namely, robbery of Home Savings of America, 301 South Maclay Street, San Fernando, California, in violation of Title 18, United States Code, Section 2113(a), by brandishing the pistol at the employees and customers of Home Savings of America.

A TRUE BILL

_____
Foreperson

ALEJANDRO N. MAYORKAS
United States Attorney

GEORGE S. CARDONA
Assistant United States Attorney
Chief, Criminal Division

GREGORY W. JESSNER
Assistant United States Attorney
Chief, Criminal Complaints

SHARON MCCASLIN
Assistant United States Attorney
Deputy Chief, Criminal Complaints

6

# EXHIBIT B

1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

THE HONORABLE A. HOWARD MATZ, JUDGE PRESIDING

- - -

```
------------------------------
UNITED STATES OF AMERICA,      )
                 PLAINTIFF,    )
         -v-                   )      CASE NO. CR 99-123-AHM
BRUCE BELL,                    )
                 DEFENDANT.    )
------------------------------
```

COPY

REPORTER'S TRANSCRIPT OF PROCEEDINGS
LOS ANGELES, CALIFORNIA
FRIDAY, MAY 14, 1999

LYNNE SMITH
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
312 NORTH SPRING STREET, #430
LOS ANGELES, CALIFORNIA  90012

2

1

APPEARANCES:

2

ON BEHALF OF PLAINTIFF:

3       ALEJANDRO MAYORKAS
        UNITED STATES ATTORNEY

4       BY:  ANDREW BROWN
        ASSISTANT UNITED STATES ATTORNEY

5       312 NORTH SPRING STREET
        LOS ANGELES, CALIFORNIA     90012

6

7

8

ON BEHALF OF DEFENDANT:

9       BRIAN NEWMAN
        400 CORPORATE POINTE, #805

10      CULVER CITY, CALIFORNIA  90230

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1              FRIDAY, MAY 14, 1999; LOS ANGELES, CALIFORNIA

2                                  -000-

3              THE CLERK:  Item 1, CR 99-123-AHM, U.S.A. versus Bruce

4    Bell and Montez Day.

5              Appearances, counsel.

6              MR. BROWN:  Good afternoon, Your Honor.  Andrew Brown

7    for the government.

8              MR. NEWMAN:  Good afternoon, Your Honor.  Brian Newman

9    for Bruce Bell.  And I do apologize for being late.

10             THE COURT:  You had an important event, one of your

11   kids had a social event at school?

12             MR. NEWMAN:  Yes, Your Honor.

13             THE COURT:  That's very important.

14             MR. NEWMAN:  It is.  It's something that we do as a

15   support group for the school a couple times a year and it's

16   something that I'm active in.

17             THE COURT:  How old is this child?

18             MR. NEWMAN:  Eight.

19             THE COURT:  That's priority.  Unless there are

20   compelling circumstances, I understand why.  No problem.

21             MR. MAYOCK:  Good afternoon, Your Honor.  Michael

22   Mayock with Mr. Montez Day.

23             THE COURT:  Nice to see you Mr. Mayock.  We were

24   colleagues in the U.S. attorney's office.  You should know that.

25   We're here for a change of plea to a single indictment in which

4

1   Mr. Bell and Mr. Day are both named as defendants; is that

2   correct?

3          MR. NEWMAN:  Correct.

4          MR. MAYOCK:  Correct, Your Honor.

5          THE COURT:  Is there a plea agreement for one but not

6   for the other?

7          MR. BROWN:  Yes, Your Honor.

8          THE COURT:  Is there any reason there can't be

9   reference to that agreement?

10         MR. BROWN:  No, Your Honor.

11         THE COURT:  The plea agreement for Mr. Bell refers to

12   Counts 2 and 3.  To which count or counts is Mr. Day intending

13   to change his plea?

14         MR. BROWN:  One, two and three.

15         THE COURT:  All three.  Is that correct, all three?

16         MR. BROWN:  Yes, Your Honor.

17         THE COURT:  Okay.  Let me address my remarks to Mr. Day

18   and Mr. Bell for a second.  This procedure of changing a plea

19   and entering a guilty plea is elaborate.  Certain things have to

20   be dealt with.  A certain format has to be followed.  I'm going

21   to explain it.

22         I need your cooperation and I need your careful

23   attention.  I will be asking each of you a number of questions.

24   But at some point in the proceedings I will be telling both of

25   you the identical thing such as what rights you have that you

5

1  will be giving up.

2        To save time I will say certain things once that apply

3  to both and then I will ask each of you separately whether you

4  enter that plea.  If either of you, once you talk to your

5  respective lawyers or raise a question with me or otherwise

6  pause in what we're doing, just let me know and you will have a

7  right to do that.  But otherwise work with me.  Please be very

8  attentive because I want to make sure you know what you're doing

9  and the consequences to you of what you are planning to do.

10        Is that understood by both of you?  Mr. Bell?

11        DEFENDANT BELL:  Right.

12        THE COURT:  Mr. Day?

13        DEFENDANT DAY:  Yes, Your Honor.

14        THE COURT:  The first thing to remember is that you can

15  change your mind before we get to the finish line.  And by the

16  finish line, I don't mean to minimize the importance of what

17  we're doing with these changes of plea being accepted and

18  entered.  Once that happens there is no going back on that.  You

19  will be found guilty and what will remain will be sentencing

20  basically.  So until we get there, you have a right to change

21  your mind.  But it may be something that you have already

22  committed to do and that's fine also.

23        At the outset I'm going to ask the clerk to swear each

24  of you in.  She'll ask you preliminary questions and then I will

25  turn to the questions and the advice of rights that I will be

6

1   giving to each of you.

2           THE CLERK:  Mr. Bell, is Bruce Bell your true and full

3   name?

4           DEFENDANT BELL:  Yes, it is.

5           THE CLERK:  It has been indicated that you wish to

6   withdraw your previously entered pleas of not guilty to Counts 2

7   and 3 of the indictment and tender a different plea.  Do you now

8   withdraw your previously entered plea of not guilty to Counts 2

9   and 3 of the indictment?

10          DEFENDANT BELL:  Yes.

11          THE CLERK:  How do you now plead to the indictment

12  filed against you, guilty or not guilty?

13          DEFENDANT BELL:  Guilty.

14          THE CLERK:  How do you now plead to Count 3 of the

15  indictment, guilty or not guilty?

16          DEFENDANT BELL:  Guilty.

17          THE CLERK:  Mr. Day, is Montez Day your true and full

18  name?

19          THE DEFENDANT:  Yes.

20          THE CLERK:  It has been indicated that you wish to

21  withdraw your previously entered pleas of not guilty to Counts

22  1, 2 and 3 of the indictment and enter a different plea.  Do you

23  now withdraw your previously entered plea of not guilty to

24  Counts 1, 2 and 3 of the indictment?

25          DEFENDANT DAY:  Yes.

7

1          THE CLERK:   How do you now plead to Count 1 of the

2   indictment filed against you, guilty or not guilty?

3          DEFENDANT DAY:   Guilty.

4          THE CLERK:   How do you now plead to Count 2, guilty or

5   not guilty?

6          DEFENDANT DAY:   Guilty.

7          THE CLERK:   How do you now plead to Count 3, guilty or

8   not guilty?

9          DEFENDANT DAY:   Guilty.

10          THE CLERK:   The court will ask you the nature of your

11   pleas under oath.   Would each of you please raise your right

12   hand to be sworn.

13          (DEFENDANTS SWORN)

14          THE COURT:   Okay.   Let me start with you, Mr. Bell.

15   Tell me how you're feeling right now.

16          DEFENDANT BELL:   How do I feel?   I feel all right.

17          THE COURT:   Are you dealing with any physical or

18   emotional illnesses or conditions that might affect your ability

19   to make a decision, a sensibly formed decision?

20          DEFENDANT DAY:   No.

21          THE COURT:   Are you under any treatment for any

22   condition today?

23          DEFENDANT BELL:   No, I'm not.

24          THE COURT:   Any illness?

25          DEFENDANT BELL:   No.

8

1          THE COURT:  Have you taken any medicines or drugs

2   today?

3          DEFENDANT BELL:  No.

4          THE COURT:  Alcoholic beverages?

5          DEFENDANT BELL:  No.

6          THE COURT:  Are you currently under any doctor's care?

7          DEFENDANT BELL:  No.

8          THE COURT:  Tell me please what your age is.

9          DEFENDANT BELL:  46.

10          THE COURT:  And your level of education?

11          DEFENDANT BELL:  High school.

12          THE COURT:  High school?

13          DEFENDANT BELL:  Yes.

14          THE COURT:  Did you finish?

15          THE DEFENDANT:  I got a G.E.D.

16          THE COURT:  Have you been under psychiatric care of any

17   kind?

18          DEFENDANT BELL:  No, I haven't.

19          THE COURT:  Are you a citizen of the United States?

20          DEFENDANT BELL:  Yes.

21          THE COURT:  Okay.  Now I'm going to ask the same

22   questions to you, Mr. Day.  Then I will turn to some things that

23   apply to both of you.

24          How are you feeling today?

25          DEFENDANT DAY:  I'm feeling okay.

9

```
 1              THE COURT:  Have you taken any medicines or drugs
 2    today?
 3              DEFENDANT BELL:  No.
 4              THE COURT:  Any alcoholic beverages or any other kind
 5    of drug?
 6              DEFENDANT DAY:  No, sir.
 7              THE COURT:  Are you under any doctor's care today?
 8              DEFENDANT DAY:  No, sir.
 9              THE COURT:  Please tell me your age.
10              DEFENDANT DAY:  28.
11              THE COURT:  And your level of education?
12              DEFENDANT DAY:  G.E.D., pre-college.
13              THE COURT:  Have you been under any psychiatric or
14    psychological care?
15              DEFENDANT DAY:  Yes.
16              THE COURT:  Are you currently receiving psychological
17    or psychiatric care?
18              DEFENDANT DAY:  No.
19              THE COURT:  Do you feel you're in condition and a
20    position today to understand what is going on?
21              DEFENDANT DAY:  Yes.
22              THE COURT:  Are you also a citizen of the United
23    States?
24              DEFENDANT DAY:  Yes.
25              THE COURT:  Okay.  Mr. Bell, did you receive a copy of
```

10

1    the indictment?

2            DEFENDANT BELL:  Yes, I have.

3            THE COURT:  Did you also, Mr. Day?

4            DEFENDANT DAY:  Yes, sir.

5            THE COURT:  Mr. Bell, did you read it?

6            DEFENDANT BELL:  Yes.

7            THE COURT:  Did you read it, Mr. Day?

8            DEFENDANT DAY:  I did, yes.

9            THE COURT:  Okay.  Do you each believe that you

10   understand the charges that are in that indictment?  First you,

11   Mr. Bell.

12           DEFENDANT BELL:  Yes.

13           THE COURT:  Mr. Day?

14           DEFENDANT DAY:  Yes.

15           THE COURT:  Let me tell you now collectively, jointly,

16   each of you, certain things which I think you already know and

17   in the case of Mr. Bell which are actually placed in writing in

18   the plea agreement.  These are rights that you will be giving

19   up.  They were mentioned I think in the arraignment when you

20   were first arraigned on these charges.  But it's important that

21   you understand these are your rights.

22           By pleading guilty, with the exception of the right to

23   counsel, you will be giving up these rights.  Each time I

24   mention a right, I will ask you in turn whether you wish to give

25   it up.  So let me begin.

11

1          You each have a constitutional right to a speedy and

2     public trial by jury.  Do you wish to give up that right,

3     Mr. Bell?

4          DEFENDANT BELL:  Yes.

5          THE COURT:  Do you, Mr. Day?

6          DEFENDANT DAY:  Yes.

7          THE COURT:  You each have a right to be presumed

8     innocent and to have the burden shifted to the government to

9     prove you guilty beyond a reasonable doubt.  Neither of you has

10    to prove yourself innocent.  The burden is always upon the

11    government.

12          Do you wish to give up that right, Mr. Bell?

13          DEFENDANT BELL:  Yes.

14          THE COURT:  Mr. Day?

15          DEFENDANT DAY:  Yes.

16          THE COURT:  Each of you, if you went to trial, would

17    have the right to see and examine the evidence and to

18    cross-examine the witnesses.  Do you wish to give up that right,

19    Mr. Bell?

20          DEFENDANT BELL:  Yes.

21          THE COURT:  Do you, Mr. Day?

22          DEFENDANT DAY:  Yes.

23          THE COURT:  At all times you would have the right

24    against self incrimination.  And as I think you undoubtedly

25    know, that means the right to refuse to testify.  No one can

12

1   compel you to give information that may hurt you.  You could

2   always remain silent.  Do you wish to give up that right?

3            DEFENDANT BELL:  Yes.

4            THE COURT:  Do you, Mr. Day?

5            DEFENDANT DAY:  Yes.

6            THE COURT:  The other side of the coin is true also.

7   If you do take the case to trial, each of you could choose to

8   testify, go up to the witness stand and give your versions of

9   the facts and ask the jury to accept your view.  Do you wish to

10  give up that right, Mr. Bell?

11           DEFENDANT BELL:  Yes.

12           THE COURT:  Do you, Mr. Day?

13           DEFENDANT DAY:  Yes, sir.

14           THE COURT:  You could also, if the case went to trial,

15  use the subpoena power of the court to compel other witnesses to

16  come to court and if they were in a position to do so, to

17  testify on your behalf.  Did you wish to give up that right,

18  Mr. Bell?

19           DEFENDANT BELL:  Yes.

20           THE COURT:  Do you, Mr. Day?

21           DEFENDANT DAY:  Yes.

22           THE COURT:  If you took the case to trial and were

23  found guilty, you could appeal the verdict of guilt.  But if you

24  plead guilty, you won't be able to do that.  Do you understand

25  that?

13

1    DEFENDANT BELL:  Yes.

2    THE COURT:  Are you willing to give up that right?

3    DEFENDANT BELL:  Yes.

4    THE COURT:  And you, Mr. Day?

5    DEFENDANT DAY:  Yes.

6    THE COURT:  Each of you will continue to have the right

7    to counsel and if you can't afford counsel to have counsel

8    appointed at the public's expense to continue to represent you.

9    Mr. Newman, is it your intention to continue to

10   represent Mr. Bell?

11   MR. NEWMAN:  It is, Your Honor.

12   THE COURT:  Mr. Mayock?

13   MR. MAYOCK:  Yes, Your Honor.

14   THE COURT:  Okay.  Those are rights that neither of you

15   will lose.  Until the completion of this case and through the

16   point of sentencing, each of you will continue to enjoy that

17   right to effective counsel.

18   Now both of you being citizens, and I don't know

19   anything about your background so some of this may apply, maybe

20   not, but I want you to understand by pleading guilty to those

21   charges you are more likely than not going to lose certain civil

22   rights that citizens otherwise enjoy:  The right to vote, the

23   right to run for public office, the right to serve on a jury,

24   the right to purchase and possess firearms.  You will be giving

25   up all those rights.

14

1       Do you wish to do that, Mr. Bell?

2       DEFENDANT BELL:  Yes.

3       THE COURT:  Do you, Mr. Day?

4       DEFENDANT DAY:  Yes.

5       THE COURT:  Does either of you have any questions about

6  the rights that I just spelled out for you?

7       DEFENDANT BELL:  No, sir.

8       DEFENDANT DAY:  No, sir.

9       THE COURT:  Do you understand, Mr. Bell, that each of

10  the two counts to which you're pleading guilty is a felony,

11  separate felony?

12       DEFENDANT BELL:  Yes.

13       THE COURT:  All the three counts you're pleading guilty

14  to, Mr. Day, those are felonies too.  Do you understand that?

15       DEFENDANT DAY:  Yes.

16       THE COURT:  Okay.  Now I'm going to ask that Mr. Brown

17  set forth first the elements of these offenses.  I'm going to

18  summarize the offenses as paraphrased in the indictment.  I'm

19  going to ask Mr. Brown to summarize what the elements are, what

20  the government would have to prove.

21       I will ask him to do it for all three counts.  And then

22  I will address each of you.  Then I will go back to you, Mr.

23  Brown, and ask you to summarize what the evidence would be,

24  first against Mr. Bell and then against Mr. Day.

25       Now the indictment in case Number 99-123 is only a

15

1    single indictment.  It wasn't superseding, was it?

2         MR. BROWN:  That's correct, Your Honor.

3         THE COURT:  Okay.  In Count 1 the indictment alleges

4    violation of 18 USC Section 371, conspiracy to commit a bank

5    robbery.  This is particularly applicable to you, Mr. Day,

6    because you're pleading guilty to that count.

7         It says beginning on or before January 22 of this year,

8    1999, and continuing to on or about January 26 of '99, both you

9    and Mr. Bell and others known and unknown to the grand jury

10   conspired and agreed with each other to commit a bank robbery of

11   Home Savings in San Fernando, California.

12        On Page 2 it describes the means by which this

13   agreement, this conspiracy was to be accomplished and it sets

14   forth eight ways in which the object of the conspiracy was to be

15   accomplished.  It claims that both defendants would obtain a

16   stolen van to use as a preliminary getaway vehicle; that both

17   defendants would park illegally a Ford Expedition a distance

18   from Home Savings for use as a secondary getaway vehicle.

19        That both defendants would drive to Home Savings in the

20   stolen van.  They would enter Home Savings brandishing guns,

21   handguns, would order the employees and customers inside to get

22   down on the floor.  Both defendants would order the manager of

23   Home Savings to open the bank vault and then they would flee

24   from Home Savings in a stolen van.  After that it's alleged that

25   both defendants would switch from the stolen van to the Ford

16

1    Expedition and drive the Ford Expedition to a safe place and

2    divide the money.

3         The first counts also alleges that they commit various

4    fraudulent and overt acts to carry out this plan.  And they

5    include driving a stolen getaway van to Home Savings.  That's

6    something that's alleged as to both defendants.  Both defendants

7    entering the bank wearing masks and hand gloves and brandishing

8    a revolver, semi-automatic handgun.  Both defendants forced the

9    employees to open the vault and give them over $85,000.

10        And I'm going to focus on the ones you're specifically

11   mentioned in Mr. Bell -- excuse me, Mr. Day.  Both defendants

12   fled Home Savings in the stolen getaway van.  One of the

13   defendants --  actually I should mention this -- told by the

14   assistant manager that she was sorry she put a dye pack in with

15   the stolen money and prevented her from exiting the bank by

16   grabbing her hair and pulling her back.

17        Attention now to you, Mr. Day, drove the Ford

18   Expedition to avoid the police and you stopped the Ford

19   Expedition at a mall so defendants could hide themselves from

20   the view of a helicopter, police helicopter, and from pursuing

21   police officers.  All of that is spelled out in the first count.

22        The second count says that 18 USC Section 2113,

23   Subsections A and D was violated in that both defendants by

24   force, violence, intimidation knowingly took from a person

25   approximately $85,600 belonging to Home Savings, San Fernando

1  branch, Home Savings then insured by the FDIC, Federal Deposit

2  Insurance Corporation; that both defendants assaulted and put in

3  jeopardy the life of the victim assistant manager and others by

4  using a handgun.

5  Finally the third count says that both defendants

6  violated 18 USC Section 924(c) by knowingly using and carrying a

7  firearm, namely a loaded .38 caliber revolver during the

8  commission of A crime of violence of robbing Home Savings.

9  Now Mr. Brown, would you as to Count 1, just stop after

10  you do it for Count 1, describe what the elements of the offense

11  of conspiracy in violation 18 USC 371 would be.

12  MR. BROWN:  In order for defendant Day to be proved

13  guilty of conspiracy, he must have, on or about the dates

14  charged in the indictment, agreed with another person to commit

15  the bank robbery.  Second, he must have become a member of the

16  conspiracy knowing of its object and intending to help

17  accomplish it.

18  And third, at least one of the members of the

19  conspiracy must have performed at least one overt act for the

20  purpose of carrying out the conspiracy.

21  THE COURT:  Now again, in order to make this clear and

22  simple, I would appreciate it if you would turn to, Mr. Brown,

23  only focusing on Count 1 and only as to Mr. Day and summarize

24  what the evidence would be that the government would introduce

25  before the jury.

18

1          MR. BROWN:  The government would prove that on or about

2    January 22nd, 1999, the day on which the getaway van was stolen,

3    and continuing through January 26th, 1999, the date on which the

4    bank robbery was committed in Los Angeles County, defendant

5    Montez Day agreed with defendant Bruce Bell to commit an armed

6    takeover robbery of Home Savings of America in San Fernando,

7    California, the deposits of which were then insured by the

8    Federal Deposit Insurance Corporation.

9          THE COURT:  Mr. Day, I have asked the prosecutor to

10   focus only on Count 1 because that's a count that you are

11   planning to change your plea to.  Did you hear what he said?

12         DEFENDANT DAY:  Yes.

13         THE COURT:  Did you understand it?

14         DEFENDANT DAY:  Yes, sir.

15         THE COURT:  So what he did was describe technically

16   what has to be proven to convict someone of conspiracy.  He

17   summarized what the government would introduce --

18         MR. BROWN:  Your Honor, I omitted one element.  The

19   government would show that the overt act occurred and that is

20   established by the defendants entering the bank.

21         THE COURT:  Do you have -- would you be putting on

22   witnesses, eyewitnesses?

23         MR. BROWN:  Yes, Your Honor.  And surveillance photos.

24         THE COURT:  Did the eyewitnesses identify these

25   defendants through lineups or through pictures?

19

1       MR. BROWN:  No, they were wearing masks.   The

2   identifications would have been made based on clothing and

3   witnesses seeing the defendants fleeing and the police following

4   them until their vehicle was stopped.   The stolen van was found

5   and one of the weapons was later found.

6       THE COURT:  Is it correct that each of the defendants

7   was caught and arrested shortly after they fled the bank?

8       MR. BROWN:  Yes, Your Honor.

9       THE COURT:  In possession of the money?

10      MR. BROWN:  Yes, Your Honor.

11      THE COURT:  Let's focus back on you, Mr. Day.  Do you

12   agree with what the prosecutor said as far as the summary of the

13   proof that he would introduce?  Let me explain what the question

14   is.  It may be the question wasn't very clear.

15      In order for this proceeding to be conducted properly,

16   the record has to show that there's a factual basis.  It's not

17   enough for someone to come in and say I plead guilty, I want to

18   get the benefit of whatever deal or whatever impact pleading

19   guilty may be to the person that's done what he's accused of.

20      I asked Mr. Brown to summarize what the evidence would

21   be hoping that you would listen to it and be able to tell me

22   whether in fact you would agree that those are things that

23   happened.  If you do agree, if you did the things that he's

24   talking about, then the record will show a factual basis and I

25   will be entitled to accept your guilty plea.  Does that help you

20

1   understand what I'm driving at?

2           DEFENDANT DAY:  Yes.

3           THE COURT:  Do you agree with what Mr. Brown said?

4           DEFENDANT DAY:  Yes.

5           THE COURT:  Did you in fact do those things?

6           DEFENDANT DAY:  Yes, Your Honor.

7           THE COURT:  Okay.  Now Mr. Brown, do the same thing,

8   but this is going to apply to both Mr. Bell and Mr. Day.

9   They're both planning to plead to each of Counts 2 and 3.  So

10  set forth what the elements of Count 2 are and what the evidence

11  would be.

12          MR. BROWN:  In order to be guilty of armed bank

13  robbery, the defendant must have taken from a teller money

14  belonging to a bank.  The defendant must have used force and

15  violence or intimidation in doing so.  The deposits of the bank

16  must have been insured by the Federal Deposit Insurance

17  Corporation at that time.  And finally, the defendant must have

18  intentionally made a show of force that caused the teller to

19  fear bodily harm by using a dangerous weapon.

20          If this case went to trial, the government would prove

21  that defendants Bruce Bell and Montez Day entered the Home

22  Savings of America in San Fernando, California on January 26th,

23  1999 and that defendant Montez Day brandished a semi-automatic

24  pistol while defendant Bruce Bell brandished a loaded .38

25  caliber revolver.  Defendants Montez Day and Bruce Bell forced

21

1    the assistant manager Elizabeth Aguillon to open the bank vault

2    and took from the bank vault approximately $85,600 in cash.

3          THE COURT:  Mr. Bell, do you understand what Mr. Brown

4    said?

5          DEFENDANT BELL:  Yes.

6          THE COURT:  Did you in fact do the things he just

7    described?

8          DEFENDANT BELL:  Yes.

9          THE COURT:  How about you, Mr. Day, do you understand

10   what he said?

11         DEFENDANT DAY:  Yes.

12         THE COURT:  Did you do those things?

13         DEFENDANT DAY:  Yes.

14         THE COURT:  Let me hear Count 3, Mr. Brown.  Summarize

15   what the elements are and what the evidence would be, please.

16         MR. BROWN:  In order to be guilty of using or carrying

17   a firearm during a crime of violence, the following must be

18   true.  One, defendant committed the crime of violence charged in

19   the indictment, bank robbery in this case; two, the defendant

20   knowingly used or carried a firearm; three, defendant used or

21   carried the firearm during and in relation to the crime of

22   violence.

23         Because the 924(c) charge in this case carries a

24   mandatory minimum sentence of seven years, the government would

25   also have to prove the defendant brandished the firearm.

22

1          Now Your Honor, because the firearm charged was only

2    possessed by defendant Bell and the government is relying on

3    Pinkerton liability as to defendant Day for that firearm, I'd

4    also like to put on the record the elements of Pinkerton

5    liability.

6          THE COURT:   I want Mr. Day to pay attention to this.

7    Is it an accurate way of paraphrasing what you're about to do,

8    Mr. Brown, that you're saying the indictment singles out only

9    the weapon that Mr. Bell actually carried, but that you have a

10   basis to obtain a conviction of guilt as to Mr. Day?

11         MR. BROWN:   That's correct, Your Honor.

12         THE COURT:   It's a legal basis called Pinkerton?

13         MR. BROWN:   Yes.  In order, if you have a criminal

14   agreement with somebody to commit an act, there are certain

15   instances in which you will be liable for the crime, the acts

16   committed by the person you're conspiring with.  That is called

17   Pinkerton liability.  And if the acts of your partner in crime

18   are reasonably foreseeable and a necessary and natural

19   consequence of your criminal agreement, you will be liable for

20   those acts as well.  Shall I specify the elements, Your Honor?

21         THE COURT:   Yes.

22         MR. BROWN:   In order for the defendant to be guilty of

23   a crime committed by his co-conspirator, the following must be

24   true.  One, defendant's co-conspirator committed a crime such as

25   a bank robbery; two, that the co-conspirator was a member of the

23

1  conspiracy charged in Count 1 of the indictment; three, that the

2  co-conspirator committed the crime in furtherance of the

3  conspiracy; four, defendant was a member of the conspiracy on

4  the date that the co-conspirator committed the crime; and five,

5  the crime fell within the scope of the conspiracy and could

6  reasonably have been foreseen to be a necessary and natural

7  consequence of the conspiracy.

8          Shall I proceed with the factual basis, Your Honor?

9          THE COURT:  Yes.

10          MR. BROWN:  On January 26, 1999, defendants Bruce Bell

11  and Montez Day entered the Home Savings of America in San

12  Fernando which was then insured by the Federal Deposit Insurance

13  Corporation.  Bruce Bell brandished a loaded .38 caliber

14  revolver.  Bruce Bell's brandishing of a .38 caliber revolver

15  was within the scope of Montez Day and Bruce Bell's unlawful

16  agreement and could reasonably have been foreseen by defendant

17  Montez Day as a necessary and natural consequence of that

18  agreement.  And the defendants used that weapon in order to rob

19  the bank on that day.

20          THE COURT:  Okay.  I want to turn to you first,

21  Mr. Day.  There were a lot words Mr. Brown used.  Were you able

22  to understand what he was saying as to why you could be found

23  guilty of what Mr. Bell did as to his .38 caliber revolver?

24          DEFENDANT DAY:  Yes.

25          THE COURT:  Okay.  Mr. Bell, did you do the things that

24

1   Mr. Brown referred to in connection with Count 3 relating to the

2   use of a firearm?

3          DEFENDANT BELL:  Yes.

4          THE COURT:  Did you, Mr. Day?

5          DEFENDANT DAY:  Yes.

6          THE COURT:  All right.  And I want to address some

7   questions next to you, Mr. Bell, because I have been informed

8   and have been given a copy of the plea agreement.  And do you

9   have this with you, Mr. Newman?

10          MR. NEWMAN:  I do, Your Honor.

11          THE COURT:  Okay.  Would you turn to Page 8, please.

12          Mr. Bell, on Page 8 is that your signature?

13          DEFENDANT BELL:  Yes, it is.

14          THE COURT:  Did you sign that agreement in the presence

15   of Mr. Newman?

16          DEFENDANT BELL:  Yes.

17          THE COURT:  Before you signed it, did you read it?

18          DEFENDANT BELL:  Yes.

19          THE COURT:  Did you understand it?

20          DEFENDANT BELL:  Yes.

21          THE COURT:  As far as you're concerned, does this plea

22   agreement contain the entire terms of the agreement between you

23   on the one hand and the U.S. attorney's office on the other?

24          DEFENDANT BELL:  Yes.

25          THE COURT:  Has anyone made you any promises or

1    representations of guarantees other than whatever may be set

2    forth in this plea agreement?

3         DEFENDANT BELL:  No.

4         THE COURT:  Has anyone made any threats to you that

5    prompted you to plead guilty this afternoon?

6         DEFENDANT BELL:  No.

7         THE COURT:  Did anyone tell you about or promise to you

8    what specific sentence would be imposed?

9         DEFENDANT BELL:  No.

10        THE COURT:  Do you have any other agreement with the

11   government besides what is now in your hands as a written plea

12   agreement?

13        DEFENDANT BELL:  No.

14        THE COURT:  Did anyone promise you any leniency or

15   probation or any kind of outcome once the day of sentencing

16   comes?

17        DEFENDANT BELL:  No.

18        THE COURT:  Are you presently on parole?

19        DEFENDANT BELL:  Yes.

20        THE COURT:  Have you discussed with your lawyer the

21   impact on your parole of being found guilty today, the impact on

22   the offense for which you're on parole?

23        DEFENDANT BELL:  Yes.

24        THE COURT:  Are you involved in any court proceedings?

25        DEFENDANT BELL:  No.

26

1    THE COURT:  Have you been advised of the maximum
2  penalty under the law?
3    DEFENDANT BELL:  Yes, I have.
4    THE COURT:  For these offenses, at least for Count 3,
5  there's also a minimum penalty; is that correct?
6    MR. BROWN:  Yes, Your Honor.
7    THE COURT:  Both of you should listen because I'm now
8  going to ask Mr. Brown to place on the record both the maximum
9  and minimum penalties.
10    MR. BROWN:  The maximum penalty for the conspiracy
11  count, Count 1, is five years imprisonment, a three-year period
12  of supervised release, a fine of $250,000 and a mandatory
13  special assessment of $100.
14    The maximum sentence the court could impose for the
15  armed bank robbery, Count 2, is 25 years imprisonment, a
16  five-year period of supervised release, a fine of $250,000 and a
17  mandatory special assessment of $100.
18    The statutory maximum sentence the court could impose
19  for violation of 924(c), the third count, is life imprisonment,
20  a five-year period of supervised release, a fine of $250,000 and
21  a mandatory special assessment of $100.
22    The statutory mandatory minimum sentence that the court
23  must impose for Count 3 and the 924(c) charge is a seven-year
24  term which must run consecutive to any other sentence of
25  imprisonment.  Therefore, the total maximum sentence for all of

1    these offenses to which defendant Montez Day is pleading guilty

2    is life imprisonment, a five-year period of supervised release,

3    a fine of $750,000 and a mandatory special assessment of $300.

4            The maximum total sentence for the two offenses to

5    which defendant Bruce Bell is pleading guilty is life

6    imprisonment, a five-year period of supervised release, a fine

7    of $500,000 and a mandatory special assessment of $200.

8            THE COURT:  Okay.  Mr. Bell, continuing with you for a

9    moment.  You've heard some reference to supervised release.

10   This is something that applies to both of you.  Do you both

11   understand that in the federal system there's no longer such a

12   thing as parole?  If someone sentenced to prison serves out the

13   term of sentence except for the reduction that may be earned for

14   good time or good behavior and then when that person is released

15   from prison he may be subjected to something called supervised

16   release which is basically supervision that has conditions,

17   restrictions, terms and limitations.  If a person violates the

18   terms of his supervised release, he can be sent back to prison

19   for the entire amount of the period of supervised release.

20           Do you understand that, Mr. Bell?

21           DEFENDANT BELL:  Yes, I do.

22           THE COURT:  Do you understand that, Mr. Day?

23           DEFENDANT DAY:  Yes, sir.

24           THE COURT:  Now there's also been some reference at

25   least in the plea agreement I think and perhaps there's

28

1    something been said today about the Sentencing Commission

2    guidelines.  I want to tell you both about those.  There will be

3    some things you and I will talk about directly with you in a

4    minute, Mr. Day.  I will be getting to you as well, Mr. Bell.

5          Now this again applies to both of you.  Under the

6    federal system that you're now part of there are sentencing

7    guidelines which are issued by something called the Sentencing

8    Commission.  They contain an analysis of the relevant facts and

9    those include the nature of the offense, the criminal history of

10   the defendant, whether the defendant accepted responsibility for

11   what he was accused of, whether in the alternative he obstructed

12   justice; a lot of factors.  They are all taken into account by

13   the probation office.

14         The probation office applies these guidelines issued by

15   the commission and comes up with a guideline range expressed in

16   months, how many months can the defendant be sentenced.  The low

17   end and the high end are included.  But I'm not bound by these

18   guideline determinations.  Under certain circumstances I impose

19   a tougher sentence, a longer sentence, or I can impose a shorter

20   sentence.  You each will get through your lawyers and directly

21   in your own right a copy of the presentence report which is

22   prepared by the probation office and which deals with these

23   guidelines.

24         Each of you through your lawyer will have a chance to

25   challenge it or add to it or change it.  It eventually comes to

29

1   me and then I will review it.  But I again want to make sure you

2   each understand that I'm not bound by it.

3          Do you understand that, Mr. Bell?

4          DEFENDANT BELL:  Yes, sir.

5          THE COURT:  Are there any questions you have at the

6   moment about what I have said about the sentencing guidelines?

7          DEFENDANT BELL:  No.

8          THE COURT:  Mr. Day, do you understand what I said

9   about the guidelines?

10          DEFENDANT DAY:  Yes, sir.

11          THE COURT:  Do you have any questions about those

12   guidelines?

13          DEFENDANT DAY:  No, sir.

14          THE COURT:  Okay.  Now Mr. Brown, in the plea agreement

15   from Mr. Bell is there any provision relating to appeal?

16          MR. BROWN:  No, Your Honor.

17          THE COURT:  Okay.  And there's no agreement restricting

18   Mr. Day; is that correct, Mr. Mayock?

19          MR. MAYOCK:  That's correct, Your Honor.

20          THE COURT:  Each of you needs to understand that when I

21   finally do impose sentence, if we get to that point, if I'm

22   wrong you can appeal what I did.  You may file your appeal

23   through your lawyer, challenge the sentence, not the finding of

24   guilty, not the guilty verdict, but the sentence.

25          Do you understand that, Mr. Bell?

30

1          DEFENDANT BELL:  Yes, sir.

2          THE COURT:  Do you, Mr. Day?

3          DEFENDANT DAY:  Yes, sir.

4          THE COURT:  Okay.  Turning to you for a minute,

5   Mr. Bell, have you had sufficient time to discuss this case with

6   Mr. Newman?

7          DEFENDANT BELL:  Yes.

8          THE COURT:  Are you satisfied that he's fully

9   considered any defenses you might have to the charges?

10          DEFENDANT BELL:  Yes, I am.

11          THE COURT:  Are you satisfied with his representation

12   of you?

13          DEFENDANT BELL:  Yes.

14          THE COURT:  Has he advised you of the nature of these

15   charges and how the factors that go into the sentence generally

16   work?

17          DEFENDANT BELL:  Yes.

18          THE COURT:  Have you told him all the facts and

19   circumstances surrounding this case?

20          DEFENDANT BELL:  Yes.

21          THE COURT:  Okay.  Mr. Day, same question.  I'm asking

22   now a few questions about Mr. Mayock.  Have you had a sufficient

23   opportunity to discuss this case with him?

24          DEFENDANT DAY:  Yes.

25          THE COURT:  Are you satisfied with his representation

31

1    of you?

2           DEFENDANT DAY:  Yes.

3           THE COURT:  Has he told about any defenses you might

4    have to these charges?

5           DEFENDANT DAY:  Yes.

6           THE COURT:  Has he explained the nature of the

7    charges?

8           DEFENDANT DAY:  Yes.

9           THE COURT:  Has he explained how the sentencing process

10   works in general?

11          DEFENDANT DAY:  Yes.

12          THE COURT:  Have you given him all the facts that

13   you're aware of that he would need to know to figure out what is

14   in your best interest?

15          DEFENDANT DAY:  Yes.

16          THE COURT:  Continuing with you for a moment, Mr. Day,

17   there is no plea agreement that I'm aware of.  But I want to

18   make sure you tell me whether anyone has made you any promises

19   or representations, guarantees or other statements about what

20   will happen to you at the time of sentencing.

21          DEFENDANT DAY:  No.

22          THE COURT:  Has anyone made any threats to you or to

23   any member of your family that prompts you to plead guilty this

24   afternoon?

25          DEFENDANT DAY:  No, sir.

32

1          THE COURT:  Has anyone made you any promises of
2    leniency?
3          DEFENDANT DAY:  No, sir.
4          THE COURT:  No one has told you what specific sentence
5    the court will impose; is that correct?
6          DEFENDANT DAY:  That's correct, sir.
7          THE COURT:  Are you presently on parole?
8          DEFENDANT DAY:  No.  I'm on supervised release, sir.
9          THE COURT:  From an earlier federal offense?
10         DEFENDANT DAY:  Yes, sir.
11         THE COURT:  Are you aware of the consequences for
12   pleading guilty today in terms of what happens on that other
13   previous federal case?
14         DEFENDANT DAY:  I'm aware of the consequences, yes.
15         THE COURT:  Mr. Bell, do you feel that you understand
16   everything that's taking place here this afternoon?
17         DEFENDANT BELL:  Yes.
18         THE COURT:  Do you know of any reason why I shouldn't
19   accept your guilty plea?
20         DEFENDANT BELL:  No.
21         THE COURT:  Do you understand then that all that's left
22   in your case if I do accept the plea is for sentence to be
23   imposed?
24         DEFENDANT BELL:  Yes.
25         THE COURT:  And is your decision to plead guilty this

33

1    afternoon to Counts 2 and 3 entirely free and voluntary?

2                   DEFENDANT BELL:  Yes.

3                   THE COURT:  Mr. Day, I'm going to ask you the same

4    questions.  Do you think you understand everything that's been

5    going on here today?

6                   DEFENDANT DAY:  Yes.

7                   THE COURT:  Do you know of any reason why I shouldn't

8    accept your guilty plea?

9                   DEFENDANT DAY:  No.

10                  THE COURT:  Then do you understand that all that will

11   be left in this case is for sentence to be imposed?

12                  DEFENDANT DAY:  Yes.

13                  THE COURT:  Is it still your desire to plead guilty

14   notwithstanding everything that I have tried to explain to you?

15                  DEFENDANT DAY:  Yes.

16                  THE COURT:  Mr. Newman, there are a few questions I

17   would like to address to you.  Through your representation of

18   Mr. Bell, has he been able to cooperate with you in a competent

19   fashion?

20                  MR. NEWMAN:  Yes, Your Honor.

21                  THE COURT:  Did you sign the plea agreement in his

22   presence?

23                  MR. NEWMAN:  I did, Your Honor.

24                  THE COURT:  Did you discuss it with him before he and

25   you signed it?

34

1          MR. NEWMAN:  Yes, Your Honor.

2          THE COURT:  Does this plea agreement that Mr. Bell

3   entered into represent the entire disposition of his case?

4          MR. NEWMAN:  It does, Your Honor.

5          THE COURT:  Did anyone make any promises,

6   representations or guarantees to you that prompted you to

7   recommend that Mr. Bell plead guilty?

8          MR. NEWMAN:  No, Your Honor.

9          THE COURT:  Are you satisfied that his constitutional

10   rights have been observed?

11          MR. NEWMAN:  I am, Your Honor.

12          THE COURT:  Is Mr. Bell pleading guilty because of any

13   illegally obtained evidence in the government's possession that

14   you're aware of?

15          MR. NEWMAN:  No, Your Honor.

16          THE COURT:  Based upon your analysis of the law and of

17   the facts, is it your conclusion that it's in Mr. Bell's

18   interest for him to plead guilty today?

19          MR. NEWMAN:  It is, Your Honor.

20          THE COURT:  Same questions to Mr. Mayock.  I know

21   there's no plea agreement, but throughout your representation of

22   Mr. Day, has he been able to cooperate with you in a competent

23   way?

24          MR. MAYOCK:  He has, Your Honor.

25          THE COURT:  Have you discussed the facts of this case

35

1    in detail with him?

2            MR. MAYOCK:  I have.

3            THE COURT:  Are you satisfied that he has no

4    meritorious defenses?

5            MR. MAYOCK:  I am, Your Honor.

6            THE COURT:  Is he pleading guilty because of any

7    illegally obtained evidence in the possession of the government

8    that you're aware of?

9            MR. MAYOCK:  No, Your Honor.

10           THE COURT:  Do you think after your analysis of the law

11   and the facts that it's in his best interests to plead guilty?

12           MR. MAYOCK:  Yes, I do.

13           THE COURT:  Mr. Brown.

14           MR. BROWN:  Yes.  Your Honor, I would like to state the

15   obvious consequence of pleading guilty in this case as regards

16   supervised release that constitute a violation of their

17   supervised release.

18           THE COURT:  That applies only I think to Mr. Day.

19   Parole is the same basic consequence as to Bell.

20           MR. BROWN:  Thank you, Your Honor.  I'd also like to

21   point out that restitution is mandatory in this case.  To my

22   knowledge, currently all the currency from the bank was

23   recovered so I don't believe it will apply.  But in case I'm

24   incorrect on that or there was some other loss at the bank, I

25   did want the defendants to know they could be required to pay

36

1    restitution.

2         THE COURT:  You anticipated something I was going to

3    ask you about when I got to you.  Your turn will come in just a

4    minute.

5         MR. BROWN:  I apologize, Your Honor.

6         THE COURT:  That's all right.  Mr. Mayock, do you know

7    of any reason why I shouldn't accept Mr. Day's guilty plea?

8         MR. MAYOCK:  No, Your Honor.

9         THE COURT:  Mr. Brown, as to the plea agreement between

10   the government and Mr. Bell, other than what is expressly set

11   forth in that plea agreement, has the government made any other

12   promises or representations, guarantees to him or his counsel?

13        MR. BROWN:  No, Your Honor.

14        THE COURT:  Has the government obtained a written

15   statement from either defendant?

16        MR. BROWN:  No, Your Honor.

17        THE COURT:  Other than what was seized at the time of

18   the arrest, has the government obtained any other evidence

19   directly from the defendants?

20        MR. BROWN:  No, Your Honor.

21        THE COURT:  Can you think of any reason why I shouldn't

22   accept the guilty pleas?

23        MR. BROWN:  No, Your Honor.

24        THE COURT:  That's true for both Mr. Bell and Mr. Day?

25        MR. BROWN:  Yes.

37

1       THE COURT:  Is there any additional inquiry you want me

2    to touch on, Mr. Brown?

3       MR. BROWN:  No, Your Honor.

4       THE COURT:  How about you, Mr. Mayock?

5       MR. MAYOCK:  No, Your Honor.

6       THE COURT:  All right.  I'm going to do certain things

7    and here's what they are.  As to each of Mr. Bell and Mr. Day, I

8    find that there's a factual basis for the entry of each of the

9    guilty pleas, in the case of Mr. Bell to Counts 2 and 3;

10   Mr. Day, Counts 1, 2 and 3.  I find that each of them is alert,

11   seem to be able, intelligent, responsive, good demeanor.

12       I think each of them knows what he's doing and why.

13   Each of them understands the consequences.  There seems to be no

14   basis to believe for either of them that there is any extrinsic

15   factor such as threats or physical condition or mental condition

16   or use of prescriptive drugs or other drugs that might interfere

17   with their ability to make a free and voluntary decision.

18       I think they're making a free and voluntary decision.

19   I find there's been no promises made by anyone and no other

20   instances of inducements or coercion that place in question the

21   voluntariness of the decision that each of them is making this

22   afternoon.

23       For all those reasons I order that the guilty plea from

24   Mr. Bell be accepted and the guilty plea from Mr. Day be

25   accepted.  We're going to accept the guilty pleas to each of the

38

1    respective counts.  We're going to set a date for sentencing

2    and it won't be until September for a host of reasons.

3           What date do you recommend?

4           THE CLERK:  The 13th.

5           THE COURT:  September 13th which is a Monday.  Is that

6    available?

7           MR. MAYOCK:  It is, Your Honor.

8           THE COURT:  Mr. Newman?

9           MR. NEWMAN:  Yes, Your Honor.

10          THE COURT:  Mr. Brown?

11          MR. BROWN:  Yes, Your Honor.

12          THE COURT:  September 13th, 4:00, this court.  The

13   presentence report will be compiled by the probation office.

14   Subject to advice that each of you may get from your respective

15   lawyer, I order you to cooperate with the probation office and

16   to return here for sentencing.  Whatever the terms were of bail

17   and confinement that were previously imposed, those will remain

18   in effect.  I think the marshal representatives are here.  I

19   will remand you to the custody of the marshals.

20          Thank you, counsel.

21          MR. MAYOCK:  There is one thing Mr. Brown has to bring

22   to your attention at this time regarding the custodial

23   situation.

24          MR. BROWN:  Well, Your Honor, it's actually not for

25   Your Honor.  It's for the Metropolitan Detention Center.  I need

39

1   to write them a letter, status can be renotified.

2           THE COURT:  Mr. Brown --

3           MR. BROWN:  There's an order between the two defendants

4   and the Metropolitan Detention Center.  It's administrative,

5   Metropolitan Detention Center.  But it is true I'm going to

6   rescind that request today.

7           THE COURT:  Okay.  You may and now you're confirming it

8   on the record.

9           MR. BROWN:  I don't think it's actually an agreement,

10  Your Honor.  It's a representation that I'm going to do that.

11          THE COURT:  All right.  Does that take care of that?

12          MR. MAYOCK:  Yes, Your Honor.

13          THE COURT:  Anything else, counsel?

14          MR. MAYOCK:  No, Your Honor.

15          THE COURT:  Thank you.

16          (PROCEEDINGS ADJOURNED)

17

18                    ˉCˉ E R T I F I C A T E

19          I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT
    TRANSCRIPT OF THE ABOVE-ENTITLED PROCEEDINGS, PAGES 1-39.
20  DATED JANUARY 6, 2000; LOS ANGELES, CALIFORNIA.

21

22  LYNNE SMITH
    OFFICIAL COURT REPORTER

23

24

25

56

# EXHIBIT C

1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

THE HONORABLE A. HOWARD MATZ, JUDGE PRESIDING

- - -

```
-------------------------------
UNITED STATES OF AMERICA,        )
                    PLAINTIFF,   )
        -v-                      )    CASE NO. CR 99-123-AHM
BRUCE BELL,                      )
                    DEFENDANT.   )
-------------------------------
```

COPY

REPORTER'S TRANSCRIPT OF PROCEEDINGS
LOS ANGELES, CALIFORNIA
MONDAY, OCTOBER 25, 1999

LYNNE SMITH
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
312 NORTH SPRING STREET, #430
LOS ANGELES, CALIFORNIA  90012

2

APPEARANCES:

    ON BEHALF OF PLAINTIFF:
    ALEJANDRO MAYORKAS
    UNITED STATES ATTORNEY
    BY:  ANDREW BROWN
    ASSISTANT UNITED STATES ATTORNEY
    312 NORTH SPRING STREET
    LOS ANGELES, CALIFORNIA      90012


    ON BEHALF OF DEFENDANT:
    BRIAN NEWMAN
    400 CORPORATE POINTE, #805
    CULVER CITY, CALIFORNIA  90230

3

1          MONDAY, OCTOBER 25, 1999; LOS ANGELES, CALIFORNIA

2                                -000-

3          THE CLERK:  CR 99-123-AHM, U.S.A. versus Montez Day and

4    Bruce Bell.

5          Appearances, counsel.

6          MR. BROWN:  Good afternoon, Your Honor.  Andrew Brown

7    for the government.

8          THE COURT:  Good afternoon, Mr. Brown.

9          MR. NEWMAN:  Good afternoon, Your Honor.  Brian Newman

10   for Mr. Bell who is present in court.

11         MR. MAYOCK:  Good afternoon, Your Honor.  Michael

12   Mayock on behalf of Montez Day who likewise is present.

13         THE COURT:  Good afternoon to all four of you.

14         All right.  We're here for the pronouncement of

15   judgment and the sentence on both Mr. Day and Mr. Bell.  I would

16   like to do Mr. Bell first.

17         MR. NEWMAN:  Your Honor, on behalf of Mr. Bell, HE has

18   asked for a further continuance of today's sentencing.  The

19   reason for the continuance -- and we would ask that a short

20   continuance of no more than a week -- is because of a flurry of

21   last-minute responses to my arguments by the probation office

22   which I didn't receive until late I believe Thursday, and also

23   had not gotten the psychiatric report until Tuesday, I think it

24   was Tuesday of last week, none of which Mr. Bell has had an

25   opportunity to even see.

4

1      So we were talking about he would like the opportunity

2  to see those reports and give me input considering the fact that

3  I think the structural issue that we're going to be addressing,

4  Your Honor, today is the core, whether Mr. Bell is actually a

5  career offender or not.  These differences in sentencing between

6  whether he is or he isn't is very significant.

7      THE COURT:  What does the psychiatric report then have

8  to do with whether he's a career offender?

9      MR. NEWMAN:  Well, that doesn't.  He has not seen that

10  report.  And that is not the foundation for my request for a

11  week continuance.

12      THE COURT:  All right.  Well, that's what you said

13  though.

14      MR. NEWMAN:  I'm sorry.

15      THE COURT:  And I'm really not inclined to drag this

16  out any further.

17      Mr. Brown.

18      MR. BROWN:  Your Honor, I just wanted to object to the

19  continuance.  We had the change of plea on May 14th.  It's been

20  five-and-a-half months.  The late filings have been caused by

21  the defendant who filed his papers just days before the hearing

22  putting great strain on the government, the court and the

23  probation office in filing responses within 24 hours so that

24  people would have them.

25      And if he wanted to be sentenced second today to give

5

1    him a chance to go over the probation officer's responses, the

2    government wouldn't object to that.  But the reply from the

3    probation office to his papers, they are minuscule changes.

4    They basically just reiterated their earlier position.  So I

5    don't see that there's some big new thing that he needs to read

6    before the sentencing.

7         THE COURT:  Okay.  Well, I was just going to suggest

8    that you give your -- and I'll go first with Mr. Bell, with Mr.

9    Day.  Sit down.  You can do it at that table in the back so

10   you're not distracted.  You can show him these very skimpy

11   items.  They won't take long to review.  You can explain them to

12   him.  They don't address what you tell me is going to be the

13   principal focus of your argument anyway.

14        I have given both sides so many extensions and so many

15   opportunities to build their case and I have too many other

16   sentences on for next week to continue this again.  So I'm going

17   to deny that request.

18        MR. NEWMAN:  I understand, Your Honor.  But for the

19   record, a lot of the continuance or extensions were because for

20   some reason the Bureau of Prisons moved Mr. Bell to Oklahoma, if

21   the court recalls, and it took a while to find him and to get

22   him back.

23        THE COURT:  Let me make it clear to both you and Mr.

24   Bell, I'm not holding that against him in terms of your request

25   now.  I'm simply reflecting that this has gone on for a long

6

1    time.  You've both had an opportunity to meet with other each

2    and coordinate with each other.  And I think you'll both have

3    the full opportunity to be heard.  So I'll take Mr. Day first,

4    but that won't take all that long.  So be efficient in showing

5    this material to your client.

6              MR. NEWMAN:  I will, Your Honor.

7              THE COURT:  Don't tell me you're going to seek a

8    continuance, Mr. Mayock.

9              MR. MAYOCK:  Well, perhaps, Your Honor.  There was a

10   little bit of a miss in the communications.  Apparently

11   Mr. Brown had filed and FAXed a response to my position paper,

12   which admittedly I didn't file until Wednesday of last week as

13   your court stamp will indicate.

14             However, it will also indicate inside the attachment

15   that it was at that time that I was getting a copy from the

16   psychologist, a report, and I waited for that report.  That was

17   the basis for the delay waiting for that.

18             But in any event, going back to the issue, I did not

19   receive a copy of the government's opposition.  There was a FAX

20   number that I had about four or five years ago.  And apparently

21   there was a FAX that was transmitted, that's happened in the

22   past.

23             Unless Mr. Brown has that document showing the FAX

24   number, it's a FAX of a firm that used to be on the same floor

25   where I was and I didn't get it in any event.

7

1          THE COURT:  When did you get it?

2          MR. MAYOCK:  I just was able to read his in court

3    today.  And the problem that I have is this.  Essentially my

4    client has advised me and I saw nothing to contradict this that

5    the early conviction, the first conviction was for powder

6    cocaine, not crack cocaine.

7          And secondly, there was an objection to unsworn

8    statements of the defendant.  Now if there's going to be some

9    allegation that his father was not arrested and actually

10   convicted for murdering his mother, we can get court records if

11   that's what the prosecution seems to want.  But I don't think

12   that that is essential.  If that's the kind of record that

13   they're looking for, we can definitely obtain that if we had a

14   very brief continuance.

15         MR. BROWN:  Two points, Your Honor.  As far as the

16   crack cocaine versus powder cocaine, that was an inference that

17   I made from the quantity of the cocaine.  I remembered reading

18   it, but I went over the presentence report just before sitting

19   down and I don't see it.  So for all I know, it may well be

20   powder cocaine and I'm willing to so stipulate for purposes of

21   the sentencing.

22         And as to the second point, Your Honor, the government

23   isn't contending that it didn't happen.  The government is

24   merely saying that they haven't carried their burden.

25         THE COURT:  Okay.  Well, there's no need for a

8

1  continuance in terms of what your concerns are, Mr. Mayock.  I

2  have not assumed that it was crack cocaine and the difference

3  between whether it was crack or other cocaine is not going to be

4  at all a factor in my, and hasn't been as I prepared for this

5  sentencing.

6         In terms of the government's position relating to your

7  client's childhood history, I have construed it the way

8  Mr. Brown just described.  I have assumed for purposes of my

9  analysis that what apparently happened did happen, what you say

10  happened happened.  And that is to say that as horrific as it

11  is, your client as a very young boy may have actually seen, but

12  in any event, directly experienced the slaying of his mother by

13  his father.

14         I think that there are other reasons why it's highly

15  unlikely I would consider that as a basis for departure.  It may

16  be a basis and I think there may well be other bases to not

17  impose the sentence at the high end of the guidelines as the

18  probation recommended, at least as to your client.  But what you

19  think I might be inclined to misunderstand or not apply won't be

20  a factor at all.  So I want to go ahead with today's proceeding.

21         MR. MAYOCK:  Fine, Your Honor.  If that's the case,

22  we're ready to proceed.

23         THE COURT:  Okay.  Then let's do so.

24         Now did you show to Mr. Day the government's very brief

25  response?

1    MR. MAYOCK:  No, I didn't.  I just read it in court.

2    THE COURT:  Well, I want you --

3    MR. MAYOCK:  I have discussed some of the factors with

4    him.

5    THE COURT:  Mr. Day, do you feel that based upon what

6    Mr. Mayock summarized to you after he this afternoon for the

7    first time read the government's opposition to your position

8    about sentencing, do you feel that you understand what the

9    government's position is?

10   DEFENDANT DAY:  Yes.  Yes, Your Honor.

11   THE COURT:  Okay.  Then I don't think it's necessary

12   even to take a short break for Mr. Day to read that.  And it's

13   pretty straightforward anyway.  So we're going to proceed now

14   and let me start by saying this.  Obviously both sides have read

15   the presentence report.  So have I.

16   On Mr. Day's behalf, Mr. Mayock has made a number of

17   points and I'm going to recite those and then give you an

18   opportunity, Mr. Mayock, to supplement those by giving you a

19   focus and that focus will be my response to it.  The way to do

20   this most efficiently and Mr. Newman, I want you to listen to

21   what I'm saying because this is going to be applicable to your

22   client as well.

23   After careful review of the way that the presentence

24   report and the recommendation characterize the guideline range,

25   I believe that there is a more precise way of stating it.  And

10

1    this is the way it should be stated and this is the way I

2    believe the range is as presented by the probation office.

3            Your client, Mr. Mayock, has pled guilty to all three

4    counts.  Mr. Bell pleaded only to Counts 2 and 3.  As to

5    Mr. Day, the guideline sentencing range really is between 188

6    and 235 months.  Well, at least as to Mr. Bell it is.  Let's

7    take his to begin with.  That's on Count 2.  Plus an additional

8    84 months consecutive for Count 3.  That means that the

9    guideline range is 272 months at the downward end, at the low

10   end, and 319 months at the high end.

11           For your client, Mr. Mayock, who is dealing with a

12   guilty plea to all three counts, it comes out much the same, but

13   the calculation is a little bit different.  There is 60 months

14   on Count 1 -- excuse me.  There is a range on Count 2 of just

15   what it is for Mr. Bell, between 188 months and 235 months.

16   There is a range, not a range, but a consecutive sentence

17   mandated on Count 3 of 84 months.  Those two counts wind up

18   being at the range of 272 months to 319 months and that's the

19   range that I have calculated for purposes of figuring out what

20   is the fair sentence for your client as well.

21           As to the first count, for Mr. Day I would like to ask

22   our representative from the probation office whether that

23   changes the range given that there's a third count.

24           THE PROBATION OFFICER:  It does not change the

25   guideline range; however, the sentencing mandatory maximum is 60

11

1    months.   And then on that particular count your cap is 60

2    months.

3            THE COURT:   Okay.   So the range will be the same,

4    Mr. Mayock.

5            MR. MAYOCK:   Yes.

6            THE COURT:   Now getting back then to the positions that

7    you have asserted, Mr. Mayock, you believe that the criminal

8    history is overstated.   And essentially as I construe and

9    understand your argument, it's because your client after appeal

10   was sentenced to a 16-month sentence, had already served 27

11   months before the weapon component of the conviction was

12   reversed and really was being sentenced for mere possession, not

13   mere possession for sale.   But the offense occurred when he was

14   young and that to consider it to be a basis for career offender

15   status is unfair and distorts what is in fact the true situation

16   in terms of the prior criminal history.

17           Secondly, you have made an eloquent argument for a

18   departure based on what you classify as post-traumatic stress

19   syndrome and that gets us to the unique situation of the

20   father's apparent slaying of the mother.   And coupled with that,

21   you point to a different classification arising out of the I

22   think the same concept and the same facts and that's that he

23   suffered extraordinary abuse as a child.

24           As to the criminal history factor, I think that I'm

25   inclined to accept Mr. Brown's response to that.   I think that

12

1   the circumstances of the offense and the nature of the drug that

2   was being possessed unquestionably make it appropriate to serve

3   as the basis for career offender status.  I do want you to

4   address that in light of what the government has said.

5          As to the request for departure, what most, what I find

6   to be most noteworthy is that Dr. Maloney's report itself and he

7   had two reports and I read them both, every word of both of

8   them.  He said that it couldn't be argued that these awful

9   events caused Mr. Day to engage in, quote, "the illegal and

10  problematical behavior."  He said -- and this is also a quote --

11  "He certainly does not present with any significant symptoms of

12  a major mental disturbance."

13         I went and looked at not only the provisions you've

14  cited, but 5(k)(2.13) which is the guideline provision relating

15  to diminished capacity.  And then that speaks in terms of a

16  significant impairment, significantly impaired ability to

17  understand the wrongfulness of the behavior or to control the

18  behavior that the defendant knows is wrongful.  And neither

19  component of what would be significantly reduced capacity has

20  been established by Dr. Maloney's report.

21         So although I think there are considerations that

22  militate in favor of not sentencing Mr. Day to the 319 months

23  that the probation office recommended -- and I'll give you a

24  chance to be heard about that too, Mr. Brown -- and although I

25  acknowledge that under the Brown decision where the Ninth

13

1    Circuit clarified a misunderstanding that Judge Tevrizian had, I

2    would have the discretion, if I thought it was warranted, to

3    make a departure, I decline to do so tentatively.

4         I'll listen to both of you, you and your client.  For

5    the reasons that I have indicated, I don't think a departure is

6    warranted under the evidence before me.  It is presumptively

7    discouraged.  Disadvantaged upbringing and psychological trauma

8    such as this are not presumptively the basis.  I think that the

9    guideline range as I have defined it and refined it is the range

10   within which the sentence should be imposed.

11        So that's my attempt, Mr. Mayock, to give you guidance.

12   You need to know, Mr. Day, that you have a right to speak to me.

13   I have been addressing your lawyer inkind of technical terms and

14   that's inevitable because that's what the guidelines require a

15   judge to do.  It's just the way they're structured.  But I do

16   want to hear from you.  And with that I'll give the lawyers a

17   chance to be heard now.

18        Go ahead, Mr. Mayock.

19        MR. MAYOCK:  Thank you, Your Honor.

20        The first point that I would want to make, and I will

21   focus these points on the departure, there are admittedly

22   categories that have been set forth in the sentencing

23   guidelines, particularly the 5(h)(1) sequence.  The prosecution

24   has said that family ties is not ordinarily a basis for

25   departure and that under 5(h)(1.2) lack of guidance and a

69

14

1   disadvantaged upbringing is not relevant.  They cite those and

2   they also cite a lack of guidance case coming from another

3   circuit involving a decision from the Second Circuit about --

4           THE COURT:  A very recent decision.

5           MR. MAYOCK:  Yes, but it's not from this circuit

6   either.  But it's a stepfather killing, being killed.  It

7   doesn't saying anything about whether it was in the presence of

8   the defendant in that case who was apparently eight at the time.

9   Also it was not a mother.  Particularly important and

10  instructive would be the fact that you have a mother who is

11  murdered by her husband.

12          These are the parents of Mr. Day when he's

13  approximately six years old.  And as Dr. Maloney reports, that

14  is a very crucial and important time in any child's life as far

15  as what impact that is going to have on them.  So I would say

16  that even though Revera seems to talk about something that might

17  be significant, it's not relevant.

18          We pointed out in our position paper Section 5(h)(1.3)

19  as mental and emotional condition.  And I analogize that to

20  departures that had been made under the post-traumatic stress

21  syndrome ground.  And essentially as the court has recognized,

22  that is under diminished capacity.  Diminished capacity, as the

23  court I'm sure is recognizing in looking at it, does not deal

24  specifically or allow departures where you have a violent act

25  taking place.  But we're not asking in this case for any

15

1    departure based on that basis.

2            Rather, what we're asking for and it's specifically

3    mentioned is a downward departure because of extraordinary abuse

4    suffered by the defendant as a child.  I would suggest that does

5    not come within the compass of family ties.  It does not come

6    within the compass of lack of guidance either which the

7    prosecutor cites.  Instead we're talking about unchartered

8    waters.  I would talk about this in this way.

9            The Kuhn decision was decided in 1998 as this court is

10   well aware.  In Kuhn they said virtually any appropriate

11   information relevant to a defendant's background, character or

12   conduct could be presented to the court as a basis for a

13   downward departure and the court's discretion was virtually

14   unlimited.  If those bases were presented in an unusual way, the

15   court can depart downward.

16           My suggestion is that extraordinary abuse suffered as a

17   child doesn't directly fall under mental or emotional condition,

18   although that may be the closest.  It doesn't fall under lack of

19   guidance and it doesn't fall under family ties.

20           Instead I think we have to take a look at those

21   sections, these 5(h) sections, and see when they were enacted.

22   Those were enacted in 1991.  If you look at Kuhn, that's a 1998

23   U.S. Supreme Court decision.  Clearly the U.S. Supreme Court

24   could recognize those and in essence gave authorization for a

25   court to create and have a departure where something doesn't fit

16

1   neatly within the box.  And clearly in this case we don't

2   believe the box includes Mr. Day within the family ties or lack

3   of guidance 5(h)(1) groupings.

4         Again I would point out, as the court is well aware,

5   that the Ninth Circuit in the Brown case did consider severe

6   childhood abuse and neglect and a psychologist's report about

7   that childhood trauma as a basis for a downward departure.  And

8   again, forgetting about Brown for a moment but a more recent

9   case, in United States versus Sanchez Rodriguez, the court

10  authorized, an en banc decision, authorized a departure for a

11  career offender along the base offense level where the predicate

12  offense was a very small amount of drugs.  So I'm trying to come

13  around back to this point.

14        I think if we look at this entire situation based on

15  what has happened to my client in his life, you see here's a

16  person who, and I won't reiterate all the points that were made

17  in the paper, who has had a very traumatic, a very difficult

18  life, a life that no one would ever wish upon anyone else, any

19  other human being.

20        And he falls within a scope that is not clearly covered

21  by any of the guidelines and that's why Kuhn would apply.  And

22  that's why under these circumstances too the court could look

23  under the authority of Sanchez Rodriguez for a downward

24  departure.

25        Specifically we've pointed out in looking at this kind

17

1    of case the four building blocks of mental health, the first one

2    being heredity.  And here we've got an individual whose father

3    was diagnosed as a paranoid schizophrenic.  And I've been

4    advised by his uncle, Arthur Day, that in the last couple of

5    months he's attempted to commit suicide.  This is the heredity

6    that Mr. Day has.

7          The second building block is early nurturance.  He

8    didn't get that.  His mother was murdered.  He was shifted from

9    place to place.  And then his father came back when he was

10   probably about nine or ten years old and then raised him based

11   on voices that he heard directing him where to go and put him in

12   incredibly difficult situations in gang infested areas, poor

13   schools.

14         He's had numerous problems with early nurturance which

15   he did not receive.  His traumatic experiences are just

16   overwhelming, start again with the murder and being reared by a

17   paranoid schizophrenic father, clearly that's a traumatic life

18   experience.  And last, the quality of support system.  He

19   doesn't have that.  It's clear he has nothing.  He has on all

20   four building blocks of mental health, he has fallen far, far

21   short.

22         On TV the other night there was a program involving

23   Mike Wallace.  Mike Wallace talked about having depression and

24   what effect it had on him.  But you look at him and you look at

25   other people like Tipper Gore who have had admitted problems

18

1    with chronic depression and you look at what they have as far as

2    the quality of their support systems.  And early nurturance and

3    a lack of traumatic experiences -- I can't say anything about

4    heredity -- but on those bases they're very different.

5           Even though they have mental problems, they don't have

6    the problems with the whole, all four building blocks basically

7    being shattered and falling down.  That's why Mr. Day is very

8    much different than other people who might come in and might

9    make this sort of claim.  On that basis I would respectfully

10   submit to the court that there is a basis for a downward

11   departure because of that and because of these circumstances

12   which are particularly unusual.

13          Turning to the overstated criminal history.  I think

14   Your Honor hit the nail on the head.  You said there were

15   problems that he had in getting an extra 11 months after the

16   case came back.  He entered a guilty plea.  Rather than remain

17   in custody and go through another trial after serving 27 months,

18   he did enter a plea.

19          Clearly the circumstances of that for an immediate

20   release would be a justification for someone to think that the

21   criminal history was over represented, particularly because he

22   had those extra 11 months.  He'd already served above and beyond

23   the maximum that he could possibly get if he were convicted of a

24   charge.

25          At the time he was an 18-year-old youth.  It was a

1    possession only case of powder cocaine which was for personal

2    use.   On that basis I suggest respectfully that the court

3    reconsider the criminal history as being over represented,

4    particularly when you think of the circumstances under which

5    someone at 18 would have the opportunity to go on with his life

6    and the easiest thing to do would be to enter that plea and get

7    released from jail instead of continuing on on the presumptive

8    detention that, as the court is well aware, occurs in drug

9    cases.

10            THE COURT:  Are you basically saying that I should

11   consider your client not have to been factually guilty, that he

12   didn't commit the crime that he wound up pleading to because he

13   pled given the circumstances you've now described?

14            MR. MAYOCK:  Well, I'm saying that under the

15   circumstances rather than go forward with the trial, the case

16   was reversed and tainted parts were thrown out.

17            THE COURT:  Right.

18            MR. MAYOCK:  That was a clear motivating factor as

19   to -- and I'm not saying he didn't enter a plea.  He's never

20   denied that he entered a plea.  But when you look behind the

21   motive for entering that plea, to be released, particularly when

22   you've got a young man who committed this offense at age 18.

23   He's definitely not going to be as thoughtful as someone with

24   more life experiences, particularly more beneficial life

25   experiences than Mr. Day has had in his life, that that's a

20

1    basis for saying over representation or overstating the criminal

2    history occurred.  And if that's the case, I have suggested in

3    our papers that the court consider looking at this as a

4    non-criminal history, a non- --

5         THE COURT:  Non-career offender.

6         MR. MAYOCK:  -- non-career offender case and look at

7    the offense level and consider what the offense level would have

8    been just considering all these factors, and we came up with a

9    calculation if the court did that it would be a guideline

10   range -- and this is a criminal history offense level of 27 that

11   was calculated by the probation officer -- would come out to be,

12   if the court made his criminal history category 4 instead of 5,

13   because it was just on the border of 5, 100 to 125 months plus

14   84 months which would give a sentencing range of 184 to 209

15   months.

16        Clearly that's a very, very substantial sentence.

17   We're not talking about anything that's inconsequential in any

18   way.  That's an awful lot of time and it's a time that would

19   give my client the opportunity, we hope as Dr. Maloney hopes, to

20   receive the kind of counseling that he didn't receive early in

21   life and which he clearly needs and which Dr. Maloney who is a

22   clinical psychologist at the USC Medical School recognizes and I

23   would ask that the court impose that sort of a sentence.

24        THE COURT:  Okay.  Now a couple of questions.  In terms

25   of counseling, I can make a recommendation and it will either

1  become available or not regardless of which alternative proposal

2  I adopt, right?

3       MR. MAYOCK:  That's true, Your Honor.  The Bureau of

4  Prisons has its own authority to do what it wants often.

5       THE COURT:  And I hope he does get the benefit of

6  counseling if he needs it and I'll say so when I pronounce the

7  judgment.

8       Secondly, why don't you address what has been very

9  troubling to me which is the circumstances of the flight.  Your

10  client was the driver.  We could be sitting here, but for the

11  grace of God, with dead victims out there given that incredibly

12  reckless conduct that he displayed in trying to get away from

13  arrest.

14       I know what your arguments are and you've made them

15  very, very eloquently and that's not just trying to pat you on

16  the back.  You've really done a good job.  But you haven't said

17  anything about that and any judge sitting up here is going to be

18  greatly troubled, at least I'm greatly troubled by that.

19       MR. MAYOCK:  I thought that the court might be asking a

20  question like that.  I directed that specific question to my

21  client earlier to ask him what happened.  And that's one of the

22  reasons why the post-traumatic stress analogy and argument was

23  made.  What happens to somebody who has mental problems of this

24  kind and has experienced this kind of life is they just react.

25  They don't sit and contemplate.  They in a stressful situation

22

1   find that they are acting in ways that a normal person wouldn't

2   act.  That's what that entire stress syndrome is all about is

3   that kind of behavior.

4        What he did was he did drive, although there were a

5   couple of parts of the report that are inaccurate.  Initially he

6   did not drive the van away, the vehicle away from the bank.

7   They got in a second vehicle and he was driving that vehicle.

8   That vehicle ended up being chased.  There were --

9        THE COURT:  Don't go into what happened during the

10  chase because it's just going to upset me all over again.  I

11  know how dangerous it was.

12       MR. MAYOCK:  The police were following.  I think there

13  was a helicopter or two as well.  He pulled into a mall and just

14  stopped where the police came up.  He was the only one who

15  remained in the car.  He didn't try to run at that point.

16       He has expressed to me that the concern he had was that

17  he was going to be shot and he felt that if he went to a mall,

18  that by being there where there were a lot of people, he

19  wouldn't get shot by the police.

20       I'm not saying this is clear thinking because clearly

21  it's not.  But it is stressful thinking and it's the kind of

22  thinking that a person who has had the kind of upbringing that

23  my client has maybe engages in.  That's the explanation he's

24  given me about why he stopped there and why he just sat in the

25  car and didn't make any effort to take his hands off the

23

1   steering wheel.  He just brought the car to a stop and made no

2   further effort to run away.

3           THE COURT:  I would like to hear from Mr. Brown before

4   I give Mr. Day a chance to speak with me.  That way you can at

5   least have in mind whatever it is the prosecution is going to

6   say, Mr. Day.

7           MR. Brown.

8           MR. BROWN:  Thank you, Your Honor.

9           First, I have a different explanation for arriving at

10  the mall and that's when you're being chased by a helicopter,

11  you don't really have a lot of options to evade the police on

12  the ground.  Really the only way you're going to be able to get

13  away from them is if you can be someplace where a helicopter

14  can't see you such as inside an enclosed building.

15          There really isn't a better way to flee in hot pursuit

16  than if you can blend in with the crowd.  And the fact that he

17  did not continue to flee after he stopped the car, I attribute

18  to the fact that the police were right on him and he didn't have

19  an opportunity and that his co-conspirator who was not driving

20  and was therefore able to leave the car more quickly only got a

21  few feet before being captured by the police.

22          THE COURT:  Mr. Brown, what I would find most

23  productive in terms of your response is the issue of whether he

24  he's a career offender and how to deal with that first

25  conviction for the cocaine.

24

1          MR. BROWN:  Okay.  Well, Your Honor, he pled guilty to

2     possession of cocaine with the intent to distribute which is

3     clearly a predicate felony under the guidelines.  And the

4     offense was actually a very serious one.  There were three

5     separate firearms found in the house in which he was hiding.

6          THE COURT:  But in the end, he wasn't convicted of

7     anything related to those firearms; is that correct?

8          MR. BROWN:  No.  His conviction for possession of a

9     firearm during the drug trafficking crime was reversed on

10    appeal.  But it's not necessary that he be convicted of a

11    firearms offense in order for the conviction to count as a

12    predicate felony.

13         And here it's the defendant's burden to prove that his

14    criminal history is overstated.  And all the defendant has said

15    is well, he may have had a reason to plead to an offense that he

16    didn't in fact commit.  The defendant certainly hasn't said

17    that.  There's certainly no evidence.  This is merely a lawyer's

18    speculation as to what happened.

19         All we know for a fact is that he pled guilty to a drug

20    trafficking offense.  Not only that, but there were very serious

21    circumstances surrounding it, including the shooting of a police

22    officer.  So I don't think that there's any way to get around,

23    even if Your Honor was inclined to go there, the defendant

24    certainly has not carried his burden.  There's nothing that

25    indicates that the count of conviction is an accurate one.

25

1    Moreover, I think that the history of the defendant

2    shows that a departure on criminal history access would be

3    inappropriate because of the danger he poses to the community,

4    which I think is the most serious factor warranting a sentence

5    at the high end.   The defendant has numerous involvements with

6    firearms.   In Paragraphs 59, 66, 73 and 84 there's all the

7    defendant involved with firearms.

8          Let's just take one of those, for instance Paragraph

9    84, where he was not actually charged with this.   He was

10   arrested for being a felon in possession of a firearm in January

11   of 1994.   Your Honor, that was just months before he then got

12   convicted of armed bank robbery where he had a pistol that the

13   teller saw tucked into his belt.   And now, Your Honor, he gets

14   out of prison in mid-1998 and then in the beginning of 1999 he's

15   again arrested for armed bank robbery.   This time two

16   defendants, two firearms.   I think with his history of

17   involvement in firearms, the court should decline any departure

18   in the court's discretion because he's simply a danger to the

19   community.

20         Whether he's going to kill somebody for recklessly

21   fleeing from a crime or whether he's going to kill somebody with

22   the firearms that he uses time and again is immaterial.   The

23   fact of the matter is, he's an extremely dangerous man.   He's

24   had two opportunities to turn his life around in prison and each

25   time all he's done is get involved in ever-escalating crimes in

26

1   terms of their seriousness.

2           THE COURT:  Just for the sake of analytical precision,

3   do you construe Mr. Mayock's arguments relating to the career

4   offender status as a request for a departure?

5           MR. BROWN:  That is how I understood it, Your Honor.

6           THE COURT:  Okay.  I understood it slightly differently

7   as a request for a correction in terms of the calculation.

8   Which did you intend it to be, Mr. Mayock?

9           MR. MAYOCK:  As a departure.  That's why I was citing

10  the Sanchez Rodriguez case.

11          THE COURT:  Okay.  Anything further, Mr. Brown?

12          MR. BROWN:  No, Your Honor.

13          THE COURT:  Okay.  Thank you.

14          Mr. Day, would you like to say anything to me?  You

15  have a right to do it and sometimes it's very helpful to a

16  judge.  So feel free to do it if you choose.

17          THE DEFENDANT:  Your Honor, I'm not going to try to

18  make excuses for what I've done wrong.  I admit to what I did

19  wrong in this case and in the last bank robbery.

20          I pled guilty to unarmed bank robbery which I did

21  commit.  And I went to trial and the jury found me guilty of not

22  having a gun because -- not because they just didn't believe,

23  because they believed me, but they found me not guilty of not

24  having a gun because I didn't have one and because the people

25  had doubt.

27

1    They wasn't sure where I brought my bag from.  They

2    couldn't say.  They said I had a bag with blue and brown writing

3    on the bag and they said the gun was blue and brown.  When they

4    asked where was that, where did I get it, they didn't even know.

5    Well, we don't know, he just had it in his hand; one minute he

6    did, one minute he didn't.

7         But I didn't have a gun.  That's what I pled guilty

8    immediately.  When my lawyer told me, I said I'll plead guilty

9    to the robbery.  I did it.  I was desperate and in the act of

10   impulse I went into Wells Fargo.  I banked at Wells Fargo.  I

11   had about $12 in my account.  My wife was -- my fiancee was

12   pregnant.  The rent was due.  I walked into there and I said

13   give me the money.  I did that.  That was just stupidity and it

14   was done -- it was just stupidity.

15        The first criminal case that I have, the possession

16   with intent to distribute powder cocaine, I was visiting a

17   friend's house.  I was in the back room where there was no guns

18   with a lady.  There was no drugs found in that room.  The guy

19   who shot the police was in a totally different room with the gun

20   that belonged to his girlfriend.  Okay?

21        The cocaine that they found was found in a can inside

22   of a bathroom.  There was no evidence in the whole trial against

23   me being a drug dealer of any sort in there.  There was nobody

24   said that I sold drugs.  It was they were saying that the guy

25   that lived there sold the drugs.

28

1          I was visiting, the girl that was with me was visiting

2     that house.  And the Appeals Court overturned the case because

3     of the lack of evidence in the trial, not just because of the

4     judge's ruling in the argument, but because of a lack of

5     evidence also.  And I pled guilty because they told me I was

6     going to go home.  When they said you plead guilty you go home

7     tomorrow.  I mean, I've already been in prison two years, over

8     two years.  I pled guilty.  I didn't know that this would do

9     this to me later.

10         This case right here, this was stupidity.  I mean, this

11    was just -- I don't know why.  I don't know where the impulse,

12    why I just allowed myself to do something this stupid.  Running

13    from the police, I was scared.  The police was pulling guns out

14    on us.  Every time we turned a corner they were coming out their

15    cars pointing guns.  We were ducking.  I didn't want to get

16    shot.

17         There was no guns in the car when the police finally

18    caught up to us.  And I ran because I did not want to get shot.

19    I did not want them to shoot us because I know they're coming

20    because of the armed bank robbery.  I don't want them to shoot

21    me.  I'm trying to get away.  I don't want no guns in the car.

22         I don't want to get killed.  I don't want to get

23    killed.  I pulled into the parking lot because I know there's a

24    lot of cars there, there's a lot of people there.  I'm hoping

25    they're not going to open fire.  I didn't jump out of the car

29

1   because I don't want to get killed.

2          THE COURT:  A couple of people got hit by the car,

3   didn't they?

4          THE DEFENDANT:  I had an accident in the intersection.

5   A light turned red on me and I was going so fast I slid on the

6   brakes.  I couldn't stop and I wish I could apologize to the

7   person.

8          THE COURT:  You hit one car and that car hit a second

9   car, right?

10         THE DEFENDANT:  Yes.  I hit the back of a burgundy,

11  dark burgundy mini van.  I remember it clear as day.  And that

12  car slid and hit the front of another car that was turning

13  right, making a right-hand corner.  I mean I stopped for a

14  second and all I could think about was the police was going to

15  shoot me.  So I proceeded on.

16         I didn't get out -- I wasn't trying to run from them as

17  far as -- I knew I couldn't get away from no helicopter.  I know

18  once the helicopter's on you, you're going to jail.  But I

19  didn't want them to shoot me and I kept driving around looking

20  for somewhere where it was populated that I could go to to keep

21  them from killing me.  That's all I could think of.  I didn't

22  want them to shoot me and kill me.

23         I mean, I can't ask -- I'm not asking, Your Honor, I'm

24  not asking you give me leniency because I didn't do anything

25  wrong or because I don't deserve to be punished.  I agree.  I

30

1   accept the fact that I deserve to be punished.  I pled guilty

2   with no plea agreement, not because I was going to get a

3   benefit.  I didn't get a benefit from the plea.  I pled guilty

4   because I know I was guilty.  There was no benefit offered to

5   me.  No deal.  There was no deal.  I pled guilty because I know

6   I was guilty.  I know I was caught dead bang doing what I was

7   doing.

8            As far as my childhood, Your Honor, that's something

9   that I don't normally discuss.  I don't normally even tell

10  people.  I have friends that's known me for years that don't

11  know my father killed my mother.  And they don't know because

12  that's something that I don't talk about and I don't think is

13  any of their business.

14           I didn't tell none -- I never told anybody about it

15  until -- I didn't tell -- my fiancee told my lawyer the last

16  time I had a case when my lawyer talked about the issue.  I just

17  didn't want to push the issue because it's something that I have

18  been dealing with all my life.  And I have never known how to

19  deal with it.  It's not something that -- I mean, it's just

20  something I've never known how to deal with it.

21           I'm asking for leniency not because I want to go home.

22  Because I don't feel that I deserve that much time.  Because I

23  didn't make -- the mistakes that I made, a lot of it was made

24  out of impulses.  The robbery of the bank was pure impulse.  I

25  was visiting a friend which bad company brings about problems, I

31

1   agree.  And this robbery right here was a stupid mistake.  But I

2   know maybe one day I'll have the opportunity, I don't know.

3          Maybe I could write a letter and apologize to the

4   people in the car.  I would like to apologize to the people in

5   the bank because I know they were scared.  Even the teller in

6   the bank, I told -- not the teller, but the security guard, he

7   had his hands up.  I said put your hands down, man, I'm not

8   going to do anything to you, man.  Because I had no intentions

9   of physically hurting anybody.  I needed some money.

10          My father after the FBI went and talked to my father,

11   they got my father attempting suicide.  My family had to move

12   him back out of town.  And now I'm going through more.  I've got

13   more pain from my personal life than I do about being in jail.

14          THE COURT:  Well, I understand the impact of that and I

15   also understand as best as somebody who is a total stranger to

16   you can from a very different perspective why the trauma of your

17   childhood or at least the experience of your childhood is not

18   something you quickly or routinely talk about.  I really hear

19   you on that.

20          Is there anything further that you think I need to

21   know?

22          THE DEFENDANT:  I mean, I think you have more than

23   enough in front of you to take your judgment, Your Honor.  I

24   would just like to apologize to those that I've hurt.  I mean,

25   the people inside the bank and the people that I ran into their

32

1    cars and the person that was involved in it and the trauma that

2    I brought upon them.

3            As I started to say about post-traumatic stress

4    disorder, I realize the trauma that I put people in by the

5    things that I've done.  And I just hope that it doesn't affect

6    them like it's affected me.  And there's nothing else I have to

7    say, Your Honor.  Thank you for your time.

8            THE COURT:  All right.  I find that the guideline range

9    is what I stated.  The low end would be 272 and the high end

10   would be 319, taking into account the mandatory consecutive 84

11   months on Count 3.  I am not going to depart of either of the

12   bases that Mr. Day or his lawyer ask for and here's why.

13           As to whether or not the prior criminal record

14   overstates the seriousness of Mr. Day's offenses or distorts his

15   criminal profile, I think that the real question at its core is

16   what kind of risk to society does the prior history suggest

17   should be a factor for classification and for purposes of

18   sentencing.  And I don't think that Mr. Day's history can be

19   looked at only in terms of the possession with intent to

20   distribute offense and the current charge before me and the

21   prior bank robbery before that.

22           There is a pattern of criminal behavior.  It's

23   reflected in the probation report only in part in the sections

24   that Mr. Brown pointed to.  I think that the fact that he was 18

25   when the cocaine offense occurred is a factor that affects where

33

1    I come out on the guidelines.  I find that the particular

2    details of this offense and the explanation that Mr. Day just

3    gave me for what happened during the attempted flight reflect a

4    couple of factors that actually incline me not to depart.

5         Mr. Day's own statements are understandable.  Not

6    wanting to be shot is a basic and very survival instinct that we

7    all, almost all of us have.  But the choice that he made to

8    attempt to protect himself was made at the expense of society

9    and I'm afraid that that would be the choice he would make in

10   comparable circumstances in the future until and unless he can

11   get either the counseling or the treatment or the self insight

12   that would enable him to balance his interests as he perceives

13   them, his fears as he feels them with the interest and the fears

14   and the needs and the rights of other people, particularly other

15   innocent people.

16        So while I would have the discretion to accept

17   Mr. Mayock's requested departure on the seriousness of the

18   offense and whether or not Mr. Day should be classified as a

19   career offender, I decline to do so.

20        With respect to the impact of what happened when

21   Mr. Day was five or six, it's astonishing that someone could be

22   as strong as you appear to be, Mr. Day.  I don't want you to

23   think I'm holding that against you.  But in fact, I admire that

24   you can stand before me and speak to me in a really unusually

25   articulate way.  You can deal with something in public that

34

1    slices anybody to the bone and that you can be capable of

2    alternative behavior in light of that.

3        The information that Mr. Mayock attempted to get and

4    that in fact was provided by the doctor doesn't support the

5    factors that Mr. Mayock pointed to.  He has done what a good

6    lawyer should try to do and that is develop a basis for a

7    departure that isn't focused on any particular ground but

8    combines all of them and would make the whole greater than the

9    sum of its parts.

10       I don't say that to demean your argument, Mr. Mayock.

11   But that's the way I think it comes over.  And I'm trying to

12   look at the whole here.  And the whole that I see is somebody

13   who had other alternatives, even -- what I understand from the

14   probation reports -- in terms of the Seventh Day Adventist

15   suffering that you were exposed to, the several years of

16   non-criminal, non-violent, non-suicidal behavior on the part of

17   your father, you had opportunities, that you didn't have the

18   opportunities that many other people in society have, that I may

19   have had is unfortunate, but it doesn't require or authorize a

20   judge to say I'm going to depart downward from these factors.

21       And for those reasons and even given the recognition

22   that I'm now reflecting that I could do it, I decline to do it.

23   But I'm not going to sentence you to the 319 months.  I don't

24   think that that would be appropriate for a number of reasons.

25   And those reasons need to be expressed because the range of the

1    guidelines here is in excess of 24 months.

2         Unlike Mr. Bell, Mr. Day is a younger man.  There's an

3    opportunity that if the message is correct and if it's

4    calibrated, if I came out with something that is appropriate and

5    you may not be ever in agreement with that either today,

6    tomorrow or ten years from now.  But what I'm trying to do is

7    reflect the seriousness of your conduct to the potential for you

8    to do better.

9         To simply and routinely give you what I'm authorized to

10   because of what you did, which is incredibly serious and not

11   just an isolated event, I think would be a mistake.  I think

12   that you need to be given a hope and I'm trying to give you the

13   basis to hope that there is some opportunity, particularly at

14   your relatively young age.  You'll be in jail no matter whether

15   I bought and accepted every argument that Mr. Mayock made.  The

16   term would be lengthy even at that classification.

17        I haven't accepted his argument.  But I don't want you

18   to think that I'm putting you in the same boat as Mr. Bell or

19   that I would just take all of the significant and very

20   compelling circumstances and say this is a bad guy, I'll give

21   him the highest end of the range I'm authorized to consider.

22   That is what I'm not going to do.  So that's the reason for the

23   sentence that I'm now about to impose and here is the sentence.

24        Pursuant to Section 5E1.2, Subsection A of the

25   guidelines -- Mr. Brown?

36

1    MR. BROWN: Yes, Your Honor. I apologize if I missed

2 this, but I don't believe Your Honor has inquired whether the

3 defendant and defense counsel reviewed and discussed the

4 presentence report as is required under Rule 32(c)(3)(A). I

5 also don't whether -- I don't believe Your Honor has adopted the

6 findings of the presentence report.

7    THE COURT: Well, I will get to the findings in a

8 minute. I have not adopted the findings in terms of the way the

9 range has been reflected. I don't understand exactly what the

10 basis is for a potential life sentence. Neither lawyer has

11 addressed that. I've looked into that and I'm aware of at least

12 one decision, a Ninth Circuit decision, that says in essence if

13 there is a mandatory minimum and no max, a life sentence can be

14 implied as the max.

15    But that's under 924 Subsection E, not under 924(c).

16 So I don't know what the basis is for considering that there was

17 a potential upward range of a life sentence here. For that

18 reason I'm not accepting their findings. But as reflected and

19 corrected, and I thought I did this adequately at the beginning,

20 I accept their findings and their calculations.

21    In terms of the review of the report, I thought we had

22 gone over that. Mr. Mayock and Mr. Day, you have had a chance

23 to review the presentence report; is that correct?

24    MR. MAYOCK: It is, Your Honor.

25    THE COURT: And you and at least the government's

37

1    response to your opposition, correct?

2             MR. MAYOCK:  Yes, Your Honor.

3             THE COURT:  Is there any basis that you can think of

4    procedurally why it is not timely for me to impose sentence?

5             MR. MAYOCK:  No, Your Honor, no legal cause.

6             THE COURT:  Okay.  Pursuant to Section 5E1.2 of the

7    guidelines, all fines are waived because I find that Mr. Day

8    does not have the ability to pay a fine.  It is ordered that the

9    defendant shall pay to the United States a special assessment of

10   $300 which is due immediately to the clerk of the court.

11            Pursuant to the Sentencing Reform Act of 1984 it is the

12   judgment of the court that the defendant Mr. Montez Day is

13   hereby committed on Counts 1, 2 and 3 of the indictment to the

14   custody of the Bureau of Prisons to be imprisoned for a term of

15   288 months.  That is 24 years.  This term consists of -- I have

16   to break this down.  A combined -- Mr. Brown?

17            MR. BROWN:  No, Your Honor.  I was just going to break

18   it down.

19            THE COURT:  How were you going to break it down?

20            MR. BROWN:  60 months on Count 1 to be run concurrently

21   with 204 months on Count 2, followed by a mandatory consecutive

22   term of 84 months.

23            THE COURT:  Yes.  Well, that's what I had scoped out

24   and that's the basis for the calculation of 288.

25            Upon release from imprisonment, Mr. Day shall be placed

38

1   on supervised release for a term of five years.   This term

2   consists of three years on Count 1 and five years on Counts 2

3   and 3, with all those terms to be served concurrently and under

4   these conditions and terms.

5           First, Mr. Day shall comply with the rules and

6   regulations of the U.S. Probation Office and General Order 318.

7   Second, he shall participate in outpatient substance abuse

8   treatment and submit to drug and alcohol testing as instructed

9   by the probation officer.   Mr. Day shall abstain from using

10  elicit drugs, alcohol and abusing prescription medications

11  during the period of supervision.   During the period of

12  community supervision the defendant shall pay a special

13  assessment in accordance with this judgment's orders pertaining

14  to such payment.

15          The defendant shall participate in a psychological

16  psychiatric counseling or treatment program as approved and

17  directed by the probation office.   And the defendant shall not

18  obtain or possess any driver's license, social security number,

19  birth certificate, passport or any other form of identification

20  without the prior written approval of the probation officer.

21  And he shall not use for any purpose or in any manner any name

22  other than his true legal name.

23          Now you have a right to appeal this sentence, Mr. Day.

24  And if you do so, you need to do so within ten days from today.

25  Please speak to Mr. Mayock who will give you all of the

39

1   information you need on how to prosecute an appeal from the

2   sentence that I've now imposed.  And if you are in doubt and

3   need to know this, if you cannot afford to have Mr. Mayock

4   represent you on appeal, he will continue to be appointed at no

5   cost to you.

6          Now there are no counts to dismiss; is that right,

7   Mr. Brown?

8          MR. BROWN:  That's right, Your Honor.

9          THE COURT:  Okay.  Is there anything further that needs

10  to be addressed?

11         MR. MAYOCK:  Yes, Your Honor.  I believe you said that

12  with respect to the supervised release each of the terms were to

13  run concurrently.  But I don't know if you said that with

14  respect to the 60-month, 204-month and 84-month sentence.  Those

15  are consecutive or concurrent?

16         THE COURT:  Well, the 84 months is consecutive.

17         MR. MAYOCK:  The 60 then is a concurrent sentence; is

18  that correct?  I just wanted to make sure because otherwise the

19  Bureau of Prisons will run every sentence, if there's no record,

20  it runs consecutively.

21         THE COURT:  I'm not sure how to --

22         MR. BROWN:  Count 1, the 60-month term, runs concurrent

23  with Count 2, the 204-month term.

24         THE COURT:  And that's what my findings were.

25         MR. MAYOCK:  And then the 84-month term for the 924(C)

40

1   is consecutive.

2           THE COURT:  Right.  All right.  Thank you.

3           MR. MAYOCK:  Thank you, Your Honor.

4           THE COURT:  Now let's turn to Mr. Bell, please.

5           Okay.  Mr. Bell and Mr. Newman, have you had a chance

6   to review what you needed to?

7           MR. NEWMAN:  We have, Your Honor.

8           THE COURT:  Can you think of any reason why I should

9   not impose the sentence?

10          MR. NEWMAN:  No, Your Honor.

11          THE COURT:  Okay.  Did you understand -- did you listen

12  to and understand what I said concerning the way I believe that

13  the calculations need to be articulated?

14          MR. NEWMAN:  Yes, Your Honor.

15          THE COURT:  Okay.  Now I would like to proceed much as

16  I did with Mr. Day and that is to give you, Mr. Newman, a chance

17  to understand what my take is on your arguments.  Then you can

18  address those in your oral arguments.  Your client will be given

19  an opportunity also.

20          You have seen, Mr. Newman, that to the extent you are

21  objecting to the references in the presentence report concerning

22  the uncharged bank robberies, those have been modified and

23  changed.  And I want you to know I truly have not taken those

24  into account.

25          MR. NEWMAN:  I understand.

41

1        THE COURT:  I don't have basis to consider that your

2   client committed those robberies and I don't think that he

3   should be treated that way and I haven't treated him that way in

4   my provisional thinking.  So I want you to be clear about that.

5        To the extent that much of your position is based upon

6   Mr. Bell's designation as a career offender, it is that he was

7   not serving a sentence within the 15-year period that is the

8   outer scope.  I think that the government's assessment of what

9   really happened, and it may be the probation officer's

10  assessment is correct too, he began serving a sentence on August

11  6th, 1981.  That was aggregated.  It was 30-plus year sentence.

12       The fact that he has chosen not to return from the day

13  of release was built into the sentence.  It was basically for

14  the unauthorized escape.  And had he not escaped, he'd have been

15  in custody past the start date which is January 29th in 1984.

16       I believe that the calculation is correct.  I believe

17  that the reasons for the calculation make sense in this

18  particular case.  I am not inclined to adopt your contention

19  that he should not be classified as a career offender.

20       You have also moved for a downward departure because

21  your client didn't wield a semi-automatic weapon, but instead a

22  .38 caliber weapon.  I have no difficulty whatsoever in

23  rejecting that basis for a departure.  Just because there's no

24  basis for departing upward under 5K2.17 doesn't mean and doesn't

25  justify flipping that concept and granting your client a

42

1    downward departure.

2         As to the relatively recent issue concerning his mental

3    status and his capacity, I have looked at Dr. St. John's report

4    and the diagnosis is what I think I'm required to pay most

5    attention to.  The diagnosis is that Mr. Bell had borderline

6    intellectual functioning.

7         But the report itself makes it clear that while

8    immature, your client was capable of distinguishing right from

9    wrong and I don't find any basis, none, in the evidence before

10   me to suggest that the classification or the diagnosis that your

11   expert has come up with of being borderline intellectual, being

12   in the borderline intellectual functioning status warrants any

13   special consideration given the nature of this conduct.  So

14   those are my initial reactions to the contentions that you have

15   asserted in response to the presentence report.

16        So that this transcript can stand alone and the Court

17   of Appeals can have a basis to evaluate from where I'm coming

18   from and how I've approached this sentencing, let me reiterate

19   what I said earlier this afternoon as to the co-defendant

20   Mr. Day.  I think that the correct way of assessing the

21   guidelines, and your client is being sentenced only on Counts 2

22   and 3, is that the range for Count 2 is 188 months to 235

23   months.  Count 3 brings a mandatory consecutive period of 84

24   months.  So correctly stated the range would really be 272

25   months to 319 months.