1

1     IN THE UNITED STATES DISTRICT COURT

2

3     CENTRAL DISTRICT OF CALIFORNIA

4
                    - - -
5
        THE HONORABLE A. HOWARD MATZ, JUDGE PRESIDING
6
                    - - -
7

8

9
        ------------------------------
10    UNITED STATES OF AMERICA,        )
                      PLAINTIFF,        )
11             -v-                      )    CASE NO. CR 99-123-AHM
        BRUCE BELL,                     )
12                    DEFENDANT.        )
        ------------------------------
13

14                              COPY

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS
                 LOS ANGELES, CALIFORNIA
17               MONDAY, OCTOBER 25, 1999

18

19

20

21

22

23                    LYNNE SMITH
               OFFICIAL COURT REPORTER
24           UNITED STATES DISTRICT COURT
             312 NORTH SPRING STREET, #430
25           LOS ANGELES, CALIFORNIA  90012

1

APPEARANCES:

2

ON BEHALF OF PLAINTIFF:
3    ALEJANDRO MAYORKAS
UNITED STATES ATTORNEY
4    BY:  ANDREW BROWN
ASSISTANT UNITED STATES ATTORNEY
5    312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA    90012

6

7

8

ON BEHALF OF DEFENDANT:
9    BRIAN NEWMAN
400 CORPORATE POINTE, #805
10    CULVER CITY, CALIFORNIA  90230

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              MONDAY, OCTOBER 25, 1999; LOS ANGELES, CALIFORNIA

 2                              -000-

 3         THE CLERK:  CR 99-123-AHM, U.S.A. versus Montez Day and

 4    Bruce Bell.

 5         Appearances, counsel.

 6         MR. BROWN:  Good afternoon, Your Honor.  Andrew Brown

 7    for the government.

 8         THE COURT:  Good afternoon, Mr. Brown.

 9         MR. NEWMAN:  Good afternoon, Your Honor.  Brian Newman

10    for Mr. Bell who is present in court.

11         MR. MAYOCK:  Good afternoon, Your Honor.  Michael

12    Mayock on behalf of Montez Day who likewise is present.

13         THE COURT:  Good afternoon to all four of you.

14         All right.  We're here for the pronouncement of

15    judgment and the sentence on both Mr. Day and Mr. Bell.  I would

16    like to do Mr. Bell first.

17         MR. NEWMAN:  Your Honor, on behalf of Mr. Bell, HE has

18    asked for a further continuance of today's sentencing.  The

19    reason for the continuance -- and we would ask that a short

20    continuance of no more than a week -- is because of a flurry of

21    last-minute responses to my arguments by the probation office

22    which I didn't receive until late I believe Thursday, and also

23    had not gotten the psychiatric report until Tuesday, I think it

24    was Tuesday of last week, none of which Mr. Bell has had an

25    opportunity to even see.
```

```
 1              So we were talking about he would like the opportunity
 2    to see those reports and give me input considering the fact that
 3    I think the structural issue that we're going to be addressing,
 4    Your Honor, today is the core, whether Mr. Bell is actually a
 5    career offender or not.  These differences in sentencing between
 6    whether he is or he isn't is very significant.
 7              THE COURT:  What does the psychiatric report then have
 8    to do with whether he's a career offender?
 9              MR. NEWMAN:  Well, that doesn't.  He has not seen that
10    report.  And that is not the foundation for my request for a
11    week continuance.
12              THE COURT:  All right.  Well, that's what you said
13    though.
14              MR. NEWMAN:  I'm sorry.
15              THE COURT:  And I'm really not inclined to drag this
16    out any further.
17              Mr. Brown.
18              MR. BROWN:  Your Honor, I just wanted to object to the
19    continuance.  We had the change of plea on May 14th.  It's been
20    five-and-a-half months.  The late filings have been caused by
21    the defendant who filed his papers just days before the hearing
22    putting great strain on the government, the court and the
23    probation office in filing responses within 24 hours so that
24    people would have them.
25              And if he wanted to be sentenced second today to give
```

1    him a chance to go over the probation officer's responses, the

2    government wouldn't object to that.  But the reply from the

3    probation office to his papers, they are minuscule changes.

4    They basically just reiterated their earlier position.  So I

5    don't see that there's some big new thing that he needs to read

6    before the sentencing.

7        THE COURT:  Okay.  Well, I was just going to suggest

8    that you give your -- and I'll go first with Mr. Bell, with Mr.

9    Day.  Sit down.  You can do it at that table in the back so

10   you're not distracted.  You can show him these very skimpy

11   items.  They won't take long to review.  You can explain them to

12   him.  They don't address what you tell me is going to be the

13   principal focus of your argument anyway.

14       I have given both sides so many extensions and so many

15   opportunities to build their case and I have too many other

16   sentences on for next week to continue this again.  So I'm going

17   to deny that request.

18       MR. NEWMAN:  I understand, Your Honor.  But for the

19   record, a lot of the continuance or extensions were because for

20   some reason the Bureau of Prisons moved Mr. Bell to Oklahoma, if

21   the court recalls, and it took a while to find him and to get

22   him back.

23       THE COURT:  Let me make it clear to both you and Mr.

24   Bell, I'm not holding that against him in terms of your request

25   now.  I'm simply reflecting that this has gone on for a long

1    time.  You've both had an opportunity to meet with other each

2    and coordinate with each other.  And I think you'll both have

3    the full opportunity to be heard.  So I'll take Mr. Day first,

4    but that won't take all that long.  So be efficient in showing

5    this material to your client.

6              MR. NEWMAN:  I will, Your Honor.

7              THE COURT:  Don't tell me you're going to seek a

8    continuance, Mr. Mayock.

9              MR. MAYOCK:  Well, perhaps, Your Honor.  There was a

10   little bit of a miss in the communications.  Apparently

11   Mr. Brown had filed and FAXed a response to my position paper,

12   which admittedly I didn't file until Wednesday of last week as

13   your court stamp will indicate.

14             However, it will also indicate inside the attachment

15   that it was at that time that I was getting a copy from the

16   psychologist, a report, and I waited for that report.  That was

17   the basis for the delay waiting for that.

18             But in any event, going back to the issue, I did not

19   receive a copy of the government's opposition.  There was a FAX

20   number that I had about four or five years ago.  And apparently

21   there was a FAX that was transmitted, that's happened in the

22   past.

23             Unless Mr. Brown has that document showing the FAX

24   number, it's a FAX of a firm that used to be on the same floor

25   where I was and I didn't get it in any event.

7

1          THE COURT:  When did you get it?

2          MR. MAYOCK:  I just was able to read his in court

3     today.  And the problem that I have is this.  Essentially my

4     client has advised me and I saw nothing to contradict this that

5     the early conviction, the first conviction was for powder

6     cocaine, not crack cocaine.

7          And secondly, there was an objection to unsworn

8     statements of the defendant.  Now if there's going to be some

9     allegation that his father was not arrested and actually

10     convicted for murdering his mother, we can get court records if

11     that's what the prosecution seems to want.  But I don't think

12     that that is essential.  If that's the kind of record that

13     they're looking for, we can definitely obtain that if we had a

14     very brief continuance.

15          MR. BROWN:  Two points, Your Honor.  As far as the

16     crack cocaine versus powder cocaine, that was an inference that

17     I made from the quantity of the cocaine.  I remembered reading

18     it, but I went over the presentence report just before sitting

19     down and I don't see it.  So for all I know, it may well be

20     powder cocaine and I'm willing to so stipulate for purposes of

21     the sentencing.

22          And as to the second point, Your Honor, the government

23     isn't contending that it didn't happen.  The government is

24     merely saying that they haven't carried their burden.

25          THE COURT:  Okay.  Well, there's no need for a

8

1    continuance in terms of what your concerns are, Mr. Mayock. I

2    have not assumed that it was crack cocaine and the difference

3    between whether it was crack or other cocaine is not going to be

4    at all a factor in my, and hasn't been as I prepared for this

5    sentencing.

6         In terms of the government's position relating to your

7    client's childhood history, I have construed it the way

8    Mr. Brown just described. I have assumed for purposes of my

9    analysis that what apparently happened did happen, what you say

10   happened happened. And that is to say that as horrific as it

11   is, your client as a very young boy may have actually seen, but

12   in any event, directly experienced the slaying of his mother by

13   his father.

14        I think that there are other reasons why it's highly

15   unlikely I would consider that as a basis for departure. It may

16   be a basis and I think there may well be other bases to not

17   impose the sentence at the high end of the guidelines as the

18   probation recommended, at least as to your client. But what you

19   think I might be inclined to misunderstand or not apply won't be

20   a factor at all. So I want to go ahead with today's proceeding.

21        MR. MAYOCK: Fine, Your Honor. If that's the case,

22   we're ready to proceed.

23        THE COURT: Okay. Then let's do so.

24        Now did you show to Mr. Day the government's very brief

25   response?

9

1        MR. MAYOCK:  No, I didn't.  I just read it in court.

2        THE COURT:  Well, I want you --

3        MR. MAYOCK:  I have discussed some of the factors with

4   him.

5        THE COURT:  Mr. Day, do you feel that based upon what

6   Mr. Mayock summarized to you after he this afternoon for the

7   first time read the government's opposition to your position

8   about sentencing, do you feel that you understand what the

9   government's position is?

10        DEFENDANT DAY:  Yes.  Yes, Your Honor.

11        THE COURT:  Okay.  Then I don't think it's necessary

12   even to take a short break for Mr. Day to read that.  And it's

13   pretty straightforward anyway.  So we're going to proceed now

14   and let me start by saying this.  Obviously both sides have read

15   the presentence report.  So have I.

16        On Mr. Day's behalf, Mr. Mayock has made a number of

17   points and I'm going to recite those and then give you an

18   opportunity, Mr. Mayock, to supplement those by giving you a

19   focus and that focus will be my response to it.  The way to do

20   this most efficiently and Mr. Newman, I want you to listen to

21   what I'm saying because this is going to be applicable to your

22   client as well.

23        After careful review of the way that the presentence

24   report and the recommendation characterize the guideline range,

25   I believe that there is a more precise way of stating it.  And

1   this is the way it should be stated and this is the way I

2   believe the range is as presented by the probation office.

3        Your client, Mr. Mayock, has pled guilty to all three

4   counts. Mr. Bell pleaded only to Counts 2 and 3. As to

5   Mr. Day, the guideline sentencing range really is between 188

6   and 235 months. Well, at least as to Mr. Bell it is. Let's

7   take his to begin with. That's on Count 2. Plus an additional

8   84 months consecutive for Count 3. That means that the

9   guideline range is 272 months at the downward end, at the low

10  end, and 319 months at the high end.

11       For your client, Mr. Mayock, who is dealing with a

12  guilty plea to all three counts, it comes out much the same, but

13  the calculation is a little bit different. There is 60 months

14  on Count 1 -- excuse me. There is a range on Count 2 of just

15  what it is for Mr. Bell, between 188 months and 235 months.

16  There is a range, not a range, but a consecutive sentence

17  mandated on Count 3 of 84 months. Those two counts wind up

18  being at the range of 272 months to 319 months and that's the

19  range that I have calculated for purposes of figuring out what

20  is the fair sentence for your client as well.

21       As to the first count, for Mr. Day I would like to ask

22  our representative from the probation office whether that

23  changes the range given that there's a third count.

24       THE PROBATION OFFICER: It does not change the

25  guideline range; however, the sentencing mandatory maximum is 60

1    months.  And then on that particular count your cap is 60

2    months.

3            THE COURT:  Okay.  So the range will be the same,

4    Mr. Mayock.

5            MR. MAYOCK:  Yes.

6            THE COURT:  Now getting back then to the positions that

7    you have asserted, Mr. Mayock, you believe that the criminal

8    history is overstated.  And essentially as I construe and

9    understand your argument, it's because your client after appeal

10   was sentenced to a 16-month sentence, had already served 27

11   months before the weapon component of the conviction was

12   reversed and really was being sentenced for mere possession, not

13   mere possession for sale.  But the offense occurred when he was

14   young and that to consider it to be a basis for career offender

15   status is unfair and distorts what is in fact the true situation

16   in terms of the prior criminal history.

17           Secondly, you have made an eloquent argument for a

18   departure based on what you classify as post-traumatic stress

19   syndrome and that gets us to the unique situation of the

20   father's apparent slaying of the mother.  And coupled with that,

21   you point to a different classification arising out of the I

22   think the same concept and the same facts and that's that he

23   suffered extraordinary abuse as a child.

24           As to the criminal history factor, I think that I'm

25   inclined to accept Mr. Brown's response to that.  I think that

1    the circumstances of the offense and the nature of the drug that

2    was being possessed unquestionably make it appropriate to serve

3    as the basis for career offender status. I do want you to

4    address that in light of what the government has said.

5         As to the request for departure, what most, what I find

6    to be most noteworthy is that Dr. Maloney's report itself and he

7    had two reports and I read them both, every word of both of

8    them. He said that it couldn't be argued that these awful

9    events caused Mr. Day to engage in, quote, "the illegal and

10   problematical behavior." He said -- and this is also a quote --

11   "He certainly does not present with any significant symptoms of

12   a major mental disturbance."

13        I went and looked at not only the provisions you've

14   cited, but 5(k)(2.13) which is the guideline provision relating

15   to diminished capacity. And then that speaks in terms of a

16   significant impairment, significantly impaired ability to

17   understand the wrongfulness of the behavior or to control the

18   behavior that the defendant knows is wrongful. And neither

19   component of what would be significantly reduced capacity has

20   been established by Dr. Maloney's report.

21        So although I think there are considerations that

22   militate in favor of not sentencing Mr. Day to the 319 months

23   that the probation office recommended -- and I'll give you a

24   chance to be heard about that too, Mr. Brown -- and although I

25   acknowledge that under the Brown decision where the Ninth

1    Circuit clarified a misunderstanding that Judge Tevrizian had, I

2    would have the discretion, if I thought it was warranted, to

3    make a departure, I decline to do so tentatively.

4         I'll listen to both of you, you and your client.  For

5    the reasons that I have indicated, I don't think a departure is

6    warranted under the evidence before me.  It is presumptively

7    discouraged.  Disadvantaged upbringing and psychological trauma

8    such as this are not presumptively the basis.  I think that the

9    guideline range as I have defined it and refined it is the range

10   within which the sentence should be imposed.

11        So that's my attempt, Mr. Mayock, to give you guidance.

12   You need to know, Mr. Day, that you have a right to speak to me.

13   I have been addressing your lawyer inkind of technical terms and

14   that's inevitable because that's what the guidelines require a

15   judge to do.  It's just the way they're structured.  But I do

16   want to hear from you.  And with that I'll give the lawyers a

17   chance to be heard now.

18        Go ahead, Mr. Mayock.

19        MR. MAYOCK:  Thank you, Your Honor.

20        The first point that I would want to make, and I will

21   focus these points on the departure, there are admittedly

22   categories that have been set forth in the sentencing

23   guidelines, particularly the 5(h)(1) sequence.  The prosecution

24   has said that family ties is not ordinarily a basis for

25   departure and that under 5(h)(1.2) lack of guidance and a

1   disadvantaged upbringing is not relevant.  They cite those and

2   they also cite a lack of guidance case coming from another

3   circuit involving a decision from the Second Circuit about --

4             THE COURT:  A very recent decision.

5             MR. MAYOCK:  Yes, but it's not from this circuit

6   either.  But it's a stepfather killing, being killed.  It

7   doesn't saying anything about whether it was in the presence of

8   the defendant in that case who was apparently eight at the time.

9   Also it was not a mother.  Particularly important and

10  instructive would be the fact that you have a mother who is

11  murdered by her husband.

12            These are the parents of Mr. Day when he's

13  approximately six years old.  And as Dr. Maloney reports, that

14  is a very crucial and important time in any child's life as far

15  as what impact that is going to have on them.  So I would say

16  that even though Revera seems to talk about something that might

17  be significant, it's not relevant.

18            We pointed out in our position paper Section 5(h)(1.3)

19  as mental and emotional condition.  And I analogize that to

20  departures that had been made under the post-traumatic stress

21  syndrome ground.  And essentially as the court has recognized,

22  that is under diminished capacity.  Diminished capacity, as the

23  court I'm sure is recognizing in looking at it, does not deal

24  specifically or allow departures where you have a violent act

25  taking place.  But we're not asking in this case for any

1    departure based on that basis.

2        Rather, what we're asking for and it's specifically

3    mentioned is a downward departure because of extraordinary abuse

4    suffered by the defendant as a child.  I would suggest that does

5    not come within the compass of family ties.  It does not come

6    within the compass of lack of guidance either which the

7    prosecutor cites.  Instead we're talking about unchartered

8    waters.  I would talk about this in this way.

9        The Kuhn decision was decided in 1998 as this court is

10   well aware.  In Kuhn they said virtually any appropriate

11   information relevant to a defendant's background, character or

12   conduct could be presented to the court as a basis for a

13   downward departure and the court's discretion was virtually

14   unlimited.  If those bases were presented in an unusual way, the

15   court can depart downward.

16       My suggestion is that extraordinary abuse suffered as a

17   child doesn't directly fall under mental or emotional condition,

18   although that may be the closest.  It doesn't fall under lack of

19   guidance and it doesn't fall under family ties.

20       Instead I think we have to take a look at those

21   sections, these 5(h) sections, and see when they were enacted.

22   Those were enacted in 1991.  If you look at Kuhn, that's a 1998

23   U.S. Supreme Court decision.  Clearly the U.S. Supreme Court

24   could recognize those and in essence gave authorization for a

25   court to create and have a departure where something doesn't fit

1  neatly within the box. And clearly in this case we don't

2  believe the box includes Mr. Day within the family ties or lack

3  of guidance 5(h)(1) groupings.

4  Again I would point out, as the court is well aware,

5  that the Ninth Circuit in the Brown case did consider severe

6  childhood abuse and neglect and a psychologist's report about

7  that childhood trauma as a basis for a downward departure. And

8  again, forgetting about Brown for a moment but a more recent

9  case, in United States versus Sanchez Rodriguez, the court

10  authorized, an en banc decision, authorized a departure for a

11  career offender along the base offense level where the predicate

12  offense was a very small amount of drugs. So I'm trying to come

13  around back to this point.

14  I think if we look at this entire situation based on

15  what has happened to my client in his life, you see here's a

16  person who, and I won't reiterate all the points that were made

17  in the paper, who has had a very traumatic, a very difficult

18  life, a life that no one would ever wish upon anyone else, any

19  other human being.

20  And he falls within a scope that is not clearly covered

21  by any of the guidelines and that's why Kuhn would apply. And

22  that's why under these circumstances too the court could look

23  under the authority of Sanchez Rodriguez for a downward

24  departure.

25  Specifically we've pointed out in looking at this kind

1    of case the four building blocks of mental health, the first one

2    being heredity.  And here we've got an individual whose father

3    was diagnosed as a paranoid schizophrenic.  And I've been

4    advised by his uncle, Arthur Day, that in the last couple of

5    months he's attempted to commit suicide.  This is the heredity

6    that Mr. Day has.

7         The second building block is early nurturance.  He

8    didn't get that.  His mother was murdered.  He was shifted from

9    place to place.  And then his father came back when he was

10   probably about nine or ten years old and then raised him based

11   on voices that he heard directing him where to go and put him in

12   incredibly difficult situations in gang infested areas, poor

13   schools.

14        He's had numerous problems with early nurturance which

15   he did not receive.  His traumatic experiences are just

16   overwhelming, start again with the murder and being reared by a

17   paranoid schizophrenic father, clearly that's a traumatic life

18   experience.  And last, the quality of support system.  He

19   doesn't have that.  It's clear he has nothing.  He has on all

20   four building blocks of mental health, he has fallen far, far

21   short.

22        On TV the other night there was a program involving

23   Mike Wallace.  Mike Wallace talked about having depression and

24   what effect it had on him.  But you look at him and you look at

25   other people like Tipper Gore who have had admitted problems

1    with chronic depression and you look at what they have as far as

2    the quality of their support systems. And early nurturance and

3    a lack of traumatic experiences -- I can't say anything about

4    heredity -- but on those bases they're very different.

5         Even though they have mental problems, they don't have

6    the problems with the whole, all four building blocks basically

7    being shattered and falling down. That's why Mr. Day is very

8    much different than other people who might come in and might

9    make this sort of claim. On that basis I would respectfully

10   submit to the court that there is a basis for a downward

11   departure because of that and because of these circumstances

12   which are particularly unusual.

13        Turning to the overstated criminal history. I think

14   Your Honor hit the nail on the head. You said there were

15   problems that he had in getting an extra 11 months after the

16   case came back. He entered a guilty plea. Rather than remain

17   in custody and go through another trial after serving 27 months,

18   he did enter a plea.

19        Clearly the circumstances of that for an immediate

20   release would be a justification for someone to think that the

21   criminal history was over represented, particularly because he

22   had those extra 11 months. He'd already served above and beyond

23   the maximum that he could possibly get if he were convicted of a

24   charge.

25        At the time he was an 18-year-old youth. It was a

1    possession only case of powder cocaine which was for personal

2    use.  On that basis I suggest respectfully that the court

3    reconsider the criminal history as being over represented,

4    particularly when you think of the circumstances under which

5    someone at 18 would have the opportunity to go on with his life

6    and the easiest thing to do would be to enter that plea and get

7    released from jail instead of continuing on on the presumptive

8    detention that, as the court is well aware, occurs in drug

9    cases.

10    THE COURT:  Are you basically saying that I should

11    consider your client not have to been factually guilty, that he

12    didn't commit the crime that he wound up pleading to because he

13    pled given the circumstances you've now described?

14    MR. MAYOCK:  Well, I'm saying that under the

15    circumstances rather than go forward with the trial, the case

16    was reversed and tainted parts were thrown out.

17    THE COURT:  Right.

18    MR. MAYOCK:  That was a clear motivating factor as

19    to -- and I'm not saying he didn't enter a plea.  He's never

20    denied that he entered a plea.  But when you look behind the

21    motive for entering that plea, to be released, particularly when

22    you've got a young man who committed this offense at age 18.

23    He's definitely not going to be as thoughtful as someone with

24    more life experiences, particularly more beneficial life

25    experiences than Mr. Day has had in his life, that that's a

1    basis for saying over representation or overstating the criminal

2    history occurred. And if that's the case, I have suggested in

3    our papers that the court consider looking at this as a

4    non-criminal history, a non- --

5              THE COURT: Non-career offender.

6              MR. MAYOCK: -- non-career offender case and look at

7    the offense level and consider what the offense level would have

8    been just considering all these factors, and we came up with a

9    calculation if the court did that it would be a guideline

10   range -- and this is a criminal history offense level of 27 that

11   was calculated by the probation officer -- would come out to be,

12   if the court made his criminal history category 4 instead of 5,

13   because it was just on the border of 5, 100 to 125 months plus

14   84 months which would give a sentencing range of 184 to 209

15   months.

16             Clearly that's a very, very substantial sentence.

17   We're not talking about anything that's inconsequential in any

18   way. That's an awful lot of time and it's a time that would

19   give my client the opportunity, we hope as Dr. Maloney hopes, to

20   receive the kind of counseling that he didn't receive early in

21   life and which he clearly needs and which Dr. Maloney who is a

22   clinical psychologist at the USC Medical School recognizes and I

23   would ask that the court impose that sort of a sentence.

24             THE COURT: Okay. Now a couple of questions. In terms

25   of counseling, I can make a recommendation and it will either

1 become available or not regardless of which alternative proposal

2 I adopt, right?

3 MR. MAYOCK: That's true, Your Honor. The Bureau of

4 Prisons has its own authority to do what it wants often.

5 THE COURT: And I hope he does get the benefit of

6 counseling if he needs it and I'll say so when I pronounce the

7 judgment.

8 Secondly, why don't you address what has been very

9 troubling to me which is the circumstances of the flight. Your

10 client was the driver. We could be sitting here, but for the

11 grace of God, with dead victims out there given that incredibly

12 reckless conduct that he displayed in trying to get away from

13 arrest.

14 I know what your arguments are and you've made them

15 very, very eloquently and that's not just trying to pat you on

16 the back. You've really done a good job. But you haven't said

17 anything about that and any judge sitting up here is going to be

18 greatly troubled, at least I'm greatly troubled by that.

19 MR. MAYOCK: I thought that the court might be asking a

20 question like that. I directed that specific question to my

21 client earlier to ask him what happened. And that's one of the

22 reasons why the post-traumatic stress analogy and argument was

23 made. What happens to somebody who has mental problems of this

24 kind and has experienced this kind of life is they just react.

25 They don't sit and contemplate. They in a stressful situation

77

1   find that they are acting in ways that a normal person wouldn't

2   act.  That's what that entire stress syndrome is all about is

3   that kind of behavior.

4        What he did was he did drive, although there were a

5   couple of parts of the report that are inaccurate.  Initially he

6   did not drive the van away, the vehicle away from the bank.

7   They got in a second vehicle and he was driving that vehicle.

8   That vehicle ended up being chased.  There were --

9        THE COURT:  Don't go into what happened during the

10  chase because it's just going to upset me all over again.  I

11  know how dangerous it was.

12       MR. MAYOCK:  The police were following.  I think there

13  was a helicopter or two as well.  He pulled into a mall and just

14  stopped where the police came up.  He was the only one who

15  remained in the car.  He didn't try to run at that point.

16       He has expressed to me that the concern he had was that

17  he was going to be shot and he felt that if he went to a mall,

18  that by being there where there were a lot of people, he

19  wouldn't get shot by the police.

20       I'm not saying this is clear thinking because clearly

21  it's not.  But it is stressful thinking and it's the kind of

22  thinking that a person who has had the kind of upbringing that

23  my client has maybe engages in.  That's the explanation he's

24  given me about why he stopped there and why he just sat in the

25  car and didn't make any effort to take his hands off the

1    steering wheel.  He just brought the car to a stop and made no

2    further effort to run away.

3         THE COURT:  I would like to hear from Mr. Brown before

4    I give Mr. Day a chance to speak with me.  That way you can at

5    least have in mind whatever it is the prosecution is going to

6    say, Mr. Day.

7         MR. Brown.

8         MR. BROWN:  Thank you, Your Honor.

9         First, I have a different explanation for arriving at

10   the mall and that's when you're being chased by a helicopter,

11   you don't really have a lot of options to evade the police on

12   the ground.  Really the only way you're going to be able to get

13   away from them is if you can be someplace where a helicopter

14   can't see you such as inside an enclosed building.

15        There really isn't a better way to flee in hot pursuit

16   than if you can blend in with the crowd.  And the fact that he

17   did not continue to flee after he stopped the car, I attribute

18   to the fact that the police were right on him and he didn't have

19   an opportunity and that his co-conspirator who was not driving

20   and was therefore able to leave the car more quickly only got a

21   few feet before being captured by the police.

22        THE COURT:  Mr. Brown, what I would find most

23   productive in terms of your response is the issue of whether he

24   he's a career offender and how to deal with that first

25   conviction for the cocaine.

1     MR. BROWN: Okay. Well, Your Honor, he pled guilty to

2  possession of cocaine with the intent to distribute which is

3  clearly a predicate felony under the guidelines. And the

4  offense was actually a very serious one. There were three

5  separate firearms found in the house in which he was hiding.

6     THE COURT: But in the end, he wasn't convicted of

7  anything related to those firearms; is that correct?

8     MR. BROWN: No. His conviction for possession of a

9  firearm during the drug trafficking crime was reversed on

10  appeal. But it's not necessary that he be convicted of a

11  firearms offense in order for the conviction to count as a

12  predicate felony.

13     And here it's the defendant's burden to prove that his

14  criminal history is overstated. And all the defendant has said

·15  is well, he may have had a reason to plead to an offense that he

16  didn't in fact commit. The defendant certainly hasn't said

17  that. There's certainly no evidence. This is merely a lawyer's

18  speculation as to what happened.

19     All we know for a fact is that he pled guilty to a drug

20  trafficking offense. Not only that, but there were very serious

21  circumstances surrounding it, including the shooting of a police

22  officer. So I don't think that there's any way to get around,

23  even if Your Honor was inclined to go there, the defendant

24  certainly has not carried his burden. There's nothing that

25  indicates that the count of conviction is an accurate one.

1          Moreover, I think that the history of the defendant

2    shows that a departure on criminal history access would be

3    inappropriate because of the danger he poses to the community,

4    which I think is the most serious factor warranting a sentence

5    at the high end.  The defendant has numerous involvements with

6    firearms.  In Paragraphs 59, 66, 73 and 84 there's all the

7    defendant involved with firearms.

8          Let's just take one of those, for instance Paragraph

9    84, where he was not actually charged with this.  He was

10   arrested for being a felon in possession of a firearm in January

11   of 1994.  Your Honor, that was just months before he then got

12   convicted of armed bank robbery where he had a pistol that the

13   teller saw tucked into his belt.  And now, Your Honor, he gets

14   out of prison in mid-1998 and then in the beginning of 1999 he's

15   again arrested for armed bank robbery.  This time two

16   defendants, two firearms.  I think with his history of

17   involvement in firearms, the court should decline any departure

18   in the court's discretion because he's simply a danger to the

19   community.

20         Whether he's going to kill somebody for recklessly

21   fleeing from a crime or whether he's going to kill somebody with

22   the firearms that he uses time and again is immaterial.  The

23   fact of the matter is, he's an extremely dangerous man.  He's

24   had two opportunities to turn his life around in prison and each

25   time all he's done is get involved in ever-escalating crimes in

1    terms of their seriousness.

2    THE COURT:  Just for the sake of analytical precision,

3    do you construe Mr. Mayock's arguments relating to the career

4    offender status as a request for a departure?

5    MR. BROWN:  That is how I understood it, Your Honor.

6    THE COURT:  Okay.  I understood it slightly differently

7    as a request for a correction in terms of the calculation.

8    Which did you intend it to be, Mr. Mayock?

9    MR. MAYOCK:  As a departure.  That's why I was citing

10   the Sanchez Rodriguez case.

11   THE COURT:  Okay.  Anything further, Mr. Brown?

12   MR. BROWN:  No, Your Honor.

13   THE COURT:  Okay.  Thank you.

14   Mr. Day, would you like to say anything to me?  You

15   have a right to do it and sometimes it's very helpful to a

16   judge.  So feel free to do it if you choose.

17   THE DEFENDANT:  Your Honor, I'm not going to try to

18   make excuses for what I've done wrong.  I admit to what I did

19   wrong in this case and in the last bank robbery.

20   I pled guilty to unarmed bank robbery which I did

21   commit.  And I went to trial and the jury found me guilty of not

22   having a gun because -- not because they just didn't believe,

23   because they believed me, but they found me not guilty of not

24   having a gun because I didn't have one and because the people

25   had doubt.

1       They wasn't sure where I brought my bag from.  They
2    couldn't say.  They said I had a bag with blue and brown writing
3    on the bag and they said the gun was blue and brown.  When they
4    asked where was that, where did I get it, they didn't even know.
5    Well, we don't know, he just had it in his hand; one minute he
6    did, one minute he didn't.

7       But I didn't have a gun.  That's what I pled guilty
8    immediately.  When my lawyer told me, I said I'll plead guilty
9    to the robbery.  I did it.  I was desperate and in the act of
10   impulse I went into Wells Fargo.  I banked at Wells Fargo.  I
11   had about $12 in my account.  My wife was -- my fiancee was
12   pregnant.  The rent was due.  I walked into there and I said
13   give me the money.  I did that.  That was just stupidity and it
14   was done -- it was just stupidity.

15      The first criminal case that I have, the possession
16   with intent to distribute powder cocaine, I was visiting a
17   friend's house.  I was in the back room where there was no guns
18   with a lady.  There was no drugs found in that room.  The guy
19   who shot the police was in a totally different room with the gun
20   that belonged to his girlfriend.  Okay?

21      The cocaine that they found was found in a can inside
22   of a bathroom.  There was no evidence in the whole trial against
23   me being a drug dealer of any sort in there.  There was nobody
24   said that I sold drugs.  It was they were saying that the guy
25   that lived there sold the drugs.

1          I was visiting, the girl that was with me was visiting

2     that house.  And the Appeals Court overturned the case because

3     of the lack of evidence in the trial, not just because of the

4     judge's ruling in the argument, but because of a lack of

5     evidence also.  And I pled guilty because they told me I was

6     going to go home.  When they said you plead guilty you go home

7     tomorrow.  I mean, I've already been in prison two years, over

8     two years.  I pled guilty.  I didn't know that this would do

9     this to me later.

10         This case right here, this was stupidity.  I mean, this

11    was just -- I don't know why.  I don't know where the impulse,

12    why I just allowed myself to do something this stupid.  Running

13    from the police, I was scared.  The police was pulling guns out

14    on us.  Every time we turned a corner they were coming out their

15    cars pointing guns.  We were ducking.  I didn't want to get

16    shot.

17         There was no guns in the car when the police finally

18    caught up to us.  And I ran because I did not want to get shot.

19    I did not want them to shoot us because I know they're coming

20    because of the armed bank robbery.  I don't want them to shoot

21    me.  I'm trying to get away.  I don't want no guns in the car.

22         I don't want to get killed.  I don't want to get

23    killed.  I pulled into the parking lot because I know there's a

24    lot of cars there, there's a lot of people there.  I'm hoping

25    they're not going to open fire.  I didn't jump out of the car

1    because I don't want to get killed.

2         THE COURT: A couple of people got hit by the car,

3    didn't they?

4         THE DEFENDANT: I had an accident in the intersection.

5    A light turned red on me and I was going so fast I slid on the

6    brakes.  I couldn't stop and I wish I could apologize to the

7    person.

8         THE COURT: You hit one car and that car hit a second

9    car, right?

10        THE DEFENDANT: Yes.  I hit the back of a burgundy,

11   dark burgundy mini van.  I remember it clear as day.  And that

12   car slid and hit the front of another car that was turning

13   right, making a right-hand corner.  I mean I stopped for a

14   second and all I could think about was the police was going to

15   shoot me.  So I proceeded on.

16        I didn't get out -- I wasn't trying to run from them as

17   far as -- I knew I couldn't get away from no helicopter.  I know

18   once the helicopter's on you, you're going to jail.  But I

19   didn't want them to shoot me and I kept driving around looking

20   for somewhere where it was populated that I could go to to keep

21   them from killing me.  That's all I could think of.  I didn't

22   want them to shoot me and kill me.

23        I mean, I can't ask -- I'm not asking, Your Honor, I'm

24   not asking you give me leniency because I didn't do anything

25   wrong or because I don't deserve to be punished.  I agree.  I

1    accept the fact that I deserve to be punished. I pled guilty

2    with no plea agreement, not because I was going to get a

3    benefit. I didn't get a benefit from the plea. I pled guilty

4    because I know I was guilty. There was no benefit offered to

5    me. No deal. There was no deal. I pled guilty because I know

6    I was guilty. I know I was caught dead bang doing what I was

7    doing.

8         As far as my childhood, Your Honor, that's something

9    that I don't normally discuss. I don't normally even tell

10   people. I have friends that's known me for years that don't

11   know my father killed my mother. And they don't know because

12   that's something that I don't talk about and I don't think is

13   any of their business.

14        I didn't tell none -- I never told anybody about it

15   until -- I didn't tell -- my fiancee told my lawyer the last

16   time I had a case when my lawyer talked about the issue. I just

17   didn't want to push the issue because it's something that I have

18   been dealing with all my life. And I have never known how to

19   deal with it. It's not something that -- I mean, it's just

20   something I've never known how to deal with it.

21        I'm asking for leniency not because I want to go home.

22   Because I don't feel that I deserve that much time. Because I

23   didn't make -- the mistakes that I made, a lot of it was made

24   out of impulses. The robbery of the bank was pure impulse. I

25   was visiting a friend which bad company brings about problems, I

1   agree.  And this robbery right here was a stupid mistake.  But I

2   know maybe one day I'll have the opportunity, I don't know.

3          Maybe I could write a letter and apologize to the

4   people in the car.  I would like to apologize to the people in

5   the bank because I know they were scared.  Even the teller in

6   the bank, I told -- not the teller, but the security guard, he

7   had his hands up.  I said put your hands down, man, I'm not

8   going to do anything to you, man.  Because I had no intentions

9   of physically hurting anybody.  I needed some money.

10         My father after the FBI went and talked to my father,

11  they got my father attempting suicide.  My family had to move

12  him back out of town.  And now I'm going through more.  I've got

13  more pain from my personal life than I do about being in jail.

14         THE COURT:  Well, I understand the impact of that and I

15  also understand as best as somebody who is a total stranger to

16  you can from a very different perspective why the trauma of your

17  childhood or at least the experience of your childhood is not

18  something you quickly or routinely talk about.  I really hear

19  you on that.

20         Is there anything further that you think I need to

21  know?

22         THE DEFENDANT:  I mean, I think you have more than

23  enough in front of you to take your judgment, Your Honor.  I

24  would just like to apologize to those that I've hurt.  I mean,

25  the people inside the bank and the people that I ran into their

1   cars and the person that was involved in it and the trauma that

2   I brought upon them.

3           As I started to say about post-traumatic stress

4   disorder, I realize the trauma that I put people in by the

5   things that I've done.  And I just hope that it doesn't affect

6   them like it's affected me.  And there's nothing else I have to

7   say, Your Honor.  Thank you for your time.

8           THE COURT:  All right.  I find that the guideline range

9   is what I stated.  The low end would be 272 and the high end

10  would be 319, taking into account the mandatory consecutive 84

11  months on Count 3.  I am not going to depart of either of the

12  bases that Mr. Day or his lawyer ask for and here's why.

13          As to whether or not the prior criminal record

14  overstates the seriousness of Mr. Day's offenses or distorts his

15  criminal profile, I think that the real question at its core is

16  what kind of risk to society does the prior history suggest

17  should be a factor for classification and for purposes of

18  sentencing.  And I don't think that Mr. Day's history can be

19  looked at only in terms of the possession with intent to

20  distribute offense and the current charge before me and the

21  prior bank robbery before that.

22          There is a pattern of criminal behavior.  It's

23  reflected in the probation report only in part in the sections

24  that Mr. Brown pointed to.  I think that the fact that he was 18

25  when the cocaine offense occurred is a factor that affects where

1   I come out on the guidelines. I find that the particular

2   details of this offense and the explanation that Mr. Day just

3   gave me for what happened during the attempted flight reflect a

4   couple of factors that actually incline me not to depart.

5           Mr. Day's own statements are understandable. Not

6   wanting to be shot is a basic and very survival instinct that we

7   all, almost all of us have. But the choice that he made to

8   attempt to protect himself was made at the expense of society

9   and I'm afraid that that would be the choice he would make in

10  comparable circumstances in the future until and unless he can

11  get either the counseling or the treatment or the self insight

12  that would enable him to balance his interests as he perceives

13  them, his fears as he feels them with the interest and the fears

14  and the needs and the rights of other people, particularly other

15  innocent people.

16          So while I would have the discretion to accept

17  Mr. Mayock's requested departure on the seriousness of the

18  offense and whether or not Mr. Day should be classified as a

19  career offender, I decline to do so.

20          With respect to the impact of what happened when

21  Mr. Day was five or six, it's astonishing that someone could be

22  as strong as you appear to be, Mr. Day. I don't want you to

23  think I'm holding that against you. But in fact, I admire that

24  you can stand before me and speak to me in a really unusually

25  articulate way. You can deal with something in public that

1    slices anybody to the bone and that you can be capable of

2    alternative behavior in light of that.

3         The information that Mr. Mayock attempted to get and

4    that in fact was provided by the doctor doesn't support the

5    factors that Mr. Mayock pointed to.  He has done what a good

6    lawyer should try to do and that is develop a basis for a

7    departure that isn't focused on any particular ground but

8    combines all of them and would make the whole greater than the

9    sum of its parts.

10        I don't say that to demean your argument, Mr. Mayock.

11   But that's the way I think it comes over.  And I'm trying to

12   look at the whole here.  And the whole that I see is somebody

13   who had other alternatives, even -- what I understand from the

14   probation reports -- in terms of the Seventh Day Adventist

15   suffering that you were exposed to, the several years of

16   non-criminal, non-violent, non-suicidal behavior on the part of

17   your father, you had opportunities, that you didn't have the

18   opportunities that many other people in society have, that I may

19   have had is unfortunate, but it doesn't require or authorize a

20   judge to say I'm going to depart downward from these factors.

21        And for those reasons and even given the recognition

22   that I'm now reflecting that I could do it, I decline to do it.

23   But I'm not going to sentence you to the 319 months.  I don't

24   think that that would be appropriate for a number of reasons.

25   And those reasons need to be expressed because the range of the

1    guidelines here is in excess of 24 months.

2         Unlike Mr. Bell, Mr. Day is a younger man.  There's an

3    opportunity that if the message is correct and if it's

4    calibrated, if I came out with something that is appropriate and

5    you may not be ever in agreement with that either today,

6    tomorrow or ten years from now.  But what I'm trying to do is

7    reflect the seriousness of your conduct to the potential for you

8    to do better.

9         To simply and routinely give you what I'm authorized to

10   because of what you did, which is incredibly serious and not

11   just an isolated event, I think would be a mistake.  I think

12   that you need to be given a hope and I'm trying to give you the

13   basis to hope that there is some opportunity, particularly at

14   your relatively young age.  You'll be in jail no matter whether

15   I bought and accepted every argument that Mr. Mayock made.  The

16   term would be lengthy even at that classification.

17        I haven't accepted his argument.  But I don't want you

18   to think that I'm putting you in the same boat as Mr. Bell or

19   that I would just take all of the significant and very

20   compelling circumstances and say this is a bad guy, I'll give

21   him the highest end of the range I'm authorized to consider.

22   That is what I'm not going to do.  So that's the reason for the

23   sentence that I'm now about to impose and here is the sentence.

24        Pursuant to Section 5E1.2, Subsection A of the

25   guidelines -- Mr. Brown?

1    MR. BROWN:  Yes, Your Honor.  I apologize if I missed

2    this, but I don't believe Your Honor has inquired whether the

3    defendant and defense counsel reviewed and discussed the

4    presentence report as is required under Rule 32(c)(3)(A).  I

5    also don't whether -- I don't believe Your Honor has adopted the

6    findings of the presentence report.

7    THE COURT:  Well, I will get to the findings in a

8    minute.  I have not adopted the findings in terms of the way the

9    range has been reflected.  I don't understand exactly what the

10   basis is for a potential life sentence.  Neither lawyer has

11   addressed that.  I've looked into that and I'm aware of at least

12   one decision, a Ninth Circuit decision, that says in essence if

13   there is a mandatory minimum and no max, a life sentence can be

14   implied as the max.

15   But that's under 924 Subsection E, not under 924(c).

16   So I don't know what the basis is for considering that there was

17   a potential upward range of a life sentence here.  For that

18   reason I'm not accepting their findings.  But as reflected and

19   corrected, and I thought I did this adequately at the beginning,

20   I accept their findings and their calculations.

21   In terms of the review of the report, I thought we had

22   gone over that.  Mr. Mayock and Mr. Day, you have had a chance

23   to review the presentence report; is that correct?

24   MR. MAYOCK:  It is, Your Honor.

25   THE COURT:  And you and at least the government's

1    response to your opposition, correct?

2         MR. MAYOCK:  Yes, Your Honor.

3         THE COURT:  Is there any basis that you can think of

4    procedurally why it is not timely for me to impose sentence?

5         MR. MAYOCK:  No, Your Honor, no legal cause.

6         THE COURT:  Okay.  Pursuant to Section 5E1.2 of the

7    guidelines, all fines are waived because I find that Mr. Day

8    does not have the ability to pay a fine.  It is ordered that the

9    defendant shall pay to the United States a special assessment of

10   $300 which is due immediately to the clerk of the court.

11        Pursuant to the Sentencing Reform Act of 1984 it is the

12   judgment of the court that the defendant Mr. Montez Day is

13   hereby committed on Counts 1, 2 and 3 of the indictment to the

14   custody of the Bureau of Prisons to be imprisoned for a term of

15   288 months.  That is 24 years.  This term consists of -- I have

16   to break this down.  A combined -- Mr. Brown?

17        MR. BROWN:  No, Your Honor.  I was just going to break

18   it down.

19        THE COURT:  How were you going to break it down?

20        MR. BROWN:  60 months on Count 1 to be run concurrently

21   with 204 months on Count 2, followed by a mandatory consecutive

22   term of 84 months.

23        THE COURT:  Yes.  Well, that's what I had scoped out

24   and that's the basis for the calculation of 288.

25        Upon release from imprisonment, Mr. Day shall be placed

1  on supervised release for a term of five years.  This term
2  consists of three years on Count 1 and five years on Counts 2
3  and 3, with all those terms to be served concurrently and under
4  these conditions and terms.

5          First, Mr. Day shall comply with the rules and
6  regulations of the U.S. Probation Office and General Order 318.
7  Second, he shall participate in outpatient substance abuse
8  treatment and submit to drug and alcohol testing as instructed
9  by the probation officer.  Mr. Day shall abstain from using
10 elicit drugs, alcohol and abusing prescription medications
11 during the period of supervision.  During the period of
12 community supervision the defendant shall pay a special
13 assessment in accordance with this judgment's orders pertaining
14 to such payment.

15          The defendant shall participate in a psychological
16 psychiatric counseling or treatment program as approved and
17 directed by the probation office.  And the defendant shall not
18 obtain or possess any driver's license, social security number,
19 birth certificate, passport or any other form of identification
20 without the prior written approval of the probation officer.
21 And he shall not use for any purpose or in any manner any name
22 other than his true legal name.

23          Now you have a right to appeal this sentence, Mr. Day.
24 And if you do so, you need to do so within ten days from today.
25 Please speak to Mr. Mayock who will give you all of the

1    information you need on how to prosecute an appeal from the

2    sentence that I've now imposed.  And if you are in doubt and

3    need to know this, if you cannot afford to have Mr. Mayock

4    represent you on appeal, he will continue to be appointed at no

5    cost to you.

6         Now there are no counts to dismiss; is that right,

7    Mr. Brown?

8         MR. BROWN:  That's right, Your Honor.

9         THE COURT:  Okay.  Is there anything further that needs

10   to be addressed?

11        MR. MAYOCK:  Yes, Your Honor.  I believe you said that

12   with respect to the supervised release each of the terms were to

13   run concurrently.  But I don't know if you said that with

14   respect to the 60-month, 204-month and 84-month sentence.  Those

15   are consecutive or concurrent?

16        THE COURT:  Well, the 84 months is consecutive.

17        MR. MAYOCK:  The 60 then is a concurrent sentence; is

18   that correct?  I just wanted to make sure because otherwise the

19   Bureau of Prisons will run every sentence, if there's no record,

20   it runs consecutively.

21        THE COURT:  I'm not sure how to --

22        MR. BROWN:  Count 1, the 60-month term, runs concurrent

23   with Count 2, the 204-month term.

24        THE COURT:  And that's what my findings were.

25        MR. MAYOCK:  And then the 84-month term for the 924(C)

1    is consecutive.

2              THE COURT:  Right.  All right.  Thank you.

3              MR. MAYOCK:  Thank you, Your Honor.

4              THE COURT:  Now let's turn to Mr. Bell, please.

5              Okay.  Mr. Bell and Mr. Newman, have you had a chance

6    to review what you needed to?

7              MR. NEWMAN:  We have, Your Honor.

8              THE COURT:  Can you think of any reason why I should

9    not impose the sentence?

10             MR. NEWMAN:  No, Your Honor.

11             THE COURT:  Okay.  Did you understand -- did you listen

12   to and understand what I said concerning the way I believe that

13   the calculations need to be articulated?

14             MR. NEWMAN:  Yes, Your Honor.

15             THE COURT:  Okay.  Now I would like to proceed much as

16   I did with Mr. Day and that is to give you, Mr. Newman, a chance

17   to understand what my take is on your arguments.  Then you can

18   address those in your oral arguments.  Your client will be given

19   an opportunity also.

20             You have seen, Mr. Newman, that to the extent you are

21   objecting to the references in the presentence report concerning

22   the uncharged bank robberies, those have been modified and

23   changed.  And I want you to know I truly have not taken those

24   into account.

25             MR. NEWMAN:  I understand.

1          THE COURT:  I don't have basis to consider that your

2     client committed those robberies and I don't think that he

3     should be treated that way and I haven't treated him that way in

4     my provisional thinking.  So I want you to be clear about that.

5          To the extent that much of your position is based upon

6     Mr. Bell's designation as a career offender, it is that he was

7     not serving a sentence within the 15-year period that is the

8     outer scope.  I think that the government's assessment of what

9     really happened, and it may be the probation officer's

10    assessment is correct too, he began serving a sentence on August

11    6th, 1981.  That was aggregated.  It was 30-plus year sentence.

12         The fact that he has chosen not to return from the day

13    of release was built into the sentence.  It was basically for

14    the unauthorized escape.  And had he not escaped, he'd have been

15    in custody past the start date which is January 29th in 1984.

16         I believe that the calculation is correct.  I believe

17    that the reasons for the calculation make sense in this

18    particular case.  I am not inclined to adopt your contention

19    that he should not be classified as a career offender.

20         You have also moved for a downward departure because

21    your client didn't wield a semi-automatic weapon, but instead a

22    .38 caliber weapon.  I have no difficulty whatsoever in

23    rejecting that basis for a departure.  Just because there's no

24    basis for departing upward under 5K2.17 doesn't mean and doesn't

25    justify flipping that concept and granting your client a

1   downward departure.

2   As to the relatively recent issue concerning his mental
3   status and his capacity, I have looked at Dr. St. John's report
4   and the diagnosis is what I think I'm required to pay most
5   attention to.  The diagnosis is that Mr. Bell had borderline
6   intellectual functioning.

7   But the report itself makes it clear that while
8   immature, your client was capable of distinguishing right from
9   wrong and I don't find any basis, none, in the evidence before
10  me to suggest that the classification or the diagnosis that your
11  expert has come up with of being borderline intellectual, being
12  in the borderline intellectual functioning status warrants any
13  special consideration given the nature of this conduct.  So
14  those are my initial reactions to the contentions that you have
15  asserted in response to the presentence report.

16  So that this transcript can stand alone and the Court
17  of Appeals can have a basis to evaluate from where I'm coming
18  from and how I've approached this sentencing, let me reiterate
19  what I said earlier this afternoon as to the co-defendant
20  Mr. Day.  I think that the correct way of assessing the
21  guidelines, and your client is being sentenced only on Counts 2
22  and 3, is that the range for Count 2 is 188 months to 235
23  months.  Count 3 brings a mandatory consecutive period of 84
24  months.  So correctly stated the range would really be 272
25  months to 319 months.

1        And in a moment I will listen very carefully to what

2    you say and anything that Mr. Bell may choose to say.  I am

3    inclined to sentence him at the upward level of 319 months.

4    With that as guidance, feel free to address it.

5        MR. NEWMAN:  Thank you, Your Honor.  We'll start first

6    with the career offender issue and that is that the basis of the

7    probation department's calculation as to what transpired with

8    the court subsequent to his recapture from the 1975 bank robbery

9    is based on records from the Bureau of Prisons that were

10   received from Metropolitan Detention Center because the records

11   were so old that that's where the probation officer went.

12       My client insists that the fact that the cut-off date

13   that he was sentenced to ten years on the bank robbery and that

14   that sentence had been terminated and that the second sentence

15   of 25 years on the second bank robbery was started after the

16   date of the, the break-off date.

17       THE COURT:  If you can be precise and give me months,

18   dates and years, I'll be able to follow you better.

19       MR. NEWMAN:  Yes.  The date of -- let me get my paper

20   here.

21       THE COURT:  Maybe you should look at Paragraphs 88 and

22   89.

23       MR. NEWMAN:  Yes, Your Honor.  That's what I was just

24   trying to find.

25       Mr. Bell was sentenced and was received at Lompoc on

1    January 16th, 1976 concerning the 1975 bank robbery; that he

2    continued serving that sentence until he was released on I

3    believe March 13th, 1981.  At that time Mr. Bell was released on

4    a day pass and was then classified as an escapee.  And I should

5    note that this paragraph and the subsequent paragraph are all

6    taken from the Bureau of Prisons records and not from the

7    court's records.

8         THE COURT:  Do you have conflicting information from

9    these?

10        MR. NEWMAN:  No, I don't, Your Honor, because the

11   records are so old.  And I think that's why the probation

12   department usually tries to use court records, but in this case

13   was unable to which in and of itself makes the accuracy of this

14   information somewhat, somewhat -- I don't want to say unreliable

15   is probably too harsh a word -- but let's put it questionable.

16        THE COURT:  Okay.  Keep going.

17        MR. NEWMAN:  That Mr. Bell was arrested on April the

18   28th of 1981 for the second bank robbery.  Now that bank robbery

19   I should note, Your Honor, is not an issue as to being a

20   predicate offense.  And as to what Mr. Bell states, is that the

21   sentence that he received for that conviction on July 8th, 1981,

22   he received consecutive sentences from the first bank robbery to

23   which he had previously been sentenced to.

24        So that by the time we get to I think it's July of 1984

25   wherein we're within the 15 years for the predicate first

45

1    offense for a career offender, that sentence had already been

2    served and at that time he was serving the subsequent sentence

3    for the 1981 bank robbery.  Therefore, the 1975 bank robbery

4    would not be a predicate offense for career offender status.

5         THE COURT:  Well, if you'll look at Paragraph 87, it

6    says he was sentenced in Docket 81-000583, escaped -- five

7    years' imprisonment concurrent to Count 1 in a different docket.

8    I'm trying to figure out what that different docket was.

9         MR. NEWMAN:  I would assume the different docket would

10   have been the 1975 bank robbery.

11        THE COURT:  Yes, but that's not what -- it's a

12   different docket number.  The docket number for the '75

13   robbery's in Paragraph 84.  Then you get to Paragraph 87 and it

14   refers to a different docket number, 497.  I don't understand

15   why they do it this way.  It would be so much easier to say the

16   1975 Crocker robbery and the 1981 Great Western robbery.  It

17   would be much easier -- I'm just saying this for the sake of

18   communicating.  It is so hard for a court to be as conscientious

19   as we try to be.

20        Anyway, what's your point?

21        MR. NEWMAN:  So the point is is if the 19, if he had

22   completed his sentence for the 1975 bank robbery prior to July

23   1984, that would have been outside the 15-year requirement for a

24   predicate offense and he would not be a career offender.

25        THE COURT:  I think that's analytically sound.  That's

1   correct.  But what about the "if," what makes you say that he

2   did complete it?

3        MR. NEWMAN:  Well, Your Honor, the records are, I

4   believe are questionable at best.  They're confusing as written

5   here as Your Honor just noticed.  And the numbers don't really,

6   I should say the case numbers, docket numbers do not jive and I

7   think that that's evidence of the fact that it was an old case

8   that the records are not readily available.

9        The Bureau of Prisons in maintaining their records, I'm

10  not sure how complete they are or whether they're summarized.

11  They don't generally have the first information.  They do now,

12  but in those days it was different.  And whether they just had

13  case summaries, that would make the efforts of the probation

14  officer who I believe is conscientious and well meaning, make it

15  inaccurate or tend to be inaccurate or unclear.  And certainly

16  if it's unclear, then the benefit of the doubt should go to the

17  defendant.

18        THE COURT:  Okay.

19        MR. NEWMAN:  The second other matter that Your Honor

20  addressed with regard to why the court would not do sort of an

21  about face because no --

22        THE COURT:  I just want to help you out because if you

23  look at Paragraph 95, that's what seems to describe the nature

24  of the sentence that was imposed on July 8th of '81.  That

25  supports the government's contention that the sentence for

47

1    No. 75-1734 which is the Crocker Bank 1975 holdup, was part of

2    an aggregated sentence.

3         MR. NEWMAN:  But this was all taken from MDC records

4    and not from court files or judgment commitment orders.

5         THE COURT:  Okay.  But if I were to find or required to

6    find that this evidence is reliable, what does that do to your

7    argument?

8         MR. NEWMAN:  Well, certainly if the sentences are

9    merged or are combined, then it appears that he would be a

10   career offender.

11        THE COURT:  Okay.

12        MR. NEWMAN:  I mean, I've got to be honest.

13        The other issue that Your Honor addressed with regard

14   to a requested downward departure based on the fact that he was

15   not armed with an automatic weapon, there is some case law to

16   support the fact, and we did cite some in our papers, that some

17   courts have taken the discretion and downward departed because

18   of the lack of using an automatic weapon.

19        Those cases have said that in a -- if you look at the

20   types of cases that where people are armed, that the typical

21   armed robber is armed with an automatic weapon as opposed to a

22   revolver and, therefore, some courts have elected to, because of

23   the ability of course of an automatic weapon to facilitate more

24   damage.

25        THE COURT:  This weapon was plenty lethal enough.  I

1    really don't think you should press that argument because I find

2    it to be utterly unpersuasive.

3              MR. NEWMAN:  I understand, Your Honor.

4              The next issue Your Honor did not address in the

5    summary that I did raise in my paper, two other issues, where

6    the probation officer has increased his sentence or his range.

7    One is concerning the escape and the probation officer increased

8    his level by two levels pursuant to 2(b)(3.1)(B)(3)(a) of that

9    being, you know, a danger to the public.  I think as the court

10   noted in the previous sentence --

11             THE COURT:  Wait a minute.  Are you talking about

12   whether there was an increment for reckless endangerment?

13             MR. NEWMAN:  Reckless endangerment, that's correct,

14   Your Honor.

15             THE COURT:  I don't think you're correct.  I think the

16   probation office did not tack on two points for that.

17             MR. NEWMAN:  I'm looking at Paragraph 36, Your Honor,

18   Page 8.  And it certainly indicates a two-level increase.

19             THE COURT:  Yes, but that's for physical restraint.

20   That's for what happened inside the bank.  That's not for what

21   happened on the attempted flight.

22             MR. NEWMAN:  Well, my understanding was the -- let's

23   see.  Well, the following Paragraph 38 referred to a two-level

24   for the physically restrained.

25             THE COURT:  No.  I think what you need to appreciate,

1    Mr. Newman, is that the probation officer's calculation, which I

2    think is correct, is that you add on two points for the

3    restraint of the tellers and the bank manager.  That occurred

4    inside the premises of the bank.  The probation officer was very

5    explicit in saying that as to what happened in the cars

6    afterward really is attributable to the co-defendant.  And I

7    took that into account in assessing the co-defendant's

8    arguments.  So Mr. Day, but not Mr. Bell, was assessed for

9    reckless endangerment after the flight.

10             MR. NEWMAN:  Well, my interpretation of those

11   paragraphs, Your Honor, was in Paragraph 37 -- I'm sorry, 36,

12   37, 38 in that she increased Paragraph 36 two levels.

13             THE COURT:  Look at 40 and look at the top of Page 9

14   and you'll see zero, a big zero.  This enhancement has not been

15   applied to Bell.  It can't be any clearer.  On top of Page 9.

16             MR. NEWMAN:  I see where it is, Your Honor.  But I also

17   see where -- I'm adding the points here.  That she increased by

18   eight levels.

19             THE COURT:  Two for property being taken, two for

20   bodily injury out of the collision, two for physical restraint

21   in the bank, two for the loss.  That's 8 plus 20 which is the

22   base offense level.  That would get to the 28.  That's your 28.

23   If there were no career offender status, their reduction, the

24   three points for acceptance of responsibility and you would get

25   to the 25 that you're advocating.

1    MR. NEWMAN: Well, then it was my understanding in

2 reading this, Your Honor, in that my interpretation was that she

3 had increased it for physical restraint of the manager in the

4 branch which we argued against and the reckless endangerment

5 which we believe that Mr. Bell should not be --

6    THE COURT: I think you are not correct on that point,

7 Mr. Newman. The reckless endangerment has not been applied to

8 this.

9    Is that correct, Mr. Brown?

10    MR. BROWN: It is, Your Honor.

11    THE COURT: Okay. So why don't you move on beyond

12 that.

13    MR. NEWMAN: Okay. Going with Dr. St. Martin's report,

14 Your Honor, yes, Mr. Bell was considered of low intellectual

15 function and being immature, if you want to talk about someone

16 being immature at 47 years old. But what we have here is

17 someone who has had extreme difficulty functioning and that for

18 a short period of time he was able to beat a long history of

19 drug abuse and that we can say that this offense was not

20 predicated by his drug abuse, but predicated on the need for his

21 loss of his job, that he had no income and that, as was stated

22 earlier, it was virtually a spontaneous decision to do this.

23    And that Mr. Bell as a disjunctive argument to the

24 downward departure for the psychological impact or immaturity of

25 Mr. Bell, we ask that the court in the alternative mitigate that

1  because of his mental state, his low intellect would mitigate

2  some of the aggravating factors in the sentence.

3       Mr. Bell has been very vocal in his claim that he never

4  threatened to kidnap the manager, that he did push her away from

5  the door.  He did not pull her by the hair.  That it was a

6  violent robbery.  He's not minimizing what he's done.  But if

7  Your Honor sentences him as the court indicated, he will be in

8  his late seventies or eighties by the time he is released.

9       We are asking for a sentence in the low to mid-range of

10  the guideline range.  The sentence that Your Honor meted out to

11  the co-defendant, 24 years, even if you sentenced Mr. Bell to

12  that sentence would put him into the upper sixties or seventies

13  by the time he would be released, certainly over any age of the

14  ability to commit any further offenses.

15       Mr. Bell has shown that for a period of time he was

16  able to function lawfully in society until some, until he lost

17  his job and he lost his job through no fault of his own or even

18  the employer.  But he was injured on the job and therefore was

19  unable to work.  And Mr. Bell came in early and pled guilty to

20  this offense.

21       THE COURT:  For which he has been given three downward

22  points.

23       MR. NEWMAN:  I understand that, Your Honor.  But what

24  we're asking for -- and we're not asking for an unsubstantial

25  sentence.  That 188 months is roughly 22 years.  Where the

1   range -- I should say to 235, it goes up to 25 years -- is more

2   than substantial to adequately protect society and also to act

3   as a deterrent and rehabilitation such as it is within the

4   Bureau of Prisons to date.

5          But it should be noted, Your Honor, that Mr. Bell has

6   succeeded at least in his prior prison sentence in deridding

7   himself of a substantial drug habit that he's had.  If Your

8   Honor looks at his record, it goes back to when he was a

9   teenager in the 1960s.  And unless the court has any other

10  questions....

11         THE COURT:  I don't think I do, but thank you,

12  Mr. Newman.

13         Mr. Brown, I think you heard what I said before about

14  my inclination.  Do you feel any compelling need to add to what

15  you've said in your papers?

16         MR. BROWN:  No, Your Honor.

17         THE COURT:  Okay.  Thank you.

18         Mr. Bell, you have a right, as did Mr. Day, to speak to

19  me.  Please feel free to tell me anything that you want me to

20  take into account.

21         THE DEFENDANT:  I have nothing to say, Your Honor.

22         THE COURT:  All right.  I respectfully decline to

23  depart from the guidelines and I also decline to deviate from

24  the probation office recommendation.  I am going to sentence

25  Mr. Bell to the high end of the guideline range.  And for the

1 record, the reasons are that I think that at the age of 47 the

2 lessons of the past still have not been learned.

3       This is a man who has an extremely extensive criminal

4 record. This offense was extremely serious. The factors that

5 counsel have pointed to in an admirable effort to do the best he

6 can for his client are unpersuasive. The mental considerations

7 I already addressed.

8       I do find and Mr. Newman was professional enough to

9 acknowledge that if there's no clear basis to dispute or reject

10 the calculation as to what happened in the aggregated sentence,

11 then there is a basis to incorporate the prior '75 offense as a

12 predicate felony for purposes of career offender status. I

13 don't find that there's any basis to question what apparently is

14 in the records of the MDC.

15       I think that the circumstances of this offense, the

16 nature of the offense, the defendant's previous history,

17 especially his criminal history all warrant sentencing at the

18 upward end of the guidelines. So for those reasons here's the

19 sentence.

20       All fines are waived as it is found that the defendant

21 does not have the ability to pay a fine. It is ordered that the

22 defendant shall pay to the United States a special assessment of

23 $200 which is due immediately to the clerk of the court.

24       Pursuant to the Sentencing Reform Act of 1984, it is

25 the judgment of the court that Bruce Bell is hereby committed on

1   Counts 2 and 3 of the indictment to the custody of the Bureau of

2   Prisons to be imprisoned for a term of 319 months.  This term

3   consists of 235 months on Count 2 and 84 months on Count 3 which

4   shall be served consecutively to the term on Count 2.

5        Upon release from imprisonment, the defendant shall be

6   placed on supervised release for a term of five years.  This

7   term consists of five years on Counts 2 and 3 with all such

8   terms of supervised release to be served concurrently and under

9   these terms and conditions.

10       First, the defendant shall comply with the rules and

11   regulations of the U.S. Probation Office and General Order 318.

12       Second, the defendant shall participate in outpatient

13   substance abuse treatment and submit to drug and alcohol testing

14   as instructed by the probation officer.  The defendant shall

15   abstain from using elicit drugs, alcohol and abusing

16   prescription medications during the period of supervision.

17       Third, during the period of community supervision, the

18   defendant shall pay the special assessment in accordance with

19   this judgment's order pertaining to such payment.

20       Fourth, the defendant shall not obtain or possess any

21   driver's license, social security number, birth certificate,

22   passport or any other form of identification without the prior

23   written approval of the probation officer.  Further, the

24   defendant shall not use for any purpose or any manner any name

25   other than his true legal name.

1      Mr. Bell, you may appeal the sentence. To do so you to

2      need to file a notice of appeal within ten days. Please speak

3      to Mr. Newman about that. He will be available to represent

4      you. If you cannot afford to have a lawyer for purposes of

5      appeal, he can be made available to serve as your attorney.

6           Is there a motion concerning Count 1?

7           MR. BROWN: Yes, Your Honor. The government moves to

8      dismiss Count 1.

9           THE COURT: Okay. That motion, in the interest of

10     justice will be granted.

11          Is there anything further, counsel?

12          MR. NEWMAN: No, Your Honor.

13          THE COURT: Mr. Brown?

14          MR. BROWN: Nothing, Your Honor.

15          THE COURT: All right. Thank you, counsel.

16          (PROCEEDINGS ADJOURNED)

17

18                    C E R T I F I C A T E
                I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT
19     TRANSCRIPT OF THE ABOVE-ENTITLED PROCEEDINGS, PAGES 1-56.
20     DATED JANUARY 10, 2000; LOS ANGELES, CALIFORNIA.

21

22     LYNNE SMITH
       OFFICIAL COURT REPORTER

23

24

25

111